

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

SEP **1 0** 2020

Clerk, U.S. District Court
Texas Eastern

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | **SEALED** |
| | § | |
| v. | § | No. 4:20-CR-00212 |
| | § | Judge Mazzant |
| DEBRA LYNN MERCER-ERWIN (1) | § | |



## **FIRST SUPERSEDING INDICTMENT**

THE UNITED STATES GRAND JURY CHARGES:

At all times material to this First Superseding Indictment:

### **INTRODUCTION**

1.      Aircraft Guaranty Corporation (AGC) registered thousands of aircraft in

Onalaska Texas, an East Texas town without an airport.  The true owners of many of

these aircraft are foreign nationals. Non-citizens can register aircraft with the United

States Federal Aviation Administration if the aircraft is placed in a trust managed by a

United States trustee. 14 C.F.R. § 47.7(c).  In exchange for entering into this

arrangement, the foreign national receives a coveted "N" tail number for his aircraft.

This "N" number is valuable because foreign countries are less likely to inspect an U.S.-

registered aircraft for airworthiness or force down an American aircraft. It also avoids

foreign taxes related to the aircraft's importation to that foreign country and increases the aircraft's resell value.

2.      To register an aircraft held in a U.S. Trust, the U.S. Trustee submits at least three documents for FAA review: (1) the Trust Agreement; (2) an Affidavit of Citizenship of the Owner Trustee; and (3) the Operating Agreement or Lease Agreement. The FAA then issues a reasoned opinion about whether the aircraft is eligible for registration.  AGC followed this procedure. It then received an opinion letter from the FAA stating, "we have reviewed both the Trust Agreement and the Affidavit for compliance with 14 C.F.R. § 47.7(c). "Regarding the Trust Agreement, . . . Article 6.2(c) directs the owner trustee to effect registration of the aircraft with the FAA." Article 6.2 of AGC's standard Trust Agreement outlines the actions the Trustee "covenants and agrees to take." Article 6.2(c) requires the Trustee to "take all actions which the Trustee deems necessary or advisable to register any Aircraft which comprises a portion of the Trust Property with the United States Federal Aviation Administration and to insure that the Aircraft maintains its registration and *complies with related regulations and requirements*." (emphasis added). After reading this provision, and others, the FAA concluded that "the form of the Trust Agreement ... satisfies the requirements of Sections 47.7(c)(2)(i) and 47.7(c)(2)(iii)." It determined the aircraft was "eligible for United States registration in the name of the Owner Trustee."   Without this representation, the FAA would not register the aircraft.

3.      Upon entering this arrangement, the trustee is responsible for complying with aircraft reporting obligations, which they cannot delegate to third parties. In June

First Superseding Indictment – Page 2

2013, the FAA stressed, "The regulatory obligations of an owner trustee with regard to an aircraft registered in the U.S. using a non-citizen trust are, and always have been, the same as the regulatory obligations of all owners of U.S. registered aircraft." Fed. Reg. Vol 78, No. 117 (June 18, 2013). "The FAA Registry is an 'owner' registry; it is not an 'operator' registry." *Id.* "Once the FAA completes the registration process, the registered owner is the owner for all purposes under the regulations." *Id.* "The FAA has determined that there is nothing inherent in the status of a trustee owner of a U.S.-registered aircraft that would affect or limit its responsibilities for ensuring compliance with applicable laws and regulations." *Id.* Thus, "an owner of an aircraft on the U.S. registry cannot avoid a regulatory obligation imposed on it by the FAA simply by entering into a private contract with another party." *Id.*

4.      The aircraft is subject to United States regulations and requirements, including those issued by the Department of Commerce. The Owner Trustee promised the FAA compliance. If the aircraft is exported, then the Trustee must insure the required Electronic Export Information is filed under 15 C.F.R. §§ 30.3, 758.1(b)(5), and 758.2. AGC refused to comply, even when confronted by United States authorities.

5.      The defendants circumvent United States laws and regulations by placing "N" numbers in the hands of drug traffickers and prohibited foreign nationals. The defendants use their status as United States citizens with United States corporations to execute a three-part scheme furthering international drug trafficking activity. *First*, the defendants violate FAA and Department of Commerce regulations to register aircraft with the United States while concealing the aircraft's true ownership and exportation.

First Superseding Indictment – Page 3

*Second*, when law enforcement seize a registered aircraft laden with drugs, the defendants deregister or otherwise transfer ownership of the aircraft.  *Finally*, the defendants participated in a series of bogus aircraft sales transactions in order to conceal the movement of illegally obtained funds.

## THE DEFENDANTS AND THEIR CORPORATE ENTITIES

6.      **Aircraft Guaranty Corporation Holdings (AGC)**, was founded in Onalaska, Texas, Eastern District of Texas. In December 2014, Debbie Mercer-Erwin purchased AGC and continued registering aircraft in Onalaska, Texas. On January 22, 2020, AGC changed its address to 928 SW 107th St. Oklahoma City, Oklahoma 73170.

7.      **Wright Brothers Aircraft Title, Inc. (WBAT)** is an Oklahoma corporation with a principle place of business in Oklahoma at 928 SW 107th Street, Oklahoma City, Oklahoma 73170. WBAT often acts as an escrow agent in aircraft purchase transactions. WBAT shares resources, office space, and employees with AGC. At times, it makes FAA filings related to AGC aircraft.

8.      **GMAVIATION S.A. de C.V.** is listed on AGC's website as its Mexican-based location.

9.      **Debra Lynn Mercer-Erwin** owns AGC and WBAT.

10.     ███████████████ is an officer of AGC and WBAT.

11.     ███████████████████ owns and operates GMAVIATION. ██████████ ███████████ and GMAVIACION S.A. de C.V. are listed on AGC's website as its representatives in Mexico.

12.     **South Aviation, Inc. (SAI)** is a Florida corporation, with its principal place of business located at 1470 Lee Wagener Boulevard, Suite 100, Ft. Lauderdale, FL 33315. SAI acts as a broker for third-party buyers of aircraft.

13.     ████████████ owns and operates South Aviation Inc.

14.     **Ford Electric Co.** is a Wyoming company, with a principle place of business at 1712 Pioneer Ave. STE 1461, Cheyenne, Wyoming 82001.

15.     **Texton Enterprises, LLC (Texton)** is a Wyoming corporation, with its principle place of business at 1712 Pioneer Ave #500 Cheyenne, WY 82001.

16.     **TWA International, Inc.  (TWA)** is a Wyoming corporation, with its principle place of business at 17122 Pioneer Ave #500 Cheyenne, WY 82001.

17.     ████████████ purchases aircraft and illegally exports them to foreign countries using Texton, TWA, and Ford Electric Co.

18.     ████████████ is a Costa Rican national and pilot.

19.     ████████████ is a Mexican national and pilot.

20.     **Projets Inc.** is a Texas corporation with its principle place of business at 8620 West Monroe Rd., Suite 204 Houston, TX 77061.

21.     **Jetnet, LLC** is a Delaware limited liability corporation with its principle place of business at 2711 Centerville Rd Suite #400 Wilmington, DE, 19808.

22.     **Global Jets LLC** is a Delaware limited liability corporation with its principle place of business at 5444 Westheimer Rd. Ste. 1090 Houston, TX 77056

23.     ████████████ is the Managing Member of Jetnet, LLC and the President of Projets, Inc. He also owns Global Jets

24.     The above-mentioned companies are interrelated. For example, GMAVIACION is the Mexican representative of AGC. AGC and WBAT comingle leadership, employees, resources, and office space.   Texton and TWA have similarly comingled their operations. South Aviation contracts with WBAT as an escrow agent and TWA transacts business with WBAT. In November 2018, WBAT received three wires comprising $220,000 from TWA for the purchase of an aircraft. WBAT was also involved in the purchase of aircraft used by Marcos.

## OFFENDING AIRCRAFT TRANSACTIONS

25.     Homeland Security Investigation and the Department of Commerce initiated their investigation of Defendants after noticing irregularities in aircraft filings and learning that several defendant-registered aircraft were seized or destroyed while smuggling drugs internationally. The following paragraphs provide non-exhaustive examples by aircraft.

26.     **N8286M / N456PF**. On February 11, 2020, N8286M and N456PF were registered with the FAA to Irvin A. Romero Lozano, an illegal alien with an apartment in San Jose, California. In the registration documents, Lozano claimed to be a U.S. Citizen (in violation of 49 U.S.C. § 46306 and 18 U.S.C. § 1001). That same day, Declarations of International Operation were filed for both "N" numbers listing Guadalajara, Mexico as the final destination. The associated bills of sale for this aircraft were dated December 10, 2019 for N8286M and December 27, 2019 for N456PF.  These transactions were brokered by Guillermo Garcia of GMAVIATION. Because Lozano is an illegal alien, he cannot legally register an aircraft as an individual with the United States. The Department

of Commerce notified Lozano that his aircraft had been seized. Lozano signed a notice of abandonment for the aircraft and stated that he believed his identity had been stolen.

27.     **N260RC**. On January 31, 2020, N260RC was scheduled to depart Brownsville, Texas to Monterrey, Mexico. 19 C.F.R. 122.22(c) requires private aircraft pilots or their designees departing the U.S. to provide CBP Automated Passenger Information System filings for each passenger at least one hour before departure. This information was not provided and the aircraft was seized. Agents reviewed the ownership documents for the aircraft and determined that on September 15, 2017, the Mescalero Apache Tribe sold this aircraft to ITRC, LLC. On October 20, 2017, ITRC and AGC entered into a Trust Agreement for this aircraft.  Rodolfo Camarillo Montemayor—a foreign national—was the manager of ITRC. Ingenieria y Transportacion R.C., S.A. de C.V., a Mexican corporation, held 100% of the membership shares of ITRC and Montemayor was the president, CEO, and 99% shareholder of Ingeneria y Transportacion R.C. A bill of sale showed transfer of this aircraft to AGC and a corresponding Lease Agreement dated October 20, 2017, leased the aircraft to Camro Transportes, S.A. de C.V. Montemayor signed the Lease Agreement as the "Sole-Administrator."  AGC is a Texas corporation and the sales records show an address for AGC of POB 2547 Onalaska, Texas, which subjects its purchase to Texas's 6.25% sales tax.  Rather than pay this tax, AGC filed a Texas Aircraft Exemption Certificate on October 30, 2017, stating that AGC did not owe the tax because "the aircraft will be registered in Onalaska, Texas" but will "be hangered in Apodaca, NL, Mexico and is not purchased for use in Texas."

The aircraft has been outside of the United States for three years without any export filings.

28.  **N18BA.** On September 15, 2014, Daniel Regalado Orta signed a bill of sale for N18BA to AGC. That same day, AGC registered the aircraft with the FAA. On July 24, 2014, AGC executed an Amended Dry Lease Agreement leasing the aircraft to Orta. On January 13, 2016, WBAT filed for a duplicate certificate with the FAA. On March 10, 2019, N18BA crashed in Mexico killing one pilot. Mexican authorities seized 1,215 kilograms of cocaine from the aircraft. Five years earlier, in 2014, Connie Wood (who died in 2019 of natural causes) placed this aircraft in a trust controlled by AGC. AGC continued to file registration documents for this aircraft under the leadership of Debbie Mercer and ███████████. On March 21, 2019, AGC employee Dawna Peters, the Executive Vice President of Trust Administration, wrote the lessee of N18BA, Daniel Regalado Orta.

> We have received reports that N18BA was involved in a fatal accident in Mexico, March 10th. Please confirm if this is accurate, and if not, where is N18BA currently located? This is an urgent request, we are being asked by a US government entity to provide the current location of your aircraft, British Aerospace HS 125-700A, s/n NA0316, N18BA.

Mr. Orta responded, "This information is false. The aircraft is currently located in Toluca airport in hangar 6A. It is currently in maintenance and therefore grounded." Continuing its investigation, the Department of Commerce served a subpoena on AGC. AGC provided a written response. It claimed that the crashed aircraft falsely displayed the N18BA tail number, which belongs to a different AGC aircraft. "The aircraft which crashed, Beechcraft 256046, was formerly registered in the U.S. under N299GS and was

held by AGC in 'Trust 1936' from October 3, 2011 to May 29, 2014." The beneficiary of the trust was Administración Aeronáutica International S.A. de C.V. and Marco Antonio Alvarado Padilla was the manager of that company. According to AGC, the aircraft was transferred to the foreign beneficiary before the crash on March 29, 2015 and the FAA Registration for this aircraft was canceled on February 15, 2018. AGC and its co-conspirators did not make any export filings for this transaction. On January 22, 2020, ▮▮▮▮▮▮▮▮ filed an address update with the FAA for N18BA.

29.     *N305AG.* On October 5, 2012, N305AG was registered to AGC. That same day, a Declaration of International Operation was filed by AGC for this aircraft. On September 8, 2018, ▮▮▮▮▮▮▮▮ filed a FAA Registration renewal. On January 27, 2020, N305AG was seized in Guatemala with approximately 1,700 kilograms of cocaine. The aircraft was taken into Guatemalan custody, where it has remained ever since. On January 29, 2020, news reports published the seizure. Two days later, on January 31, 2020, ▮▮▮▮▮▮▮▮ transferred ownership of the aircraft to Arrendadora THH SA de CV, a foreign company. AGC and its co-conspirators did not make any export filings for this transaction. On February 6, 2020, an open source video of N305AG flying out of the Guatemalan jungle went viral. On February 20, 2020, ▮▮▮▮▮ filed a bill of sale with the FAA and asked to deregister the aircraft.

30.     *N311BD.* On December 16, 2019, ▮▮▮▮▮▮▮▮ filed a bill of sale for N311BD, which transferred the aircraft from Gastelum—a convicted drug trafficker

**First Superseding Indictment – Page 9**

located in Sinaloa, Mexico[1]—to AGC. That same day, ███████████ filed for a Declaration of International Operation to Mexico on behalf of N311BD as trustee. On February 27, 2020, the aircraft was seized in Belize with approximately 2,310 kilograms of cocaine. The aircraft was taken into government custody, where it remains. The news broadcasted this seizure on March 1, 2020. Four days later, Debbie Mercer sent Gastelum a letter stating that AGC will begin the reassignment and deregistration of N311BD. On March 14, 2020, ███████████ filed a bill of sale transferring the aircraft to Gastelum despite the fact that the aircraft was in government custody in Belize. AGC and its co-conspirators did not make any export filings. In July 2020, the FAA advised Gastelum that he does not meet the U.S. citizenship requirements to register an aircraft.

31.    **N569LM.** On March 31, 2016, AGC entered into a trust agreement with Ancheta SA. de C.V. for the purposes of holding N56LM in a trust.  It then leased the aircraft back to Ancehta, SA. de CV.  On June 16, 2016, ███████████ registered N569LM with the FAA. That same day, Ancheta, S.A. de C.V., a Mexican company, sold N569LM to AGC. Robert Miguel Gonzalez Barragan signed on behalf of Ancheta. On June 30, 2016, Debra Mercer-Erwin filed a Declaration of International Operations as president of AGC.  On January 3, 2020, the government learned that the aircraft is located in Mexico 90% of the time. AGC and its co-conspirators did not make any export filings for this aircraft. On January 15, 2020, ███████████ filed a change of address for trustee AGC.

---

[1] A simple Google search yield articles related to Gastelum's US drug conviction.
https://www.cleveland19.com/story/7488478/mexican-drug-ring-busted-2-million-in-cocaine-seized/

32.   **N515BA.** On June 25, 2020, AGC entered into a trust agreement with Jorge Alberto Torres Isalas. This document was certified as a true and correct copy by ████ on a line noting WBAT. AGC then leased the aircraft back to Torres Isalas. AGC and its co-conspirators did not file export documents for this plane. On June 28, 2020, HSI learned of a suspicious flight leaving Mexican airspace in violation of a filed flight plan. The aircraft left Mexican airspace and entered Venezuelan airspace. Authorities located the flight and photographed the aircraft. It bore tail number N515BA. Authorities continued to monitor the aircraft and noticed that false tail number N5674 was later applied to the aircraft. N5674 is tied to a deregistered aircraft that differs substantially in appearance from the targeted aircraft. The Venezuelan military attempted to force the aircraft down but lost tracking near a clandestine runway. The following morning, a destroyed aircraft was located on the clandestine runway. Photos of the destroyed aircraft briefly appeared on a social media account and identified the aircraft as N515BA.

33.   **N770SW.** From January 5, 2018 until April 16, 2019, N770SW was registered with the FAA as belonging to AGC. On April 16, 2019, ████████ as secretary of AGC sent the FAA a bill of sale transferring the aircraft to Aircraft Finance Aircorp, Inc. The bill of sale was dated April 17, 2019. On June 17, 2019, ████ told the government that Aircraft Finance Aircorp, Inc. was his company and that it had not purchased N770SW.  On June 18, 2019, a bill of sale transferred ownership of N700SW to EOLO Air Corp. This form is DocuSigned by ████ as company secretary. On June 20, 2019, EOLO filed a Declaration of International Operations for N770SW to fly from Opa-Locka, Florida to Toluco, Mexico. EOLO asked the FAA to fax the flight wire to

WBAT. EOLO Air Corp. is listed as the owner of the aircraft. A document on WBAT letterhead asked the FAA to return all un-recordable documents to WBAT.  AGC and its co-conspirators did not make any export filings for this aircraft.

34.    **N224EA.** On March 10, 2017, TWA purchased N224EA. The aircraft was registered with the FAA under TWA. ▮▮▮▮▮▮ is the sole owner and president of TWA. That same day, ▮▮▮▮▮▮ filed a Declaration of International Operations to fly the aircraft from Pompano, Florida to Cancun, Mexico. TWA and its co-conspirators did not make any export filings. On November 9, 2018, TWA sold N224EA to VICA Aviation, Inc. This company is wholly owned and operated by a relative of ▮▮▮▮▮▮. Despite TWA's representations that it owned the aircraft, other entities funded and operated the aircraft. On December 19, 2018, N224EA crashed in Honduras while transporting drugs. On January 7, 2019, VICA Aviation requested the deregistration of the aircraft for export to Mexico.

35.    **N241CW.** On October 11, 2018, TWA purchased N241CW. That same day, ▮▮▮▮▮▮ registered N241CW with the FAA under TWA and filed a Declaration of International Operations to fly the aircraft from Phoenix, Arizona to Ciudad Juarez, Mexico.  TWA and its co-conspirators did not make any export filings. On December 9, 2018, N241CW crashed in Venezuela while delivering 1,200 kilograms of cocaine for the Sinaloa Cartel. On January 7, 2019, TWA submitted a deregistration request for export to Mexico.

36.    **N322BC.** On January 11, 2019, TWA purchased N322BC and registered it with the FAA under TWA.  On January 14, 2019, ▮▮▮▮▮▮ filed a Declaration of

International Operation to fly the aircraft from McAllen, Texas to Monterrey, Mexico. On September 11, 2019, ▮▮▮▮▮▮ submitted a deregistration request for export to Mexico. TWA and its co-conspirators did not make any export filings.  On October 19, 2019, the aircraft landed on a clandestine airstrip in Cayo District, Belize, where it was found abandoned. The seats had been removed and the aircraft was configured for narcotics transportation.

37.     **N35531.** On February 14, 2019, Texton purchased N35531, but never registered it. An unregistered aircraft should not be flown by anyone at any time.  From April 4, 2019 to November 13, 2019, the FAA sent letters to Texton notifying Texton that the aircraft was not registered. On February 15, 2019, a flight plan was filed for N35531. It disclosed a departure from Fort Worth, Texas to Tampico, Mexico. On June 6, 2019, the aircraft was found abandoned in Guatemala. TWA and its co-conspirators did not make any export filings.

38.     **N465BC.** On August 16, 2019, TWA purchased N465BC and registered it with the FAA under TWA. Despite TWA's representations that it owned the aircraft, other entities funded and operated the aircraft. On August 19, 2019, TWA filed a Declaration of International Operations to fly the aircraft from Memphis, Tennessee to Merida, Mexico. TWA and its co-conspirators did not make any export filings. On October 25, 2019, the aircraft landed on a clandestine airstrip in Guatemala. The aircraft was configured for narcotics transportation. That same day, TWA filed a request to deregister the aircraft for export to Mexico.

**First Superseding Indictment – Page 13**

39.    **N530GA.** On March 2, 2018, TWA purchased N530GA and registered it with the FAA under TWA. On June 6, 2018, ███████ filed a Declaration of International Operations to fly the aircraft from Chino, California to Tijuana, Mexico. TWA and its co-conspirators did not make any export filings. On October 26, 2019, the aircraft landed on a clandestine airstrip in Guatemala. The aircraft was configured for narcotics transportation. As of August 10, 2020, N530GA was still registered to TWA.

40.    **N939RR.** On January 11, 2017, Texton purchased N939RR and registered it with the FAA under Texton. ███████ is the sole owner and president of Texton. Despite Texton's representations that it owned the aircraft, other entities funded and operated the aircraft. On May 29, 2018, ███████ deregistered the aircraft for export to Mexico. On December 15, 2019, the aircraft was seized in Guatemala with approximately 2,572 kilograms of cocaine. ███████ did not make any export filings.

41.    **N990PA.** On May 9, 2018, ███████ purchased N990PA and registered it with the FAA under TWA. Despite TWA's representations that it owned the aircraft, other entities funded and operated the aircraft. On March 22, 2019, the aircraft crashed in Honduras with one kilogram of cocaine and one firearm. On March 25, 2019, ███████ deregistered the aircraft with the acknowledgement that it was exported and destroyed. TWA and its co-conspirators did not make any export filings.

42.    **N368AG.** On August 2, 2019, ███████ purchased N368AG and registered it with the FAA under TWA. ███████ entered into an Aircraft Security Agreement with AW Asset Holdings, LLC, a company located in Plano, Texas. AW Asset Holdings entered into this agreement with TWA on August 2, 2019. On August 2,

2019, ███████ filed a Declaration of International Operation to fly from Wichita, Kansas to Cancun, Mexico. TWA and its co-conspirators did not make any export filings. On October 15, 2019, this aircraft was sold to SMB G-IV IX LLC.

43.   **N2000.** On October 29, 2016, ███████ registered N2000 with the FAA through Ford Electric Co. On October 31, 2016, Hadid Design and Management LLC sold N2000 to Ford Electric Co. On November 1, 2016, ███████ filed a Declaration of International Operations for a flight from Nassau, Bahamas to Opa Locka, Florida.  In March 2017, Michael Marcos attempted to use N2000 to conduct a narcotics delivery. On December 11, 2017, ███████ through Ford Electronic Co. sold N2000 to Soto Santiago William. The corresponding Bill of Sale was filed on January 10, 2018.

44.   **N466MM / NN886N.** November 25, 2015, Exmegs Marketing, LLC, sold N466MM to Projets, Inc. On December 25, 2015, Projets, Inc. registered N466MM with the FAA. On October 30, 2018, Projets, Inc. sold N466MM to Jetnet LLC.  N466MM was a Hawker 700A. On November 30, 2018, a Hawker 700A attempted to land on a clandestine airstrip in Belize, but aborted its landing plans and landed in the Chetumal Airport in Mexico. This aircraft bore a modified registration number—NN886N. The pilot abandoned the aircraft.  The aircraft contained approximately 1,556 kilograms of cocaine. The aircraft also had two Honeywell TFE731 series engines with serial numbers P84284 and P76292. According to FAA documents, these serial numbers are assigned to N466MM, the aircraft registered to Jetnet, LLC by ███████ and leased to Mexican national Luis Alberto Romero Rosales. On December 14, 2018, ███████ deregistered the aircraft noted that it was sold to a foreign purchaser exported to Mexico

while it was in the custody of the Mexican government. No export filing was made for this aircraft.

45. **N884AB.** On August 10, 2020, Horizons Ahead, LLC sold N384AB to Projets, Inc. On August 14, 2020, Projets, Inc. filed a Declaration of International Operation for a flight to Monterrey, Mexico. On August 17, 2020, the registration number N384AB was changed to N884AB.  On August 25, 2020, ▓▓▓▓▓ filed a Declaration of International Operation with the FAA for a flight from Houston, Texas to Monterrey, Mexico. On August 26, 2020, Marcos deregistered N884AB with the FAA and sold it to Vander Servicios y Comercial, SA de CV, a Mexican company. An export filing listing Vander Servicios was made for this aircraft. After August 26, 2020, it is illegal to display tail number N884AB on any aircraft because it is a de-registered number. On August 29, 2020, the Mexican government seized N884AB as a stateless aircraft. According to its pilots, the aircraft's true owner is Hector Sanchez Garcia in Guadalajara, Jalisco, Mexico. This individual should have been listed on the export filing.

46. **N740HB.** On June 10, 2019, N740HB was sold by PIBSA Ignerio Construccion Industrial (PIBSA) to Victor Gilberto Alverez, a Mexican citizen. On May 24, 2020, an aircraft with fictitious registration number N740HBH arrived at Hobby Airport in Houston, Texas from Durango, Mexico. This number was a clerical error. The true registration number for this aircraft was N740HB. FAA registration documents for N740HB list Global Jets LLC—a company owned by ▓▓▓▓▓▓▓▓▓—as the trustee owner and PIBSA Ignerio Construccion Industrial (PIBSA) as the operator.  However, the Automated Passenger Information System filing for N740HB listed Global Jets LLC

as the operator and Victor Gilberto Alverez, in Toluca Mexico as the owner.  Victor

Gilberto Alverez is not listed on the FAA registration.  No export filing was made for this

aircraft.

47.     **N777EH.** On January 26, 2018, the FAA received a Bill of Sale for

N777EH noting that Projets, Inc. purchased N777EH from Charter Equipment Leasing

LLC. That same day, ███████████ filed an Aircraft Registration Application for

N777EH on the behalf of Projets, Inc.  On February 27, 2018, the FAA received a bill of

sale noting the sale of N777EH from Projets Inc. to Jet Net LLC as Trustee. On January

26, 2020, Passengers waiting to board the N777EH were detained on the tarmac with

approximately 168 kilograms of cocaine. The Aircraft was taken into Colombian custody.

On January 27, 2020, ███████████, as the Managing Member of Jetnet, LLC, sold

N777EH to Jesus Arteaga Morales. That same day ███████████ deregistered the

aircraft with the FAA for export to Mexico.  These filings occurred while the aircraft was

in Colombian custody. No export filings were made for this aircraft.

### THE TRUST SCHEME

48.     AGC typically enters into a (1) Trust Agreement, (2) Purchase Agreement

and corresponding Bill of Sale, and (3) Dry Lease Agreement with a corporation owned

by a foreign national. On at least one occasion, this foreign national was a convicted drug

trafficker. Typically, the documents are structured as follows:

49.     **Trust Agreement.** The Trust Agreement creates a legal structure in which

AGC holds the title to the aircraft for the benefit of the drug dealer's corporation.  As

explained earlier, the FAA requires this arrangement for a non-citizen to register his

aircraft with the United States.  AGC does not specifically identify any aircraft in its trust agreements by unique identifier. This runs contrary to the model trust agreement promulgated by the FAA in 2013.

| FAA Model | AGC Agreement |
|---|---|
| "Aircraft" means the Aircraft, serial number [], FAA Registration Number N [] together with the [] engines, bearings, manufacturer's serial numbers and [], which are transferred to the Owner Trustee in trust under this Trust Agreement | "Aircraft" means those certain airplanes or helicopters, including engines and parts, for which the Trustee holds title for the benefit of Beneficiary, and which shall constitute the Trust Property."<br><br>*Note, the Aircraft is not identified anywhere in AGC's trust agreements.* |

The following provisions are noteworthy:

- *Section 2.4 Activities* — "The Trust may engage in the following activities: (i) the ownership, management, registration and leasing of the Trust property, (ii) activities which are necessary, suitable or convenient to accomplish the foregoing, and (iii) other such activities as may be required in connection with conserving the Trust Property and making distributions to the Beneficiaries."

- *Section 3.2. Limitations on Transfer* — allows the Beneficiary to transfer his beneficial interest in the trust but requires Trustee approval.

- *Section 4.3 Beneficiary's Duties to Provide Information under the FAA Trust Policy* — Beneficiary acknowledges that Trustee has reporting obligations to the FAA and agrees to provide information to fulfill those obligations.

- *Section 6.2 Specific Authority* — explains authorized activities of the Trustee including authorization to "take all actions which the Trustee deems necessary or advisable to register any Aircraft which comprises the Trust Property with the [FAA] and to insure that such Aircraft maintains its registration and complies with related regulations and requirements."

- *Section 6.4 (d)* — "nothing in this Agreement shall relieve any of the Beneficiary, Trustee or any other Person of any obligation to comply with any law, rule or regulation of any governmental authority with respect to the ownership and operation of the Aircraft."

- *Section 11.13 Beneficiary Compliance with US Law.* — The Beneficiary acknowledges that the aircraft may be subject to export and re-export restrictions and that these laws and OFAC regulations bind the Trustee.

- *Exhibit 1 Trustee Fee Schedule* — This form sets out payments owed to the Trustee for maintaining the trust. In the AGC trust agreements on file with the FAA, this form is blank.

- *Exhibit 2 FAA Trust Policy Certificate* — This is the form the Beneficiary fills out to aid the Trustee in meeting its FAA reporting obligations. In the AGC trust agreements on file with the FAA, this form is blank.

50.     **Bill of Sale.** AGC's Trust Agreements create the trust, but do not transfer the aircraft from the foreign owner to the trustee. AGC executes an Aircraft Purchase Agreement and files a one-page Bill of Sale that appears to transfer the aircraft into AGC's possession in exchange for a nominal amount, usually from $1 to $10.

51.     **Dry Lease Agreement.** After transferring the aircraft into the newly created trust, AGC leases the aircraft back to the foreign national through his corporation in a Dry Lease Agreement. A Dry Lease Agreement allows the Lessee to operate the aircraft and select his own crew. AGC also attempts to shirk its responsibilities by delegating regulation obligations to the foreign national. As explained above, the FAA publically rejected this arrangement. The following are notable provisions:

- *Lease Agreement Section 3.1. Operation and Control* — "Lessee is responsible for operating the Aircraft in accordance and compliance with all laws, ordinances and regulations relating to the possession, use, operation, or maintenance of the Aircraft, including but not limited to, Federal Aviation Regulations."

- *Lease Agreement Section 3.4. Limits of Operations* — Lessee warrants it will not use the aircraft for an illegal purpose.

- *Lease Agreement Section 5.1 Lessor's Warranty* — Lessor warrants, among other things, that the aircraft is properly registered in the name of the Lessor in accordance with U.S. law.

- *Lease Agreement Section 6.13 FAA Trust Policy* — Lessee agrees to provide Lessor with the information needed to fulfill FAA reporting obligations.

- *Exhibit A* — Lessee provides name and contact information as well as the location where the aircraft will be primarily hangered. This location is usually foreign.

- *Exhibit B Addendum to Dry Lease Agreement Section 2. Compliance with US Law* — Lessee affirms it is in compliance with OFAC regulations and acknowledges that the aircraft may be subject to export restrictions.

- *Exhibit 1 to Exhibit B Addendum to Dry Lease Agreement FAA Trust Policy Certificate* — provides the address, contact information, and Jurisdiction of incorporation for the Lessee. This is usually a foreign corporation. It also identifies the airport where the aircraft is "normally based" and the jurisdiction where the "aircraft is normally operated." These typically are foreign locations.

52.     After executing these agreements, the aircraft receives an "N" number. Now, it must adhere to all United States laws and regulations. The Trustee agrees to comply with to all of the reporting obligations for the aircraft. This streamlines the reporting process for the FAA by designating a U.S. citizen that is responsible for providing the FAA (and other agencies) with information related to the aircraft.

## THE SCHEME TO CONCEAL FUNDS

53.     WBAT and its co-conspirators funnel money through refundable deposits placed on un-sellable aircraft during bogus sales transactions. The typical aircraft purchase transaction proceeds as follows:

- **Step 1:** The buyer identifies an aircraft he would like to purchase. There is usually a period of time during which the buyer will perform due diligence on the aircraft. In order to ensure the seller does not continue marketing the

First Superseding Indictment – Page 20

aircraft, the buyer will agree to provide a refundable deposit of money. The buyer and seller will agree to conditions that, if met, render the deposit non-refundable. Usually, the "hardening" of the deposit into a non-refundable deposit depends on whether the aircraft has passed an inspection initiated by the buyer.

- **Step 2:** The buyer typically secures a lender to help provide funds for the full-purchase price of the aircraft. The loan is for the purchase of the aircraft, not the deposit. If a buyer cannot afford the deposit, it signals to the seller that he is not capable of purchasing the aircraft.

- **Step 3:** The buyer and seller enter into an escrow agreement with an escrow agent. The escrow agent holds the buyer's refundable deposit in a separate account and controls disbursement of the funds. If there is a dispute between the buyer and seller about whether the deposit has become nonrefundable under the conditions of the parties' agreement, the escrow agent will decide the dispute and disburse the funds accordingly.

- **Step 4:** After completion of the sale, the buyer usually sells the aircraft to a company for a higher asking price. Sometimes the buyer will already have this second purchaser lined-up before he purchases the aircraft from the seller.

54.     The WBAT scheme differs from this model in two key respects. *First*, the loan money is for the refundable deposit, not the purchase of the aircraft. *Second*, the sale of the aircraft is never consummated because the aircraft either does not exist or belongs to someone else. The WBAT scheme is as follows:

- **Step 1:** Illegitimate lender agrees to lend illegitimate buyer a percentage of the refundable deposit. The illegitimate buyer provides the remaining percentage of the deposit. However, because the illegitimate buyer secured a loan, he also owes the lender interest. The "hardening" of the deposit into a non-refundable deposit is contingent upon the illegitimate buyer's successful inspection of the aircraft.

- **Step 2:** Illegitimate lender gets a legitimate bank to loan it a portion of the deposit money that it loans to the seller. The bank's honest percentage is mixed with the illegitimate lender's dirty percentage of the deposit.

- **Step 3:** The deposit money is placed into an illegitimate escrow company's escrow account. Whereas a typical escrow agreement includes the buyer, seller, and escrow agent, this escrow agreement is usually between just the escrow agent and the lender.

- **Step 4:** The illegitimate buyer never inspects the aircraft because the aircraft either does not exist (has been decommissioned) or is not actually for sale (belongs to a commercial airline). As a result, the deal falls through and the deposit does not harden. All of the deposit money is transferred to the illegitimate lender, including the portion contributed by the illegitimate buyer because it is the illegitimate lender's interest fee.

55.     On or about September 27, 2019, SAI, and WBAT entered into a series of agreements for the sale of an unsellable plane. The plane was unsellable because it belonged to a private airline and located in China. On September 27, 2019, a company known to the grand jury as "UC1" and SAI entered into a letter agreement regarding a refundable deposit on an aircraft. Machado signed this agreement on behalf of SAI. That same day, UC1 entered into an Escrow Agreement with WBAT. Mercer signed this agreement on behalf of WBAT.

56.     In or about December 2019, UC1 approached a legitimate bank known to the grand jury as "LB1" to secure a loan to perpetuate the scheme outlined in paragraphs 53-54. On or about January 14, 2020, ████████ spoke with the CEO of LB1 over the phone about the proposed transaction. The proposed buyer in this transaction was SAI and the proposed escrow company was WBAT. UC1 engaged LB1 in a series of negotiations surrounding this proposal.  UC1 provided LB1 the serial number and registration of the aircraft. It did not correspond to any existing aircraft records. When asked about the discrepancy, UC1 responded that the information it originally provided

was incorrect. UC1 provided a new registration number. This number corresponded to an aircraft that was decommissioned in 2017.

57.     On or about February 28, 2019, SAI and WBAT entered into a series of agreements for the sale of an unsellable aircraft. The aircraft was unsellable because the aircraft has belonged to All Nippon Airways Co., LTD. since 2010 and is registered in Japan.  On February 28, 2019, UC1 and SAI entered into a letter agreement regarding a refundable deposit on an aircraft. ███████ signed this agreement on behalf of SAI. That same day, UC1 and SAI entered into an escrow agreement with WBAT. ███████ signed this agreement on behalf of SAI.

## COUNT ONE

> Violation:  21 U.S.C. § 846 (Conspiracy to
> Manufacture and Distribute Cocaine)

That sometime in or about 2012, and continuously thereafter up to and including the date of this First Superseding Indictment, in the Eastern District of Texas, and elsewhere, **Debra Lynn Mercer-Erwin**, ███████████████████████████ ████████████████████████████████████ ████████████████████████████ defendants, did knowingly and intentionally combine, conspire, and agree with other persons known and unknown to the United States Grand Jury, to knowingly and intentionally possess with the intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a schedule II controlled substance, a violation of 21 U.S.C. § 841(a)(1).

In violation of 21 U.S. § 846.

## COUNT TWO

Violation:  21 U.S.C. § 963 (Conspiracy to Manufacture   and   Distribute   Cocaine Intending, Knowing, and with Reasonable Cause to Believe that the Cocaine will be Unlawfully Imported into the United States)

That sometime in or about 2012, and continuously thereafter up to and including the date of this First Superseding Indictment, in Colombia, Ecuador, Panama, Costa Rica, Guatemala, Mexico, Belize, Venezuela, and elsewhere, **Debra Lynn Mercer-Erwin,**

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ defendants, did knowingly and intentionally combine, conspire, and agree with other persons known and unknown to the United States Grand Jury, to knowingly and intentionally manufacture and distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a schedule II controlled substance, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a) and 960.

In violation of 21 U.S.C. § 963.

## COUNT THREE

Violation: 21 U.S.C. § 959, 18 U.S.C. §  2 (Manufacturing   and   Distributing   Five Kilograms or More of Cocaine Intending, Knowing and with Reasonable Cause to Believe that the Cocaine will be Unlawfully

Imported into the United States)

That sometime in or about 2012, and continuously thereafter up to and including the date of this First Superseding Indictment, in Colombia, Ecuador, Panama, Costa Rica, Guatemala, Mexico, Belize, Venezuela, and elsewhere, **Debra Lynn Mercer-Erwin**,

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████, defendants, aided and abetted by each other, did knowingly and intentionally manufacture and distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, intending, knowing, and with reasonable cause to believe that such cocaine would be unlawfully imported into the United States.

In violation of 21 U.S.C. § 959.

## COUNT FOUR

Violation: 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering)

From in or about 2016, and continuing thereafter up to and including the date of this First Superseding Indictment, in the Eastern District of Texas, and elsewhere, **Debra Lynn Mercer-Erwin,** ████████████████████████████████████ ████████████████████████████████████████████████, defendants, did knowingly combine, conspire, and agree together and with others known and unknown to the Grand Jury, to commit offenses against the United States in violation of 18 U.S.C. §§ 1956 and 1957, that is:

(a)      to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, wire fraud; distribution or conspiracy to distribute or possess with the intent to distribute a controlled substance; and distribution or conspiracy to distribute or possess with the intent to distribute a controlled substance to a place in the United States from or through a place outside the United States, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i);

(b)      to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, wire fraud; distribution or conspiracy to distribute or possess with the intent to distribute a controlled substance; and distribution or conspiracy to distribute or possess with the intent to distribute a controlled substance to a place in the United States from or through a place outside the United States, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(2)(B)(i); and

(c)      to knowingly engage and attempt to engage, in monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, and such property having been derived from a specified unlawful activity, that is, wire fraud; distribution or conspiracy to distribute or possess with the intent to distribute a controlled substance; and distribution or conspiracy to distribute or possess with the intent to distribute a controlled substance to a place in the United States from or through a place outside the United States, in violation of 18 U.S.C. § 1957.

In violation of 18 U.S.C. § 1956(h).

## COUNT FIVE

> Violation: 18 U.S.C. § 371 (Conspiracy to
> Commit Export Violations)

All prior allegations are re-alleged and incorporated by reference as though fully set forth herein.

### Introduction

The U.S. Department of Commerce, through the U.S. Census Bureau and the U.S. Department of Homeland Security, Customs and Border Protection, participates in and maintains the Automated Export System (AES), an electronic portal of information for exports of goods from the United States.  Both the Census Bureau and the Bureau of Industry and Security, also within the Department of Commerce, require the filing of electronic export information (EEI) through the AES (using AESDirect) pursuant to 13 C.F.R. Part 30 and 15 C.F.R. Part 758.  The EEI is also known as a shipper's export

declaration (SED).  The purpose of these requirements is to strengthen the U.S.

Government's ability to prevent the export of certain items to unauthorized destinations

and end users because the AES aids in targeting, identifying, and, when necessary,

confiscating suspicious or illegal shipments prior to exportation. 15 C.F.R. § 30.1(b).

Exporters file EEI by entering data into AES via a computer. 15 C.F.R. § 30.6(a). EEI

includes the date of export, the U.S. principle party of interest, the description of the

commodity to be exported, the intermediate consignee's name and address (if applicable),

the ultimate consignee's name and address, and the country of ultimate destination. 15

C.F.R. § 30.6. Each filing can be identified by a unique Internal Transaction Number.

Exporters, shippers, and freight forwarders, with limited exceptions inapplicable here, are

required to file an EEI for every export of goods or technology from the United States

that has a value greater than $2,500 or for which an export license was required.  15

C.F.R. § 758.1(b)(5); 15 C.F.R. § 30.2.

### The Agreement

Sometime in or about 2014, and continuously thereafter up to and including the

date of this First Superseding Indictment, in the Eastern District of Texas, and elsewhere,

the defendants **Debra Lynn Mercer-Erwin,** █████████████████████

████████ did knowingly conspire with each other and with other persons, both known and

unknown to the Grand Jury, to commit offenses against the United States, specifically:

(i)  Knowingly failing to file an EEI, in violation of 13 U.S.C. § 305; and

(ii) Fraudulently and knowingly attempting to export or send from the United States
any merchandise, article, and object contrary to 13 U.S.C. § 305, a law and
regulation of the United States, in violation of 18 U.S.C. § 554.

## Manner and Means

It was part of the conspiracy that Debra Mercer-Erwin, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ would file or cause to be filed with the FAA documents that

either concealed the true ownership of the aircraft, falsely identified the citizenship of the

aircraft owner, or that established a trust. If the documents established the trust, the

documents would contain misrepresentation and false assurances that the trustee would

comply with United States regulations and laws as explained in more detail above in the

section titled "The Trust Scheme."  These aircraft were then shipped overseas without the

requisite exportation filings under 15 C.F.R. §§ 30.3, 758.1. and 758.2.

## Overt Acts

In furtherance of the conspiracy and to accomplish its objects, at least one of the

Defendants committed or cause to be committed, in the Eastern District of Texas and

elsewhere, the overt acts described in the section titled "Offending Aircraft Transactions"

above.

In violation of 18 U.S.C. §§ 371 and 554, 13 U.S.C. § 305.

## <u>COUNT SIX</u>

> Violation: 18 U.S.C. § 371 (Conspiracy to
> Commit Registration Violations Involving
> Aircraft Not Providing Air Transportation in
> violation of 49 U.S.C. § 46306)

All prior allegations are re-alleged and incorporated by reference as though fully

set forth herein.

That sometime in or about 2014, and continuously thereafter up to and including the date of this First Superseding Indictment, **Debra Lynn Mercer-Erwin**, ███████ ████████████████████████████████████████████████████████ defendants, did knowingly and intentionally combine, conspire, and agree with other persons known and unknown to the United States Grand Jury, to intentionally obtain and cause to be obtained a certificate authorized to be issued under Title 49, United States Code, Section 44103, that is, an owner's certificate of registration, by knowingly and willfully falsifying and concealing the following material facts with respect to the below aircraft:

| "N" Number | Material Misrepresentation |
|---|---|
| N8286M/N456F | Irvine A. Romero Lozano was the owner of the aircraft and was a United States citizen. |
| N260RC | That AGC would adhere to all regulatory and statutory requirements under United States law. |
| N18BA | That AGC would adhere to all regulatory and statutory requirements under United States law. |
| N305AG | That AGC would adhere to all regulatory and statutory requirements under United States law. |
| N311BD | That AGC would adhere to all regulatory and statutory requirements under United States law. |
| N35531 | Texton did not submit a registration filing and yet operated the aircraft in violation of United States law. |
| N515BA | That AGC would adhere to all regulatory and statutory requirements under United States law. |
| N770SW | The true owner of N770SW. |
| N224EA | The true owner of N224EA. |
| N465BC | The true owner of N465BC. |
| N939RR | The true owner of N939RR. |

| N990PA | The true owner of N990PA. |
|---|---|

## Objects of the Conspiracy

The objects of the conspiracy were: (1) to illegally enrich the conspirators by providing United States registration for aircraft that otherwise would not qualify for registration; (2) avoid compliance with United State regulatory and statutory requirements; and (3) to conceal the prohibited activities from the United States government as to avoid penalties, deregistration of the above listed aircraft, and disruption of the illegal activity.

## Manner and Means of the Conspiracy

It was part of the conspiracy and among the manner and means that some of the defendants, aided and abetted by each other and others: (1) either entered into a series of contracts that hid ownership, possessory, and citizenship information related to the aircraft; (2) to transmit  this information or cause this information to be transmitted to the FAA by wire in foreign or interstate commerce; and (3) to obscure the true end use of the aircraft and compliance with United States laws.

## Overt Acts

In furtherance of the conspiracy and to accomplish its objects, at least one of the Defendants committed or cause to be committed, in the Eastern District of Texas and

elsewhere, the overt acts described in in the section titled "Offending Aircraft Transactions" above.

In violation of 18 U.S.C. § 371 and 49 U.S.C. § 46306.

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE
18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), and 982(a)(2); 21 U.S.C. §§ 853, 881(a), and 970; 28 U.S.C. § 2461; 49 U.S.C. § 46306(d); and 50 U.S.C. § 4819(d)

As a result of committing the offenses as alleged in this First Superseding Indictment, defendants shall forfeit to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), and 982(a)(2); 21 U.S.C. §§ 853, 881(a), and 970; 28 U.S.C. § 2461;  and 49 U.S.C. § 46306(d) any property constituting, or derived from, proceeds obtained directly, or indirectly, as a result of the said violations, and any property used, or intended to be used in any manner or part, to commit or to facilitate the commission of the said violations, including but not limited to the following:

**Money Judgment**

A sum of money equal to $350,000,000 in United States currency, and all interest and proceeds traceable thereto, representing the amount of proceeds obtained by defendants as a result of the offenses alleged in this Indictment.

**Aircraft**

a.  A Cessna T210K, Serial No. 21059286,  United States Registered Number N8286M

b.  A Beech 200, Serial No. BB413, United States Registration number N456PF

c.  A Lear 31A, Serial No. 080, United States Registered Number N260RC

d.  A Gulfstream G-1159, Serial No. 236, United States Registered Number N311BD

e.  A British Aerospace BAE 125-800A, Serial No. 258013, United States Registered
    Number N305AG

f.  A Cessna 560, Serial No. 560-0068, United States Registered Number N569LM

g.  A Gulfstream G-1159A, Serial No. 332, United States Registered Number N939RR

h.  A Gulfstream G-IV, Serial No. 1087, United States Registered Number N368AG

i.  A Hawker 800 XP, Serial No. 258740, United States Registered Number N740HB

**Substitute Assets**

If any of the property described above as being subject to forfeiture, as a result of

any act or omission of the defendant:

a.   cannot be located upon the exercise of due diligence;
b.   has been transferred or sold to, or deposited with, a third person;
c.   has been placed beyond the jurisdiction of the court;
d.   has been substantially diminished in value; or
e.   has been commingled with other property which cannot be divided without
     difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of

any other property of defendants up to the value of the above forfeitable property,

including but not limited to all property, both real and personal, owned by the defendants.

By virtue of the commission of the felony offenses charged in this First

Superseding Indictment, any and all interest defendants have in the above-described

property is vested in the United States and hereby forfeited to the United States pursuant

to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461.

A TRUE BILL

_____

GRAND JURY FOREPERSON

STEPHEN J. COX
UNITED STATES ATTORNEY


_____

ERNEST GONZALEZ
COLLEEN BLOSS                              Date
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | SEALED |
| | § | |
| v. | § | No. |
| | § | Judge |
| DEBRA LYNN MERCER-ERWIN (1) | § | |



## NOTICE OF PENALTY

### Count One

Violation:    21 U.S.C. § 846

Penalty:    If 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine – not less than 10 years and not more than life imprisonment, a fine not to exceed $10 million, or both. A term of supervised release of at least five years

Special Assessment:  $100.00

### Count Two

Violation:    21 U.S.C. § 963

Penalty:    Violation:    21 U.S.C. § 963

Penalty:    Imprisonment for not less than ten years or more than life, a fine not to exceed $10,000,000.00 or both.  A term of supervised release of at least five years.

**First Superseding Indictment – Page 35**

Special Assessment: $100.00

## Count Three

Violation:       21 U.S.C. § 959

Penalty:         Imprisonment for not less than ten years or more than life, a fine not to
                 exceed $10,000,000.00 or both.  A term of supervised release of at least
                 five years

Special Assessment: $100.00

## Count Four

Violation:       18 U.S.C. § 1956(h) and 1956(a)(2)(A) and (a)(2)(B)(i)

Penalty:         Not more than 20 years imprisonment; a fine not to exceed $250,000 or
                 twice the pecuniary gain or loss. A term of supervised release of not more
                 than 3 years.

Special Assessment: $100.00

## Count Five

Violation:       18 U.S.C. § 371 (Conspiracy to Commit Export Violations)

Penalty:         Not more than 10 years imprisonment; a fine not to exceed $250,000 or
                 both. A term of supervised release of not more than 3 years.

Special Assessment: $100.00

## Count Six

Violation:       18 U.S.C. § 371 (Conspiracy to Commit Registration Violations Involving
                 Aircraft, Not Providing Air Transportation in violation of 49 U.S.C. §
                 46306)

Penalty:        Not more than 5 years imprisonment to be served in addition to, and not, concurrently with, any other term of imprisonment imposed on the individual; a fine not to exceed $250,000, or both. A term of supervised release of not more than 3 years.

Special Assessment:  $100.00