

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 4:20-CR-212 |
| | § | Judge Mazzant |
| DEBRA LYNN MERCER-ERWIN (1) | § | |
| KAYLEIGH MOFFETT (2) | § | |
| GUILLERMO GARCIA MENDEZ (3) | § | |
| FEDERICO ANDRES MACHADO (4) | § | |
| CARLOS ROCHA VILLAURRUTIA (5) | § | |
| ALBAN GERARDO AZOFEIFA-CHACON (6) | § | |
| AARON BELLO-MILLAN (7) | § | |
| MICHAEL ASSAD MARCOS (8) | § | |

## THIRD SUPERSEDING INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

At all times material to this Third Superseding Indictment:

## INTRODUCTION

1.      Aircraft Guaranty Corporation (AGC) registered thousands of aircraft in

Onalaska Texas, an East Texas town without an airport.  The true owners of many of

these aircraft are foreign nationals. Non-citizens can register aircraft with the United

States Federal Aviation Administration if the aircraft is placed in a trust managed by a

United States trustee. 14 C.F.R. § 47.7(c).  In exchange for entering into this

arrangement, the foreign national receives a coveted "N" tail number for his aircraft.

This "N" number is valuable because foreign countries are less likely to inspect an U.S.-

registered aircraft for airworthiness or force down an American aircraft. It also avoids

foreign taxes related to the aircraft's importation to that foreign country and increases the aircraft's resell value.

2.     To register an aircraft held in a U.S. Trust, the U.S. Trustee submits at least three documents for FAA review: (1) the Trust Agreement; (2) an Affidavit of Citizenship of the Owner Trustee; and (3) the Operating Agreement or Lease Agreement. The FAA then issues a reasoned opinion about whether the aircraft is eligible for registration.  AGC followed this procedure, but made several fraudulent representations or filings in the process. It then received an opinion letter from the FAA stating, "we have reviewed both the Trust Agreement and the Affidavit for compliance with 14 C.F.R. § 47.7(c). "Regarding the Trust Agreement, . . . Article 6.2(c) directs the owner trustee to effect registration of the aircraft with the FAA."  Article 6.2 of AGC's standard Trust Agreement outlines the actions the Trustee "covenants and agrees to take." Article 6.2(c) requires the Trustee to "take all actions which the Trustee deems necessary or advisable to register any Aircraft which comprises a portion of the Trust Property with the United States Federal Aviation Administration and to insure that the Aircraft maintains its registration and *complies with related regulations and requirements*." (emphasis added). After reading this provision, and others, the FAA concluded that "the form of the Trust Agreement … satisfies the requirements of Sections 47.7(c)(2)(i) and 47.7(c)(2)(iii)." It determined the aircraft was "eligible for United States registration in the name of the Owner Trustee."   Without this representation, the FAA would not register the aircraft.

3.     Upon entering this arrangement, the trustee is responsible for complying with aircraft reporting obligations, which they cannot delegate to third parties. In June

2013, the FAA stressed, "The regulatory obligations of an owner trustee with regard to an aircraft registered in the U.S. using a non-citizen trust are, and always have been, the same as the regulatory obligations of all owners of U.S. registered aircraft." Fed. Reg. Vol 78, No. 117 (June 18, 2013). "The FAA Registry is an 'owner' registry; it is not an 'operator' registry." *Id.* "Once the FAA completes the registration process, the registered owner is the owner for all purposes under the regulations." *Id.* "The FAA has determined that there is nothing inherent in the status of a trustee owner of a U.S.-registered aircraft that would affect or limit its responsibilities for ensuring compliance with applicable laws and regulations." *Id.* Thus, "an owner of an aircraft on the U.S. registry cannot avoid a regulatory obligation imposed on it by the FAA simply by entering into a private contract with another party." *Id.*

4.      The aircraft is subject to United States regulations and requirements, including those issued by the Department of Commerce. The Owner Trustee promised the FAA compliance. If the aircraft is exported, then the Trustee must insure the required Electronic Export Information is filed under 15 C.F.R. §§ 30.3, 758.1(b)(5), and 758.2. AGC refused to comply, even when confronted by United States authorities.

5.      The defendants circumvent United States laws and regulations by placing "N" numbers in the hands of drug traffickers and prohibited foreign nationals. Each named individual participated in the scheme. The defendants use their status as United States citizens with United States corporations to execute a three-part scheme furthering international drug trafficking activity. *First*, the defendants violate FAA and Department of Commerce regulations to register aircraft with the United States while concealing the

aircraft's true ownership and exportation. *Second*, when law enforcement seizes a registered aircraft laden with drugs, the defendants deregister or otherwise transfer ownership of the aircraft. *Finally*, the defendants participated in a series of bogus aircraft sales transactions in order to conceal the movement of illegally obtained funds.

### THE DEFENDANTS AND THEIR CORPORATE ENTITIES

6.      **Aircraft Guaranty Corporation Holdings (AGC)**, was founded in Onalaska, Texas, Eastern District of Texas. In December 2014, Debbie Mercer-Erwin purchased AGC and continued registering aircraft in Onalaska, Texas. On or about January 22, 2020, AGC changed its address to 928 SW 107th St. Oklahoma City, Oklahoma 73170.

7.      **Wright Brothers Aircraft Title, Inc. (WBAT)** is an Oklahoma corporation with a principle place of business in Oklahoma at 928 SW 107th Street, Oklahoma City, Oklahoma 73170. WBAT often acts as an escrow agent in aircraft purchase transactions involving AGC and other co-conspirators. WBAT shares resources, office space, and employees with AGC.  At times, it makes FAA filings related to AGC aircraft.

8.      **GMAVIATION S.A. de C.V.** is listed on AGC's website as its Mexican-based location.

9.      **Debra Lynn Mercer-Erwin** owns AGC and WBAT.

10.     **Kayleigh Moffett** is an officer of AGC and WBAT.

11.     **Guillermo Garcia Mendez** owns and operates GMAVIATION. Guillermo Garcia Mendez and GMAVIACION S.A. de C.V. are listed on AGC's website as its representatives in Mexico.

12.     **South Aviation, Inc. (SAI)** is a Florida corporation, with its principal place of business located at 1470 Lee Wagener Boulevard, Suite 100, Ft. Lauderdale, Florida 33315. SAI acts as a broker for third-party buyers of aircraft.

13.     **Pampa Aircraft Financing (PAF)** is a Florida corporation, with its principal place of business located at 1470 Lee Wagener Blvd, Suite 100, Ft. Lauderdale, Florida 33315. PAF acts as a broker for third-party buyers of aircraft.

14.     **Federico Andres Machado** owns and operates SAI and PAF.

15.     **Ford Electric Co.** is a Wyoming company, with a principle place of business at 1712 Pioneer Ave. STE 1461, Cheyenne, Wyoming 82001.

16.     **Texton Enterprises, LLC (Texton)** is a Wyoming corporation, with its principle place of business at 1712 Pioneer Ave #500 Cheyenne, Wyoming 82001.

17.     **TWA International, Inc.  (TWA)** is a Wyoming corporation, with its principle place of business at 17122 Pioneer Ave #500 Cheyenne, Wyoming 82001.

18.     **Carlos Rocha Villaurrutia** purchases aircraft and illegally exports them to foreign countries using Texton, TWA, and Ford Electric Co.

19.     **Alban Gerardo Azofeifa-Chacon** is a Costa Rican national and pilot.

20.     **Aaron Bello-Millan** is a Mexican national and pilot.

21.     **Projets Inc.** is a Texas corporation with its principle place of business at 8620 West Monroe Rd., Suite 204 Houston, Texas 77061.

22.     **Jetnet, LLC** is a Delaware limited liability corporation with its principle

place of business at 2711 Centerville Rd Suite #400 Wilmington, Delaware, 19808.

23.     **Global Jets LLC** is a Delaware limited liability corporation with its

principle place of business at 5444 Westheimer Rd. Ste. 1090 Houston, Texas 77056

24.     **Michael Assad Marcos** is the Managing Member of Jetnet, LLC and the

President of Projets, Inc. He also owns Global Jets.

25.     The above-mentioned companies are interrelated. For example,

GMAVIACION is the Mexican representative of AGC. AGC and WBAT comingle

leadership, employees, resources, and office space.   Texton and TWA have similarly

comingled their operations. SAI and PAF contract with WBAT as an escrow agent and

TWA transacts business with WBAT. In November 2018, WBAT received three wires

comprising $220,000 from TWA for the purchase of an aircraft. WBAT was also

involved in the purchase of aircraft used by Marcos.

### OFFENDING AIRCRAFT TRANSACTIONS

26.     The Department of Commerce (DOC), Bureau of Industry and Security

(BIS), Office of Export Enforcement (OEE), and Homeland Security Investigation (HSI)

initiated their investigation of Defendants after noticing irregularities in aircraft filings

and learning that several defendant-registered aircraft were seized or destroyed while

smuggling drugs internationally. The following paragraphs provide non-exhaustive

examples by aircraft.

27.     **N8286M / N456PF**. On or about February 11, 2020, N8286M and N456PF

were registered with the FAA to Irvin A. Romero Lozano, an illegal alien with an

apartment in San Jose, California. In the registration documents, Lozano claimed to be a U.S. Citizen (in violation of 49 U.S.C. § 46306 and 18 U.S.C. § 1001). That same day, Declarations of International Operation were filed for both "N" numbers listing Guadalajara, Mexico as the final destination. The associated bills of sale for this aircraft were dated December 10, 2019 for N8286M and December 27, 2019 for N456PF.  These transactions were brokered by Guillermo Garcia of GMAVIATION. Because Lozano is an illegal alien, he cannot legally register an aircraft as an individual with the United States. DOC notified Lozano that his aircraft had been seized. Lozano signed a notice of abandonment for the aircraft and stated that he believed his identity had been stolen.

28.    **N260RC**. On or about January 31, 2020, N260RC was scheduled to depart Brownsville, Texas to Monterrey, Mexico. 19 C.F.R. 122.22(c) requires private aircraft pilots or their designees departing the U.S. to provide CBP Automated Passenger Information System filings for each passenger at least one hour before departure. This information was not provided, and the aircraft was seized. Agents reviewed the ownership documents for the aircraft and determined that on September 15, 2017, the Mescalero Apache Tribe sold this aircraft to ITRC, LLC. On or about October 20, 2017, ITRC and AGC entered into a Trust Agreement for this aircraft.  Rodolfo Camarillo Montemayor—a foreign national—was the manager of ITRC. ITRC., a Mexican corporation, held 100% of the membership shares of ITRC and Montemayor was the president, CEO, and 99% shareholder of ITRC. A bill of sale showed transfer of this aircraft to AGC and a corresponding Lease Agreement dated October 20, 2017, leased the aircraft to Camro Transportes, S.A. de C.V. Montemayor signed the Lease Agreement

as the "Sole-Administrator." AGC is a Texas corporation and the sales records show an address for AGC of POB 2547 Onalaska, Texas, which subjects its purchase to Texas's 6.25% sales tax. Rather than pay this tax, AGC filed a Texas Aircraft Exemption Certificate on or about October 30, 2017, stating that AGC did not owe the tax because "the aircraft will be registered in Onalaska, Texas" but will "be hangered in Apodaca, NL, Mexico and is not purchased for use in Texas." The aircraft has been outside of the United States for three years without any export filings.

29.     **N18BA.** On or about September 15, 2014, Daniel Regalado Orta signed a bill of sale for N18BA to AGC. That same day, AGC registered the aircraft with the FAA. On or about July 24, 2014, AGC executed an Amended Dry Lease Agreement leasing the aircraft to Orta. On or about January 13, 2016, WBAT filed for a duplicate certificate with the FAA. On or about March 10, 2019, N18BA crashed in Mexico killing one pilot. Mexican authorities seized 1,215 kilograms of cocaine from the aircraft. Approximately five years earlier, in 2014, Connie Wood (who died in 2019 of natural causes) placed this aircraft in a trust controlled by AGC. AGC continued to file registration documents for this aircraft under the leadership of Debbie Mercer and Kayleigh Moffett. On or about March 21, 2019, AGC employee Dawna Peters, the Executive Vice President of Trust Administration, wrote the lessee of N18BA, Daniel Regalado Orta.

> We have received reports that N18BA was involved in a fatal accident in Mexico, March 10th. Please confirm if this is accurate, and if not, where is N18BA currently located? This is an urgent request, we are being asked by a US government entity to provide the current location of your aircraft, British Aerospace HS 125-700A, s/n NA0316, N18BA.

Mr. Orta responded, "This information is false. The aircraft is currently located in Toluca airport in hangar 6A. It is currently in maintenance and therefore grounded." Continuing its investigation, the Department of Commerce served a subpoena on AGC. AGC provided a written response, which claimed that the crashed aircraft falsely displayed the N18BA tail number, which belongs to a different AGC aircraft. "The aircraft which crashed, Beechcraft 256046, was formerly registered in the U.S. under N299GS and was held by AGC in 'Trust 1936' from October 3, 2011 to May 29, 2014." The beneficiary of the trust was Administración Aeronáutica International S.A. de C.V. and Marco Antonio Alvarado Padilla was the manager of that company. According to AGC, the aircraft was transferred to the foreign beneficiary before the crash on or about March 29, 2015, and the FAA Registration for this aircraft was canceled on or about February 15, 2018. AGC and its co-conspirators did not make any export filings for this transaction. On or about January 22, 2020, Kayleigh Moffett filed an address update with the FAA for N18BA.

30.   **N305AG.** On or about October 5, 2012, N305AG was registered to AGC. That same day, a Declaration of International Operation was filed by AGC for this aircraft. On or about September 11, 2018, Kayleigh Moffett filed a FAA Registration renewal. On or about January 27, 2020, N305AG was seized in Guatemala with approximately 1,700 kilograms of cocaine. The aircraft was taken into Guatemalan custody, where it has remained ever since. On or about January 29, 2020, news reports published the seizure. Two days later, on or about January 31, 2020, Kayleigh Moffett transferred ownership of the aircraft to Arrendadora THH SA de CV, a foreign company.

AGC and its co-conspirators did not make any export filings for this transaction. On or about February 6, 2020, an open source video of N305AG flying out of the Guatemalan jungle went viral. On or about February 20, 2020, Moffett filed a bill of sale with the FAA and asked to deregister the aircraft.

31.     **N311BD.** On or about December 16, 2019, Kayleigh Moffett filed a bill of sale for N311BD, which transferred the aircraft from Gastelum—a convicted drug trafficker located in Sinaloa, Mexico[1]—to AGC. That same day, Kayleigh Moffett filed for a Declaration of International Operation to Mexico on behalf of N311BD as trustee. On or about February 27, 2020, the aircraft was seized in Belize with approximately 2,310 kilograms of cocaine. The aircraft was taken into government custody, where it remains. The news broadcasted this seizure on or about March 1, 2020. Approximately four days later, Debbie Mercer sent Gastelum a letter stating that AGC will begin the reassignment and deregistration of N311BD. On or about April 14, 2020, Kayleigh Moffett filed a bill of sale transferring the aircraft to Gastelum despite the fact that the aircraft was in government custody in Belize. AGC and its co-conspirators did not make any export filings. In July 2020, the FAA advised Gastelum that he does not meet the U.S. citizenship requirements to register an aircraft.

32.     **N569LM.** On or about May 16, 2016, AGC entered into a trust agreement with Ancheta SA. de C.V. for the purposes of holding N56LM in a trust. It then leased the aircraft back to Ancehta, SA. de CV. On or about June 16, 2016, Kayleigh Moffett

---

[1] A simple Google search yield articles related to Gastelum's US drug conviction.
https://www.cleveland19.com/story/7488478/mexican-drug-ring-busted-2-million-in-cocaine-seized/

registered N569LM with the FAA. That same day, Ancheta, S.A. de C.V., a Mexican company, sold N569LM to AGC. Robert Miguel Gonzalez Barragan signed on behalf of Ancheta. On or about June 16, 2016, Debra Mercer-Erwin filed a Declaration of International Operations as president of AGC.  On or about January 3, 2020, the government learned that the aircraft is located in Mexico 90% of the time. AGC and its co-conspirators did not make any export filings for this aircraft.  On or about January 15, 2020, Kayleigh Moffett filed a change of address for trustee AGC.

33.    **N515BA.** On or about June 25, 2020, AGC entered into a trust agreement with Jorge Alberto Torres Isalas. This document was certified as a true and correct copy by Moffett noting WBAT. AGC then leased the aircraft back to Torres Isalas. AGC and its co-conspirators did not file export documents for this plane. On or about June 28, 2020, HSI learned of a suspicious flight leaving Mexican airspace in violation of a filed flight plan. The aircraft left Mexican airspace and entered Venezuelan airspace. Authorities located the flight and photographed the aircraft. It bore tail number N515BA. Authorities continued to monitor the aircraft and noticed that false tail number N5674 was later applied to the aircraft. N5674 is tied to a deregistered aircraft that differs substantially in appearance from the targeted aircraft. The Venezuelan military attempted to force the aircraft down but lost tracking near a clandestine runway. The following morning, a destroyed aircraft was located on the clandestine runway. Photos of the destroyed aircraft briefly appeared on a social media account and identified the aircraft as N515BA.

34.   **N770SW.**  From approximately January 5, 2018 until April 16, 2019,
N770SW was registered with the FAA as belonging to AGC. On or about April 16, 2019,
Kayleigh Moffett as secretary of AGC sent the FAA a bill of sale transferring the aircraft
to Aircraft Finance Aircorp, Inc. The bill of sale was dated April 17, 2019. On or about
June 17, 2019, Federico Andres Machado told the government that Aircraft Finance
Aircorp, Inc. was his company and that it had not purchased N770SW.  On or about June
18, 2019, a bill of sale transferred ownership of N700SW to EOLO Air Corp. This form
is DocuSigned by Federico Machado as company secretary. On or about June 20, 2019,
EOLO filed a Declaration of International Operations for N770SW to fly from Opa-
Locka, Florida to Toluco, Mexico. EOLO asked the FAA to fax the flight wire to WBAT.
EOLO Air Corp. is listed as the owner of the aircraft. A document on WBAT letterhead
asked the FAA to return all un-recordable documents to WBAT.  AGC and its co-
conspirators did not make any export filings for this aircraft.

35.   **N224EA.** On or about March 10, 2017, TWA purchased N224EA. The
aircraft was registered with the FAA under TWA. Villaurrutia is the sole owner and
president of TWA. That same day, Villaurrutia filed a Declaration of International
Operations to fly the aircraft from Pompano, Florida to Cancun, Mexico. TWA and its
co-conspirators did not make any export filings. On or about November 9, 2018, TWA
sold N224EA to VICA Aviation, Inc. This company is wholly owned and operated by a
relative of Villaurrutia. Despite TWA's representations that it owned the aircraft, other
entities funded and operated the aircraft. On or about December 19, 2018, N224EA

crashed in Honduras while transporting drugs. On or about January 7, 2019, VICA

Aviation requested the deregistration of the aircraft for export to Mexico.

36.     **N241CW.** On or about October 11, 2018, TWA purchased N241CW. That

same day, Villaurrutia registered N241CW with the FAA under TWA and filed a

Declaration of International Operations to fly the aircraft from Phoenix, Arizona to

Ciudad Juarez, Mexico.  TWA did not make any export filings. On or about December 9,

2018, N241CW crashed in Venezuela while delivering 1,200 kilograms of cocaine for the

Sinaloa Cartel. On or about January 7, 2019, TWA submitted a deregistration request for

export to Mexico.

37.     **N322BC.** On or about January 11, 2019, TWA purchased N322BC and

registered it with the FAA under TWA.  On or about January 14, 2019, Villaurrutia filed

a Declaration of International Operation to fly the aircraft from McAllen, Texas to

Monterrey, Mexico. On or about September 11, 2019, Villaurrutia submitted a

deregistration request for export to Mexico. TWA and its co-conspirators did not make

any export filings.  On or about October 19, 2019, the aircraft landed on a clandestine

airstrip in Cayo District, Belize, where it was found abandoned. The seats had been

removed and the aircraft was configured for narcotics transportation.

38.     **N35531.** On or about February 14, 2019, Texton purchased N35531, but

never registered it. An unregistered aircraft should not be flown by anyone at any time.

From approximately April 4, 2019 to November 13, 2019, the FAA sent letters to Texton

notifying Texton that the aircraft was not registered. On or about February 15, 2019, a

flight plan was filed for N35531. It disclosed a departure from Fort Worth, Texas to

Tampico, Mexico. On or about June 6, 2019, the aircraft was found abandoned in Guatemala. TWA did not make any export filings.

39.     **N465BC.** On or about August 16, 2019, TWA purchased N465BC and registered it with the FAA under TWA. Despite TWA's representations that it owned the aircraft, other entities funded and operated the aircraft. On or about August 19, 2019, TWA filed a Declaration of International Operations to fly the aircraft from Memphis, Tennessee to Merida, Mexico. TWA and its co-conspirators did not make any export filings. On or about October 25, 2019, the aircraft landed on a clandestine airstrip in Guatemala. The aircraft was configured for narcotics transportation. That same day, TWA filed a request to deregister the aircraft for export to Mexico.

40.     **N530GA.** On or about March 2, 2018, TWA purchased N530GA and registered it with the FAA under TWA. On or about June 6, 2018, Villaurrutia filed a Declaration of International Operations to fly the aircraft from Chino, California to Tijuana, Mexico. TWA and its co-conspirators did not make any export filings. On or about October 26, 2019, the aircraft landed on a clandestine airstrip in Guatemala. The aircraft was configured for narcotics transportation. As of December 11, 2020, N530GA was still registered to TWA.

41.     **N939RR.** On or about January 11, 2017, Texton purchased N939RR and registered it with the FAA under Texton. Villaurrutia is the sole owner and president of Texton.  Despite Texton's representations that it owned the aircraft, other entities funded and operated the aircraft. On or about May 29, 2018, Villaurrutia deregistered the aircraft for export to Mexico. On or about December 16, 2019, the aircraft was seized in

Guatemala with approximately 2,572 kilograms of cocaine. TWA did not make any export filings.

42.     **N990PA.** On or about May 9, 2018, Villaurrutia purchased N990PA and registered it with the FAA under TWA. Despite TWA's representations that it owned the aircraft, other entities funded and operated the aircraft. On or about March 22, 2019, the aircraft crashed in Honduras with one kilogram of cocaine and one firearm. On or about March 25, 2019, Villaurrutia deregistered the aircraft with the acknowledgement that it was exported and destroyed. TWA and its co-conspirators did not make any export filings.

43.     **N368AG.** On or about August 2, 2019, Villaurrutia purchased N368AG and registered it with the FAA under TWA. Villaurrutia entered into an Aircraft Security Agreement with AW Asset Holdings, LLC, a company located in Plano, Texas. AW Asset Holdings entered into this agreement with TWA on or about August 2, 2019. On or about August 2, 2019, Villaurrutia filed a Declaration of International Operation to fly from Wichita, Kansas to Cancun, Mexico. TWA and its co-conspirators did not make any export filings. On or about October 15, 2019, this aircraft was sold to SMB G-IV IX LLC.

44.     **N2000.** On or about October 29, 2016, Villaurrutia registered N2000 with the FAA through Ford Electric Co. On or about October 31, 2016, Hadid Design and Management LLC sold N2000 to Ford Electric Co. On or about November 1, 2016, Villaurrutia filed a Declaration of International Operations for a flight from Nassau, Bahamas to Opa Locka, Florida.  In approximately March 2017, Michael Marcos

attempted to use N2000 to conduct a narcotics delivery. On or about December 11, 2017, Carlos Villaurrutia through Ford Electronic Co. sold N2000 to Soto Santiago William. The corresponding Bill of Sale was filed on or about January 10, 2018.

45.   **N466MM / NN886N.**  On or about November 25, 2015, Exmegs Marketing, LLC, sold N466MM to Projets, Inc. On or about December 25, 2015, Projets, Inc. registered N466MM with the FAA. On or about October 30, 2018, Projets, Inc. sold N466MM to Jetnet LLC.  N466MM was a Hawker 700A. On or about November 30, 2018, a Hawker 700A attempted to land on a clandestine airstrip in Belize, but aborted its landing plans and landed in the Chetumal Airport in Mexico. This aircraft bore a modified registration number—NN886N. The pilot abandoned the aircraft.  The aircraft contained approximately 1,556 kilograms of cocaine. The aircraft also had two Honeywell TFE731 series engines with serial numbers P84284 and P76292. According to FAA documents, these serial numbers are assigned to N466MM, the aircraft registered to Jetnet, LLC by Michael Marcos and leased to Mexican national Luis Alberto Romero Rosales. On or about December 14, 2018, Marcos deregistered the aircraft noted that it was sold to a foreign purchaser and exported to Mexico while it was in the custody of the Mexican government. No export filing was made for this aircraft.

46.   **N884AB.** On or about August 10, 2020, Horizons Ahead, LLC sold N384AB to Projets, Inc. On or about August 14, 2020, Projets, Inc. filed a Declaration of International Operation for a flight to Monterrey, Mexico. On or about August 17, 2020, the registration number N384AB was changed to N884AB.  On or about August 25, 2020, Marcos filed a Declaration of International Operation with the FAA for a flight

from Houston, Texas to Monterrey, Mexico. On or about August 26, 2020, Marcos

deregistered N884AB with the FAA and sold it to Vander Servicios y Comercial, SA de

CV, a Mexican company. An export filing listing Vander Servicios was made for this

aircraft. After August 26, 2020, it is illegal to display tail number N884AB on any

aircraft because it is a de-registered number. On or about August 29, 2020, the Mexican

government seized N884AB as a stateless aircraft. According to its pilots, the aircraft's

true owner is Hector Sanchez Garcia in Guadalajara, Jalisco, Mexico. This individual

should have been listed on the export filing.

47.     **N740HB.** On or about June 10, 2019, N740HB was sold by PIBSA Ignerio

Construccion Industrial (PIBSA) to Victor Gilberto Alverez, a Mexican citizen. On or

about May 24, 2020, an aircraft with fictitious registration number N740HBH arrived at

Hobby Airport in Houston, Texas from Durango, Mexico. This number was a clerical

error. The true registration number for this aircraft was N740HB. FAA registration

documents for N740HB list Global Jets LLC—a company owned by Michael Marcos—

as the trustee owner and PIBSA Ignerio Construccion Industrial (PIBSA) as the operator.

However, the Automated Passenger Information System filing for N740HB listed Global

Jets LLC as the operator and Victor Gilberto Alverez, in Toluca Mexico as the owner.

Victor Gilberto Alverez is not listed on the FAA registration.  No export filing was made

for this aircraft.

48.     **N777EH.** On or about January 26, 2018, the FAA received a Bill of Sale

for N777EH noting that Projets, Inc. purchased N777EH from Charter Equipment

Leasing LLC. That same day, Michael Marcos filed an Aircraft Registration Application

for N777EH on the behalf of Projets, Inc.  On or about February 27, 2018, the FAA

received a bill of sale noting the sale of N777EH from Projets Inc. to Jet Net LLC as

Trustee. On or about January 26, 2020, Passengers waiting to board the N777EH were

detained on the tarmac with approximately 168 kilograms of cocaine. The Aircraft was

taken into Colombian custody. On or about January 27, 2020, Michael Marcos, as the

Managing Member of Jetnet, LLC, sold N777EH to Jesus Arteaga Morales. That same

day Michael Marcos deregistered the aircraft with the FAA for export to Mexico.  These

filings occurred while the aircraft was in Colombian custody. No export filings were

made for this aircraft.

**THE TRUST SCHEME**

49.     AGC typically enters into a (1) Trust Agreement, (2) Purchase Agreement

and corresponding Bill of Sale, and (3) Dry Lease Agreement with a corporation owned

by a foreign national. On at least one occasion, this foreign national was a convicted drug

trafficker. Typically, the documents are structured as follows:

50.     **Trust Agreement.** The Trust Agreement creates a legal structure in which

AGC holds the title to the aircraft for the benefit of the drug dealer's corporation.  As

explained earlier, the FAA requires this arrangement for a non-citizen to register his

aircraft with the United States.  AGC does not specifically identify any aircraft in its trust

agreements by unique identifier. This runs contrary to the model trust agreement

promulgated by the FAA in 2013.

| FAA Model | AGC Agreement |
|---|---|
| "Aircraft" means the Aircraft, serial number [], FAA Registration Number N [] together with the [] engines, bearings, manufacturer's serial numbers and [], which are transferred to the Owner Trustee in trust under this Trust Agreement | "Aircraft" means those certain airplanes or helicopters, including engines and parts, for which the Trustee holds title for the benefit of Beneficiary, and which shall constitute the Trust Property." <br><br> *Note, the Aircraft is not identified anywhere in AGC's trust agreements.* |

The following provisions are noteworthy:

- *Section 2.4 Activities* — "The Trust may engage in the following activities: (i) the ownership, management, registration and leasing of the Trust property, (ii) activities which are necessary, suitable or convenient to accomplish the foregoing, and (iii) other such activities as may be required in connection with conserving the Trust Property and making distributions to the Beneficiaries."
- *Section 3.2. Limitations on Transfer* — allows the Beneficiary to transfer his beneficial interest in the trust but requires Trustee approval.
- *Section 4.3 Beneficiary's Duties to Provide Information under the FAA Trust Policy* — Beneficiary acknowledges that Trustee has reporting obligations to the FAA and agrees to provide information to fulfill those obligations.
- *Section 6.2 Specific Authority* — explains authorized activities of the Trustee including authorization to "take all actions which the Trustee deems necessary or advisable to register any Aircraft which comprises the Trust Property with the [FAA] and to insure that such Aircraft maintains its registration and complies with related regulations and requirements."
- *Section 6.4 (d)* — "nothing in this Agreement shall relieve any of the Beneficiary, Trustee or any other Person of any obligation to comply with any law, rule or regulation of any governmental authority with respect to the ownership and operation of the Aircraft."
- *Section 11.13 Beneficiary Compliance with US Law.* — The Beneficiary acknowledges that the aircraft may be subject to export and re-export restrictions and that these laws and OFAC regulations bind the Trustee.
- *Exhibit 1 Trustee Fee Schedule* — This form sets out payments owed to the Trustee for maintaining the trust. In the AGC trust agreements on file with the FAA, this form is blank.
- *Exhibit 2 FAA Trust Policy Certificate* — This is the form the Beneficiary fills out to aid the Trustee in meeting its FAA reporting obligations. In the AGC trust agreements on file with the FAA, this form is blank.

51.    **Bill of Sale.** AGC's Trust Agreements create the trust, but do not transfer the aircraft from the foreign owner to the trustee. AGC executes an Aircraft Purchase Agreement and files a one-page Bill of Sale that appears to transfer the aircraft into AGC's possession in exchange for a nominal amount, usually from $1 to $10.

52.    **Dry Lease Agreement.** After transferring the aircraft into the newly created trust, AGC leases the aircraft back to the foreign national through his corporation in a Dry Lease Agreement. A Dry Lease Agreement allows the Lessee to operate the aircraft and select his own crew. AGC also attempts to shirk its responsibilities by delegating regulation obligations to the foreign national. As explained above, the FAA publicly rejected this arrangement. The following are notable provisions:

- *Lease Agreement Section 3.1. Operation and Control* — "Lessee is responsible for operating the Aircraft in accordance and compliance with all laws, ordinances and regulations relating to the possession, use, operation, or maintenance of the Aircraft, including but not limited to, Federal Aviation Regulations."
- *Lease Agreement Section 3.4. Limits of Operations* — Lessee warrants it will not use the aircraft for an illegal purpose.
- *Lease Agreement Section 5.1 Lessor's Warranty* — Lessor warrants, among other things, that the aircraft is properly registered in the name of the Lessor in accordance with U.S. law.
- *Lease Agreement Section 6.13 FAA Trust Policy* — Lessee agrees to provide Lessor with the information needed to fulfill FAA reporting obligations.
- *Exhibit A* — Lessee provides name and contact information as well as the location where the aircraft will be primarily hangered. This location is usually foreign.
- *Exhibit B Addendum to Dry Lease Agreement Section 2. Compliance with US Law* — Lessee affirms it is in compliance with OFAC regulations and acknowledges that the aircraft may be subject to export restrictions.
- *Exhibit 1 to Exhibit B Addendum to Dry Lease Agreement FAA Trust Policy Certificate* — provides the address, contact information, and Jurisdiction of incorporation for the Lessee. This is usually a foreign corporation. It also

identifies the airport where the aircraft is "normally based" and the jurisdiction where the "aircraft is normally operated." These typically are foreign locations.

53.    After executing these agreements, the aircraft receives an "N" number. Now, it must adhere to all United States laws and regulations. The Trustee agrees to comply with to all of the reporting obligations for the aircraft. This streamlines the reporting process for the FAA by designating a U.S. citizen that is responsible for providing the FAA (and other agencies) with information related to the aircraft.

### THE PONZI SCHEME

54.    WBAT, through its principals and agents, and its co-conspirators funnel money through refundable deposits placed on un-sellable aircraft during bogus sales transactions.  Beginning on a date unknown, but no later than 2016, Mercer-Erwin, Moffett, and Machado devised a scheme and artifice, namely a "Ponzi" scheme, to defraud persons and to obtain money by means of false and fraudulent pretenses, representations, and promises.

55.    This scheme took advantage of the typical aircraft purchase transaction to dupe investors into depositing money in the WBAT escrow account.  The typical aircraft purchase transaction proceeds as follows:

- **Step 1:** The buyer identifies an aircraft he would like to purchase. There is usually a period of time during which the buyer will perform due diligence on the aircraft. In order to ensure the seller does not continue marketing the aircraft, the buyer will agree to provide a refundable deposit of money. The buyer and seller will agree to conditions that, if met, render the deposit non-refundable. Usually, the "hardening" of the deposit into a non-refundable deposit depends on whether the aircraft has passed an inspection initiated by the buyer.

- **Step 2:** The buyer typically secures a lender to help provide funds for the full-purchase price of the aircraft. The loan is for the purchase of the aircraft, not the deposit. If a buyer cannot afford the deposit, it signals to the seller that he is not capable of purchasing the aircraft.

- **Step 3:** The buyer and seller enter into an escrow agreement with an escrow agent. The escrow agent holds the buyer's refundable deposit in a separate account and controls disbursement of the funds. If there is a dispute between the buyer and seller about whether the deposit has become nonrefundable under the conditions of the parties' agreement, the escrow agent will decide the dispute and disburse the funds accordingly.

- **Step 4:** After completion of the sale, the buyer usually sells the aircraft to a company for a higher asking price. Sometimes the buyer will already have this second purchaser lined-up before he purchases the aircraft from the seller.

56.     The WBAT Ponzi scheme differs from this model in two key respects.

*First*, the loan money is for the refundable deposit, not the purchase of the aircraft.

*Second*, the sale of the aircraft is never consummated because the aircraft either does not exist or belongs to someone else. The WBAT Ponzi scheme is as follows:

- **Step 1:** The lender agrees to lend the fraudulent buyer a refundable deposit. The fraudulent buyer secures a loan and now owes the lender interest. The "hardening" of the deposit into a non-refundable deposit is contingent upon the illegitimate buyer's successful inspection of the aircraft and other things.

- **Step 2:** The lender's deposit money is placed into a WBAT's escrow account, which is always designated by the fraudulent buyer.

- **Step 3:** The fraudulent buyer never inspects the aircraft because the aircraft either does not exist (e.g., has been decommissioned) or is not actually for sale (e.g., belongs to a commercial airline). WBAT transfers the refundable deposit into accounts designated by the fraudulent buyer to be used for other purposes, and not for the purchase of the designated aircraft. WBAT is compensated for these fraudulent transactions with money taken from the escrow account as well. As a result, the deal falls through and the deposit does not harden.

- **Step 4:** The fraudulent buyer then secures another loan from another lender for the purchase of another unsellable aircraft. This loan pays for the principle and interest owed to the previous lender for the previous aircraft transaction involving WBAT and the fraudulent buyer.

57.     On or about September 27, 2019, SAI, and WBAT entered into a series of agreements for the sale of an unsellable plane. The plane was unsellable because it belonged to a private airline and was located in China. On or about September 27, 2019, a company known to the grand jury as "UC1" and SAI entered into a letter agreement regarding a refundable deposit on an aircraft. Machado signed this agreement on behalf of SAI. That same day, UC1 entered into an Escrow Agreement with WBAT. Mercer signed this agreement on behalf of WBAT.

58.     In or about December 2019, UC1 approached a legitimate bank known to the grand jury as "LB1" to secure a loan to perpetuate the scheme.  On or about January 14, 2020, Machado spoke with the CEO of LB1 over the phone about the proposed transaction. The proposed buyer in this transaction was SAI and the proposed escrow company was WBAT. UC1 engaged LB1 in a series of negotiations surrounding this proposal.  UC1 provided LB1 the serial number and registration of the aircraft. It did not correspond to any existing aircraft records. When asked about the discrepancy, UC1 responded that the information it originally provided was incorrect. UC1 provided a new registration number. This number corresponded to an aircraft that was decommissioned in 2017.

59.     On or about February 28, 2019, SAI and WBAT entered into a series of agreements for the sale of an unsellable aircraft. The aircraft was unsellable because the aircraft has belonged to All Nippon Airways Co., LTD. since 2010 and is registered in Japan.  On February 28, 2019, UC1 and SAI entered into a letter agreement regarding a refundable deposit on an aircraft. Machado signed this agreement on behalf of SAI. That same day, UC1 and SAI entered into an escrow agreement with WBAT. Machado signed this agreement on behalf of SAI.

60.     On or about November 12, 2020, PAF, and Rusty 115 Corp entered into an agreement for the sale of an unsellable aircraft utilizing WBAT. The aircraft was unsellable because the aircraft belonged to Air India and was not for sale.  This agreement was for $5,000,000 refundable deposit on the unsellable aircraft. Machado signed this agreement on behalf of PAF.  $550,000 was subsequently transferred to Machado by WBAT for use other than the purchase of the aircraft.

61.     To further the Ponzi scheme, Mercer-Erwin and Moffett directed funds from the WBAT escrow account to Machado within hours of the lender depositing them. Machado then used those funds for purposes other than the purchase of the aircraft.

62.     The below table provides a non-exhaustive list of transactions that Mercer-Erwin, Moffett, and Machado engaged in to further the Ponzi scheme.[2] This list shows transactions occurring in 2016 and 2017.

---

[2] Unindicted third-party participants are listed by initials.

| Month/Year | Depositor | Wire in | Wire Out | Recipient |
|---|---|---|---|---|
| Oct. 2016 | A.H. | $6,777,725 | $50,0000.00 | Escrow Fee |
| | | | $530,000.00 | S |
| | | | $85,190.15 | W |
| | | | $230,000.00 | I |
| | | | $203,500.00 | G.G. |
| | | | 275,000.00 | N.G. |
| | | | $172,445.00 | N272TX/ N488AM |
| | | | $1,700,000.00 | N51NM Ghotic |
| | | | $275,000.00 | South Aviation |
| Nov. 2016 | N272TX | $168,418.32 | $1,120,613.86 | N951DP BAM |
| | | | $262,500.00 | N.C. |
| Nov. 2016 | C | $7,600,000.00 | $5,088,333.33 | P.G. |
| | | | $1,000,388.89 | R |
| Nov. 2016 | P.B.F.E. | $1,971.69 | $220,000.00 | I |
| | | | $200,000.00 | C.A. |
| | | | $2,725.00 | Escrow fee |
| | | | $50,000.00 | K.J.C. |
| | | | $58,830.00 | Bond Cost |
| | | | $50,000.00 | Escrow Fee |
| | | | $347,135.22 | J.A |
| | | | $200,000.00 | N752CS |
| | | | $100,000.00 | N425SU |
| | | | $84,444.14 | W. |
| | | | $20,188.10 | South Aviation |
| Dec. 2016 | G. | $8,550,00.00 | | |
| | | | $7,950,000.00 | S.G.V. |
| Dec. 2016 | G5 Buyer | $36,960.41 | $150,00.00 | K.J. |
| Dec. 2016 | N272TX | $108,000.00 | $96,960.00 | C |
| | | | $102,695.00 | A.L.G. |
| | | | $50,000.00 | Escrow Fee |
| | | | $200,345.00 | South Aviation |
| | | | $250,000.00 | A.C. |
| | | | $200,000.00 | South Aviation |
| | | | $17,341.87 | O |
| Dec. 2016 | H. | $6,000,000.00 | | |
| | | | $4,010,961.67 | C |
| | | | $230,000.00 | I |
| | | | $200,000.00 | A |
| | | | $50,000.00 | Escrow Fee |

*Third Superseding Indictment – Page 25*

| Month/Year | Depositor | Wire in | Wire Out | Recipient |
|---|---|---|---|---|
| | | | $23,320.00 | Insurance extra |
| | | | $275,000.00 | South Aviation |
| | | | $480,000.00 | H. |
| Dec. 2016 | N1904W | $1,200,000.00 | $1,000,000.00 | C |
| | | | $100,000.00 | K |
| | | | $90,839.92 | S |
| | | | $150,000.00 | South |
| | | | $84,500.00 | W |
| | | | $177,340.00 | N425SU |
| | | | $5,398.82 | Escrow |
| Jan. 2017 | N272TX | $84,209.16 | | |
| | | | $200,000.00 | South |
| Jan. 2017 | C | $4,000,000.00 | $1,450,000.00 | N752CS |
| | | | $1,043,062.50 | H.A. |
| | | | $125,000.00 | G |
| | | | $210,000.00 | C |
| | | | $540,000.00 | N |
| | | | $105,000.00 | I |
| | | | $250,000.00 | South |
| | | | $25,000.00 | Escrow Fee |
| | | | $15,650.90 | Insurance |
| | | | $19,604.70 | Insurance |
| | | | $95,000.00 | K |
| | | | $5,891.06 | Escrow |
| Jan. 2017 | N1904W | $118,795.82 | $92,600.00 | W |
| | | | $26,453.95 | South Aviation |
| Feb. 2017 | N1904W | $100,000.00 | $154,500.00 | W.N. |
| | | | $83,703.38 | W |
| | | | $177,719.18 | BAM |
| Mar. 2017 | N272TX | $84,209.16 | $102,695.00 | A.L.G. |
| Mar. 2017 | N752CS | $960,000.00 | $75,000.00 | South Aviation |
| | | | $220,000.00 | I |
| | | | $192,500.00 | A.C. |
| | | | $10,000.00 | Escrow Fee |
| | | | $140,000.00 | C. |
| Apr. 2017 | N1904W | $100,000.00 | $83,703.38 | W. |
| Apr. 2017 | H. | $3,000,000.00 | $319,196.66 | C |
| | | | $210,000.00 | G.R. |
| | | | $102,695.00 | A.L.G. |
| | | | $15,000.00 | Escrow Fee |

*Third Superseding Indictment – Page 26*

| Month/Year | Depositor | Wire in | Wire Out | Recipient |
|---|---|---|---|---|
| | | | $750,000.00 | N.C. |
| | | | $375,000.00 | South Aviation |
| | | | $75,000.00 | H |
| | | | $137,450.00 | D, V, B |
| | | | $799,583.33 | C |
| | | | $220,463.23 | South |
| Apr. 2017 | N272TX | $168,418.32 | $102,695.00 | A.L.G. |
| May 2017 | N1904W | $100,000.00 | $300,000.00 | M.G. |
| | | | $2,744.69 | E Invoice |
| May 2017 | N272TX | $84,209.16 | $83,820.72 | W |
| | | | $75,000.00 | H |
| May 2017 | I | $500,000.00 | $386,420.00 | C |
| | | | $66,921.00 | A.L.G. |
| June 2017 | South Aviation | $60,973.93 | | |
| June 2017 | C | $6,000,000.00 | $360,000.00 | C |
| | | | $250,000.00 | N.C. |
| | | | $50,000.00 | Escrow Fee |
| | | | $236,000.00 | M4L |
| | | | $5,000,000.00 | A.C. |
| June 2017 | JTG | $100,000.00 | $435,000.00 | H |
| June 2017 | N862VP | $1,450,000.00 | $1,312,500.00 | G.A. |
| June 2017 | N272TX | $84,209.16 | $80,000.00 | C |
| June 2017 | H.A. | $1,880,000.00 | $4,209.16 | Escrow |
| | | | $1,250,000.00 | G |
| | | | $630,000.00 | D,V,B |
| June 2017 | G.R. | $200,000.00 | $2,500.00 | Escrow Fee |
| July 2017 | N1904W | $100,000.00 | $520,000.00 | G |
| July 2017 | N272TX | $84,209.16 | $30,000.00 | S.I. |
| July 2017 | S.I. | $750,000.00 | $750,000.00 | G. |
| July 2017 | B.G. | $1,846,685,00 | $1,000,000.00 | C |
| | | ; | $75,000.00 | H |
| | | | $278,920.00 | South |
| July 2017 | W.P. | $3,000,000.00 | $4,500,000.00 | S.E. |
| July 2017 | A.C. | $1,800,000.00 | $3,00,000.00 | C |
| July 2017 | G.C. | $200,000.00 | | |
| July 2017 | C | $4,000,000.00 | $2,000,000.00 | C |
| July 2017 | C | $3,000,000.00 | $480,000.00 | C |
| | | | $213,600.00 | W.P. |
| | | | $533,664.50 | N546MG |
| | | | $840,000.00 | S |

*Third Superseding Indictment – Page 27*

| Month/Year | Depositor | Wire in | Wire Out | Recipient |
|---|---|---|---|---|
|  |  |  | $168,055.68 | W |
|  |  |  | $291,653.98 | South |
|  |  |  | $100,000.00 | Escrow Fee |
|  |  |  | $120,000.00 | South |
| Aug. 2017 | W.P. | $3,000,000,00 | $2,000,000.00 | N272TX |
| Aug. 2017 | S.I. | $750,000.00 | $250,000.00 | G.E.R. |
|  |  |  | $157,500.00 | W.P. |
|  |  |  | $50,000.00 | Escrow Fee |
|  |  |  | $50,000.00 | W |
|  |  |  | $30,000.00 | S.I. |
|  |  |  | $50,000.00 | South |
|  |  |  | $150,000.00 | H.A. |
|  |  |  | $657,285.00 | C |
|  |  |  | $75,000.00 | H |
| Aug. 2017 | A.C. | $1,400,000.00 | $78,000.00 | N.C. |
|  |  |  | $350,000.00 | A.F.A |
|  |  |  | $107,270.00 | South |
|  |  |  | $10,000.00 | Escrow Fee |
|  |  |  | $46,220.00 | South |
|  |  |  | $133,780.00 | C |
|  |  |  | $50,000.00 | A.F.A. |
|  |  |  | $100,000.00 | South |
| Sept. 2017 | SN7 | $100,000.00 | $100,000.00 | South |
| Sept. 2017 | W.P. | $2,000,000.00 | $1,450,000.00 | H.A. |
|  |  |  | $292,500.00 | G |
|  |  |  | $100,000.00 | W.P |
|  |  |  | $75,000.00 | H |
| Sept. 2017 | KCL6 | $750,000.00 | $450,000.00 | ACA |
|  |  |  | $430,000.00 | G.R. |
|  |  |  | $50,000.00 | South |
| Sept. 2017 | P. | $1,450,000.00 | $20,000.00 | Escrow Fee |
|  |  |  | $212,780.00 | C |
|  |  |  | $750,000.00 | S.I. |
|  |  |  | $319,720.00 | South |
| Sept. 2017 | Spe. | $1,000,000.00 | $60,000.00 | South |
| Sept. 2017 | C | $1,500,000.00 | $2,427,005.28 | W |
| Sept. 2017 | C | $5,000,000.00 | $40,000.00 | S.I. |
|  |  |  | $300,000.00 | C |
|  |  |  | $60,000.00 | C |
|  |  |  | $50,000.00 | Escrow Fee |

| Month/Year | Depositor | Wire in | Wire Out | Recipient |
|---|---|---|---|---|
| | | | $150,000.00 | A.F.A. |
| | | | $105,000.00 | S.C. |
| | | | $231,500.00 | 2E |
| | | | $4,500,000.00 | E |
| Oct. 2017 | P.I. | $708,173.00 | $200,000.00 | South |
| Oct. 2017 | E | $9,000,000.00 | $540,000.00 | ES |
| | | | $2,000,000.00 | WP |
| | | | $3,000,000.00 | H |
| | | | $1,500,000.00 | A.C. |
| | | | $230,000.00 | G.R. |
| | | | $300,000.00 | Ghm |
| | | | $100,000.00 | S.C. |
| | | | $50,00.00 | Escrow Fee |
| | | | $180,000.00 | C |
| | | | $300,000.00 | South Aviation |
| | | | $100,000.00 | K |
| | | | $184,667.72 | South |
| Oct. 2017 | T.B. | $250,000.00 | $100,000.00 | A.C. |
| Nov. 2017 | T.B. | $440,000.00 | $780,000.00 | G.A.T. |
| Nov. 2017 | G.A.T. | $2,805,000.00 | $690,000.00 | T.B. |
| | | | $2,285,000.00 | N770SW |
| | | | $50,000.00 | Escrow Fee |
| | | | $90,000.00 | South Aviation |
| Nov. 2017 | E | $5,000,000.00 | $3,000,000.00 | W.P |
| | | | $1,500,000.00 | A.C. |
| | | | $50,000.00 | Escrow Fee |
| | | | $268,33.32 | F.W. |
| Nov. 2017 | C | $500,000.00 | $356,400.00 | J.A.A. |
| Nov. 2017 | H.A. | $1,880,000.00 | $2,000,000.00 | W.P.F. 2000 |
| | | | $10,000.00 | Escrow Fee |
| | | | $40,000.00 | G.C. |
| Nov. 2017 | N546MG | $550,000.00 | $117,000.00 | C |
| | | | $217,000.00 | 2E |
| | | | $100,000.00 | South Aviation |
| | | | $78,000.00 | Insurance |
| | | | $46,296.59 | J.A.A. |
| | | | $100,000.00 | P.S. |
| | | | $50,000.00 | T |
| Nov. 2017 | WP | $7,000,000.00 | $4,000,000.00 | C |
| | | | $567,000.00 | WP |

| Month/Year | Depositor | Wire in | Wire Out | Recipient |
|---|---|---|---|---|
| | | | $312,000.00 | G.R. |
| | | | $1,000,000.00 | S.I. |
| | | | $40,000.00 | L.B. |
| | | | $82,000.00 | S |
| | | | $50,000.00 | Escrow Fee |
| | | | $57,970.09 | South Aviation |
| Dec. 2017 | S | $750,000.00 | $311,238.00 | J.S.C.X. |
| | | | $80,000.00 | A.F. |
| | | | $60,000.00 | C |
| Dec. 2017 | C | $9,000,000.00 | $9,000,000.00 | G MD |
| | | | $450,000.00 | C MD |
| | | | $50,000.00 | Escrow Fee |
| Dec. 2017 | Spe | $1,500,000.00 | $75,000.00 | S.I. |
| | Spe | $500,000.00 | $25,000.00 | S.I. |
| | | | $1,500,000.00 | C |
| Dec. 2017 | G.A.T. | $1,870,000.00 | $1,750,000.00 | C |
| | | | $20,000.00 | Escrow Fee |
| | | | $100,000.00 | South Aviation |
| Dec. 2017 | N770SW | $1,937,719.96 | $250,000.00 | South Aviation |
| | | | $180,000.00 | H.A. |
| | | | $280,000.00 | C |
| | | | $4,000,000.00 | H |
| Dec. 2017 | C | $3,000,000.00 | $50,000.00 | Escrow Fee |

## COUNT ONE

> Violation:  21 U.S.C. § 846 (Conspiracy to Manufacture and Distribute Cocaine)

That sometime in or about 2012, and continuously thereafter up to and including December 18, 2020, in the Eastern District of Texas, and elsewhere, **Debra Lynn Mercer-Erwin**, **Kayleigh Moffett**, **Guillermo Garcia Mendez**, **Federico Andres Machado**, **Carlos Rocha Villaurrutia**, **Alban Gerardo Azofeifa-Chacon**, **Aaron Bello-Millan**, and **Michael Assad Marcos**, defendants, did knowingly and intentionally combine, conspire, and agree with other persons known and unknown to the United

States Grand Jury, to knowingly and intentionally possess with the intent to distribute

five kilograms or more of a mixture and substance containing a detectable amount of

cocaine, a schedule II controlled substance, a violation of 21 U.S.C. § 841(a)(1).

In violation of 21 U.S. § 846.

## COUNT TWO

> Violation:  21 U.S.C. § 963 (Conspiracy to
> Manufacture  and  Distribute  Cocaine
> Intending, Knowing, and with Reasonable
> Cause to Believe that the Cocaine will be
> Unlawfully Imported into the United States)

That sometime in or about 2012, and continuously thereafter up to and including

December 18, 2020, in Colombia, Ecuador, Panama, Costa Rica, Guatemala, Mexico,

Belize, Venezuela, and elsewhere, **Debra Lynn Mercer-Erwin**, **Kayleigh Moffett**,

**Guillermo Garcia Mendez**, **Federico Andres Machado**, **Carlos Rocha Villaurrutia**,

**Alban Gerardo Azofeifa-Chacon**, **Aaron Bello-Millan**, and **Michael Assad Marcos**,

defendants, did knowingly and intentionally combine, conspire, and agree with other

persons known and unknown to the United States Grand Jury, to knowingly and

intentionally manufacture and distribute five kilograms or more of a mixture and

substance containing a detectable amount of cocaine, a schedule II controlled substance,

intending, knowing, and having reasonable cause to believe that such substance would be

unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a) and 960.

In violation of 21 U.S.C. § 963.

## COUNT THREE

Violation: 21 U.S.C. § 959, 18 U.S.C. § 2 (Manufacturing and Distributing Five Kilograms or More of Cocaine Intending, Knowing and with Reasonable Cause to Believe that the Cocaine will be Unlawfully Imported into the United States)

That sometime in or about 2012, and continuously thereafter up to and including December 18, 2020, in Colombia, Ecuador, Panama, Costa Rica, Guatemala, Mexico, Belize, Venezuela, and elsewhere, **Debra Lynn Mercer-Erwin**, **Kayleigh Moffett**, **Guillermo Garcia Mendez**, **Federico Andres Machado**, **Carlos Rocha Villaurrutia**, **Alban Gerardo Azofeifa-Chacon**, **Aaron Bello-Millan**, and **Michael Assad Marcos**, defendants, aided and abetted by each other, did knowingly and intentionally manufacture and distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, intending, knowing, and with reasonable cause to believe that such cocaine would be unlawfully imported into the United States.

In violation of 21 U.S.C. § 959.

## COUNT FOUR

Violation: 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering)

From in or about 2016, and continuing thereafter up to and including December 18, 2020, in the Eastern District of Texas, and elsewhere, **Debra Lynn Mercer-Erwin**, **Kayleigh Moffett**, **Guillermo Garcia Mendez**, **Federico Andres Machado**, **Carlos Rocha Villaurrutia**, and **Michael Assad Marcos**, defendants, did knowingly combine,

conspire, and agree together and with others known and unknown to the Grand Jury, to commit offenses against the United States in violation of 18 U.S.C. §§ 1956 and 1957, that is:

(a)      to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, wire fraud in violation of 18 U.S.C. §§ 1343, 1349; distribution or conspiracy to distribute or possess with the intent to distribute a controlled substance in violation of 21 U.S.C. § 846; and distribution or conspiracy to distribute or possess with the intent to distribute a controlled substance to a place in the United States from or through a place outside the United States in violation of 21 U.S.C. §§ 959 and 963, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i);

(b)      to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, wire fraud and conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343, 1349; distribution or conspiracy to distribute or possess with the intent to distribute a controlled substance in violation of 21 U.S.C. § 846; distribution or conspiracy to distribute or possess with the intent to distribute a

controlled substance to a place in the United States from or through a place outside the

United States in violation of 21 U.S.C. §§ 959 and 963; and interstate and foreign

transportation of stolen property in violation of 18 U.S.C. § 2314, knowing that the

transactions were designed in whole and in part to conceal and disguise the nature,

location, source, ownership, and control of the proceeds of specified unlawful activity,

and that while conducting and attempting to conduct such financial transactions, knew

that the property involved in the financial transactions represented the proceeds of some

form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(2)(B)(i); and

(c)     to knowingly engage and attempt to engage, in monetary transactions by,

through, and to a financial institution, affecting interstate and foreign commerce, in

criminally derived property of a value greater than $10,000, and such property having

been derived from a specified unlawful activity, that is, wire fraud; distribution or

conspiracy to distribute or possess with the intent to distribute a controlled substance; and

distribution or conspiracy to distribute or possess with the intent to distribute a controlled

substance to a place in the United States from or through a place outside the United

States, in violation of 18 U.S.C. § 1957.

In violation of 18 U.S.C. § 1956(h).

## COUNT FIVE

> Violation: 18 U.S.C. § 371 (Conspiracy to
> Commit Export Violations)

All prior allegations are re-alleged and incorporated by reference as though fully set

forth herein.

### Introduction

The U.S. Department of Commerce, through the U.S. Census Bureau and the U.S.

Department of Homeland Security, Customs and Border Protection, participates in and

maintains the Automated Export System (AES), an electronic portal of information for

exports of goods from the United States.  Both the Census Bureau and the Bureau of

Industry and Security, also within the Department of Commerce, require the filing of

electronic export information (EEI) through the AES (using AESDirect) pursuant to 13

C.F.R. Part 30 and 15 C.F.R. Part 758.  The EEI is also known as a shipper's export

declaration (SED).  The purpose of these requirements is to strengthen the U.S.

Government's ability to prevent the export of certain items to unauthorized destinations

and end users because the AES aids in targeting, identifying, and, when necessary,

confiscating suspicious or illegal shipments prior to exportation. 15 C.F.R. § 30.1(b).

Exporters file EEI by entering data into AES via a computer. 15 C.F.R. § 30.6(a). EEI

includes the date of export, the U.S. principle party of interest, the description of the

commodity to be exported, the intermediate consignee's name and address (if applicable),

the ultimate consignee's name and address, and the country of ultimate destination. 15

C.F.R. § 30.6. Each filing can be identified by a unique Internal Transaction Number.

Exporters, shippers, and freight forwarders, with limited exceptions inapplicable here, are required to file an EEI for every export of goods or technology from the United States that has a value greater than $2,500 or for which an export license was required.  15 C.F.R. § 758.1(b)(5); 15 C.F.R. § 30.2.

## The Agreement

Sometime in or about 2014, and continuously thereafter up to and including December 18, 2020, in the Eastern District of Texas, and elsewhere, the defendants **Debra Lynn Mercer-Erwin**, **Kayleigh Moffett**, and **Michael Assad Marcos** did knowingly conspire with each other and with other persons, both known and unknown to the Grand Jury, to commit offenses against the United States, specifically:

(i)   Knowingly failing to file an EEI, in violation of 13 U.S.C. § 305; and
(ii) Fraudulently and knowingly attempting to export or send from the United States any merchandise, article, and object contrary to 13 U.S.C. § 305, a law and regulation of the United States, in violation of 18 U.S.C. § 554.

## Manner and Means

It was part of the conspiracy that Debra Mercer-Erwin, Kayleigh Moffett, and Michael Assad Marcos would file or cause to be filed with the FAA documents that either concealed the true ownership of the aircraft, falsely identified the citizenship of the aircraft owner, or that established a trust. If the documents established the trust, the documents would contain misrepresentation and false assurances that the trustee would comply with United States regulations and laws as explained in more detail above in the section titled "The Trust Scheme."  These aircraft were then shipped overseas without the requisite exportation filings under 15 C.F.R. §§ 30.3, 758.1. and 758.2.

## Overt Acts

In furtherance of the conspiracy and to accomplish its objects, at least one of the Defendants committed or cause to be committed, in the Eastern District of Texas and elsewhere, the overt acts described in the section titled "Offending Aircraft Transactions" above.

In violation of 18 U.S.C. §§ 371 and 554, 13 U.S.C. § 305.

## COUNT SIX

> Violation: 18 U.S.C. § 371 (Conspiracy to Commit Registration Violations Involving Aircraft Not Providing Air Transportation in violation of 49 U.S.C. § 46306)

All prior allegations are re-alleged and incorporated by reference as though fully set forth herein.

That sometime in or about 2014, and continuously thereafter up to and including December 18, 2020, **Debra Lynn Mercer-Erwin**, **Kayleigh Moffett, Guillermo Garcia Mendez**, and **Carlos Rocha Villaurrutia**, defendants, did knowingly and intentionally combine, conspire, and agree with other persons known and unknown to the United States Grand Jury, to intentionally obtain and cause to be obtained a certificate authorized to be issued under Title 49, United States Code, Section 44103, that is, an owner's certificate of registration, by knowingly and willfully falsifying and concealing the following material facts with respect to the below aircraft:

| "N" Number | Material Misrepresentation |
|---|---|
| N8286M/N456F | Irvine A. Romero Lozano was the owner of the aircraft and was a United States citizen. |
| N260RC | That AGC would adhere to all regulatory and statutory requirements under United States law. |
| N18BA | That AGC would adhere to all regulatory and statutory requirements under United States law. |
| N305AG | That AGC would adhere to all regulatory and statutory requirements under United States law. |
| N311BD | That AGC would adhere to all regulatory and statutory requirements under United States law. |
| N35531 | Texton did not submit a registration filing and yet operated the aircraft in violation of United States law. |
| N515BA | That AGC would adhere to all regulatory and statutory requirements under United States law. |
| N770SW | The true owner of N770SW. |
| N224EA | The true owner of N224EA. |
| N465BC | The true owner of N465BC. |
| N939RR | The true owner of N939RR. |
| N990PA | The true owner of N990PA. |

## Objects of the Conspiracy

The objects of the conspiracy were: (1) to illegally enrich the conspirators by providing United States registration for aircraft that otherwise would not qualify for registration; (2) avoid compliance with United State regulatory and statutory requirements; and (3) to conceal the prohibited activities from the United States government as to avoid penalties, deregistration of the above listed aircraft, and disruption of the illegal activity.

**Manner and Means of the Conspiracy**

It was part of the conspiracy and among the manner and means that some of the defendants, aided and abetted by each other and others: (1) either entered into a series of contracts that hid ownership, possessory, and citizenship information related to the aircraft; (2) to transmit  this information or cause this information to be transmitted to the FAA by wire in foreign or interstate commerce; and (3) to obscure the true end use of the aircraft and compliance with United States laws.

**Overt Acts**

In furtherance of the conspiracy and to accomplish its objects, at least one of the Defendants committed or cause to be committed, in the Eastern District of Texas and elsewhere, the overt acts described in in the section titled "Offending Aircraft Transactions" above.

In violation of 18 U.S.C. § 371 and 49 U.S.C. § 46306.

## COUNT SEVEN

Violation: 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud)

All prior allegations are re-alleged and incorporated by reference as though fully set forth herein.  From in or about 2016, and through in or about December 18, 2020, the exact dates being unknown to the Grand Jury, in the Eastern District of Texas and elsewhere, **Debra Lynn Mercer-Erwin**, **Kayleigh Moffett**, and **Federico Andres Machado,** along with others, both known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree to violate 18 U.S.C. § 1343, wire

fraud, that is to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce any writings, signs, signals, pictures, and sounds for the purpose of executing a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises.

### Purpose of the Conspiracy

It was the general purpose of the conspiracy for the defendants and their co-conspirators to defraud victim investors, illegally funnel investment money designated for aircraft purchases into foreign investments, and to conceal from the victim investors that their investment funds were not being used to purchase aircraft.

### Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

- **Step 1:** The lender agrees to lend the fraudulent buyer a refundable deposit. The fraudulent buyer secures a loan and now owes the lender interest. The "hardening" of the deposit into a non-refundable deposit is contingent upon the illegitimate buyer's successful inspection of the aircraft and other things.

- **Step 2:** The lender's deposit money is placed into an escrow company's escrow account, which is always designated by the fraudulent buyer, i.e. WBAT.

- **Step 3:** The fraudulent buyer never inspects the aircraft because the aircraft either does not exist (e.g., has been decommissioned) or is not actually for sale (e.g., belongs to a commercial airline). WBAT transfers the refundable deposit into accounts designated by the fraudulent buyer to be used for other purposes, and not for the purchase of the designated aircraft. WBAT is compensated for

these fraudulent transactions with money taken from the escrow account as well. As a result, the deal falls through and the deposit does not harden.

- **Step 4:** The fraudulent buyer then secures another loan from another lender for the purchase of another unsellable aircraft. This loan pays for the principle and interest owed for the previous aircraft transaction involving WBAT and the fraudulent buyer.

<strong>Acts in Furtherance of the Conspiracy</strong>

In furtherance of the conspiracy and to achieve its objects and purpose, at least one of the defendants committed and caused to be committed, in the Eastern District of Texas and elsewhere, the acts described in in the section titled "The Ponzi Scheme."

All in violation of 18 U.S.C. § 1349.

<strong><u>NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE</u></strong><br>
18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), and 982(a)(2); 21 U.S.C. §§ 853, 881(a), and 970;<br>
28 U.S.C. § 2461; 49 U.S.C. § 46306(d); and 50 U.S.C. § 4819(d)

As a result of committing the offenses as alleged in this Third Superseding Indictment, defendants shall forfeit to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), and 982(a)(2); 21 U.S.C. §§ 853, 881(a), and 970; 28 U.S.C. § 2461; and 49 U.S.C. § 46306(d) any property constituting, or derived from, proceeds obtained directly, or indirectly, as a result of the said violations, and any property used, or intended to be used in any manner or part, to commit or to facilitate the commission of the said violations, including but not limited to the following:

**Money Judgment**

A sum of money equal to $350,000,000 in United States currency, and all interest and proceeds traceable thereto, representing the amount of proceeds obtained by defendants as a result of the offenses alleged in this Third Superseding Indictment.

**Aircraft**

a.   A Cessna T210K, Serial No. 21059286, United States Registered Number N8286M

b.   A Beech 200, Serial No. BB413, United States Registration number N456PF

c.   A Lear 31A, Serial No. 080, United States Registered Number N260RC

d.   A Gulfstream G-1159, Serial No. 236, United States Registered Number N311BD

e.   A British Aerospace BAE 125-800A, Serial No. 258013, United States Registered Number N305AG

f.   A Cessna 560, Serial No. 560-0068, United States Registered Number N569LM

g.   A Gulfstream G-1159A, Serial No. 332, United States Registered Number N939RR

h.   A Gulfstream G-IV, Serial No. 1087, United States Registered Number N368AG

i.   A Hawker 800 XP, Serial No. 258740, United States Registered Number N740HB

**Substitute Assets**

If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a.   cannot be located upon the exercise of due diligence;
b.   has been transferred or sold to, or deposited with, a third person;
c.   has been placed beyond the jurisdiction of the court;
d.   has been substantially diminished in value; or
e.   has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of defendants up to the value of the above forfeitable property, including but not limited to all property, both real and personal, owned by the defendants.

By virtue of the commission of the felony offenses charged in this First Superseding Indictment, any and all interest defendants have in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461.

A TRUE BILL

_____
GRAND JURY FOREPERSON

NICHOLAS J. GANJEI
ACTING UNITED STATES ATTORNEY

_____
ERNEST GONZALEZ
COLLEEN BLOSS
ROBERT AUSTIN WELLS
Assistant United States Attorneys

_____
Date   2/24/21

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 4:20-CR-212 |
| | § | Judge Mazzant |
| DEBRA LYNN MERCER-ERWIN (1) | § | |
| KAYLEIGH MOFFETT (2) | § | |
| GUILLERMO GARCIA MENDEZ (3) | § | |
| FEDERICO ANDRES MACHADO (4) | § | |
| CARLOS ROCHA VILLAURRUTIA (5) | § | |
| ALBAN GERARDO AZOFEIFA-CHACON (6) | § | |
| AARON BELLO-MILLAN (7) | § | |
| MICHAEL ASSAD MARCOS (8) | § | |

## NOTICE OF PENALTY

### Count One

<u>Violation</u>:     21 U.S.C. § 846

<u>Penalty</u>:     If 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine – not less than 10 years and not more than life imprisonment, a fine not to exceed $10 million, or both. A term of supervised release of at least five years

<u>Special Assessment</u>:  $100.00

### Count Two

<u>Violation</u>:     21 U.S.C. § 963

<u>Penalty</u>:     <u>Violation</u>:     21 U.S.C. § 963

<u>Penalty</u>:     Imprisonment for not less than ten years or more than life, a fine not to exceed $10,000,000.00 or both.  A term of supervised release of at least five years.

Special Assessment:  $100.00

## Count Three

Violation:      21 U.S.C. § 959

Penalty:        Imprisonment for not less than ten years or more than life, a fine not to exceed $10,000,000.00 or both.  A term of supervised release of at least five years

Special Assessment:  $100.00

## Count Four

Violation:      18 U.S.C. § 1956(h) and 1956(a)(2)(A) and (a)(2)(B)(i)

Penalty:        Not more than 20 years imprisonment; a fine not to exceed $250,000 or twice the pecuniary gain or loss. A term of supervised release of not more than 3 years.

Special Assessment:  $100.00

## Count Five

Violation:      18 U.S.C. § 371 (Conspiracy to Commit Export Violations)

Penalty:        Not more than 10 years imprisonment; a fine not to exceed $250,000 or both. A term of supervised release of not more than 3 years.

Special Assessment:  $100.00

## Count Six

Violation:      18 U.S.C. § 371 (Conspiracy to Commit Registration Violations Involving Aircraft, Not Providing Air Transportation in violation of 49 U.S.C. § 46306)

Penalty:        Not more than 5 years imprisonment to be served in addition to, and not, concurrently with, any other term of imprisonment imposed on the

individual; a fine not to exceed $250,000, or both. A term of supervised release of not more than 3 years.

Special Assessment:  $100.00

## **Count Seven**

Violation:     18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud)

Penalty:      Not more than 20 years imprisonment; a fine not to exceed $250,000 or both. A term of supervised release of not more than 5 years.

Special Assessment:  $100.00