# EXHIBIT E

1              IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE WESTERN DISTRICT OF OKLAHOMA

3                                      )
4    In re:                            )
                                       )
5    WRIGHT BROTHERS AIRCRAFT TITLE,   )
     INC.                              )
6                                      )    CASE NO. 21-10994-JDL
              Putative Debtor.         )    Involuntary Chapter 7
7                                      )
                                       )
8                                      )
                                       )
9                                      )

10

11                      * * * * * *

12          TRANSCRIPT OF AUDIO-RECORDED PROCEEDINGS

13               BEFORE JANICE D. LOYD

14            UNITED STATES BANKRUPTCY JUDGE

15                   MAY 26, 2021

16                  * * * * * * *

17

18

19

20

21

22

23

24

25   Proceedings recorded by digital audio recording; transcript
     produced by computer-aided transcription.

*Emily Eakle, CSR*

1                          APPEARANCES

2

   **ON BEHALF OF WRIGHT BROTHERS AIRCRAFT TITLE, INC.:**
3
   MR. MARK B. TOFFOLI
4  Gooding Law Firm
   204 North Robinson, Suite 650
5  Oklahoma City, Oklahoma  73102

6  MR. JOHN W. COYLE, III
   Coyle Law Firm
7  125 Park Avenue, First Floor
   Oklahoma City, Oklahoma  73102
8

9  **ON BEHALF OF METROCITY HOLDINGS, LLC:**

10 JOHN T. RICHER
   STEVEN W. SOULE
11 Hall Estill
   320 South Boston Avenue, Suite 200
12 Tulsa, Oklahoma 74103

13
   **ON BEHALF OF THE UNITED STATES TRUSTEE:**
14
   M.J. CREASEY
15 U.S. Trustee Office
   215 Dean A. McGee Avenue
16 Oklahoma City, Oklahoma

17
   **ON BEHALF OF CCUR AVIATION FINANCE, LLC:**
18
   DAVID WEITMAN
19 K&L GATES
   1717 Main Street, Suite 2800
20 Dallas, Texas  75201

21 ANDREW BOWMAN
   Foliart Huff Ottaway & Bottom
22 201 Robert S. Kerr, Suite 1200
   Oklahoma City, Oklahoma  73102
23

24

25

```
1                        APPEARANCES (continued)
2

3    ON BEHALF OF MARK BRYN, SHAWN CHEMTOV, MICHAEL HORVITZ,
      ERWIN SREDNI AND JONATHAN SREDNI:
4
     CRAIG M. REGENS
5    Gable Gotwals
     211 North Robinson, 15th Floor
6    Oklahoma City, Oklahoma  73102

7
     ON BEHALF OF THE GOVERNMENT:
8
     ROBERT WELLS
9    Assistant United States Attorney
     110 North College
10   Tyler, Texas  75702

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      (Proceedings audio-recorded on MAY 26, 2021.)

2          THE COURT:  All right.  Good morning, everyone.

3  This is the status conference docket for May 26, 2021.  And

4  the case before the Court today is Case No. 21-10994, Wright

5  Brothers Aircraft Title, Inc.  And today the Court has set

6  this status -- this case for status in an effort for me to

7  understand from the parties what it is we're hoping to

8  accomplish if this case were to go forward.

9      The Court is aware that a proposed order for relief has

10  been entered by the parties.  I have reviewed that.  But

11  before I enter such an order, the Court needs to understand

12  whether or not the Court should actually take jurisdiction

13  in this case.  As the parties are aware, the Court can

14  abstain from entering the order for relief in this

15  particular case.

16      And as a consequence, I have reviewed the pleadings

17  before the Court, the involuntary petition.  I am also aware

18  and will take judicial notice of a criminal proceeding that

19  is pending in the Eastern District of Texas.  The Court has

20  been provided with the fifth superseding indictment that has

21  been issued against the principal of the putative debtor in

22  this case.

23      The Court is also aware of a receivership proceeding

24  that is pending in the Southern District of Florida

25  involving the same creditors.  Not the same debtor,

1    obviously.  And to my knowledge, Wright Brothers Aircraft

2    Title, Inc. is not a named defendant in the criminal

3    prosecution, nor is it currently a named defendant in that

4    receivership proceeding in Florida.

5         So the Court is aware of those matters that are pending

6    around the country with regard to the debtor's principals,

7    as well as other matters, and involving these creditors and

8    involving the same dollars, from what I can tell.

9         So the purpose of this hearing today, or this

10   conference today, is just to get a feel for what the parties

11   are anticipating, the motivation for filing this involuntary

12   proceeding, why it's in the best interest of creditors to

13   have a bankruptcy in light of the fact of two other

14   proceedings currently pending.  I also want to hear from the

15   U.S. trustee's office because I have concerns about

16   appointing a Chapter 7 panel trustee in this case under the

17   facts and circumstances as we know it.

18        So I want to begin first with taking appearances, and I

19   will do a little bit of housekeeping.  I will tell you, if

20   you have been vaccinated, you can remove your mask.  If you

21   have not been vaccinated, you need to keep your masks on.

22   And if you have not been vaccinated, then try to stay in one

23   place and don't mill about the courtroom.  We'll still try

24   to be socially distant.

25        So let me start first with the appearances on behalf of

1   the debtor.  If you will enter your appearance for the

2   record.

3        Debtor go ahead and turn -- well, all right.  They can

4   come up to the podium.  Mr. Toffoli, thank you.

5            MR. TOFFOLI:  Thank you.  Good morning, Your

6   Honor.  Mark Toffoli and John Coyle --

7            MR. COYLE:  Good morning, Judge.

8            THE COURT:  Good morning, John Coyle.

9            MR. TOFFOLI:  -- for Wright Brothers Aircraft

10  Title.

11           THE COURT:  I haven't seen you in forever.  It's

12  good to see you.

13       Thank you, Mr. Toffoli.

14       All right.  On behalf of Metrocity Holdings, LLC, if

15  you would enter your appearance, please.

16           MR. RICHER:  Good morning, Your Honor.  John

17  Richer and my partner Steve Soule for Metrocity Holdings.

18           THE COURT:  Thank you, sir.

19           MR. SOULE:  Good morning, Your Honor.

20           THE COURT:  Good morning.

21       All right.  On behalf of CCUR Holding, Inc., if you

22  would enter your appearance, please.

23           MR. BOWMAN:  Good morning, Your Honor, Andrew

24  Bowman on behalf of CCUR Holdings, Inc.

25           THE COURT:  All right.  And you also have

1    Mr. David Weitman.  Is he on the phone?

2              MR. BOWMAN:  Correct, Your Honor.

3              THE COURT:  Mr. Weitman, if you would enter your

4    appearance, please, for the record.

5              MR. WEITMAN:  Good morning, Your Honor.  David

6    Weitman with the law firm of K&L Gates on behalf of both

7    CCUR Holdings, together with the aviation affiliate.

8              THE COURT:  All right.  Thank you, sir.

9              MR. WEITMAN:  Thank you.

10             THE COURT:  All right.  On behalf of the U.S.

11   trustee, please.

12             MS. CREASEY:  Good morning, Your Honor.  M.J.

13   Creasey for the U.S. trustee.  And I believe Mr. Wells with

14   the assistant United States attorney's office is on the

15   phone.

16             THE COURT:  All right.  Thank you, Ms. Creasey.

17       And, Mr. Wells, are you on the line, sir?

18             MR. WELLS:  Yes, Your Honor, I am.  This is Robert

19   Coffee Wells, assistant United States attorney for the

20   Eastern District of Texas for the United States.

21             THE COURT:  Thank you.

22       And I have also received an entry of appearance on

23   behalf of Chemtov and various other creditors.  Mr. Regens,

24   do you wish to make an appearance, sir?

25             MR. REGENS:  Good morning, Your Honor.  Craig

*Emily Eakle, CSR*

1   Regens of Gable Gotwals.

2          THE COURT:  All right.  Thank you, sir.

3      All right.  Those are the entries of appearances that I

4   have received in the case thus far.  I understand there

5   might be some other folks on the phone.  Although I haven't

6   received entries of appearances, I understand that they will

7   be participating by listening in to this proceeding today.

8      All right.  I want to start first with the petitioning

9   creditors.  Let's start with Metrocity Holdings, LLC.

10  Mr. Richer, if you will kind of walk through for the Court

11  kind of what led up to filing the involuntary in light of

12  the Southern District of Florida proceeding, as well as the

13  Eastern District of Texas criminal matter, sir.  Thank you.

14          MR. RICHER:  Thank you, Your Honor.  And again,

15  John Richer for Metrocity.

16     I have been involved in this case heavily since

17  mid-January of this year.  And this case is a large case, as

18  Your Honor has already pointed out, with proceedings in

19  other jurisdictions.  There are hundreds of millions of

20  dollars at issue here.

21     Basically, I -- I will tell you a bit about my client.

22  My client is an investor, financed aircraft deals using

23  Wright Brothers as an escrow agent.  My client, as well as

24  the other petitioning creditors, had escrow agreements with

25  the debtor that had certain conditions that had to be met

*Emily Eakle, CSR*

1    before the money that was used to finance these transactions

2    could be released.  And basically, in early January, my

3    client learned that the principal of Wright Brothers had

4    been indicted.  We did not know the details of the

5    indictment at that time because it was sealed, but obviously

6    that caused a bit of a panic.  And immediately upon learning

7    of that information, my client under the escrow agreement

8    made demand for the return of our money.

9        Those requests and demands were not responded to.  And

10   at that point we had $29 million in the escrow account, and

11   that started a process where we looked at filing a federal

12   court action, which we subsequently did, but with the eye of

13   having a receiver, a court-appointed receiver over Wright

14   Brothers just to try to figure out what's going on.

15       As you can imagine, once the indictment became sealed,

16   lawyers started getting hired, the creditors started

17   talking, the investor creditors.  I'll make sure I make a

18   distinction between investor and non-investor creditors

19   here.  And it became clear that my client was one of many

20   other similarly situated folks that were making these

21   investments using Wright Brothers as an escrow agent.  And

22   the total losses, just with the investor class, is anywhere

23   from a quarter of a billion dollars to a half a billion

24   dollars of losses.

25       It became clear that once Mr. Wells' office began a

1    process of -- of working with the principals in the criminal

2    indictment to start seizing money for -- from Wright

3    Brothers, as I understand it, in January or December, the

4    federal government seized the Wright Brothers' accounts that

5    were held at Bank of America.  We understand that

6    approximately 12 million money in those accounts for Wright

7    Brothers were -- the government took custody and control of

8    that money.  So we started communicating with the government

9    and the U.S. attorney's office with respect to what they

10   were doing with these claims.

11       As we got into the process and realized that Wright

12   Brothers, this was a Ponzi scheme, allegedly learned about

13   what that entailed, learned that the money was likely gone,

14   at that particular moment a federal court receiver didn't

15   make a whole lot of sense because what assets of Wright

16   Brothers are potentially left for there -- to administer on

17   a receivership basis.

18       As we got into the -- to the case and learned about the

19   various transactions, learned about the $12 million, learned

20   about potential assets that Wright Brothers had, the

21   critical asset that we learned about were insurance

22   policies, crime loss policies that the debtor had taken out

23   with syndicates of Lloyds of London, potentially over

24   $60 million in coverage under various policies.  And we

25   began a process of communicating with Lloyds of London on

1    those policies to try to learn more about what our clients'

2    rights were, since we didn't have the policies.

3         One of the names I'm certain Your Honor has heard of is

4    Fredrick Machado, who was a broker on these deals and was a

5    purported buyer on these scam transactions, and the person

6    who's alleged to have taken the escrow account money and

7    swept them with the principal's permission.

8         Once we learned about those policies, worked with

9    Lloyds of London to try to figure out what the coverage was

10   and what the insurance was.  It became very clear to us

11   that, through various sources, that Lloyds and Wright

12   Brothers, through Ms. Mercer-Erwin, were going to rescind

13   those policies.  And they were going to do a mutual

14   rescission where the policies be rescinded on the basis of

15   alleged fraud that the principal would agree occurred, the

16   refund would go back to the federal government, and

17   potentially $60 million in coverage that could pay some of

18   these claims would be eviscerated.

19        On that point, because we believe that rescission was

20   imminent, had that information, that is the primary reason

21   why petitioning creditors filed for bankruptcy.  Under these

22   crime loss policies, the debtor is a named insured.  And my

23   clients, and many others, including those represented by

24   Mr. Regens, are loss payees under those policies, which

25   means we have certain rights under those policies.  We would

1    have no rights under those policies if they had been

2    rescinded.  So we stopped -- we filed a bankruptcy to try to

3    stop that.

4         Immediately after the bankruptcy was filed, we had

5    calls with counsel from Lloyds of London, who acknowledged

6    the bankruptcy filing and the automatic stay, told us that

7    they were not going to rescind the policies, and were

8    looking at their options in terms of enforcing -- you know,

9    filing a dec action to determine coverage to possibly, you

10   know, seek relief from the automatic stay to proceed with

11   the rescission, et cetera.

12        Given the potential of $60 million in insurance where

13   the debtor is a named insured and has potential rights under

14   those policies, given the 10 -- the $12 million that the

15   U.S. attorney has seized, and apparently has made payments

16   to non-investor creditors, given those assets and other

17   assets that we're aware of -- Ms. Mercer-Erwin has a related

18   company called Aircraft Guarantee Corp., which I'm sure Your

19   Honor saw on the indictment, that was also used as part of

20   the alleged criminal activity that occurred in that -- in

21   the indictment, we have got reason to believe that those

22   are -- there's fraudulent transfers of the (audio break)

23   from those entities, they may be alter egos of each other.

24        You have got that potential asset.  You have got

25   potential clawbacks from numerous parties that may have

1    occurred.  We don't have a debtor's books and records.  We
2    don't know the full extent of what monies the U.S.
3    government seized and has paid back to folks that were not
4    investor in these aircraft financing deals, but rather, they
5    were simply folks who were using Wright Brothers to
6    finance -- just like you and I would buy a house, put the
7    money in escrow.  Apparently some of those folks have gotten
8    refunds, but we don't know what those look like, we don't
9    know who's gotten it.  We do know it's Wright Brothers'
10   money.
11         So to put it simply, Your Honor, we filed a bankruptcy
12   to get some transparency, to have a trustee come into this
13   case, analyze the books and records of the debtor, analyze
14   the transaction, analyze the rights that the debtor has
15   under these insurance policies to figure out who may have
16   gotten a transfer that could be recovered or clawed back, to
17   figure out who and what is property of the bankruptcy estate
18   from the monies that the government has given back.  Is it
19   money that is legitimately money that was commingled into an
20   account which we understand that should be paid to the
21   benefit of all creditors, or is it money that is rightfully
22   in the hands of parties that had nothing to do with the
23   Ponzi scheme.
24         We need a trustee, we believe, to analyze those issues,
25   to look at them, and to decide in a transparent manner

1    through an open process in bankruptcy to let everyone know

2    where it stands.

3         And it may eventually -- through that process, we -- we

4    parties will assert their rights, the government will

5    certainly assert its rights.  It claims it has a section to

6    the automatic stay.  I did note Your Honor's comment that

7    Wright Brothers is not a defendant in any criminal

8    proceeding.  So we obviously have a position on that, but we

9    respect the efforts that the U.S. attorney has done.  We

10   just believe that those efforts need to be transparent.  The

11   best mechanism for this is a bankruptcy.

12        Now, Your Honor mentioned Wright Brothers -- the

13   receivership action going on in Florida.  That is going on.

14   I'm involved in that case in Florida.  That is a

15   receivership over South Aviation, which is a Machado-owned

16   entity that defrauded all these parties.  And the -- there

17   are two different entities, two different sets of assets.

18        The receivership in Florida is focused on potential

19   mining entities in Guatemala.  Mr. Machado is a native of

20   Argentina, but he was funneling the monies that he was

21   stealing from our clients through the Ponzi scheme into two

22   different mines in Guatemala.  One is a gold mine called El

23   Pato, and one is another mine that -- lead, ore, different

24   types of minerals.  And working the -- the receiver through

25   that Holland & Knight firm, Ms. Barbara Martinez, is a

1    court-appointed receiver in Florida, is working to
2    potentially bring one or both of those mines back into that
3    receivership estate and just see if there's anything he can
4    do to liquidate those for the benefit of creditors.  But
5    those are monies that were owned solely by Machado and his
6    company, different assets.
7            THE COURT:  Okay.  Hang on just a minute.  I have
8    read her -- she has filed in that proceeding a receiver's
9    first 30-day report.
10           MR. RICHER:  Right.
11           THE COURT:  And on Page 16 of this report she
12   indicates that she has consulted with the prosecutor in the
13   Texas proceeding, as well as the receivership entities, and
14   anticipates filing a motion for order expanding the
15   receivership over Wright Brothers.  So have you-all had
16   conversations with her?
17           MR. RICHER:  Did you "abstaining," Your Honor?
18           THE COURT:  Expanding --
19           MR. RICHER:  Oh, expanding.  Yes.  Of course, yes.
20           THE COURT:  -- the receivership over Wright
21   Brothers --
22           MR. RICHER:  Yes.  Yes.  Absolutely we have had
23   those conversations, and the last one was a conference call
24   with the receiver and the various attorneys and parties on
25   Friday.  And at that time they were certainly aware of the

1    involuntary filing, but they were not aware of the potential

2    for entry of an agreed order, because at that point it

3    looked like it was going to be a contested involuntary.  And

4    once they realized that it looks like the debtor's going to

5    agree, we're not going to have a fight, subject to Your

6    Honor's jurisdiction to take the case, their position, I

7    understand, is not going to be to expand that receivership.

8              THE COURT:  Okay.

9              MR. RICHER:  Because they would be going over

10   assets that, frankly, as a -- that was not assets of the

11   receivership estate as we sit here today, so they would have

12   to expand it.  And their sense, from conversations with

13   their attorneys for the receiver, is that the federal judge,

14   Judge Bloom, would respect the bankruptcy proceeding

15   involving different types of assets.

16             THE COURT:  Sure.

17             MR. RICHER:  So that's why I mentioned earlier,

18   Your Honor, that they were focused mainly on mining assets.

19   They have had numerous conversations with Mr. Wells' office.

20   I'm not sure the extent of anything that's been agreed to

21   with respect to those assets, but my sense, obviously I'm

22   not the receiver, but they are going to focus on the mining

23   assets in Guatemala which could provide a potential

24   recovery, as well as potential claw-back actions of funds

25   that may have gone through that receivership estate.

```
1              THE COURT:  The other major concern that she

2    expresses in this report in several instances, but one in

3    particular, is that there's not a lot of funds --

4              MR. RICHER:  Right.

5              THE COURT:  -- liquid assets in which to retain

6    forensic accountants and -- and do the actual job that's

7    necessary to explore all of these avenues that you're

8    talking about.

9              MR. RICHER:  Right.

10             THE COURT:  So in this particular case as well,

11   I'm aware that the U.S. attorney has taken over or seized

12   the Wright Brothers' bank accounts --

13             MR. RICHER:  Right.

14             THE COURT:  -- and I have been advised -- and

15   Mr. Wells can share with us in a few moments whatever assets

16   he may be in control of and whatever assets there still may

17   be out there.  How then would a bankruptcy trustee,

18   particularly one of my panel members, how would they go

19   about doing their duties of doing all these investigations

20   when there's no money to pay them at the outset?

21             MR. RICHER:  Right.  So this is not uncommon in

22   any type of large receivership or involuntary bankruptcy.

23   Obviously, there needs to be money to pay the professionals.

24   We don't know the full extent of Wright Brothers' assets,

25   but what we do know is they have some readily liquid assets,
```

*Emily Eakle, CSR*

1   including real estate that Wright Brothers owns that has a

2   mortgage on it, but a significant amount of equity that

3   under an agreement with the U.S. government Wright Brothers,

4   even though they're not a defendant, was going to sell that

5   property, liquidate it, proceeds going to the victim's

6   recovery fund, assuming that that eventually gets

7   formalized.  That would be low-hanging fruit, as I call it,

8   to fund a bankruptcy, because it would be a six-figure

9   amount that is clearly property of the estate.  I mean, I

10  don't think anyone can dispute that if Wright Brothers has

11  legal and equitable ownership over real property with a

12  mortgage and has equity in it, that money comes into the

13  estate.

14      There's obviously the -- and I don't know the figure,

15  but there's money that the U.S. government is holding that

16  came from the Wright Brothers' account that the debtor at

17  least has a legal interest, if not an equitable interest.

18  We don't know the full extent of that.  That's money that

19  can fund a bankruptcy.

20      The debtor, I don't know if it's Wright Brothers'

21  money, but there's property in Alabama that potentially

22  could fund it.  But to me there -- working and trying to

23  bring in 541 property to the estate, the easiest of is real

24  estate, that should fund something to get going.

25      Obviously, the creditors, if an order for relief gets

*Emily Eakle, CSR*

1    entered, is then going to commiserate and communicate with

2    the trustee, who's ever appointed, and do our best to

3    apprise them of what assets we think are out there.

4        There's also the potential -- obviously, we may

5    disagree, but one of the things we recognize in filing an

6    involuntary is that if we're going to ask a trustee to

7    perform an independent good faith analysis of the debtor's

8    rights as a named insured under these policies that I

9    mentioned, that the trustee as a state representative may

10   determine in their judgment that that -- a rescission is

11   appropriate, and that would be -- I'm told those refunds are

12   in excess of 300 to $400,000 of potential money that would

13   come into the estate.

14       And, again, now you have the ability to do subpoenas,

15   you have ability to do accounting and see where the money

16   went.  And a large part of our motivation here is just

17   simply not that we may get a huge payday.  I think that

18   there is money to pay creditors.  Clearly no one's going to

19   get a huge recovery from this, nobody's even anticipating

20   that.  But at the minimum, transparency is critical here.

21   Where did the money go?  We're talking about -- you know, if

22   you read the indictment, the government's quoting half a

23   billion dollars.  That's a significant amount of money that

24   flowed through Wright Brothers.  And this process, through a

25   trustee who's qualified and has a little bit of seed money,

1   as I mentioned, should have the means to do that.

2          THE COURT:  You-all contemplated an election of

3   the trustee under 702 --

4          MR. RICHER:  Correct.

5          THE COURT:  -- to hire a trustee of your choosing

6   that you-all would basically be kind of shepherding through

7   the process and somebody's who's willing to take on this.  I

8   understand there's over a half a billion dollars that we're

9   talking about.  I was a trustee for 21 years, so I know what

10  it takes to do the forensic accounting that's going to be

11  necessary in this sort of quasi criminal, slash, bankruptcy

12  proceeding.  It's going to take a lot of time and a lot of

13  effort.  And I'm just concerned about being able to find the

14  right person to do that job that's necessary to get to the

15  transparency that you're looking for.

16          MR. RICHER:  Right.  And you mentioned one other

17  thing, Your Honor, and I neglected to mention that.  There

18  is, of course, a possibility that the creditors might have

19  to fund that.  And there's mechanisms to get approval

20  through this Court to do that, claims that can be elevated

21  for that, but that's something that may have to be on the

22  table if an order for relief is entered.

23          THE COURT:  All right.  That's what I want to find

24  out.  I want to flesh out what the creditors are willing to

25  do in this case in terms of doing the actual accounting work

1    that's going to be necessary to flush out potential

2    fraudulent transfers, et cetera.

3         Who has possession of these policies, or do you know?

4              MR. RICHER:  Well, we have some of the policies

5    that Lloyds of London, obviously, has taken a strong

6    adversarial posture and -- and has declined to give us the

7    policy that we were loss payee on.  So we -- we worked with

8    them to try to get that.  They haven't provided it.  We have

9    had discussions with them on -- on what the rights are.  We

10   have another policy that we don't know that we're a named

11   loss payee on that we feel comfortable is -- employee of

12   Lloyds of London represents that the policy that we would

13   have, and that's what our position is under that.

14   Obviously --

15              THE COURT:  Okay.

16              MR. RICHER:  -- insurance folks tried to analyze

17   that for our client.

18              THE COURT:  So you have at least one copy of the

19   policy?

20              MR. RICHER:  Yes, we do, Your Honor.  Yes, ma'am.

21              THE COURT:  All right.  Let me hear then from --

22   is it Mr. Bowman or Mr. Weitman who is going to make the

23   presentation on behalf of CCUR Holding, Inc.

24              MR. WEITMAN:  Your Honor, David Weitman, if I may.

25         Good morning, Your Honor, David Weitman, K&L Gates, on

1   behalf of CCUR Holdings, Inc., and CCUR Aviation Finance
2   LLC.  I believe Mr. Richer has provided a fairly good
3   overview of the situation, so the Court gets a sense of
4   things.
5        We entered into -- my clients entered into escrow
6   agreements with Wright Brothers Aircraft Title in each
7   instance where we would be funding or be called refundable
8   deposits that would be kept in an escrow account.  And as we
9   came to learn, in fact, those dollars were wired to South
10  Aviation, and then Mr. Machado for other purposes.
11       In terms of what our motivation was for the
12  involuntary, it's quite simple.  We learned that the
13  principals Wright Brothers were about to cause a rescission
14  of the Wright Brothers' policies, the coverage policies
15  described by Mr. Richer, and we had to move fast, if --
16  that's $60 million or so of coverage that would be lost.
17       Although we only comprise about $14 million of claims,
18  and they are bona fide claims under separate contracts with
19  Wright Brothers under these escrow agreements, there's a
20  larger group of -- pardon me -- 250 million to $500 million
21  of creditors that are similar to us, and we viewed that this
22  would be benefitting the larger group.  It would not be for
23  us, but the larger group.
24       And we understand that the -- with the involuntary
25  having been filed, the automatic stay under 362 kicking in,

1    it stopped the rescission.  And for that, you know, we -- we

2    feel it fertilates a good faith filing for purposes of -- of

3    all of the creditors.

4        Second, Mr. Richer spoke to some of the other things

5    that we envision in the bankruptcy.  We think -- and the

6    Court, I'm sure, has folks in Oklahoma that are well

7    qualified to serve in this capacity where there really needs

8    to be the forensic work, you know, someone that's also well

9    versed in insurance policies, coverage, how to avoid, you

10   know, the -- the types of things and exclusions that are

11   under these insurance policies.  And it sounds like, in many

12   cases, the parties that will be in the best position to

13   prosecute those claims may well be the victims, all right,

14   the costs of -- you know, the fact that that coverage was

15   provided for them.  I think that's going to take quite some

16   time, as Your Honor believes as well.

17       The third point is that, yes, there is a federal court

18   receivership of South Aviation.  That is in Southern

19   District of Florida and that has its own, if you will,

20   theories of assets and recovery actions and the like, and

21   clawbacks that we would envision.  It's almost like one of

22   those Venn diagrams, Your Honor.  So you have got sort of a

23   circle of the federal court receivership of South Aviation,

24   and then another circle, if you will, Your Honor, with the

25   Wright Brothers bankruptcy estate, and probably even a third

1   circle of what the government grabbed and what the

2   government may have done with some of our money in its own

3   process.  And what is interesting here is that in each case,

4   as Your Honor pointed out from having read the various

5   pleadings and the fifth superseding indictment, none of

6   these companies are -- have been indicted.  None of the

7   companies are subject to an asset freeze.  It was through

8   the principals that asset freezes occurred, and we think

9   that is really, you know, perfect for the automatic stay and

10  the clawback rights of a trustee in Oklahoma to bring these

11  dollars back.

12      In terms of funding, Your Honor may have seen a motion

13  for turnover.  While there you have a creditor who also put

14  money into the escrow accounts of Wright Brothers and is --

15  that's $549,000.  We think, and maybe that gentleman who's a

16  counsel to that creditor, we think that those dollars are no

17  different than any of the other dollars that are owned by

18  Wright Brothers.  That certainly is a good source of

19  initial, you know, funding for a Chapter 7 trustee.

20      We, immediately after the answer was filed by

21  Mr. Toffoli, I got on the phone with him and explored

22  exactly why he filed the answer, what he thought was going

23  on.  And later he learned the larger story of what is

24  proceeding in these various actions around the country, and

25  that there is bona fide debt on account of these escrow

1   agreements.

2        And we then drafted, after several revisions, an agreed

3   order because he recognizes that his client -- really there

4   is a basis for the entry of an order for relief.  Wright

5   Brothers is not paying its debts.  We're talking $250

6   million plus.  It has ceased operations, from what we

7   understand.  And at this point his concerns are his client,

8   his principals of the client.  They are under indictment and

9   they are going to need to take the Fifth Amendment at any

10  341 meeting, and they certainly don't want to be in the

11  position of signing schedules of assets and liabilities.

12       So he and I kind of crafted an order with workarounds

13  so that there would be the cooperation of the principals,

14  but yet the trustee having received the various materials

15  and books and records from the principals would then be in a

16  position designated to file these -- these pleadings with

17  the Court.

18       We would ask the Court to consider, you know, given the

19  folks that are -- that have done similar types of, you know,

20  bankruptcy proceedings with -- with Ponzis and insurance

21  issues and clawbacks and the like, you know, what -- who the

22  Court thinks is qualified.  So the Court might choose

23  someone off the panel.  That would be helpful.  It may be

24  there would be some names or something and Mr. Richer and I

25  can look at those and have a few minutes to visit with the

1   client and confirm, that, yeah, that sounds like the one.

2        I don't know how the election would actually work at

3   this point, you know, with meeting the -- the requirements,

4   but there has been no talk, at least I am not aware of any

5   talk about an actual election of someone that we have in

6   mind.

7        Your Honor, reserved additional time for, you know, if

8   the Court has any questions, please.

9        THE COURT:  Thank you, Mr. Weitman.  Let me be

10  clear, the Court does not appoint the trustee.  The U.S.

11  trustee's office appoints the trustee.  So that should --

12  any questions or comments regarding potential panel member

13  trustees or an election would go through their office.

14       Ms. Creasey, let me hear from you real quick, because

15  I'm not sure if you have had a lot of time to review this

16  case at this point, but I am curious if you have had an

17  opportunity to canvass any of the panel members to see if

18  there is a panel member that's expressed interest in this

19  case or expressed disinterest in this case.

20       MS. CREASEY:  We have not had an opportunity to

21  canvass members.

22       THE COURT:  All right.

23       MS. CREASEY:  We are still trying to gather all of

24  the facts.

25       I will say that, you know, the U.S. trustee doesn't

1    know whether an order for relief should be entered, but it
2    does appear, as I stand here today, that it seems to be a
3    bit premature because we don't have all the facts and
4    circumstances.  And, of course, as this Court has already
5    commented on, the -- one of the biggest concerns is if a
6    trustee is appointed how would that trustee be paid.  Now, I
7    have heard the representations of counsel that there
8    certainly may be money, but we haven't seen any evidence to
9    that fact.  So that is a concern.

10        The expedited manner in which the proposed order for
11   relief has been submitted is of concern.  And, of course,
12   reading that proposed order, there are several concerns in
13   that order.  One of them is -- is saddling the Chapter 7
14   trustee right off the bat in a case that has a lot of
15   issues, as we can all tell just from the pleadings and from
16   representations today.  Again, we really don't know all the
17   facts and circumstances.  We want to make sure the Chapter 7
18   trustee is paid.

19        There is a provision with respect to the principals
20   pleading the Fifth Amendment, and I understand the reasoning
21   behind that.  However, it's an additional burden on the
22   potential trustee because the principals are still going to
23   have a duty to cooperate.  We haven't seen books and
24   records.  So we, again, don't want to put the trustee in a
25   position where, you know, they're up against a rock and

1    can't really get all the information they need because the

2    principals' concerns about pleading the Fifth Amendment.

3         In addition, there's a provision in the order with

4    respect to not converting the case to a Chapter 11.  That is

5    of great concern.  We don't want to put a stipulation like

6    that on a potential Chapter 7 trustee because we don't know

7    whether -- again, I don't know any facts and circumstances.

8    We don't know whether this debtor is operating, what the

9    situation is.  We don't want to bind the trustee or this

10   estate with a provision such as that, because as we stand

11   here today we don't know if maybe that should be the case

12   down the road, a conversion.  I have no idea.  But that

13   provision is of concern to us.

14        Another big concern is that I know we have heard

15   some -- from some investor petitioning creditors, but there

16   are other parties in interest who may wish to be heard in a

17   manner that goes beyond, perhaps, a status conference.

18   Obviously, I think we're going to hear from the United

19   States government, but there are non-investor creditors who

20   may wish to be heard and have a voice as to whether an order

21   for relief is entered also.  So the expedited manner is a

22   concern.  And, again, those -- those provisions in the order

23   that I just went through that Your Honor has already touched

24   upon, those are the concerns of the U.S. trustee.

25        You asked if we had canvassed trustees.  We haven't

spoken to them directly.  We have done an analysis, I should

say, of who we think might best fit, but we haven't broached

that subject yet because we were unclear as to where this

case would go.

THE COURT:  All right.  Thank you, Ms. Creasey.

I, too, have a concern as to whether or not we have all

the parties in interest here, as well, represented.  And

Mr. Weitman just said there's $250 million-plus worth of

creditors.  Obviously, they're not represented today.  We

don't have a creditor matrix.

Mr. Toffoli, let me hear from you real quick.  If you

will come to the podium, sir.

My reading of this proposed order that was negotiated

between yourself, and I guess Mr. Weitman, you have

indicated that the debtor, Wright Brothers, is willing to

file a creditor matrix within seven days following the entry

of this order for relief.  So to that extent your client is

willing to cooperate; is that correct?

MR. TOFFOLI:  That's correct, Your Honor.

THE COURT:  Do you have any idea how many

creditors there are in this case?

MR. TOFFOLI:  I do not, Your Honor.

THE COURT:  Okay.

MR. TOFFOLI:  I have no idea.

THE COURT:  All right.  Do you know how long it's

```
 1    going to take to get a creditor matrix together?
 2             MR. TOFFOLI:  Nor do I have that information, Your
 3    Honor.
 4             THE COURT:  Okay.  Do you have any information at
 5    all with regard to the operation of this business?
 6             MR. TOFFOLI:  With respect to what, Your Honor?
 7    I'm sorry.
 8             THE COURT:  Wright Brothers' operation at this
 9    point.
10             MR. TOFFOLI:  At this point, Your Honor, there is
11    no operation for Wright Brothers.
12             THE COURT:  All right.
13             MR. TOFFOLI:  I think Your Honor is familiar
14    enough with everything and Your Honor's heard, I mean, the
15    principal of Wright Brothers, her attention is devoted to
16    other matters, as you could well understand.
17             THE COURT:  Right.
18             MR. TOFFOLI:  Wright Brothers is not doing
19    business.  In light of everything that's happened, nobody's
20    willing to utilize Wright Brothers for what it was formerly
21    doing.  So there is no business operations.  Which, Your
22    Honor, as an aside, that was one of the things that
23    persuaded me why go forward and contest the involuntary.  I
24    didn't have an operating business.
25             THE COURT:  Okay.  And do you know where the books
```

1    and records are located?

2              MR. TOFFOLI:  Your Honor, I'm going to say -- I'm

3    going to assume they're at the building where Wright

4    Brothers occupied -- business was occupied, but I don't --

5    as I'm standing here in front of Your Honor, I don't want to

6    swear to that, but that's my assumption.

7              THE COURT:  And your client has agreed to provide

8    immediate access to all of its books and records to any

9    trustee that may or may not be appointed in this matter; is

10   that correct?

11             MR. TOFFOLI:  That is correct, Your Honor.

12             THE COURT:  And it's also equally clear your

13   client will take the Fifth Amendment at the 341 hearing?

14             MR. TOFFOLI:  Yes, Your Honor.  And that was --

15   just so Your Honor understands -- and I'm probably boring

16   some of the attorneys present and are on the phone -- but my

17   repetitive concern was I have got a principal who's going to

18   claim the Fifth Amendment and was not going to fill out

19   schedules and statement of financial affairs.  That was

20   where I was coming from.

21             THE COURT:  Okay.  All right.  I appreciate it.

22   Thank you, Mr. Toffoli.

23             MR. TOFFOLI:  Thank you.

24             THE COURT:  Mr. Regens, let me hear from you real

25   quick because you are representing parties that are not

1   petitioning creditors but represent another group of

2   creditors that may or may not be investors; is that correct?

3        MR. REGENS:  That's correct, Your Honor.  Our

4   clients are actually similarly situated to John and David's

5   clients.  We were also lenders and my clients were

6   victimized in this Ponzi scheme to the tune of $140 million.

7   They, likewise, made demand for repayment of these past-due

8   debts, no repayment was made.

9        Now, our -- our primary concerns at this stage are

10  prevention of rescission of the policies.  It's -- it's our

11  belief that in terms of actual recovery of the proceeds, you

12  know, as -- as David mentioned during his discussion, we

13  believe that the victims have assembled counsel with the

14  expertise to seek recoveries under the policies.  And if a

15  trustee is appointed, we believe that -- that we could

16  assist the trustee materially from the standpoint of -- of

17  the expertise we have in terms of interpreting the policies

18  and crafting claims to recover.

19       You know, the -- the trustee, however, I think is

20  critical in terms of being able to obtain the policies

21  themselves.  Like John and David, our client group have made

22  demands of Lloyds to obtain the policies.  Those demands

23  have been rejected.  And so as we sit here today, there

24  are -- there are policies that we believe provide coverage

25  to our client group that we have been deprived of.

```
 1              THE COURT:  You don't have possession of your

 2    policy; is that correct?

 3              MR. REGENS:  We have possession of one policy,

 4    which one -- one grouping within my client group obtained an

 5    insurance policy of its own.  It paid the premiums for that

 6    policy, and it's in possession of that policy.  However,

 7    other policies have either been -- we have either been

 8    deprived of them or we have been provided materially

 9    redacted copies.

10              THE COURT:  Okay.  Thank you, Mr. Regens.

11              MR. REGENS:  Thank you, Your Honor.

12              THE COURT:  And I'm -- let me ask you this.  I'm

13    assuming you're in support of the involuntary proceeding

14    going forward?

15              MR. REGENS:  It's our belief that going forward

16    with the involuntary proceeding at this time would prevent

17    rescission of the policies and give us an opportunity to

18    seek recovery under the policies, Your Honor.

19              THE COURT:  All right.  Thank you.

20         Mr. Wells, on behalf of the U.S. attorney, I would like

21    to hear from you at this point, sir.

22              MR. WELLS:  Thank you, Your Honor.  And thank you

23    for allowing me to participate in this -- I would have been

24    there in person, but I have got some paperwork issues as far

25    as appearing as a special assistant and I was kind of
```

1    delayed through the executive office.  So I appreciate you

2    giving me this indulgence.

3         Where should I start?  This -- I guess the government's

4    position is if there's any order for relief entered that

5    we're going to move immediately for a protective order from

6    the stay for several reasons, some of that outlined in the

7    materials that I exchanged with all counsel, but to mainly

8    prevent the bankruptcy from getting in the way of what we

9    have been already achieving and have already done with

10   respect to the Wright Brothers' assets in this criminal

11   case.

12        I mean, the bankruptcy code is as clear as can be on a

13   362(b)(1) and (b)(4) that the criminal case takes paramount.

14   And this effort right now to go and clawback monies that

15   have been refunded to people through quick release by the

16   agency that were (inaudible) inadvertently, to go and

17   clawback money from a completely innocent party that -- on a

18   turnover order that was granted by the criminal judge, the

19   District Judge Mazzant in Sherman, I have never -- I'm just

20   taken aback by this.  I'm shocked, actually.

21        I have been in touch with these victims people since

22   January when I first got involved in this case, and all

23   through this.  It's been weekend phone calls, it's been all

24   hours explaining what the government's been trying to do on

25   their behalf.  And to be sure, Your Honor, the creditors in

1    this -- in this involuntary are not the only victims in this

2    case.  So if I'm a little irritated and strident sounding,

3    it's because our duty is to all of the crime victims, not

4    just the ones who appear, and they're not only in the

5    Southern District of Florida receivership either.

6        I and the others from our office have a duty to crime

7    victims under the Crime Victims Rights Act to maximize

8    restitution recovery for everybody, and not everybody has

9    one of these short-term loan escrow agreements that -- that

10   they have made money off of for years.  There's other

11   victims out there of the misuse of Wright Brothers' escrow

12   account.

13       So there is nothing to fund it.  There's nothing to

14   fund the receivership.  There's nothing to -- Fred Machado

15   is completely upside down on all of his assets, and Wright

16   Brothers has nothing.  The office building that purportedly

17   has six figures of equity, I have seen the paperwork.

18   They're barely staving off foreclosure.  They have a

19   contract to sell that thing and they need to go and pay

20   their criminal defense lawyers, who have not been paid.

21   That's a constitutional right that the defendants have.

22   Mark didn't talk about it, Mr. Toffoli didn't talk about it.

23   Mr. Coyle certainly could.  He hadn't been paid, and that's

24   a constitutional right.  But our efforts in this criminal

25   case, which, again, takes precedence, we are mindful of

1    that.  We care about their constitutional rights and

2    balancing that with asset recovery for all the crime

3    victims.

4         There is no capability of any sort of seized funds

5    funding the receivership in the first place, or a bankruptcy

6    trustee.  Those funds, almost the entirety of seized funds,

7    less than $30,000 remains of that seized money.  It has been

8    processed by the agency via quick release processes, and all

9    of those people who got their monies that way are subject to

10   privacy rights.

11        The government's decision-making on that is

12   discretionary.  There's administrative procedures that cover

13   that, and we -- and how that was all taken care of.  So if

14   $12 million of seized funds is not there, $495,000 of some

15   innocent party's money is not there, the building for Wright

16   Brothers is not there, I'm just wondering what in the world

17   is going to be there to go and fund a trustee.

18        The only thing that I don't really care about one way

19   or the other is the insurance because we're not getting in

20   the way of a dispute between an insurance company and their

21   insured.  And from talking with Mr. Richer and with

22   Mr. Toffoli alike, as well as my understanding from speaking

23   with the folks at Lloyds of London (inaudible) receiver, is

24   that somebody somewhere needs to go and do something about

25   the insurance.  Why that can't just be a standalone

1    declaratory judgment action filed by Lloyds of London,

2    instead of something that gets sucked into this un-fundable

3    bankruptcy estate, I don't understand.  And even if there

4    were something to fund the bankruptcy estate, it's not

5    a (inaudible).  It's something that the government would go

6    and enforce against pursuant to federal law, again, on

7    behalf all the crime victims.

8         So, I mean, there's certain inevitability that I see to

9    all of this stuff.  And the analogy I came up with last

10   week, seems appropriate to this, and it's like the

11   government's driving down the highway at the speed limit.

12   The involuntary petitioners speed up behind us, flash their

13   lights, want us to move over, at a higher speed pass us.

14   Then we keep going and doing what we were doing, and lo and

15   behold, we pull up to the same red light and they're still

16   having to sit and wait there.  And we -- we have gotten the

17   red light at the same time (audio break).  You know, what's

18   the point of speeding up and (audio break) type stuff with

19   the bankruptcy.  I mean, trying to submit that order,

20   threatening sanctions against somebody because they're

21   appearing in this thing, that's just -- that's not how

22   things are done in the Eastern District of Texas.  I doubt

23   that's how they're done in the Western District of Oklahoma

24   either.

25        But we're just kind of exasperated, like, what are you

1    guys doing?  We're trying to help you.  We are -- we are in

2    this case super-duper early on anything and everything to do

3    with asset recovery, and you're trying to get ahead of us

4    and you're trying to go get money that you're not entitled

5    to, that Judge Mazzant has found that you're not entitled

6    to, and go and claw back from innocent people.  And

7    that's -- that's just not right.  That's contrary to what

8    our mission is, and that's contrary to what we have done in

9    the criminal case to date.  And that's why if any order for

10   relief is entered, we will seek relief from that.

11       I mean, I think Bank of America counsel, for example,

12   is on the line on this.  Bank of America is sitting, waiting

13   to hear something going on here.  I mean, happy that I'm not

14   moving for show cause because I know Bank of America and I

15   trust them and I respect them, and we're not going to go and

16   force the issue on the turnover order, for example, but the

17   thing is, Judge Mazzant has ordered them to turn money over

18   to the marshal service, period.  And they're not (audio

19   break) from this ominous fear of the bankruptcy today, and

20   nobody (audio break) receiver told me not entitled to that

21   money.

22       So trying to go and get ahead of parties like that,

23   we're going to (audio break) going to be (audio break) to

24   make sure that our efforts in the (audio break) to do with

25   the bankruptcy code allowed us to do to ensure that those

*Emily Eakle, CSR*

 1    are protected.

 2              THE COURT:  Mr. Wells, can you describe for me who

 3    the other victims are?  What type of claims do they have

 4    that you have experienced so far in this case?

 5              MR. WELLS:  Yes, Your Honor.  The -- the Wright

 6    Brothers' account, long before it was being used for

 7    this crime (inaudible) was just a straight-up escrow company

 8    that existed to help -- keep, like, a buyer and a seller

 9    close airplane purchase.  So those victims, there are

10    victims who had funds in that same account that was used for

11    all these -- these short-term loans, these Ponzi

12    investments.  They had monies that were sitting in there

13    that got sucked up and sent out to the various Ponzi

14    investors as part of the robbing Peter to pay Paul component

15    of that, and they don't have a contract with Wright

16    Brothers.  They have a standalone contract like (audio

17    break) purchase an airplane, and that's the designated

18    escrow agent.

19         Now, the money was sitting in there, was trying to -- a

20    perfect vehicle, if you will, for Fred Machado's

21    masterminded Ponzi scheme to have excess cash sitting around

22    so when those promissory notes, those escrow agreements,

23    those other things come due for the airplane transactions

24    that did not actually ever exist in reality.  There is

25    always the extra cash sitting around because people put

1   money in there in, like, January of 2020, for example,

2   $250,000 to go and close on a plane transaction the next

3   calendar year.  They were just doing their budgeting, they

4   put their money in there.  That -- they're not similarly

5   situated as these Ponzi investors who have made a whole

6   bunch of money off of this thing through the years.

7       So those are the other types of victims that there are

8   out there who would not be appropriate, I don't think,

9   creditors in this bankruptcy, but they definitely would be

10  entitled to restitution in the criminal case pursuant to the

11  mandatory Victim Restitution Act.

12          THE COURT:  Do you know how many of those other

13  victims there are?  Do you have a number?

14          MR. WELLS:  You know, I think it's -- I think it's

15  10 to 15.  I need to go back and double check my -- my

16  charts that I have got on that.  I would also need to bounce

17  that off of the Wright Brothers folks to make sure that

18  there's none out there that we have not otherwise heard from

19  already.  But it's not a whole lot, but it's (audio break)

20  be in the same position as the Ponzi folks as far as an

21  involuntary petition to --

22          THE COURT:  Sure.  And do you know how much those

23  victims were due?  How much money was involved with those 10

24  to 15 potential victims?

25          MR. WELLS:  I believe that the amount that they

1    are owed is in the neighborhood of 1.5 to 2 million, Your

2    Honor.

3            THE COURT:  And I think I heard you say that some

4    of those victims have already been compensated by virtue of

5    the monies that the government seized; is that accurate?

6            MR. WELLS:  No, Your Honor.  Those -- those are

7    the remaining folks who have not received -- who have not

8    received anything.

9            THE COURT:  Well, who received funds from the

10   government, then, by virtue of the assets that had been

11   seized?

12           MR. WELLS:  Well, the agency, through its

13   particular administrative procedures, evaluated the claims

14   of -- of other non-Ponzi investors, determining and

15   effecting their quick release policies, which are -- those

16   are -- each agency has them for situations just like this,

17   and they -- they have to go and determine that (audio break)

18   criteria to go and figure out what to do with monies that

19   may not be (audio break) or received inadvertently (audio

20   break) tracing for any number of issues.  So that --

21   that (audio break) --

22           THE COURT:  I'm sorry.  Say that one more time.  I

23   didn't catch the very end of that.

24           (Audio break)  I'm sorry.  That process and

25   procedure was determined by the agency.

```
 1              THE COURT:  But there were -- were there victims
 2      that received the funds, or did the money just go to various
 3      governmental agencies?
 4              MR. WELLS:  No, no.  I'm sorry.  I was not clear
 5      on that.  No.  It went to other -- it went to folks so there
 6      would not be victims because -- victims of circumstance of
 7      their funds end up getting seized and should not have been
 8      seized in the first place.
 9              THE COURT:  Okay.
10              MR. WELLS:  So, I mean -- so, for example, there
11      were -- actually, a good example would be to look at the
12      turnover order motion that was filed that kind of explains
13      how this --
14              THE COURT:  I did -- I am aware of that turnover
15      order, sir.
16              MR. WELLS:  That's the sort of thing that the
17      agency was working towards with their -- when effecting
18      their quick release.  But even if all that money was sitting
19      there, subject to a forfeiture order at the end of the day,
20      which it is not and it's not there anyways, that still
21      couldn't be touched by the bankruptcy estate (audio break)
22      trustee because it's within the criminal case.
23          So that would (audio break) ancillary proceeding within
24      the criminal case.  And, you know, the petitioners could beg
25      as much as they want to and the trustee could as well, so
```

*Emily Eakle, CSR*

1    they -- if it's locked into a forfeiture proceeding in the
2    criminal case, that's the end of it.
3            THE COURT:  Okay.  All right.  Thank you,
4    Mr. Wells.
5            MR. WELLS:  Thank you, Your Honor.
6            MR. WEITMAN:  Your Honor, David Weitman, counsel
7    with CCUR.  May I just ask a brief question?
8            THE COURT:  You may, sir.
9            MR. WEITMAN:  Thank you, Your Honor.  What I have
10   been struggling with is that there was a Bank of America
11   account which held the escrowed funds.  They came in from
12   various parties, including the 250 to $500 million of folks
13   like us, my client, Metrocity's counsel was describing, and
14   others.  And then there are other folks that are similarly
15   situated that also used this same account, sent their money
16   for failed transactions, as we did, as the 250 to 500
17   million of creditors, that quote, what -- what Mr. Wells
18   refers to as the Ponzi creditors, and yet one group got
19   their money, the other group is sitting and waiting.  And we
20   were never even informed until just a couple of weeks ago
21   that the government quickly released these funds to the,
22   quote, preferred folks who used the escrow services.
23       Under the bankruptcy code and what I have seen, is --
24   and if you look at that Madoff line of cases, they're all
25   one in the same as creditors of Wright Brothers.  And the

*Emily Eakle, CSR*

1    preferential treatment and distributions, they don't make

2    sense to me.  And maybe Mr. Wells can explain it, because I

3    have asked him to try to explain it and he told me it was

4    confidential.  But I don't see how you differentiate between

5    these creditors who sent the money out to one group and

6    leave the other ones holding the bag.  And if it was so

7    proper, why wasn't it noted in every one so we might be able

8    to talk to the district court and say, this is doesn't seem

9    right.

10        Again, it's one account with Bank of America in the

11   name of Wright Brothers designed for escrow services.  Maybe

12   Mr. Wells can explain how he is able to differentiate and

13   under what laws that differentiation is made.

14            MR. WELLS:  If I may, these decisions were made

15   (audio break) by agency under their (audio break).  And

16   every agency got these policies and procedures.  Justice

17   Department has theirs, (audio break), which is the agency

18   here has theirs.  It's basically a (audio break) for

19   example, that weren't for the Justice Department.  And so

20   this (audio break) at any time that procedure (inaudible

21   portion.)

22            MR. SOULE:  Your Honor, Steve Soule.  We -- we

23   can't understand what was --

24            THE COURT:  Yeah, I'm having some difficulty,

25   Mr. Wells, with understanding you.  Your phone line is

*Emily Eakle, CSR*

1    breaking up a little bit.  So it's -- it's very difficult.
2    Do you want to try that again, sir?
3              MR. WELLS:  Let me take it off speakerphone.
4        Hello?
5              THE COURT:  Yes, sir.  Go ahead.
6              MR. WELLS:  Okay.  I was just making reference to
7    the CFRs that exist to allow agencies who have seized things
8    that they determine are not subject to forfeiture after all
9    and how to address of dispose of those properties.  That
10   decision was not something that I decided.  That was
11   something decided by the agency following their seizure.
12             THE COURT:  And can you identify who the agencies
13   are?
14             MR. WELLS:  The suing agency is the Customs and
15   Border Protection, Department of Homeland Security.
16             THE COURT:  Okay.  And you're saying that these
17   agencies then had within their discretion to determine who
18   to pay the money to?  Is that what you're saying?
19             MR. WELLS:  Yes, Your Honor.
20             THE COURT:  And that has not been made of public
21   record at this point?
22             MR. WELLS:  We -- their determination of who would
23   get a refund or not has not been made public record.
24             THE COURT:  Okay.
25             MR. WELLS:  And I was getting questions about who

*Emily Eakle, CSR*

1    is making those decisions, and I said that is the agency

2    determination on how to do it.

3            THE COURT:  And as you explained earlier, you said

4    there's 10 to 15 other victims, and those are not the

5    parties that received any of these funds thus far; is that

6    correct?

7            MR. WELLS:  That's correct.

8            THE COURT:  Okay.  All right.

9        Is there anybody else who wants to add anything more to

10   this discussion today?

11       (No response.)

12           THE COURT:  All right.  I do appreciate everybody

13   appearing today and kind of flushing this out a little bit

14   more for the Court.  I had some concerns as I addressed the

15   parties initially.  Quite frankly, I still kind of have some

16   of those concerns.  And particularly, again, I'm very much

17   concerned as to how a bankruptcy trustee in this proceeding

18   would indeed get paid.  I'm not so sure I share

19   Mr. Weitman's belief that any and all of this money can be

20   clawed back in terms of funding the initial work that would

21   have to be done right away after an order for relief would

22   be entered.  One of the concerns that I had is putting the

23   trustee on a tight road of 14 days to prepare the schedules,

24   the statement of financial affairs, and other documents that

25   would be necessary to file initially.

 1       I was concerned that we don't have a matrix, so I don't
 2   even know who all the creditors are at this juncture.  I'm
 3   concerned about stipulating that this case could not be
 4   converted to a Chapter 11 if a trustee in the future
 5   determines that that would be appropriate.
 6       I assumed the debtor's principal would take the Fifth,
 7   obviously, with an indictment hanging over her head.  I
 8   wouldn't expect otherwise, quite frankly.  So I don't know
 9   how much she's going to actually be useful to a trustee in
10   determining what information will be forthcoming for a
11   trustee.
12       And I -- I do hear you about the insurance policies.  I
13   think that's a viable asset except to the extent that you're
14   telling me each of these policies has a named loss payee,
15   which is your individual clients.  So if a trustee is
16   appointed in this case, he would essentially be working on
17   your individual behalves to collect policy monies for
18   individual creditors as a -- as opposed to bringing assets
19   in the estate for the benefit of all creditors.  So I have a
20   concern about that.
21       So what I'm going to do today is tell the parties that
22   I want a creditor matrix prepared and filed in this case
23   within seven days.
24       Mr. Toffoli, if you could please do that as quickly as
25   possible.  I would like it before seven days, if possible,

1   but without knowing any of the information as you have

2   indicated to me, I'm going to give you seven days to try to

3   accomplish that.

4           MR. TOFFOLI:  And if I may, Your Honor, given the

5   upcoming three-day weekend, could I ask for ten days?

6           THE COURT:  I'll give you ten days.

7           MR. TOFFOLI:  Thank you, Your Honor.

8           THE COURT:  Once that matrix is then prepared, I'm

9   going to set this for an evidentiary hearing to determine

10  whether or not an order for relief will be entered.  That

11  order setting it for hearing will give the parties a certain

12  amount of time, depending on the Court's calendar and I know

13  we're going to be into June probably, if not the beginning

14  of July, for purposes of an evidentiary hearing.  I'll give

15  the parties a sufficient time to be able to prepare a brief

16  supporting their positions, and then we will conduct an

17  evidentiary hearing.

18      I would encourage the parties to be aware of our local

19  rules with regard to the exchange of exhibit and witness

20  lists, when those are due, which is 20 days before the date

21  of the setting for the hearing, as well as the exchange of

22  the actual exhibits within five business days of the hearing

23  set before the Court.

24      So we'll wait for the creditor matrix.  And in the

25  meantime, Ms. Creasey, I would ask that you please poll your

1   trustees and find out if there's an interest of a trustee

2   who would be interested in this case.  And I would ask the

3   creditors to consider the election abilities under

4   Section 702 of the code to see if there's somebody also that

5   the creditors might put forth and propose for purposes of a

6   trustee in this case.  Particularly because, again, the

7   major asset that I hear you-all saying is the insurance

8   policies that have specific loss payees, which are your

9   clients.  So, quite frankly, if anybody's going to have the

10  burden in this case, it's going to be your clients.

11      All right.  So that's what I'm going to -- Mr. Soule,

12  do you wish to speak again, sir?

13              MR. SOULE:  May I ask one question?

14              THE COURT:  You may ask, yes, sir.

15              MR. SOULE:  Just a point of clarification.

16              THE COURT:  Absolutely.

17              MR. SOULE:  We certainly get the message that we

18  need to talk to the U.S. trustee about either a panel

19  trustee or the appointment of a trustee.  As to the

20  evidentiary issues, do you want all of the evidence to come

21  in with regards to proving up the case?  I mean, I just want

22  to be clear because there's not -- as we sit here, I can't

23  really tell if Mr. Wells' position that -- there hasn't been

24  a contest to the entry, and I understand your concerns.

25  Being a panel trustee, I have those concerns.  We're

1    certainly willing to sit down with the U.S. trustee's office
2    and talk through those issues.
3         As I understand it, and I'm not an insurance lawyer, at
4    least the general policy that we don't, I don't think, have
5    a copy of, may benefit all creditors, certainly a majority
6    of creditors of this case.
7              THE COURT:  Okay.
8              MR. SOULE:  When you add in Mr. Regens' clients.
9    So I just wanted to make sure so that we don't go too far
10   astray from what the Court's looking for.
11             THE COURT:  And I appreciate that, and I probably
12   didn't make myself very clear.
13        As I understand it, the debtor is going to withdraw the
14   objection to the actual argument regarding bona fide
15   petitioning creditors.  Is that correct, Mr. Toffoli?
16             MR. TOFFOLI:  Yes, Your Honor.
17             THE COURT:  All right.  So we know that's not at
18   issue.
19        What the Court is going to be looking at is whether or
20   not the Court should abstain, under Section 305 of the
21   bankruptcy code, whether or not the Court should abstain
22   from entering the order for relief.  And in that regard, the
23   Court is going to look at the motivation of the parties
24   seeking bankruptcy jurisdiction; number two, whether another
25   forum is available to protect the interests of both parties,

1    or there is already pending litigation proceedings in

2    another Court; number three, the economy and efficiency of

3    the administration and; number four, prejudice to the

4    parties.  Those are the issues that we're going to be

5    looking at for purposes of an evidentiary hearing.  So that

6    will kind of condense this down to something, I think, more

7    easy to understand.

8              MR. WEITMAN:  Pardon me, Your Honor.

9              THE COURT:  Who is this?  Is this Mr. Weitman?

10             MR. WEITMAN:  May I?  Forgive me.

11             THE COURT:  You may.

12         Hang on just a minute, Mr. Soule.

13             MR. WEITMAN:  And, you know, today was almost like

14   a proffer of the parties for the evidentiary hearing, if I

15   would suggest to Your Honor.  I mean, to me it's all about

16   the insurance policies and the threat of rescission if

17   there's no automatic stay.  So is Your Honor of the mind

18   that we need to depose the insurance company

19   representatives, and also the efforts by Wright Brothers to

20   try to rescind, and have depositions taken in advance of the

21   hearing, and also subpoena them to be there in Oklahoma

22   City?

23             THE COURT:  I'm not suggesting that at all, and

24   I'm not setting a discovery deadline at this point in time.

25   I'm just trying to determine whether this Court should take

1   jurisdiction over proceeding in bankruptcy versus abstaining

2   and letting courts in other jurisdictions continue with

3   whatever efforts they're making.

4           MR. WEITMAN:  Yeah, but only Your Honor's court

5   will give us the automatic stay.

6           THE COURT:  I understand that.

7           MR. WEITMAN:  But yes, I hear Your Honor, yes.

8   Thank you.

9           THE COURT:  I understand that.  And I understand

10  that the parties have indicated regarding the rescission of

11  the policies.  I understand that that's going to be a big,

12  important piece of this presentation, if you will.  So I'm

13  really looking at it from the standpoint of whether or not I

14  should abstain.  So I think 304's pretty clear what I have

15  the right to do, and those four elements that I just read

16  off is what I'm going to be looking for.

17          MR. WEITMAN:  Thank you Your Honor.

18          THE COURT:  I mean, I don't need you to prove up

19  that you're entitled to insurance policies.  I just need to

20  know a little bit more information.  You just gave me

21  another piece of information that said that not all these

22  insurance policies go directly to one specific creditor.

23  There may be something --

24          MR. TOFFOLI:  That's my understanding on that.

25  May --

1          THE COURT:  All right.  All right.  Well, that's

2    another piece of information that hopefully will be flushed

3    out a little bit better for purposes of making this

4    decision.

5       The automatic stay is in place right now.  It will

6    continue to be in place until I make a decision as to

7    whether or not the order for relief should be entered.

8    Okay?

9          MR. TOFFOLI:  Thank you, Your Honor.

10         MR. WEITMAN:  Thank you, Your Honor.

11         THE COURT:  Any further clarification that needs

12   to be made?

13         MR. WELLS:  This is AUSA Wells, Your Honor.  Just

14   a couple of quick things.  Does the stay currently apply to

15   orders that have already been entered by the -- in the

16   criminal case, like with respect to Bank of America's

17   obligation to pay the $495,000 to the marshal service?

18         THE COURT:  I think it's your position it does

19   not.  That's what I heard you say earlier.

20         MR. WELLS:  Yes, Your Honor.  But I was -- I mean,

21   I think Bank of America's counsel is on the line and I think

22   that they're curious whether they should comply with Judge

23   Mazzant's order or just wait.  If it's -- I guess I was

24   asking kind of for an advisory opinion, but I need to wait

25   and see, I guess, if an order for relief is entered.

*Emily Eakle, CSR*

1          THE COURT:  I appreciate your attempt at getting

2     an advisory opinion out of the Court, but the Court doesn't,

3     as a rule, give advisory opinions.  That's not before me,

4     obviously, today.  What's before me is just simply a status

5     conference.

6        If Bank of America has some concerns, they certainly

7     can file a motion to lift at this point and I will take that

8     issue up accordingly.  But that's not before me and I'm

9     certainly not going to give an advisory opinion at this

10    point.  Nice try, though.

11         MR. WELLS:  The second question I have got, Your

12    Honor, is with respect to the government having the position

13    on whether the order for relief is appropriate or not, we

14    don't really take a position on that because this gray area

15    as far as the insurance policy is concerned, which is not

16    something that we're going to dabble with.  And on top of

17    that, as I explained, I believe that we're probably entitled

18    to -- we would move for a protective order if -- if an order

19    for relief was entered.

20       So does the Court have any expectations for the

21    government as far as that evidentiary hearing that --

22    determining whether, as a preliminary matter, the order for

23    release is appropriate?

24         THE COURT:  You're certainly welcome to

25    participate, Mr. Wells.  Anybody who wants to participate

1    can participate.  And that's one of the reasons why I want

2    the matrix done, so that we can make sure that all parties

3    in interest, that have an interest in whether this case

4    should go forward or whether this case should be dismissed,

5    is before the Court.  That's what I'm interested in.  I'm --

6    I'm willing to listen to everybody's opinion before I make

7    my determination.

8              MR. WELLS:  Understood.  Thank you, Your Honor.

9              THE COURT:  All right.  Anybody else that needs

10   furtherer clarification?

11      (No response.)

12             THE COURT:  All right.  I appreciate all of you

13   coming in today.  I appreciate you-all on the phone as well.

14   And I look forward to moving forward.

15      Thank you, all.  Court's adjourned.

16                   (Recording concluded.)

17

18

19

20

21

22

23

24

25

*Emily Eakle, CSR*

```
 1                    REPORTER'S CERTIFICATION

 2          I, Emily Eakle, a Certified Shorthand Reporter for

 3    the State of Oklahoma, certify that the transcript of the

 4    audio recording was taken by me in stenotype and thereafter

 5    transcribed by computer and is a true and correct transcript

 6    of the audio recording to the best of my ability; that the

 7    audio transcription was taken by me on May 31, 2021; and

 8    that I am not a relative, employee, attorney or counsel to

 9    any party in this case or a relative or employee to any

10    counsel in this case or otherwise financially interested in

11    this action.

12          Witness my hand and official seal this 1st day of June,

13    2021.

14

15

16

17   _____
     EMILY EAKLE, CSR, RPR, RMR, CRR
18   Oklahoma CSR No. 01701
     Expiration Date:  12/2021
19

20

21

22

23

24

25
```

*Emily Eakle, CSR*