```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF TEXAS
 2                         SHERMAN DIVISION

 3     UNITED STATES OF AMERICA          |  DOCKET 4:20-CR-212
                                         |
 4                                       |  APRIL 10, 2023
       VS.                               |
 5                                       |  11:01 A.M.
                                         |
 6     DEBRA LYNN MERCER-ERWIN           |  SHERMAN, TEXAS

 7     ---------------------------------------------------------

 8               VOLUME 1 OF 1, PAGES 1 THROUGH 212

 9             REPORTER'S TRANSCRIPT OF JURY SELECTION

10          BEFORE THE HONORABLE AMOS L. MAZZANT, III,
             UNITED STATES DISTRICT JUDGE, AND A JURY
11     ---------------------------------------------------------

12

13     APPEARANCES:

14
       FOR THE GOVERNMENT:      ERNEST GONZALEZ
15                              HEATHER RATTAN
                                U.S. ATTORNEY'S OFFICE - PLANO
16                              101 E. PARK BOULEVARD, SUITE 500
                                PLANO, TX 75074
17
                                LESLEY BROOKS
18                              U.S. ATTORNEY'S OFFICE - SHERMAN
                                600 EAST TAYLOR STREET, SUITE 2000
19                              SHERMAN, TX 75090

20

21     COURT REPORTER:         CHRISTINA L. BICKHAM, CRR, RDR
                                FEDERAL OFFICIAL REPORTER
22                              101 EAST PECAN
                                SHERMAN, TX 75090
23

24

25        PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
        TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
```

```
 1
     FOR THE DEFENDANT:       JOE ELLIS WHITE, JR.
 2                            KATE C. WHITE
                              MATTHEW P. CYRAN
 3                            WHITE & WEDDLE, PC
                              630 NE 63RD STREET
 4                            OKLAHOMA CITY, OK 73105

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1                              INDEX

 2

 3                                                      PAGE

 4    COURT ADDRESSES THE JURY                          4

 5    VOIR DIRE BY MS. RATTAN                           37

 6    VOIR DIRE BY MR. JOE WHITE                        118

 7    JURY SEATED                                       201

 8    COURT REPORTER'S CERTIFICATION                    212

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 (Open court, defendant present.)

 2                 THE COURT:  Please be seated.

 3                 Okay.  We're here in case 4:20-cr-212, United

 4     States of America versus Debra Lynn Mercer-Erwin.

 5                 And for the government, are we ready to proceed?

 6                 MR. GONZALEZ:  Your Honor, Ernest Gonzalez for the

 7     government.  The government is ready to proceed.

 8                 THE COURT:  And for the defendant?

 9                 MR. JOE WHITE:  Your Honor, on behalf of the

10     defendant, Deb Erwin, counsel at this table, and on behalf

11     of Ms. Erwin, we're ready.

12                 THE COURT:  Okay.  Thank you.

13                 Well, I want to welcome everyone here to federal

14     jury service here in the Eastern District of Texas, Sherman

15     Division.  First, let me ask I'm sorry we're running late.

16     Again, I am just -- I am really busy; and so I just

17     apologize.  I try to run a very efficient shop here.

18                 My name is Amos Mazzant.  I am the District Judge

19     here in residence, and I hope you will enjoy this

20     experience of federal jury service in the Eastern District

21     of Texas, Sherman Division.

22                 I am a United States District Judge for the

23     Eastern District.  I have lived in Sherman since 1990.  I

24     have been on the bench in this position since 2014;

25     although I've been a judge in other positions -- I was a
```

1    magistrate judge and I was in the Dallas Court of Appeals;

2    so I've been a judge since 2004.

3           I have a confession to make.  I wasn't born in

4    Texas; I got here as quick as I could.  My kids were born

5    here.  But I was born in a small town outside Pittsburgh,

6    Pennsylvania.  I had to pay for all my own education.  My

7    family couldn't pay for my education.  Baylor Law School

8    gave me a full academic scholarship; so I didn't pay for

9    tuition.  So that brought me from Pittsburgh to Texas, and

10   then I've never left.

11          I am married.  My wife actually is from the

12   same -- we weren't high school sweethearts.  She actually

13   said I was the last person she would ever marry, in high

14   school.  No joke.  No joke.  We didn't date until college

15   but -- and she is a retired schoolteacher.

16          And then I have two adult children.  My older

17   daughter is a flight attendant with American.  She went to

18   A&M.  And she was in San Diego last night.  I don't know

19   where she is right now.  She's only been doing it for a

20   couple years so she doesn't get holidays off; so she was

21   flying yesterday.

22          My younger daughter is shift manager at

23   Chick-fil-A and went to Tarleton state.

24          I tell you these things about myself because it's

25   only fair, before we start asking you questions, that you

1    should know a little bit about me.  So that's why I'm doing

2    that.

3            And, again, we are here to pick a jury and try a

4    criminal case.  But before we get to that, has anybody been

5    in this building before?

6            Okay.  Well, it's a building I love.  It's an

7    historic building.  It opened in 1907.  It was built for a

8    cost of $140,000.  It is the oldest courthouse being used

9    as a courthouse in all of the Fifth Circuit, which is all

10   of Texas, Louisiana, and Mississippi.  There have only been

11   four judges in residence in this building.

12           When you came down -- when you came into the

13   building, you saw the pictures on the wall in the hallway.

14   I always tell this story.  My older daughter once asked me,

15   "Hey, Dad, when is your picture going to be up there" and I

16   said, "When I'm dead."  She didn't laugh.

17           That's all the former judges of the district

18   but -- the first judge who ever served in this building, he

19   only served a few years before he passed away.  It was

20   David Bryant.  He didn't have a portrait, but his picture

21   is downstairs.  He served the Eastern District from 1890 to

22   1910.

23           The next judge was actually his son, Randolph

24   Bryant.  That's his picture in the back of the courtroom.

25   He served the Eastern District from 1951 to -- or '31 to

```
 1    '51.  He actually -- back at that time we only had one
 2    judge.  When he was serving, we added a second judge.  We
 3    now have eight of our position -- eight district judges for
 4    the district.  He moved the headquarters from Sherman to
 5    Tyler, which is our current headquarters.
 6            The third judge in residence was Judge Paul Brown,
 7    which is the portrait to my left, your right; and he served
 8    the Eastern District from 1985 until he passed away in
 9    2012.  In 2013 we got the building renamed the Paul Brown
10    United States Courthouse.
11            I will tell you Judge Brown was my mentor.  It was
12    my first job out of law school where I came and worked for
13    him for two years and so -- I have a special connection to
14    Judge Brown and was very close with him and his family.
15            I became the fourth judge in residence when I was
16    confirmed by the Senate on December 19th, 2014.
17            So I just wanted to give a little history.  Also
18    in this building we've made some changes.  At the request
19    of the marshals, you now enter through the Pecan Street.
20    Like if you search for the address, it's 101 East Pecan.
21    But for many years, up until I came here, we used the
22    Travis Street entrance.  So we made changes to make that a
23    little bit easier.
24            We also went back to the original wood windows.
25    In the '60s they put metal windows and put asbestos
```

 1    flooring.  We got rid of all of that.

 2            Anyways, I just wanted to give you a little bit of

 3    background of the building because it's a building I love

 4    and I've worked here, you know, many years.

 5            I hope you will enjoy the experience of federal

 6    jury service.  Jury service is so important to how we

 7    function as a society.  I know some of you are thinking

 8    there's other places I'd rather be than be here on this

 9    Monday morning.  I won't ask for a show of hands on that,

10    but I understand.

11            What I can tell you is that I've had over a

12    hundred jury trials in my little eight-plus years on the

13    bench and I've only had one jury not like the experience

14    and it was just due to the subject matter.  Otherwise, they

15    enjoyed the process of serving.  So I hope you will

16    withhold that judgment whether you want to be here or not,

17    if you are selected, until you actually kind of experience

18    the process.

19            But the experience of federal jury service is so

20    important to how we function in society.  It's something

21    our Founding Fathers put in our Constitution.  It's in the

22    Bill of Rights, both for civil and criminal cases.  So if

23    you are selected for this jury, you are doing your part as

24    a constitutional officer in deciding the matter that you

25    are going to be called upon to decide.

1            So I do hope that you will enjoy it.  There is a

2    dispute here.  And, again, I mentioned this is a criminal

3    case; and we're going to talk about that here in a minute.

4            I also wanted to say, you know, I can't do my job

5    without an amazing team.  When I mentioned about my

6    statistics, it's insane how busy the Sherman Division is.

7            We have two district judges, one in Plano and

8    one -- me here in Sherman.

9            In the federal court system, we look at -- a

10   judge's goal is to have about 400 to 450 caseload.  Mine is

11   over 2,300 and Judge Jordan who is in -- is over 2,100 and

12   so we do the work of -- on the statistics looking, we do

13   the work of, like, eight to nine judges.  There's only two

14   of us.

15           We need more resources, but that's a story and a

16   topic for another day and that's up to Congress to create

17   new positions.  But I just say that just to give you an

18   idea of just how busy this court is.

19           And I could not do my job without an amazing team,

20   and I really do have a wonderful court family here.  I have

21   my court reporter, who is amazing, Chris Bickham.  And I

22   always say she's taking down the official record.  She does

23   an amazing job.  I don't know how she does that, but it's

24   impressive how she catches every word.  There will not be

25   typewritten transcripts available for the jury but, she is

 1    taking down the record just for purposes of appeal later if

 2    necessary.

 3           Also, you've already met my courtroom deputy,

 4    Keary Conrad.  She also does an amazing job, and she is

 5    kind of the face for the jury and will be handling for the

 6    jury selected.

 7           I also have my lawyer.  Emily Norman is over

 8    there.  She is a graduate of Baylor Law School and sitting

 9    where I sat all those years ago back in 1990, and she is

10    there to help me on the legal part of preparing for today's

11    trial.

12           We also have an amazing court security staff.  We

13    call them CSOs.  They do yeoman's work for the court.  And

14    so you will deal with them every time coming into the

15    building and there will be ones here in the courtroom every

16    day.  And so we have Tracy Adair and we have Jeff Bellows

17    who are in here right now.  I don't know if they're doing

18    the whole trial, but they are the face right now and -- but

19    they are all there to assist and help you if you need

20    something.

21           Now, we're beginning a process called *voir dire*."

22    It's a French term that means to speak the truth.  The

23    process enables the parties and the Court to determine

24    which of you would be the best prospective juror for this

25    particular case.  This allows the parties to ask you

```
 1    questions.  The process works best as the questions are
 2    asked that everyone participate.  We want to hear what you
 3    have to say.
 4         One thing that is important to keep in mind in
 5    regards to the questions you're going to be asked this
 6    morning is remember to give full, complete, and truthful
 7    answers to each question.  Remember, ladies and gentlemen,
 8    there is no wrong answer to any of the questions you're
 9    going to be asked as long as you give us full, complete,
10    and truthful answers.
11         Now, what we're trying to decide is -- based on
12    everyone's life experiences, some people might be a better
13    juror for one case than they would for another.  And that's
14    kind of what we're going for here, to see which of you
15    would be the best prospective juror for this case.
16         The example I always use -- and I mentioned I was
17    born and raised outside Pittsburgh, Pennsylvania.  So I'm a
18    Steelers fan.  Any Steeler Nation here?  No.  At least I
19    didn't get booed today.
20         But I will say this.  I've had three
21    Cowboy-related cases so, I mean -- because the Cowboys are
22    headquartered in the Sherman Division, in Frisco.  So even
23    though I'm a Steelers fan, I granted and injunction to let
24    Zeke play years ago when he got suspended by the NFL.
25         So, you know, I'm a fair judge irrespective of
```

 1  whether -- and, actually, I root for the Cowboys unless

 2  they play the Steelers, which only happens every four years

 3  or every five years.

 4          Anyhow, the reason I give that example is I know

 5  about myself -- and if you saw when I watch a Steelers

 6  game -- I'm not necessarily objective.  My wife probably

 7  could attest to it more, too.

 8          So if this was a case involving the Pittsburgh

 9  Steelers, I know I couldn't be a juror on that case.

10  That's an extreme example, but that's what we're going for

11  here because everyone has background life experiences, and

12  so that's what the attorneys are going to be probing.

13          Again, the purpose of the questioning is simply to

14  ensure the jury chosen in this case can be fair and

15  impartial to both sides, be able to listen to the evidence

16  and have an open mind.

17          Jurors must be as free as humanly possible from

18  any bias, prejudice, or sympathy and must not be influenced

19  by preconceived ideas either as to the law or the facts of

20  the case.

21          All you need to bring to serve as a juror is your

22  impartiality along with your own good judgment and common

23  sense.

24          Now, as I mentioned to you, this is a criminal

25  case.  And before I -- I do have a -- I'm going to ask you

1    a couple questions before I turn it over to the attorneys.

2          None of the questions are made to invade your

3    privacy, but we are just trying to figure out which of you

4    would be the best juror for this case.

5          And if there is something of a private nature that

6    you are asked that you don't want to share among the group,

7    let us know and we can call you up later in the process.

8          Remember, again, the function of the jury is to

9    decide questions of fact.  As to what the law is, I will

10   instruct you what the law is.

11         Now, one thing I will tell you is the attorneys

12   have a seating chart that has your name, your juror number,

13   your city you're from, as well as your occupation if you

14   have one; and if you have a significant other or spouse, it

15   has their occupation as well.

16         One thing I didn't tell the attorneys -- I'll tell

17   them now; I forgot to tell them this morning -- is they are

18   going to use your numbers.  Because it's a public record, I

19   don't want your names in the record.  So they are not being

20   rude.  They would like to use your names, but I would

21   instruct them just to use your numbers when they call upon

22   you.

23         And then the other thing is as we get into the

24   process, if you have a response to a question, raise your

25   hand.

```
 1              Wait for one of our fine security officers to
 2    bring you the mic because the acoustics in here aren't very
 3    good, as you probably already realized.
 4              You would stand.
 5              You would say -- not picking on you; it's just
 6    you're right up front here.  Juror 36, you'd say "Juror 36"
 7    and then answer the question.  If you are silent to any
 8    question, we're going to assume the answer is no.
 9              And then one thing is I always try to manage your
10    expectations the best I can.  Like I started late today.
11    That was not my goal to start late.  This is going to take
12    all day, this process of getting the jury seated.
13              So we're going to do part of it and then take a
14    lunch break.  We probably will go into the lunch hour and
15    see if we can get one side finished, but I'll just judge
16    that and see how that goes.
17              And then -- but this will take -- so after all of
18    both sides get to ask all their questions, I'll meet with
19    the attorneys back in chambers and then -- you know, you'll
20    have a little break.  But the goal is to get the jury
21    seated by the end of today so -- but I just want you to
22    understand that that is going to take some time.
23              These are hard benches, I know; and we are going
24    to go for long stretches.  So if you need to stand and
25    stretch, just do so.  They may think that you have a
```

```
 1   question, but I want you to be as comfortable as possible.
 2         Our normal day for hours will be 9:00 to 5:00.
 3   Sometimes we can alter that if we need extra time, but I
 4   think that won't be a problem.
 5         I think in the notice we sent you when we summoned
 6   you here today, we indicated the case would take two weeks.
 7   I still think that's going to be the case.  It could spill
 8   into the third week but I think that's highly doubtful, but
 9   I always want to make sure.  It could spill into --
10   because, like, this week we're not going to have court
11   because I'm speaking in New Orleans on Friday.
12         So we're not having court on Friday; and we'll
13   probably finish just a little bit early, mid afternoon, on
14   Thursday.
15         So I anticipate it taking just two weeks; but it
16   could go over into the third week, just to be fair notice.
17         And I bring that up just because I had this happen
18   once before and it was horrible because I had to be a bad
19   judge and I don't like being bad judge.
20         But what happened is that the person didn't raise
21   their hand and say they had a conflict.  They had a trip
22   planned.  It was an anniversary trip.  The problem was --
23   is that they didn't think they would get selected so --
24   they were like, "We were over here.  We didn't think I'd
25   get selected; so I didn't raise my hand."  And I couldn't
```

```
 1  let them go.  And they were understanding.  They were like,
 2  "I should have said something."
 3          And so that's why I -- please, because the only
 4  time I can deal with it is this time.  I can't deal with it
 5  and I'll be bad judge, basically, if you ask me to get out
 6  after because of a conflict.
 7          So do any of these dates of going over at least
 8  the next two weeks and could spill just a little bit into
 9  the third week -- I don't think that's going to happen, but
10  it could happen -- and working 9:00 to 5:00, does that
11  present any significant problem for anybody?  Now is the
12  time to speak up.
13          Okay.  Just stand and say your juror number.
14          PROSPECTIVE JUROR:  Okay.  Number 36.
15          THE COURT:  And what is the issue?
16          PROSPECTIVE JUROR:  I'm a speech pathologist; and
17  I have two elementary schools, like over 80 kids.  So it
18  just would be really challenging to leave them for two
19  weeks.
20          THE COURT:  Okay.  And I'll take this up at the
21  end.
22          PROSPECTIVE JUROR:  Okay.
23          THE COURT:  You know, you'll be here all day
24  today.
25          PROSPECTIVE JUROR:  Okay.  Okay.
```

Jury Selection, 4/10/2023                    17

```
 1            THE COURT:  I try to accommodate all those.  I
 2   won't deal with it until the end.
 3            PROSPECTIVE JUROR:  Absolutely.
 4            THE COURT:  It just depends on our numbers.
 5            PROSPECTIVE JUROR:  Okay.
 6            THE COURT:  Thank you.
 7            Yes, 37?
 8            PROSPECTIVE JUROR:  37.
 9            Two weeks wouldn't necessarily be a problem.  But
10   if it goes over that, I'm going to pick up my daughter from
11   college out of state.  And my husband just started a new
12   job; so he won't be able to do it.  It's only me.
13            THE COURT:  Okay.  Where is she going to school?
14            PROSPECTIVE JUROR:  Regis in Colorado.
15            THE COURT:  Okay, great.  Great.  Okay.  I
16   understand.  And I don't think that's going to be a problem
17   and we'll be done in two weeks but I just --
18            PROSPECTIVE JUROR:  Just in case.
19            THE COURT:  You've disclosed it; so don't worry.
20   I mean, I wouldn't make you miss that.
21            PROSPECTIVE JUROR:  Okay.
22            THE COURT:  Okay.  Anybody else?
23            Okay.  Very good.
24            And again, as I mentioned, this is a criminal case
25   and I'm going to ask you a couple questions; but before I
```

 1   do that, a couple things I'm going to do is -- of course,

 2   the government always has the burden in a criminal case; so

 3   I'm going to have them read their witness list.

 4        But before they do that, I'll have each side

 5   introduce everybody at counsel table and I'm going to ask

 6   you if you know any of the people.  So I'll ask the

 7   government and then I'll ask the defense and then I'll have

 8   them read their witness list.

 9        Mr. Gonzalez, you want to introduce everyone at

10   your table?

11        MR. GONZALEZ:  Good morning, ladies and gentlemen.

12   My name is Ernest Gonzalez and I'm an Assistant United

13   States Attorney and I office in Plano, Texas.

14        At the table with me, I have Assistant United

15   States Attorney Heather Rattan --

16        MS. RATTAN:  Good morning.

17        MR. GONZALEZ:  -- also from the Plano office.

18        Down on that side of the table, I have Lisa Adams.

19   She is a support specialist from the Plano office.

20        And then on this side, I have AUSA, or Assistant

21   United States Attorney, Lesley Brooks.  Sorry.  I blanked

22   out.  Lesley Brooks.  And she is from our Sherman office.

23        Thank you.

24        THE COURT:  Thank you.

25        Does anybody know anybody on the prosecution, the

```
 1   government's side?

 2          Okay.  On the defense side, who would like to

 3   introduce everybody?

 4          MR. JOE WHITE:  Be happy to.

 5          THE COURT:  Just turn your mic on.

 6          MR. JOE WHITE:  Well --

 7          THE COURT:  Just hit it one time and just wait.

 8          MR. JOE WHITE:  There it is.  Yeah, great.  Thank

 9   you, your Honor.

10          My name is Joe White.  I represent the defendant

11   in this case, Deb Erwin.

12          Also assisting in defending Ms. Erwin, Kate White.

13   I've got to tell you she's my wife; so if I invade her

14   space, just know it's all right.  We're married, and

15   everything's kosher.

16          This is my co-counsel-colleague Matt Cyran.  He

17   will also be assisting during this trial.

18          We have paralegals that are with us, Amber Walker.

19   We have Josh Welch and Phil Karrawitz, who is going to run

20   our IT work.

21          That's our team.

22          THE COURT:  Thank you.

23          Does anybody know anybody on the defense side?

24          Okay.  I'm now going to have the government just

25   go ahead and read all of their witness list, and I'll ask
```

```
 1   the same question does anybody know any of the witnesses.
 2           Mr. Gonzalez --
 3           And this doesn't mean they're going to call all of
 4   these witnesses, but they will list every potential
 5   witness.
 6           MR. GONZALEZ:  Special Agent Justin Marshall,
 7   Department of Homeland Security.
 8           Special Agent Jack Stevens, Department of Homeland
 9   Security.
10           Special Agent Jesus Villarreal, Department of
11   Homeland Security.
12           Special Agent Ignacio Aguirre, Department of
13   Homeland Security.
14           Special Agent Brian Cunningham, Department of
15   Homeland Security.
16           Special Agent Dustin Wall with the Department of
17   Homeland Security.
18           Special Agent Eduardo Escobar, Department of
19   Homeland Security.
20           Special Agent Paul Mack, Department of Commerce.
21           Special Agent Sonia Hurtado, Internal Revenue
22   Service.
23           Assistant Regional Director Richard Clough, Drug
24   Enforcement Administration.
25           Group Supervisor Marcus West, Drug Enforcement
```

```
 1    Administration.
 2            Special Agent Ryan Petrasek with the Drug
 3    Enforcement Administration.
 4            Special Agent Christopher Shary with the Drug
 5    Enforcement Administration.
 6            Special Agent Michael Weigman, Department of
 7    Homeland Security.
 8            Special Agent Ryan Gorman, Department of Homeland
 9    Security.
10            Forensic Accountant John Forakis with the
11    Department of Homeland Security.
12            Forensic Accountant Grace Ellen Howe, with the
13    Department of Homeland Security.
14            Jesus Romero, retired from the Department of
15    Defense.
16            Steven Tochterman, retired from FAA.
17            Special Agent Loretta Moore with the Drug
18    Enforcement Administration.
19            Robert Pincher, computer forensic analyst for the
20    Department of Homeland Security.
21            Task Force Officer Beau Bryce -- or Price,
22    Department of Commerce.
23            Special Agent Ernest Payton with the Department of
24    Commerce retired.
25            Chief Gerard Horner, Department of Commerce,
```

 1    Washington, DC.

 2           Chief Emory Wooden Department of Commerce

 3    Washington, DC.

 4           Lieutenant Colonel Alex Humberto Landino Tellez,

 5    Colombian Air Force.

 6           Raul Francisco De Asis Quevedo Martinez.

 7           Senior Forensic Chemist Scott Wischnewsky of the

 8    Drug Enforcement Administration.

 9           Senior Forensic Chemist Paul Kusko, Drug

10    Enforcement Administration.

11           Forensic Chemist Alexander Walker, Drug

12    Enforcement Administration.

13           Forensic Chemist Angela Cassady with the Drug

14    Enforcement Administration.

15           Forensic Chemist Xiu Liu with the Drug Enforcement

16    Administration.

17           Julio Cesar Olivas-Felix.

18           Sam Sewell.

19           Bobby Watson.

20           Richard Hodkinson.

21           Detective Hernan Alexis Ochoa from Honduras.

22           Joe Gutheinz, retired with the FAA.

23           We have custodian of records from Bank of America,

24    CrossFirst Bank, Navy Federal Credit Union, Wells Fargo,

25    TWA, Ford Electric, Texton Enterprises.

```
 1              Also have Oscar Herrera-Hernandez.

 2              Jaime Max Granados-Alvarado.

 3              Jenner Adrian Suarez-Chan.

 4              Rony Alexander Pena-Gonzalez.

 5              William Estuardo Najarro-Flores.

 6              Kelvin Misael Hernandez-Lorenzana.

 7              Norman Alexis Garcia-Flores.

 8              Nery Oswaldo Ramirez-Ramirez.

 9              Manuel De Jesus Rodas-Lopez.

10              Fermin Alexander Morejon-Guzman.

11              Juan Carlos Rosales-Gonzalez.

12              Pedro Roberto Carrillo-Gudiel.

13              Jose Maria Flores-Hernandez.

14              Guillermo Cardoza-Santiago.

15              Leslly Franzoli Cortez Avila.

16              Raul La Madrid.

17              Marcos Arturo Rosales-Ventura.

18              Rony Ariel Chacon-Lopez.

19              And Miguel Angel Orozco-Orozco.

20              THE COURT:  Thank you, Mr. Gonzalez.

21              Does anybody know any of the potential witnesses

22    for the government?

23              Look around the room.  Does any one juror know

24    another juror on the panel?

25              PROSPECTIVE JUROR:  Not before today.
```

```
 1              THE COURT:  No.  I meant before today.

 2              I assume 11 and 50 know each other; so we'll

 3   just -- where is the mic at?  We'll go with Juror

 4   Number 50.

 5              PROSPECTIVE JUROR:  Tell how I know or who I know?

 6              THE COURT:  Well, just don't say the name.  But

 7   Juror Number 11 you know?

 8              PROSPECTIVE JUROR:  Number 11.  That's correct.

 9              THE COURT:  And how?

10              PROSPECTIVE JUROR:  16 years ago we went to the

11   same church.

12              THE COURT:  And that's the last time?  I mean, do

13   y'all keep in touch since then?

14              PROSPECTIVE JUROR:  No.

15              THE COURT:  Okay.  Very good.  Thank you.

16              And then as I -- I know this is a criminal case.

17              One thing different in the federal system, as the

18   judge, I do all the sentencing.

19              The jury decides whether the government meets

20   their burden of proof on proving the counts against each

21   of -- or against the defendant.

22              If they are convicted, the jury will know nothing

23   about sentencing; and the punishment is something that the

24   Court does down the road.

25              Does that present any significant problem to
```

1    anybody?  Does that bother anybody, that they will have no

2    say, won't have any idea, they will just decide whether the

3    government has met the burden to show beyond a reasonable

4    doubt whether the defendant is guilty of the crimes

5    charged?

6              And then I also just ask this question.  Some

7    people have trouble sitting in judgment.  I had a case

8    where the juror asked to get off the jury after they

9    started deliberating.  I was like, "I can't sit in judgment

10   of somebody."  Well, we didn't ask that question.  So does

11   anybody have any problem sitting in judgment of another

12   person?

13             PROSPECTIVE JUROR:  Can you clarify what you mean

14   by that?

15             THE COURT:  Well, it just means that, you know,

16   everyone looks at -- they have to judge the evidence and

17   decide whether the person is guilty or not guilty -- well,

18   the government has met their burden of proof of being

19   guilty or not.  And so some people just have problem

20   sitting in that judgment over another person.  That's what

21   I mean.

22             I didn't bring a copy of my Indictment, but can

23   you just go through what the charges are?  You don't have

24   to read the Indictment but --

25             These are what the allegations are.

1           MR. GONZALEZ:  Your Honor, Count 1 alleges a

2    violation of 21 USC, Section 846, conspiracy to commit

3    distribution of a controlled substance.

4           Count 2 alleges a violation of Title 21 United

5    States Code, Section 963, conspiracy to import a controlled

6    substance.

7           Count 3 alleges a violation of Title 21 United

8    States Code, Section 959, and 18 USC, Section 2,

9    manufacturing and distributing a controlled substance with

10   the intent to import it into the United States and aiding

11   and abetting.

12          Count 4 alleges a violation of Title 18 United

13   States Code, Section 1956, conspiracy to commit money

14   laundering.

15          Count 5 alleges a violation of 18 USC,

16   Section 371, conspiracy to commit export violations.

17          Count 6 alleges a violation of Title 18 United

18   States Code, Section 371, conspiracy to commit violations

19   against a registration with the FAA.

20          And Count 7 alleges a violation of Title 18 United

21   States Code, Section 1349, wire fraud.

22          THE COURT:  Thank you.

23          Those are the various counts that are being

24   asserted, and that's an accusation against the defendant.

25   My question is:  Is anybody here going to just assume the

1    defendant had to do something wrong just because they have

2    been indicted?

3            The reason I say that is it's just an accusation.

4    The government has to prove the case beyond a reasonable

5    doubt.  I just want to see is anybody just going to assume,

6    well, they have been indicted so there has to be something

7    wrong?

8            So will everyone hold the government to their

9    burden of proof?

10           Everyone raise hands.  All hands up?

11           Okay.  Very good.  Very good.

12           Okay -- oh, I have one more question to ask.

13   Let's see.  Oh, does anyone here or have a close friend or

14   family member that has been convicted for a crime

15   punishable either in federal or state court, nothing -- not

16   traffic crimes, like not speeding tickets, something more

17   serious than that?  Does anybody have anybody there?

18           Okay.

19           PROSPECTIVE JUROR:  Can you repeat that?

20           THE COURT:  Yes.

21           Just does anybody here, either yourself, a close

22   family member or close friend, been convicted of a crime

23   either in state or federal court that is more than a

24   traffic ticket?

25           Okay.  We'll go around.  I think Number 10.

```
 1              PROSPECTIVE JUROR:  I had a friend that was
 2   convicted of a sex crime in federal court.
 3              THE COURT:  Okay.  And were they treated fairly by
 4   the process, in your opinion?
 5              PROSPECTIVE JUROR:  No.
 6              THE COURT:  Okay.  And would that impact your
 7   ability to serve as a juror?
 8              PROSPECTIVE JUROR:  I don't believe so.
 9              THE COURT:  Well, you don't think so or -- I mean,
10   could you set that aside and just be an independent juror?
11              PROSPECTIVE JUROR:  No.
12              THE COURT:  Okay.  So you first gave kind of a
13   middle-of-the-road answer, and now you don't think you
14   could.  Tell me why just because you think -- why don't you
15   think you could be a fair juror?
16              PROSPECTIVE JUROR:  I just don't believe he was
17   treated fairly.
18              THE COURT:  Okay.  That's fine.  Thank you.  I
19   appreciate the candor.
20              PROSPECTIVE JUROR:  Juror Number 29.
21              My brother was convicted of a federal sex crime.
22              THE COURT:  Okay.  And was he treated fairly by
23   the process in your opinion?
24              PROSPECTIVE JUROR:  No.
25              THE COURT:  And would that impact your ability to
```

```
 1   serve as a juror on a criminal case?

 2          PROSPECTIVE JUROR:  No.

 3          THE COURT:  So you could be an independent juror

 4   and decide this case -- set aside anything that happened to

 5   your brother?

 6          PROSPECTIVE JUROR:  Correct.

 7          THE COURT:  Okay.  Thank you.

 8          PROSPECTIVE JUROR:  Juror 61.

 9          My cousin was convicted and arrested for drunk

10   driving and killing someone.

11          THE COURT:  And was he treated fairly by the

12   process?

13          PROSPECTIVE JUROR:  He asked for release several

14   times and was denied by the judge so --

15          THE COURT:  But ultimately was he convicted?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  And do you think that he was treated

18   fairly by the process leading up to his conviction?

19          PROSPECTIVE JUROR:  To be honest, not by the judge

20   but --

21          THE COURT:  I'm sorry?

22          PROSPECTIVE JUROR:  To be honest, not by the judge

23   but by the jury.  I mean, I believe he was guilty.

24          THE COURT:  Okay.  So you had an issue with the

25   judge, not necessarily with the jury.
```

1          PROSPECTIVE JUROR:  Not the jury, yeah.

2          THE COURT:  So would that impact your ability to

3  serve as a juror on a criminal case?

4          PROSPECTIVE JUROR:  No.  It won't affect my

5  ability, but I just wanted to be honest.

6          THE COURT:  No.  Yeah, that's -- we want to hear

7  all this stuff.  This is all good information for counsel

8  and the Court.

9          PROSPECTIVE JUROR:  I'm Juror 56.

10          I have a close friend that was charged with a

11  third-degree felony sex crime.

12          THE COURT:  Okay.  And were they treated fairly by

13  the process?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  And would that impact your ability to

16  serve as a juror?

17          PROSPECTIVE JUROR:  No, sir.

18          THE COURT:  Okay.  Thank you.

19          PROSPECTIVE JUROR:  Juror 52.

20          Father, drug-related charges.

21          THE COURT:  And was it federal or state court

22  or --

23          PROSPECTIVE JUROR:  It was state.

24          THE COURT:  And was your father treated fairly by

25  the process?

```
1              PROSPECTIVE JUROR:  I wasn't alive --

2              THE COURT:  Oh, okay.

3              PROSPECTIVE JUROR:  -- at the time.

4              THE COURT:  Well, would that impact your ability

5    to serve as a juror?

6              PROSPECTIVE JUROR:  I don't believe so, no.

7              THE COURT:  Okay.  Thank you.

8              Anybody else?

9              PROSPECTIVE JUROR:  My grandson --

10             THE COURT:  Juror Number 49.

11             PROSPECTIVE JUROR:  49.  Sorry.

12             THE COURT:  That's okay.

13             PROSPECTIVE JUROR:  My grandson was convicted of

14   possession of controlled substance, but he is now rehabbed.

15             THE COURT:  I'm sorry?

16             PROSPECTIVE JUROR:  But he is now rehabbed and

17   doing great.

18             THE COURT:  Okay.  And was he treated fairly by

19   the process?

20             PROSPECTIVE JUROR:  As far as I know.  It's not in

21   Texas; it was in another state.

22             THE COURT:  That's fine.

23             And would that impact your ability to serve as a

24   juror?

25             PROSPECTIVE JUROR:  I think the judge -- he didn't
```

 1   have a jury trial.  He --

 2          THE COURT:  No.  I'm saying would it impact your

 3   ability to serve as a juror?

 4          PROSPECTIVE JUROR:  No.

 5          THE COURT:  Okay.  Thank you.

 6          And 38.

 7          PROSPECTIVE JUROR:  Juror Number 38.

 8          My son-in-law was convicted in federal court of

 9   real estate fraud some years ago, financial crimes.

10          THE COURT:  And was he treated fairly by the

11   process, in your opinion?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  Okay.  And how would that impact your

14   ability to serve as juror, or would it?

15          PROSPECTIVE JUROR:  I like to think it wouldn't.

16   I feel that it wouldn't.

17          But I also many years ago was convicted of a

18   second-degree misdemeanor and I was mistreated very badly

19   by the agency that arrested me, and that does potentially

20   impact my --

21          THE COURT:  So it's safe to say you probably don't

22   think you're the best juror for a criminal case.  Is that

23   what you're telling me?

24          PROSPECTIVE JUROR:  I hate to say that; but I do

25   have some bias, yes.

```
 1          THE COURT:  No.  We want all your candor so

 2   that's -- no, I appreciate it.  Thank you.

 3          PROSPECTIVE JUROR:  Okay.  Thank you.

 4          THE COURT:  And then I think back -- okay.  I'll

 5   come back -- or we can go right now.  That's fine.

 6          PROSPECTIVE JUROR:  Juror Number 3.

 7          I have an aunt that was convicted of a felony for

 8   mismanagement of funds in a probate case that was actually

 9   brought on by my father and myself; so I just wanted to

10   have full disclosure there.

11          THE COURT:  Okay.  And were they treated fairly by

12   the process, in your opinion?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  Would that impact your ability to

15   serve as a juror?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  Okay.  Thank you, ma'am.

18          PROSPECTIVE JUROR:  Juror Number 1.

19          My nephew has been arrested and convicted of

20   having a controlled substance.

21          MR. JOE WHITE:  Couldn't hear that, Judge.  I'm

22   sorry.

23          PROSPECTIVE JUROR:  A controlled substance

24   conviction.

25          THE COURT:  Her nephew.
```

```
 1              PROSPECTIVE JUROR:  And he is a minor.

 2              THE COURT:  Okay.  Do you believe that he was

 3    treated fairly by the process?

 4              PROSPECTIVE JUROR:  Yes.

 5              THE COURT:  Would that impact your ability to

 6    serve as a juror?

 7              PROSPECTIVE JUROR:  No.

 8              THE COURT:  Okay.  Thank you.

 9              I think we have Number 6.

10              PROSPECTIVE JUROR:  Number 6.

11              When you say "convicted," do you mean they were

12    seen through to be guilty beyond a reasonable doubt or --

13              THE COURT:  Well, guilty or acquitted.  I mean

14    either way.

15              PROSPECTIVE JUROR:  Oh, okay.  My sister had a

16    minor possession of marijuana and paraphernalia, I believe.

17              THE COURT:  And was she convicted or pled guilty

18    or --

19              PROSPECTIVE JUROR:  It was -- the case was

20    dropped.

21              THE COURT:  Oh, the case was dropped?

22              PROSPECTIVE JUROR:  She did go through the state

23    court system, I believe.

24              THE COURT:  And was she treated fairly, in your

25    opinion?
```

```
 1              PROSPECTIVE JUROR:  I think so.
 2              THE COURT:  Would that impact your ability to
 3  serve as a juror?
 4              PROSPECTIVE JUROR:  No.
 5              THE COURT:  Okay.  Thank you.
 6              Okay.  16.
 7              PROSPECTIVE JUROR:  Juror 16.
 8              My son was discharged from military service for
 9  possession of a controlled substance and, prior to
10  discharge, spent some time in prison in, I believe,
11  Quantico.
12              THE COURT:  And was he treated fairly, in your
13  opinion?
14              PROSPECTIVE JUROR:  Yes, he was.
15              THE COURT:  And would that impact your ability to
16  serve as a juror?
17              PROSPECTIVE JUROR:  No.
18              THE COURT:  Okay.  Thank you.
19              I know we have 35 back here so --
20              PROSPECTIVE JUROR:  Juror Number 35.
21              I personally was convicted of a misdemeanor crime,
22  possession of marijuana.
23              THE COURT:  Okay.  Were you treated fairly by the
24  process?
25              PROSPECTIVE JUROR:  In the court process, yes,
```

Jury Selection, 4/10/2023                                36

```
1    uh-huh.

2            THE COURT:  And would that impact your ability to

3    serve as a juror?

4            PROSPECTIVE JUROR:  No.  I don't believe so.

5            THE COURT:  Okay.  Anybody else?

6            Oh, one more over here, Juror 45.

7            PROSPECTIVE JUROR:  Juror 45.

8            My son was arrested for controlled substance, and

9    it's still an ongoing process.

10           THE COURT:  Okay.  So it's not over yet.

11           PROSPECTIVE JUROR:  Not over yet.

12           THE COURT:  And would that impact your ability to

13   serve as a juror in the case?

14           PROSPECTIVE JUROR:  Yes.

15           THE COURT:  Okay.  And has he been treated fairly,

16   in your mind?

17           PROSPECTIVE JUROR:  As of right now, yes.

18           THE COURT:  Okay.  But you think you couldn't be a

19   good juror on a criminal case because of that experience?

20           PROSPECTIVE JUROR:  Yes.

21           THE COURT:  Okay.  Thank you.

22           Anybody else?

23           Okay.  Well, thank you very much.  I'm going to

24   turn over to the lawyers.  And, again, I know that this is

25   all going to take some time; but it's just part of the
```

 1  process.

 2          And the one thing I didn't tell you, for the jury

 3  selected there is one little bonus that will make your stay

 4  here a little bit nicer other than just the process.  I'm a

 5  baking judge.

 6          So for every week of a jury -- every trial I make

 7  something for the jury.  So it will probably be like mid

 8  week, but I'll make something homemade or something so -- I

 9  don't know what that will be yet this week but -- so that's

10  a bonus.  So that will brighten your day right there,

11  right?

12          Okay.  So let me go ahead and turn it over to the

13  government.  Ms. Rattan, are you going to do this?

14          MS. RATTAN:  Yes, thank you.  May it please the

15  Court?

16          Members of the panel, good morning.

17          In this case I realize you don't believe it now,

18  but 12 of you will actually serve as jurors.  I know I've

19  been summoned before and I think, "I'm a lawyer.  I'm a

20  prosecutor.  They're not going to want me."  Everyone

21  thinks, "They're not going to want me."

22          Twelve of you will serve, and I believe that Judge

23  Mazzant will also seat alternates.  And the 12 of you who

24  serve will sit over here in the jury box and listen to the

25  evidence.

```
 1              And before you listen to the evidence, an oath
 2    will be administered to you; and the oath will be:  Do you
 3    swear or affirm that you will listen to the evidence and
 4    render a true verdict according to the law and the
 5    evidence?  That will be the oath that you are asked to
 6    take.
 7              So this portion of the trial is called voir dire.
 8    Judge Mazzant mentioned it.  It's our only chance, as the
 9    lawyers in the case, to ask you questions about your
10    thoughts and your impressions about evidence and law that
11    we think will be applicable.
12              We don't tell you what the facts are and then say,
13    "What do you think?"  We ask you about what the law is that
14    we think that Judge Mazzant will ultimately decide applies
15    in this case.
16              So in this case what we have is evidence that
17    involves airplanes.  And Ernest Gonzalez read the charges
18    to you.  The defendant is charged in a seven-count
19    indictment, and each of the counts of the Indictment -- and
20    you'll hear, the 12 of you who serve -- relate to airplanes
21    and money related to airplanes.  So I want to talk to you
22    about that.
23              We, as a country, don't always agree.  We don't
24    always come together.  But there are certain things in our
25    collective hearts and memories that we know exactly where
```

```
1   we were and what we were doing at the moment that something

2   happened.

3              And I think we all know where we were and what we

4   were doing, those of us who were of age, on September 11th

5   of 2001.  That's an event in our collective memory and

6   history as a country that those of us who were alive and

7   had memory will never forget.

8              So let me ask you, Juror Number 7, where were you

9   and what were you doing?

10             PROSPECTIVE JUROR:  I was at my cousin's house --

11             THE COURT:  Let's wait for the mic, though.

12             PROSPECTIVE JUROR:  Oh, I'm sorry.

13             MS. RATTAN:  I'm sorry.  I should have asked for

14  the microphone.

15             THE COURT:  The acoustics in here aren't very

16  good.

17             PROSPECTIVE JUROR:  I was at -- I was in the

18  process of moving, and I was staying overnight at my

19  cousin's house.  I walked downstairs, you know, for

20  breakfast that morning; and he and I -- there it was on the

21  TV.  So that's where I was.  That was in Austin, Texas.

22             MS. RATTAN:  Uh-huh.  And you'll always remember

23  that.

24             PROSPECTIVE JUROR:  Always.

25             MS. RATTAN:  Always.
```

1          It was 8:46 a.m. in New York City when the

2    first -- the North Tower was hit, and then about 17 minutes

3    later, the South Tower was hit.

4          So were you aware and watching the news when the

5    first tower was hit?

6          PROSPECTIVE JUROR:  I believe we were -- I believe

7    we did see the first tower hit, yes.

8          MS. RATTAN:  Uh-huh.  And let me ask Juror --

9    thank you.

10          Juror Number 9, do you remember where you were and

11    what you were doing?

12          PROSPECTIVE JUROR:  I'm going to get emotional.

13          MS. RATTAN:  I know.  It's very -- yes.

14          PROSPECTIVE JUROR:  I had just taken my kids to

15    school and I came back.

16          MS. RATTAN:  And you saw the news.

17          PROSPECTIVE JUROR:  Yeah.

18          MS. RATTAN:  Right.

19          Let me ask Juror 23 -- I'm asking people who look

20    more my age.

21          PROSPECTIVE JUROR:  Juror 23.

22          I was on a business trip.  I was in Los Angeles,

23    California, and remember specifically the chatter on the

24    news prior to getting to my client's business.  Yeah, I

25    remember vividly.

```
 1              MS. RATTAN:  Uh-huh.  Thank you.

 2              And we still can't believe it.  And what was

 3  weaponized in that case?  8:46 a.m. in New York City,

 4  7:46 a.m. here in North Texas, the North Tower was hit.

 5  17 minutes later the South Tower was hit.  We all know the

 6  Pentagon was hit, and ultimately the fourth flight was

 7  taken down by people on the plane in a field in

 8  Pennsylvania.

 9              So that's airplanes.  That's airplanes and the

10  history of our country.  Our country -- the laws in our

11  country closely and carefully regulate aircraft.  Hopefully

12  we did before, but certainly we do today.

13              The Federal Aviation Administration oversees

14  aircraft registration and exportation.  And what do they

15  want to know about aircraft and what do we, as American

16  citizens, want to know that somebody's watching?  Who owns

17  those aircraft and where are those aircraft and what are

18  the aircraft --

19              MR. JOE WHITE:  Your Honor, I object.  I've yet to

20  hear a question.  She's just preaching.

21              THE COURT:  Well, overruled.

22              MS. RATTAN:  The federal government regulates

23  aircrafts.  Is there anyone here who has concern about

24  aircrafts being regulated, about there being rules that

25  relate to aircrafts that people have to follow?
```

```
 1              Is there anyone here who thinks that regulating
 2    the aircraft industry, requiring that aircrafts be
 3    registered so we know who has the plane and requiring that
 4    we know where the airplane is, where is it hangared and
 5    when is it exported -- does anyone here think that that
 6    type of regulation in the aircraft industry is too much,
 7    it's not necessary?  Does anyone feel that way?
 8              As Ernest Gonzalez told you, my name is Heather
 9    Rattan.  I'm an Assistant U.S. Attorney, and I've been one
10    a long time.  I was on September 11th, 2001; and I was
11    actually at our office.  And when the first tower was hit,
12    I stayed -- I got there early because I was on a flex
13    schedule.  And I didn't even come out of my office when
14    people were saying that --
15              MR. JOE WHITE:  Judge, this case has nothing to do
16    with 9/11.  I object.
17              THE COURT:  Okay.  Overruled.  I give free rein on
18    the voir dire.
19              Go ahead.
20              MS. RATTAN:  It seemed like an accident.  That's
21    what I first thought.  No, you know, someone flew a crop
22    jet into the North Tower, right?  Then 17 minutes later, we
23    knew there was no accident.  It wasn't a mistake.
24              Defense counsel is right.  This defendant, Debra
25    Mercer-Erwin, wasn't there at 9/11.  She's not responsible
```

1    for what happened at the towers or in the field in

2    Pennsylvania or at the Pentagon.  She's not.  But this

3    defendant has two companies, two corporations.

4            And Judge Mazzant already asked you, I think, if

5    anyone knew any of the parties; and her name is Debra

6    Mercer-Erwin.  Does anyone know the defendant in this case?

7    Has anyone heard of the defendant in this case?

8            She has two companies.  One of the companies is

9    called Wright Brothers Aircraft Title, and the other

10   company is called Aircraft Guaranty Corporation.  She's

11   owned this first business, Wright Brothers Aircraft Title,

12   for a number of years; and the second business, she

13   purchased in late 2016.

14           This, Wright Brothers Aircraft Title, is located

15   in Oklahoma.  The second business, Aircraft Guaranty

16   Corporation, was originally located in Onalaska, Texas,

17   which is here in the Eastern District of Texas; and then

18   she moved it to Oklahoma where she has her other business.

19           Is anyone here familiar with either one of these

20   businesses, Aircraft -- Wright Brothers Aircraft Title or

21   Aircraft Guaranty Corporation?  Anybody?

22           Is there anyone here who is involved in the

23   airplane business either as a pilot, a mechanic, it's a

24   hobby that you have?  Anybody?

25           Let me ask you to raise your number.  Is there

 1    anyone here on the first couple of rows, anyone involved in

 2    the aircraft industry?

 3           Turning to this side of the room, my right side of

 4    the room, anyone involved in the aircraft industry?

 5           Does anyone know a pilot, have a pilot in the

 6    family, anything like that?

 7           Okay.  Let me start up here.  Juror Number 1, yes,

 8    ma'am -- and let me ask you to just wait for the

 9    microphone.  Sorry.

10           PROSPECTIVE JUROR:  Juror Number 1.

11           My husband's first cousin is a pilot, and my

12    niece -- well, actually, she is my second cousin; but I

13    think of her as a niece because she is the same age as my

14    son.  But she is going to school to be a pilot.

15           MS. RATTAN:  Okay.  Thank you for letting us know

16    that.

17           A commercial pilot?  Private pilot?  Do you know?

18           PROSPECTIVE JUROR:  Private pilot for the cousin,

19    and the girl is undecided.

20           MS. RATTAN:  Okay.  Is there anything about that

21    that you think will affect you when you know that this case

22    relates to aircraft, the registration, the exportation, the

23    use of aircraft?  Anything about that?

24           PROSPECTIVE JUROR:  No.

25           MS. RATTAN:  Thank you for letting us know.

```
 1              And then Number 6, yes, sir.

 2              PROSPECTIVE JUROR:  Number 6.

 3              My great uncle was a pilot -- helicopter pilot in

 4   Vietnam.  That's all.

 5              MS. RATTAN:  Okay.  No.  Thank you for letting us

 6   know.  Anything about that that you think would affect you

 7   here, knowing that the charges relate to the use,

 8   registration, exportation of aircraft?

 9              PROSPECTIVE JUROR:  No.

10              MS. RATTAN:  Okay.  Thank you.

11              And then Number 14, I think, is next.

12              PROSPECTIVE JUROR:  Juror 14.

13              I have a cousin who is a private pilot in Florida.

14              MS. RATTAN:  Okay.  How close are you all?  Do you

15   talk about the business or --

16              PROSPECTIVE JUROR:  I mean, some, yeah.

17              MS. RATTAN:  Okay.  Do you know enough about it to

18   think that it would influence you here at all?

19              PROSPECTIVE JUROR:  No.

20              MS. RATTAN:  Okay.  Thank you for letting us know.

21              PROSPECTIVE JUROR:  Juror 13.

22              MS. RATTAN:  13?

23              PROSPECTIVE JUROR:  Yes, 13.

24              My coworker's husband is a pilot.

25              MS. RATTAN:  Okay.  And do you-all talk about it?
```

1   Private pilot?

2          PROSPECTIVE JUROR:  He has his sports pilot

3   license.

4          MS. RATTAN:  Okay.  Is there anything about that

5   that you think would affect or influence you here?

6          PROSPECTIVE JUROR:  No.

7          MS. RATTAN:  Okay.  Thank you.

8          Yes, sir, Number 12.

9          PROSPECTIVE JUROR:  My uncle is -- he works in the

10  FAA.  I think he's pretty high up in the FAA.  I'm not

11  exactly sure what he does, though; but I do know that he's

12  involved in that.

13         MS. RATTAN:  Where?  Texas?  Oklahoma?

14         PROSPECTIVE JUROR:  He's here in Texas.

15         MS. RATTAN:  And how often do you talk to him?

16         PROSPECTIVE JUROR:  Not very much at all.

17         MS. RATTAN:  Holidays maybe or --

18         PROSPECTIVE JUROR:  Maybe holidays, but not really

19  about business or anything.

20         MS. RATTAN:  Is there anything about that that you

21  think will influence you or affect you in this case?

22         PROSPECTIVE JUROR:  No.

23         MS. RATTAN:  Okay.  Thank you.

24         PROSPECTIVE JUROR:  My granddaughter works on

25  planes.

```
 1            MS. RATTAN:  Okay.  What -- where does she work?

 2   What does she --

 3            PROSPECTIVE JUROR:  Indiana.

 4            MS. RATTAN:  Indiana?

 5            PROSPECTIVE JUROR:  Yes.

 6            MS. RATTAN:  And she works for a company?

 7            PROSPECTIVE JUROR:  Yeah, she works for a company.

 8            MS. RATTAN:  How much do you know about what she

 9   actually does?

10            PROSPECTIVE JUROR:  Not much.

11            MS. RATTAN:  Okay.

12            PROSPECTIVE JUROR:  Not much.

13            MS. RATTAN:  Is there anything about that that you

14   think will affect you here?

15            PROSPECTIVE JUROR:  No.

16            MS. RATTAN:  Thank you for letting us know.

17            PROSPECTIVE JUROR:  Okay.

18            MS. RATTAN:  And for those of us -- you who

19   ultimately serve as jurors, I anticipate that Judge Mazzant

20   will instruct you -- and I know those of you who have

21   contact with people who know aircraft, Judge Mazzant will

22   instruct you that you are not to talk about the case to

23   anybody; so you wouldn't be able to ask their opinion or

24   any ideas that they have about aircraft.

25            Yes, sir, Number 16.
```

1              PROSPECTIVE JUROR:  Yeah, Number 16.

2              I have a friend who is a commercial pilot for a

3      private company.

4              MS. RATTAN:  Is there anything about that -- how

5      close a friend are you?  Is there anything about that that

6      you think would affect you here?

7              PROSPECTIVE JUROR:  We see each other from time to

8      time at the dog park; and, yeah, we don't really discuss

9      what he does.

10             MS. RATTAN:  Okay.  Okay.  Thank you for letting

11     us know.

12             Going back, yes, sir, 21.

13             PROSPECTIVE JUROR:  Number 21.

14             My father is a retired commercial airline pilot.

15             MS. RATTAN:  For what airline?

16             PROSPECTIVE JUROR:  Delta.

17             MS. RATTAN:  Is there anything about that that you

18     think -- I'm guessing you have knowledge of the industry

19     based on it's your father.

20             PROSPECTIVE JUROR:  I have flown on a plane.

21             MS. RATTAN:  Okay.  Is there anything about your

22     dad being a commercial airline pilot that you think will

23     affect you here?

24             PROSPECTIVE JUROR:  No.

25             MS. RATTAN:  Okay.  Thanks for letting us know.

```
 1              Coming back down, yes, 25.
 2              PROSPECTIVE JUROR:  Juror 25.
 3              My ex-sister-in-law is a pilot.
 4         MS. RATTAN:  Okay.  And, again, same question.
 5              PROSPECTIVE JUROR:  No.
 6         MS. RATTAN:  Okay.  Nothing you think will affect
 7    you in this case?
 8              PROSPECTIVE JUROR:  No, ma'am.
 9         MS. RATTAN:  All right.  Thank you.
10              PROSPECTIVE JUROR:  Uh-huh.
11         MS. RATTAN:  29.
12              PROSPECTIVE JUROR:  Juror 29.
13              My father-in-law is a pilot.  He was a fighter
14    pilot for the Honduran Air Force, trained with the U.S. Air
15    Force, and flies small planes commercially.
16              I also used to write software for a private jet
17    ownership company.  They sold fractional shares of private
18    jets.  So I wrote booking software as well as accounting
19    software for that private jet company.
20         MS. RATTAN:  So you're pretty familiar with the
21    industry.  Is that fair to say?
22              PROSPECTIVE JUROR:  Yes.
23         MS. RATTAN:  Is there anything about your
24    familiarity with the airline/airplane industry that you
25    think will influence or affect you here?
```

Jury Selection, 4/10/2023                        50

```
 1              PROSPECTIVE JUROR:  No.
 2              MS. RATTAN:  And I realize you all haven't heard
 3   the evidence and we're asking you these things in
 4   anticipation, but this is how the process works.
 5              And thank you for letting us know.
 6              And then going on down, Number 28.  Yes, sir.
 7              PROSPECTIVE JUROR:  Number 29 (sic) here.
 8              I used to work for American Airlines as a internal
 9   auditor, IT to be specific.
10              And also I worked for Boeing so -- in IT -- also
11   IT capacity.  So it's -- I don't know -- I don't think it
12   is my exposure to this company is going to affect my --
13              MS. RATTAN:  Okay.
14              PROSPECTIVE JUROR:  -- ability here.
15              MS. RATTAN:  You've personally worked there and
16   been pretty involved.  What were your positions?
17              PROSPECTIVE JUROR:  Yeah, IT audit, IT compliance,
18   reviewing regulations for the organizations.
19              MS. RATTAN:  Okay.  Thank you for letting us know.
20              And 28 and 29, since you all have more personal
21   interaction with the industry and the business, as we go
22   along, if anything comes to mind, will you please let us
23   know.
24              PROSPECTIVE JUROR:  Okay.  Thank you.
25              MS. RATTAN:  Thank you.
```

1              And then going on down, the rest of that row and

2      the back row?

3              Okay.  Thank you.

4              And then coming over here to this side of the

5      room, 39.  Yes, ma'am.

6              PROSPECTIVE JUROR:  39.

7              My husband is a retired commercial and military

8      pilot.  And then I have two sons that are pilots, both

9      working for American Airlines; and one is also a military

10     pilot.

11             MS. RATTAN:  Uh-huh.  What branch of the military?

12             PROSPECTIVE JUROR:  Air Guard for the son; and

13     then my husband was Marine Corps, helicopters.

14             MS. RATTAN:  And then what company did your

15     husband work for?

16             PROSPECTIVE JUROR:  Southwest.

17             MS. RATTAN:  Is there anything about --

18             It's the family business, basically.

19             PROSPECTIVE JUROR:  Yeah, but no.

20             MS. RATTAN:  Okay.

21             -- that you think will affect you here?

22             PROSPECTIVE JUROR:  No.

23             MS. RATTAN:  Okay.  Thank you.

24             40.

25             PROSPECTIVE JUROR:  Juror Number 40.

```
 1              My dad was -- served in the U.S. Air Force.  He
 2    was a navigator for an airplane.  I don't feel like
 3    anything would affect my ability to --
 4              MS. RATTAN:  Okay.  Thank you for letting us know.
 5              41, yes, sir.
 6              PROSPECTIVE JUROR:  A good friend of mine has a
 7    plane at Love Field he keeps.  And my neighbor has got a --
 8    fractional owner of a Learjet and a King Air.  I haven't
 9    flown in those, though.
10              MS. RATTAN:  Okay.  Do you know much about planes
11    and --
12              PROSPECTIVE JUROR:  I -- it's kind of -- I fly
13    millions of miles over the last ten years but no other than
14    sitting in them.
15              MS. RATTAN:  Okay.  Okay.  Thank you.
16              Coming down, was there anyone else on the row?
17              46, yes, ma'am.
18              PROSPECTIVE JUROR:  Number 46.
19              I have a friend who was a commercial pilot for
20    American Eagle but now works for a private company.
21              And then I have another friend who is a airline
22    mechanic for UPS.
23              MS. RATTAN:  Okay.  Is there anything about that
24    that you think will affect you --
25              PROSPECTIVE JUROR:  I don't believe so.
```

Jury Selection, 4/10/2023                           53

```
 1              MS. RATTAN:  -- in listening to the evidence in
 2    this case?
 3              PROSPECTIVE JUROR:  I'm sorry?
 4              MS. RATTAN:  In listening to the evidence in this
 5    case.
 6              PROSPECTIVE JUROR:  I don't believe so.
 7              MS. RATTAN:  Okay.  Thank you.
 8              PROSPECTIVE JUROR:  Juror 50.
 9              I know several military pilots, a couple
10    commercial pilots, and a couple private pilots but not much
11    about any of it.  And I like an aisle seat when I fly.
12    That's about all I've got.
13              MS. RATTAN:  Okay.  Me, too.  I want to get out.
14              Okay.  Thank you.
15              Coming back down.
16              PROSPECTIVE JUROR:  54.
17              MS. RATTAN:  Yes, sir.
18              PROSPECTIVE JUROR:  My uncle is a flight engineer
19    for the Air Force, and I've got a very close cousin whose
20    husband is currently going to school to be a pilot.  His
21    father is a retired American Airlines pilot.  But I don't
22    know anything about planes.
23              MS. RATTAN:  Okay.  Thank you for letting us know,
24    though.  I appreciate it.
25              And 52, yes, sir.
```

1           PROSPECTIVE JUROR:  52.

2           In-laws who are commercial pilots, lots of friends

3    who are private and commercial pilots, lots of

4    ex-colleagues and contacts at NASA who are engineers and

5    pilots; and I spent time there as well doing research

6    flight stuff in Palmdale.

7           MS. RATTAN:  Okay.  So very knowledgeable about --

8           PROSPECTIVE JUROR:  Used them a lot and lots of

9    friends who are very knowledgeable and --

10          MS. RATTAN:  Okay.  Thank you.  And the same

11   question.  Anything about that that you think will affect

12   you here?

13          PROSPECTIVE JUROR:  Bias towards regulations and

14   security and -- having experienced that -- and from a

15   military perspective as well.  But no impedance in hearing

16   facts and rendering judgment.

17          MS. RATTAN:  No preconceived ideas?  No

18   predetermination about whether the defendant's guilty?

19          PROSPECTIVE JUROR:  Relevant to a case, no.

20          MS. RATTAN:  Okay.  Okay.

21          And 52, 29, 28, you all have more personal

22   knowledge; so as things come up, if you'll let us know.

23          And thank you for letting us know about your

24   experience, your background.

25          PROSPECTIVE JUROR:  Juror 58.

```
 1                 My stepdad used to do soaring clubs.  I grew up
 2       always in a plane or the truck being towed in front.
 3                 One of my college roommates was a pilot.  I flew
 4       with him a few times.  Don't know much about it.
 5                 And my father-in-law works for Lockheed Martin as
 6       a senior level.  He builds the planes.  But I still don't
 7       know anything.  I've been there once.
 8                 MS. RATTAN:  Okay.
 9                 PROSPECTIVE JUROR:  But I don't think it will
10       affect anything.
11                 MS. RATTAN:  Okay.  Thank you.
12                 And anybody else going back?  Anyone?
13                 So it's important to -- if any of these people who
14       we just heard have exposure, experience, lengthy experience
15       with the airline industry -- that if they are one of the
16       members of the panel, if they serve as a juror, the other
17       11 of you -- once the evidence has come in and Judge
18       Mazzant has told you what the law is, when you start to
19       deliberate, you can't turn to Juror Number 52 and ask him
20       something about airplanes or the airline industry.
21                 And, Juror Number 52 and 28 and 29, you all
22       wouldn't be able to apply your specialized knowledge.
23                 Does anyone have any concerns about that?
24                 Yes, sir, 29.
25                 PROSPECTIVE JUROR:  I have a question about --
```

 1    I'll just wait.

 2            MS. RATTAN:  Sorry.

 3            PROSPECTIVE JUROR:  Juror 29.

 4            What do you mean that I can't apply my knowledge

 5    that I have?

 6            MS. RATTAN:  Well, you can use your background and

 7    your experience in your deliberations.  But what Judge

 8    Mazzant, I believe, will instruct you is that we can't have

 9    a lawyer who is selected for the panel back in the jury

10    room telling the other 11 what the law is.

11            Or let's say there are translations that come into

12    evidence from Spanish to English and we have a Spanish

13    speaker in the jury room and the Spanish speaker says, "I

14    don't think that's what they're saying."

15            So anytime a juror has -- let's say it's a medical

16    malpractice lawsuit and a doctor is a juror.  Anytime a

17    juror has specialized knowledge or training, they can --

18    not divorce themselves from what they know.  You can use it

19    to form your opinion and your conclusions.  But you can't

20    be another witness back in the jury room and say, "Guys,

21    here's what I know."

22            So it's a line that has to be drawn because the

23    parties in the case would have a right to cross-examine and

24    ask questions of any specialized knowledge that you would

25    be sharing with other jurors.

1           PROSPECTIVE JUROR:  I understand.  Thank you.

2           MS. RATTAN:  Okay.  And knowing that, is that

3    something you could do and serve?

4           PROSPECTIVE JUROR:  I think it might be difficult,

5    but I would -- I would attempt to do that.

6           MS. RATTAN:  Okay.  And this question -- it's kind

7    of like flying a plane.  When I get on Southwest Airlines

8    and the pilot is standing there, if I were to say, "Can you

9    fly this plane" and the pilot said, "I think I can do it,"

10   you know, we would all be like, "Oh, no."

11          So this is the phase of the trial.  It's sort of

12   the "speak now or forever hold your peace" phase of the

13   trial.

14          So -- if you all do have exposure and life

15   experiences and incidents, that's why we're asking you

16   about them.  So we have to pin you down and be sure, after

17   everyone goes through this process, that you don't get back

18   in the jury room and realize, guys, I have a problem.  I

19   have -- anyway.

20          PROSPECTIVE JUROR:  I would find it difficult not

21   to share my knowledge, I guess.

22          MS. RATTAN:  Okay.  You would find it difficult.

23   Thanks for letting us know.

24          And Judge Mazzant will instruct you, as a juror,

25   that the law requires that you not share it.  Even though

Jury Selection, 4/10/2023                    58

 1  you would find it difficult -- understandably -- would you
 2  be able to not share your specialized knowledge?
 3          PROSPECTIVE JUROR:  Yes.
 4          MS. RATTAN:  Okay.  All right.  Thank you for
 5  letting us know.
 6          And anybody else who has just the heightened
 7  specialized knowledge -- and I'm looking at 28 and 52.  Now
 8  that we've fleshed that out a little bit, any concerns you
 9  have?
10          Yes, sir, Number 28.
11          And, 6, I'll come back.
12          PROSPECTIVE JUROR:  28 here.
13          I think maybe I didn't hear you very well or
14  confused.  Did you mean we cannot or we can?  Because when
15  I hear "you can," "you can't," it's either you can, C-A-N,
16  or you can't, C-A-N-T, which is cannot.
17          So what are you saying about 28, 29?  Are you
18  saying we cannot use our --
19          MS. RATTAN:  Okay.  The --
20          MR. JOE WHITE:  Judge, I object.  You're going to
21  instruct on this issue.
22          THE COURT:  Well --
23          MR. JOE WHITE:  On whether jurors can -- do they
24  have to set aside their common sense and -- they've got to
25  follow your instructions.  You're the boss of the law and

Jury Selection, 4/10/2023                                    59

 1    you're going to instruct on exactly what's being discussed

 2    here and they can follow those instructions.  I object.

 3              MS. RATTAN:  I object to the speechmaking, your

 4    Honor.

 5              THE COURT:  Yeah.  This is totally appropriate, so

 6    overruled.

 7              Well, your objection is over -- well, defense

 8    objection is overruled but -- let's keep the speaking

 9    objections to minimal.

10              Go ahead.

11              MS. RATTAN:  Thank you, your Honor.

12              The acoustics in here are really hard, and then

13    maybe I was confusing.  But you cannot --

14              PROSPECTIVE JUROR:  Okay.

15              MS. RATTAN:  -- share any special information that

16    you have with the other members of the panel on the jury.

17              PROSPECTIVE JUROR:  Okay.

18              MS. RATTAN:  Will you be able to do that?

19              PROSPECTIVE JUROR:  Yes.

20              MS. RATTAN:  Okay.

21              So an N tail number, N tail number, who can tell

22    us what an N tail number is?

23              Oh, I'm so sorry.  Number 6, I said I would come

24    back to you.  Did you have an issue?

25              PROSPECTIVE JUROR:  I think it's okay.

Jury Selection, 4/10/2023                    60

```
 1              MS. RATTAN:  Okay.  It was about specialized
 2   knowledge?  Anything?
 3              PROSPECTIVE JUROR:  Well, you mentioned
 4   specifically like a -- sorry.  Number 6.
 5              You mentioned specifically about translations.
 6   And I guess I would want to at least authenticate with
 7   someone who knew the language, like, if the translation was
 8   accurate --
 9              MS. RATTAN:  Yes.
10              PROSPECTIVE JUROR:  -- because I feel like that
11   could make a difference in a case.  I don't -- I don't know
12   that the case or --
13              MS. RATTAN:  Yes.
14              PROSPECTIVE JUROR:  -- for sure.  But I guess I
15   would just want to know, like, where did the translation
16   come from because I know that --
17              MS. RATTAN:  Okay.
18              PROSPECTIVE JUROR:  -- things can get lost in
19   translation.
20              MS. RATTAN:  Yes.
21              Although you cannot share specialized knowledge
22   that you have about language, medical, whatever the
23   specialized skill might be -- CPA, anything like that --
24   you should expect, if there is a specialized area, to hear
25   testimony from someone who has some experience in that
```

1    area.  And that's fair.

2         So someone who is bilingual to come and say, "Here

3    are my credentials as a Spanish-English speaker and I

4    translated it and it is accurate."  Yes.  You should expect

5    to hear something like that.  But if you spoke Spanish and

6    you disagreed, you wouldn't be able to share that.

7         And then someone -- yes, ma'am, Number 31.

8         N tail number.  That's when you put your -- or was

9    it something else you were thinking of?  Okay.

10        PROSPECTIVE JUROR:  Juror 31.

11        This is my layman's guess.  It's the

12   identification or the tag that an airplane has for

13   registration purposes so that air traffic controllers can

14   track them, their movement, who it's registered to, so on

15   and so forth.

16        MS. RATTAN:  Yes.  Yes.  That's exactly right.

17        PROSPECTIVE JUROR:  And it's not related to

18   anything, just a random fact of knowledge that I stored

19   away somewhere so --

20        MS. RATTAN:  Okay.  Anybody else have familiarity

21   with the N tail numbers?

22        Of course 29.  Is it what we've already talked

23   about?

24        PROSPECTIVE JUROR:  Yes.

25        MS. RATTAN:  Yes, sir.

1              And then 58?

2              PROSPECTIVE JUROR:  I have something different.

3     58.

4              On Facebook there are some flight tracking groups

5     that I've been following recently, Flightradar and

6     Flight 24/7, just -- really just watching.  I don't know

7     anything about it other than that, something I'm interested

8     in.

9              MS. RATTAN:  Okay.  An N tail number, if you

10    see -- it's like a license plate, if you will, on a car.

11    If you see an N on an airplane, on the tail, that means

12    that that airplane is registered in the United States.

13             Each country has a separate letter that's assigned

14    to it.  It's just like what's our area [sic] code for the

15    United States, 1.  If I want to call Mexico, the area [sic]

16    code is 52.

17             So the tail number for an American-registered

18    airplane is N.  An airplane registered in Mexico, it

19    happens to be X.  But we have the N tail number.

20             The N tail number is a very coveted number.  It's

21    very valuable.  It's highly sought after because when the N

22    tail number, the American tail number, flies outside of the

23    United States, it gets more deference and respect by other

24    countries.  They don't want to mess with the N tail number.

25             They may not board you, they may not pull you

Jury Selection, 4/10/2023                    63

1    over, they may give you more deference and respect than you

2    would get if you had a Mexican tail number or Guatemalan

3    tail number.  So it's a more expensive airplane.  It's a

4    highly sought after tail number to get.  People want it.

5           So anybody know anything about N tail numbers

6    beyond what we've already heard?

7           Now, we talked earlier about our government and

8    the FAA wanting to know who has planes and where those

9    planes are; and we have rules and regulations about that.

10          So who can get a coveted N tail number?  Well, if

11   you're a U.S. citizen or a permanent resident, you can get

12   an American-registered aircraft.  But if you're a foreign

13   citizen, the law does not allow you to have an

14   American-registered aircraft.

15          So here's what we have.  We have a U.S. citizen, a

16   permanent resident of the U.S., and a foreign citizen.

17          These two, a U.S. citizen and a U.S. permanent

18   resident, can get registration for a plane here in the

19   United States.  A foreign citizen can register a plane here

20   in the United States; but they cannot be the owner, the

21   trustee.  They cannot.  What they have to do is they do --

22          MR. JOE WHITE:  Your Honor, can I approach?

23          THE COURT:  Yes.

24          (The following proceedings were conducted at

25   sidebar with all parties represented.)

1              MR. JOE WHITE:  So I am continuing to object to

2       the type of *voir dire* that the prosecution is conducting.

3              She is literally up there as an expert witness

4       telling the jury what the law is.

5              She's giving an opening statement.

6              She's not finding out anything about jurors.

7              She's up here literally advocating the case during

8       *voir dire*; so it's her first opening statement.

9              And the record bears out she's on a chalkboard

10      right now, or an eraser board, telling this jury what the

11      law is, what the regulations are, et cetera, about N tail

12      numbers.  This is completely inappropriate *voir dire*.  It

13      is an opening statement, and I object.

14             I've always understood *voir dire* to be Q & As with

15      jurors, who can be fair, who can be impartial, not trying

16      to educate the venire as to what the rules and regulations

17      are as to the issues in the case.  That's for case agents.

18      That's for other witnesses.  It's not for this person to

19      get up and try and be the professor as to what the issues

20      of law may be in this case.  I object.

21             THE COURT:  Ms. Rattan, response?

22             MS. RATTAN:  Yes, your Honor.

23             As we've said to the jury, this is our only

24      opportunity to ask them about their impressions of the law.

25             And in order for us to ask them about their

 1    impressions of the law, is it overly regulated, do you know

 2    about these regulations, could you uphold and enforce this

 3    law, we have to be able to talk to them about what the law

 4    is and then -- that we believe will be applicable in the

 5    case and then ask them questions about the law that we

 6    believe will be applicable.

 7            MR. JOE WHITE:  That's not what she's doing,

 8    Judge.  That is not what she's doing.  She can ask --

 9    you're the boss of the law.  She can ask will you follow

10    the law, but it's not up to her to tell these jurors what

11    the rules and regulations are.  That is not proper *voir*

12    *dire*, and I will continue to object.

13            THE COURT:  Well, you're welcome to object as much

14    as you want.  That's up to you.  But first of all, of

15    course, I will instruct the jury what the law is.  What the

16    lawyers say the law is isn't the case, and that's not what

17    she's saying.

18            You haven't been in trial in front of me, but this

19    is a totally appropriate *voir dire*.  I mean, I've tried a

20    lot of cases; and I allow a state court *voir dire* in

21    federal court.  So, essentially, this is all fair game.

22            MR. JOE WHITE:  Okay.

23            THE COURT:  I mean, she's not asking committal

24    questions.  That's not appropriate.

25            But she's probing their knowledge of these

 1  different areas that will come up in the case so -- you're

 2  welcome to object, but I'm saying just so you -- and maybe

 3  we should have talked about this at treatment conference,

 4  about what I allow.

 5       I mean, I have been pretty -- the jury selection

 6  process for me is so important.  That's why I give so much

 7  time for the process.  And, you know, she's trying to find

 8  out whether jurors have ideas about these issues that are

 9  going to come up later in the case.

10       MR. JOE WHITE:  Okay.

11       THE COURT:  Okay.

12       (Sidebar conference concluded.)

13       THE COURT:  Go ahead and continue.

14       MS. RATTAN:  Thank you, your Honor.

15       So we were talking about how a foreign owner, a

16  foreign citizen, someone who has no standing in the United

17  States, can get access to one of our planes, an N tail

18  number.

19       So what they do is the foreign citizen does a bill

20  of sale.  And this could even be $1, $10.  The foreign

21  citizen does a bill of sale, and they do it to a U.S.

22  trustee/owner.

23       So that bill of sale goes between the foreign

24  citizen and the U.S. trustee/owner, and then this U.S.

25  trustee/owner can register the plane in the United States

Jury Selection, 4/10/2023

 1    because they are a U.S. citizen.

 2            Then they do a lease and it goes back to the

 3    foreign citizen.

 4            Okay.  So we talked, at the very beginning of *voir*

 5    *dire*, about planes and our country's history with planes.

 6            Is there anyone here who, knowing that our country

 7    does allow somebody who is not a U.S. citizen, a foreign

 8    citizen -- there is a means, a mechanism for them to have

 9    this N tail number.  Do you disagree with the law that

10    allows it; and do you think that we should not allow

11    foreign citizens to have an N tail number, our planes, our

12    registration?

13            Yes, Number 49.

14            PROSPECTIVE JUROR:  I don't think they --

15            THE COURT:  Let's wait for the mic, please.

16            PROSPECTIVE JUROR:  I don't think they should be

17    allowed.  It's just a --

18            THE COURT:  Is the mic on?

19            MS. RATTAN:  I'm sorry, 49.  The mic may not be

20    on.  If you look on the -- the battery may have gone down.

21            THE COURT:  I think the batteries died.

22            MS. RATTAN:  Yeah.

23            PROSPECTIVE JUROR:  That just looks like a crooked

24    way around doing stuff, to me.

25            MS. RATTAN:  Okay.

 1              PROSPECTIVE JUROR:  That's just --

 2              MS. RATTAN:  You're concerned.

 3              PROSPECTIVE JUROR:  -- my opinion.

 4         My concern?

 5              MS. RATTAN:  No.  You're telling me you don't like

 6    it.  You're concerned.

 7              PROSPECTIVE JUROR:  No, I don't like it.  No.

 8              MS. RATTAN:  Okay.  The law in the United States

 9    allows this.  And what they say is this U.S. citizen right

10    here, they have to be a trustee and also trusted because

11    this person becomes the one who is reporting to the United

12    States government the who and the where and the what

13    related to that plane because that's what they want to know

14    about all planes, who has it, where is it, and what are

15    they doing with it.

16              PROSPECTIVE JUROR:  And why are they doing that?

17              MS. RATTAN:  What do you mean by that?

18              PROSPECTIVE JUROR:  Because it -- to me, you're

19    just not doing it the honest way.

20              MS. RATTAN:  Well --

21              PROSPECTIVE JUROR:  I don't care if it is the law.

22    It doesn't seem right.

23              MS. RATTAN:  Okay.  So are you saying why should

24    we let a foreign citizen have an N tail number, a U.S.

25    plane?

 1              PROSPECTIVE JUROR:  Yes, right.

 2          MS. RATTAN:  Ever?

 3              PROSPECTIVE JUROR:  Ever.

 4          MS. RATTAN:  Okay.  So knowing that the law allows

 5   a foreign citizen to have a U.S. plane, could you follow

 6   the law; or would that bother you so much, knowing that

 7   this is allowed, that you wouldn't be able to follow the

 8   law or consider the law in this case?

 9              PROSPECTIVE JUROR:  I really can't say.

10          MS. RATTAN:  Okay.  Flying the Southwest Airlines

11   plane --

12              PROSPECTIVE JUROR:  I --

13          MS. RATTAN:  No, thank you.  This is what -- this

14   is what we need to know.  If you come to a different

15   conclusion -- but right now you're telling us you can't

16   say?

17              PROSPECTIVE JUROR:  I -- I just don't think I

18   could trust either one of them.

19          MS. RATTAN:  Okay.

20              PROSPECTIVE JUROR:  So --

21          MS. RATTAN:  Okay.  You have concerns about this

22   person and this person.

23              PROSPECTIVE JUROR:  And that person.

24          MS. RATTAN:  Okay.  All right.  Thank you for

25   letting us know.

 1          Let's see.  I see some other numbers coming up.
 2  Number 27.
 3          PROSPECTIVE JUROR:  Yeah.  I disagree with that
 4  totally, especially with as wide-open as our borders are
 5  right now.  We have so many illegals coming in.  You don't
 6  know who is getting a plane even if they're going through a
 7  trustee, what they're going to do with it, what their
 8  intentions are.
 9          Just like what happened with 9/11.  He went
10  through pilot school down in Florida, got his license,
11  drove it into the tower.
12          So, yeah, I totally disagree.  I do not like it.
13          MS. RATTAN:  So -- thank you for letting us know.
14  Knowing the way you feel about it, is this -- knowing that
15  the law allows this, is this something that you could sit
16  and listen to?
17          PROSPECTIVE JUROR:  Probably not.  I don't think I
18  could be biased [*sic*] --
19          MS. RATTAN:  Okay.
20          PROSPECTIVE JUROR:  -- because I totally don't
21  agree with giving an N tail number to someone that is
22  foreign.
23          MS. RATTAN:  Okay.  Thank you for letting us know.
24          Now, what -- Number 34, yes, sir.
25          PROSPECTIVE JUROR:  Number 34.

1          I just wanted to -- I guess two comments.  I think

2   on a personal level, I understand it's the law.  I'm all

3   for following the law.  I could try to be impartial in

4   regards to that.

5          What I do want to note, though, is I work for a

6   manufacturing firm.  We participate in U.S. Customs and

7   Border patrol CTPAT program.  And not as it pertains to

8   planes, but my team has to actively investigate trucking

9   companies who do something similar --

10         MS. RATTAN:  Right.

11         PROSPECTIVE JUROR:  -- in the CTPAT participation

12  for the trucking companies.  And so it's actually part of

13  my role, my team, to investigate and to eliminate companies

14  that actually go through this process from a liability

15  standpoint.

16         MS. RATTAN:  You see where this is going.

17         PROSPECTIVE JUROR:  Yes, ma'am.

18         MS. RATTAN:  Yes.

19         So knowing your background -- thanks for letting

20  us know about it -- is that something that you could set

21  aside and listen to the evidence and base your verdict on

22  the evidence that Judge Mazzant rules should be before the

23  jury?

24         PROSPECTIVE JUROR:  I would like to say yes.  Me

25  just being rational saying, you know, I could probably put

1   training, job responsibilities, et cetera aside.  I would

2   like to say I could do that.

3           MS. RATTAN:  Uh-huh.  Okay.  Thank you for letting

4   us know.

5           Anyone else have any issues here?

6           So in terms of what we as a country want to know,

7   we want to know the who, the where, and the what for these

8   planes.

9           So what happens when you have a foreign citizen

10  who's trying to get an N tail number, this person, the U.S.

11  trustee/owner, becomes the responsible party.  They are

12  called the USPPI, the United States principal party in

13  interest; and they assume the responsibility through this

14  process for telling the U.S. government the who, who has

15  this plane.

16          We should be able to call this trustee, this

17  trusted person, at any time and say, "Who has this plane?

18  It got pulled over.  There's a violation, a problem, an

19  issue with this plane.  Who is it registered to?  Who has

20  this plane?"

21          And the where.  This U.S. trustee/owner right here

22  also becomes responsible by virtue of registering it in the

23  U.S. on behalf of this foreign citizen.  They're getting

24  paid to do it.  It's a business.  It is a business.  They

25  are getting paid to do it.

1          They are also responsible -- when that plane, our

2    N tail number, that coveted tail number, leaves the

3    country, is exported, they are also responsible to tell the

4    federal government where that plane went -- when it left

5    and where it went, those two things.

6          So this person right here becomes responsible for

7    saying who the plane has -- who has the plane and where

8    that plane is.

9          Now, the question that Juror Number 34 raised is

10   this right here, what is that plane doing, what.

11         And you're raising it, too, Number 27.

12         Because we talked about 9/11; and, of course,

13   we're all familiar with planes being used in terror

14   situations.  It's not all that they are used for.  And

15   that's what you investigate trucking for.

16         What else are airplanes compromised?  What else

17   can airplanes be used for?

18         You said human trafficking?

19         Unfortunately, the United States has a huge

20   appetite and we have a horrible problem with addiction and

21   we are the Number 1 destination in the world for controlled

22   substances that come from outside of our country.

23         Cocaine is sold in kilograms.  We're more familiar

24   in the United States with pounds.  But there is no cocaine

25   in the United States ever -- or at this moment that was

```
 1   manufactured or made in the United States.  It's all

 2   imported from South America.

 3        So how does cocaine get here to feed the addiction

 4   that the United States has?  How does it get to our

 5   country?  Through the compromise of our planes.  If you

 6   have an N tail number, do you think you're more likely to

 7   get your cocaine here than if you have an X tail number?

 8   The compromise of our planes.

 9        So is it critically important that this role right

10   here is on top of it, that they can tell us who, where, and

11   what's going on with that plane?

12        Number 46 or --

13        PROSPECTIVE JUROR:  I have a question.

14        MS. RATTAN:  Yes, ma'am.

15        THE COURT:  Just wait for the mic, ma'am.

16        PROSPECTIVE JUROR:  Sorry.  Number 46.

17        A question about the qualifications of the

18   trustee/owner U.S. person.  I mean, can -- is there

19   background checks or -- I mean, like, what's done to make

20   sure that they are qualified to be in that position?

21        MS. RATTAN:  Well, I see that we're all concerned

22   and we all want to make sure that the trustee can be

23   trusted, okay?  But -- yes, there are background checks

24   and, yes, there are concerns.  But what is the ultimate

25   corrupter?  When an honest man blinks.  That's what's
```

 1    happening with our airplanes, and that's the concern that

 2    the law addresses.

 3            The trustee has to be trusted.  And the thing is

 4    when the trustee doesn't register it correctly or doesn't

 5    register it at all or doesn't tell the government our

 6    N tail number was exported, it left the country, we lose

 7    track.  We lose track of where these planes are, and it's

 8    concerning.

 9            And the law makes it a crime -- it is a crime, a

10    federal crime.  It's not a regulation.  It's not a rule

11    that was broken.  It's a federal crime that a federal jury

12    can address when the trustee doesn't register the plane,

13    when the trustee doesn't tell the government that that

14    plane is going to Mexico or Belize or Honduras or Venezuela

15    or Colombia, these countries where we know our appetite,

16    unfortunately, for cocaine is being fed from.

17            So knowing that you are a potential juror --

18            12 of you will serve.  You'll have to take an oath

19    to uphold and enforce our law that says if you are a

20    trustee/owner, you are responsible for registering and

21    reporting when the plane is exported and if you don't, it's

22    a crime.

23            -- is there anyone here who thinks that, yes, it

24    should be a violation but maybe a civil violation, maybe

25    there should be a fine.  I don't think that I can enforce

Jury Selection, 4/10/2023                    76

1    it as a criminal law?

2            Is there anyone here on this side of the room, you

3    don't think it should be addressed as a crime?

4            Because I anticipate that in Counts 5 and 6, Judge

5    Mazzant will instruct the 12 of you who ultimately serve

6    that it's a crime to violate the export laws, to violate

7    the registration laws.  Anyone?

8            Now, the defendant is also charged in Count 4 of

9    the Indictment with money laundering.  Counts 5 and 6 are

10   the registration and export violations, but the defendant

11   is charged with money laundering in Count 4.

12           So you hear the term "money laundering" -- if you

13   show up to federal court and someone says the defendant is

14   charged with bank robbery, you kind of already have in your

15   mind what probably happened.  But when someone says "money

16   laundering," what is money laundering?

17           So you've got your cocaine.  And as we've said,

18   there is no cocaine that's manufactured in the United

19   States.  It's all predominately in Colombia.  That's the

20   biggest location, but there are a couple other countries

21   where the soil is very ripe for it.  But it's produced in

22   Colombia predominately.

23           Then you've got your -- it's a business.  You've

24   got tools of the trade.  So what do you need to get your

25   drugs to market?  What are you going to need to get the

Jury Selection, 4/10/2023                      77

1  cocaine from Colombia to the United States?  A boat.

2  Planes are the best.  If you can get your plane through,

3  you're going to make a lot of money.

4        So you've got planes, boats.  You probably need

5  guns.  You're going to need maybe storage, houses.

6        PROSPECTIVE JUROR:  I can't see those.  You've

7  written too low, ma'am.

8        MS. RATTAN:  I'm writing too low?

9        PROSPECTIVE JUROR:  Yeah.

10       Yeah, I can't read that.

11       MS. RATTAN:  Okay.

12       PROSPECTIVE JUROR:  The boards are kind of

13  blocking the words.

14       MS. RATTAN:  Oh, okay.  Thank you.

15       Thank you.

16       Is that any better?

17       PROSPECTIVE JUROR:  Yes.

18       MS. RATTAN:  Okay.  So tools of the trade.  There

19  are going to be any number of things.  But it's a business

20  and we all put ourselves in that place and it's just like

21  any other business.

22       When you're selling something, you've got to get

23  your wares to market.  So you're going to have planes,

24  boats.  You want to protect your product; you're going to

25  have guns.  You're going to have places where you're going

1    to store it along the way.

2          So if you think about it, all of these things are

3    regulated by any country that they are in.  The storage

4    units are going to have an owner, a renter.  There's going

5    to be paper on it.  We want these things regulated.

6          Firearms.  We have so many issues in our country

7    with trying to document firearm purchases and sales.

8          Boats and planes.  That's what this whole process

9    is concerning.

10          And then what's it all going toward?  You get your

11    product to market and you're going to get money.  Remember

12    we're talking about money laundering now.

13          So if you've got bulk cash, what do you look like?

14    If you have bulk cash, what does everyone think?  "How can

15    they pay $80,000 cash for that?"

16          You look like a drug dealer.  You don't want to

17    draw attention to yourself; so what do you want to do?  You

18    want to get your money into the banking system.  And we

19    have rules, laws, and regulations against that, too,

20    because we don't want our banking system devalued and

21    corrupted by dirty money, dirty dollars coming from any

22    criminal activity but certainly the drug industry.

23          So anytime you accept drug money for -- from a

24    foreign citizen for registering a plane and you look the

25    other way in terms of what is happening with that plane and

1    you put that money in the banking system, what have you

2    done?  The money has been laundered.

3          Anytime money from a crime is put into our system,

4    our banking system, or any time money from a crime is

5    spent, that's laundering the money.  It's layering where

6    the money came from.  It's covering what that money is.  So

7    that's what that would be, the corruption of our banking

8    system by putting money into it.

9          Now, is there anyone here who, when we talk about

10   money laundering -- basically what it is is if you take

11   money from robbing a bank and you put it in our banking

12   system, if you take money from violating other laws and you

13   put it in our banking system -- drug distribution -- and

14   you don't have to be the drug dealer.  You can be the

15   person who is helping, aiding and abetting, by providing

16   the tools of the trade, because how are they going to get

17   the drugs to market without people in these other areas?

18   You can't.  You don't.

19         And you say, "Well, you know, how do you know they

20   knew," right?  Our federal criminal law also says that you

21   can't be convicted unless you do something intentionally

22   and flowingly.  But it also says that we don't allow people

23   to be deliberately blind or willfully ignorant to what's

24   happening under their nose.  You can't just look the other

25   way and take the money.  You are responsible.

 1  Intentionally, knowingly, or willfully blind.

 2          Is there anyone here who, knowing that the law

 3  allows someone to be convicted for looking the other way,

 4  convicted of a crime, for being willfully blind, to

 5  choosing not to look at the facts before them, they could

 6  be convicted of a criminal offense -- is there anyone

 7  here --

 8          Let me ask Juror Number 14.  Willful blindness,

 9  that's our law.  Federal criminal law says that if you look

10  the other way and ignore facts that another reasonable

11  person would have said, "I know what's going on here," that

12  you could be convicted of a federal offense.

13          Any concerns about that?  You're like is there a

14  question?

15          PROSPECTIVE JUROR:  I know.  I was like what's the

16  question?

17          Any concerns about that?  No.

18          MS. RATTAN:  Okay.  Willful blindness.  Deliberate

19  ignorance, sometimes it's called that as well.

20          Let me ask Number 8.  Willful blindness,

21  deliberate ignorance, is that something that -- a law that

22  you would be able to follow?

23          PROSPECTIVE JUROR:  Like -- what do you mean

24  "follow"?

25          MS. RATTAN:  Well, if Judge Mazzant tells you, as

1  a juror, that you can convict someone for looking the other

2  way or being willfully blind or deliberately ignorant, is

3  that a law that you could follow?

4          PROSPECTIVE JUROR:  Yes.

5          MS. RATTAN:  Or would you say, "You know what?  I

6  need to know that they were told, that it was written down

7  somewhere, there is a text message where they say, 'I know

8  you're going to put drugs on the plane'"?  Is that

9  something you would require?

10         PROSPECTIVE JUROR:  No.

11         MS. RATTAN:  Okay.  Thank you.

12         Is there any -- I haven't asked you any questions.

13 Is there anything that's come up that you've been like, you

14 know, I should say something or --

15         Okay.  Okay.  Willful blindness, deliberate

16 ignorance on these issues, does anyone have any concern?

17         Again, this is a law that you will be asked to

18 uphold and enforce.  Speak now or forever hold your peace

19 if you're thinking -- yes, ma'am.

20         PROSPECTIVE JUROR:  31.

21         What burden of proof do you have in proving that

22 there was willful ignorance?

23         MS. RATTAN:  Well, the government's burden of

24 proof -- our burden of proof is always the same.  It's

25 beyond a reasonable doubt.  It's not beyond all doubt

Jury Selection, 4/10/2023                    82

1   because if it were beyond all doubt, you couldn't serve as

2   a juror because you were a witness and you saw it yourself.

3           So it's beyond a reasonable doubt.  Using common

4   sense and reason, what does it appear to you.

5           Any comments?

6           PROSPECTIVE JUROR:  So it's your duty to show us

7   that it was beyond a reasonable doubt.  We are not to pull

8   from thin air, oh, well, they clearly willfully were

9   ignorant, right?  The burden is on you for that?

10          MS. RATTAN:  Yes.

11          PROSPECTIVE JUROR:  Even though it's not in a text

12  or written on a piece of paper?

13          PROSPECTIVE JUROR:  Yes.  Yes.

14          MS. RATTAN:  Okay.  Thank you.

15          PROSPECTIVE JUROR:  Thank you.

16          Anyone -- any concerns in this area?

17          This is not the law that I expect will be

18  instructed to you in this case, but it's an example.

19  Anybody ever hear of the "one bite rule" with dogs?

20          Well, there is a rule that if your dog bites

21  somebody, you're probably not going to be civilly liable

22  and have to pay for the damages that are caused the first

23  time.

24          The second time your dog bites somebody, what

25  happens?  You're on notice that your dog is a biter; and

1    you're probably going to be held civilly liable,

2    responsible for the fact that your dog bit somebody.

3           So why am I bringing up the "one bite rule" with

4    deliberate ignorance and willful blindness?

5           So one plane gets by you and it ends up in South

6    America with a bunch of cocaine on it, maybe you missed it.

7           Another plane gets by you, ends up South or

8    Central America, it's been retrofitted to transport drugs,

9    hmm, second bite rule.

10          The third plane gets by you, are you really a

11   responsible trustee there?  You see what I'm saying?

12          So, yes, we would have the burden of proving it

13   beyond a reasonable doubt; and the jury would listen to the

14   facts and apply the law and make a determination.

15          Anything else as it relates to that?

16          So let me shift gears here -- your Honor, I hope

17   I'm using my time -- are we doing okay?

18          THE COURT:  Yeah, you have plenty of time.

19          MS. RATTAN:  And thank you so much.

20          And I know it's 12:35 and none of us have had

21   lunch.

22          THE COURT:  Ms. Rattan, I'll probably check at

23   1:00 to see where you're at.  You'll still have time left

24   but -- whether or not we break for lunch.  We'll discuss

25   that at that point.  We'll see where you're at.

```
 1              MS. RATTAN:  Okay.  Thank you, your Honor.

 2              PROSPECTIVE JUROR:  Could we take a bathroom

 3    break?

 4              THE COURT:  Yes, we certainly can.  We can just

 5    stop where we're at.  Are there any jurors that need to go

 6    use the restroom?

 7              Okay.  Well, that's fine.  Let me just have -- no,

 8    that's fine.  Let me have counsel just approach real quick.

 9              (Sidebar conference, off the record.)

10              THE COURT:  So, ladies and gentlemen, I think what

11    we're going to do is -- just because -- I think we're just

12    going to take our lunch break now instead of taking it 20

13    minutes from now and then everyone can use the facilities

14    and everything.

15              So what we'll do is -- one thing I just wanted to

16    advise everyone is although you don't know that much about

17    the case at all, you can't really discuss this among

18    yourself or anyone else.  So you can tell your work or your

19    family you're in jury selection in a criminal case in

20    Sherman, Texas, and that's it.  So I am sorry about that

21    restriction.

22              The other thing you can't do is when you go get

23    your phones, don't start looking things up about the case.

24    You can't do any research, okay?

25              I know these seem obvious and everything, but I've
```

1   had that happen.  So I just wanted to tell you, please,

2   don't go do that.

3          So what we're going to do is -- let's see.  It's

4   20 to 1:00 -- so we'll start back at 2:00.  Normally we

5   take an hour for lunch.  But because it is a large group to

6   go back through security when you leave for lunch -- so I'm

7   giving a little more time because we're breaking at this

8   time.

9          So we'll come back at 2:00.  Just be back in your

10  seats.  Have a good lunch, and we'll see you back.  Thank

11  you.  2:00.

12         (Prospective jurors exit the courtroom,

13  12:40 p.m.)

14         THE COURT:  Okay.  Anything further from the

15  government?

16         MR. GONZALEZ:  No, your Honor.

17         THE COURT:  Technically, you have 1 hour,

18  3 minutes, and 55 seconds.

19         Anything further from defense?

20         MR. JOE WHITE:  No.  I need the dry erase board

21  materials, whatever that might be.  I don't have those.

22  I'll just use whatever is on that tray that the government

23  has, I guess, when it's my turn.

24         THE COURT:  That's fine.  There should be stuff

25  there for you to use.

```
 1              And then we're just taking a little bit longer

 2    lunch.  Normally we'll take just an hour, but there are too

 3    many people to come back through security.  And so we'll

 4    resume at 2:00.  Thank you.

 5              MR. JOE WHITE:  Thank you, your Honor.

 6              (Recess, 12:42 p.m. to 2:00 p.m.)

 7              (Open court, defendant present, prospective jurors

 8    present.)

 9              THE COURT:  Please be seated.

10              Ms. Rattan, if you want to continue the voir dire

11    for the government.

12              MS. RATTAN:  Yes, your Honor.  Thank you.

13              So one thing, we read you the witness list

14    earlier; and the question about that is does anyone

15    recognize any of the names of the witnesses that

16    Mr. Gonzalez just read?

17              And then two additional names we would add are

18    Kayleigh Moffett and Carlos Rocha Villaurrutia.  Does

19    anyone recognize either of those names?

20              Okay.  So before we went to lunch, I said let's

21    switch gears.  I want to talk to you about what is charged

22    in Count 7 of the Indictment.  Count 7 charges the

23    defendant, Debra Mercer-Erwin, with wire fraud.  So the

24    question is what is wire fraud, and how does wire fraud fit

25    into this Indictment?
```

1          So wire fraud is essentially the federal charge

2  for lying and stealing.  And if you use an interstate wire

3  while you're lying and stealing, then you can be charged

4  federally with what's called wire fraud.  So Count 7 is

5  wire fraud.

6          Now, there are fairly sophisticated ways of

7  stealing; and one way of lying and stealing is known as a

8  pyramid or a Ponzi scheme.  And there are certain things

9  about a pyramid or a Ponzi scheme that are like a

10 checklist.  If these things are there, you're probably

11 involved in a pyramid or a Ponzi scheme.

12         So who here is in the banking industry?

13         Okay.  Number 37, are you familiar with what a

14 pyramid or Ponzi scheme is generally?  I know I'm springing

15 it on you.

16         PROSPECTIVE JUROR:  Actually, we just watched, me

17 and my husband, the Madoff Netflix --

18         MS. RATTAN:  Bernie Madoff?

19         PROSPECTIVE JUROR:  Yes.

20         MS. RATTAN:  Very famous Ponzi scheme.

21         PROSPECTIVE JUROR:  So we learned all about Ponzi

22 schemes.

23         And then I do wires at my job.

24         MS. RATTAN:  Okay.  So you know --

25         PROSPECTIVE JUROR:  I'm in a backup but I -- yeah.

1              MS. RATTAN:  Okay.  So what is a Ponzi scheme?

2              PROSPECTIVE JUROR:  It's basically the taking of

3    money under the pretense of one thing but actually using it

4    for another.

5              MS. RATTAN:  It gets diverted.

6              PROSPECTIVE JUROR:  Exactly.  I mean, I don't

7    know -- I'm not an expert.

8              MS. RATTAN:  Right, right, right.  That's

9    basically what it is.

10             So you solicit money from somebody, and you tell

11   them that it's going to be used for an investment maybe in

12   an airplane.  This is for an airplane investment.  And you

13   tell them that it's going to be a short-term investment and

14   it's going to pay off, sure thing, 10 percent.

15             So banking industry and all of us, is 10 percent

16   pretty good?  Oh, any of us would jump on that right now,

17   10 percent on anything.

18             So usually a Ponzi scheme is something when you're

19   offered that as an investment, it sounds too good to be

20   true.  But there is usually somebody else who did it and it

21   worked and they got their 10 percent back, because a Ponzi

22   scheme works this way:  I offer you the opportunity to

23   invest in my airplane business; and you say, "Okay.  That

24   sounds great."

25             It's going to be three months, a high-dollar

 1   investment and I'm going to give you a 10 percent return

 2   and I'm going to give it to you up front.

 3          Wow.  That sounds good.

 4          So you invest the money with me.  And instead of

 5   investing it in the airplane business, I divert the money

 6   to other purposes.  I've used your money.  The money can be

 7   traced.  It's not tracked to the airplane business at all.

 8   And out of your own money, I pay you your money back.

 9          And at the end of the time when I'm supposed to

10   give you your full amount back, what do I do?  I have to

11   give you your money back, but I already spent it.  I

12   already did something else with it.

13          So who do I go to?  Another investor.  Okay?  And

14   then I do the same spiel on you.

15          And you say, "Oh, that sounds too good to be true.

16   I'm not investing"; so I go to another investor.

17          And you say, "I'm pretty flush with money right

18   now.  That sounds pretty good."  You seem pretty credible.

19   I met you at somewhere that seemed credible or someone

20   introduced me to you who seemed credible; so I'm going to

21   invest.

22          And what do I do with your money?  Right.  I take

23   a good portion of it and do something different with it

24   than what I told you I was going to do; but a big portion

25   of the money, I pay her back.  Okay?

1          Then it's time for me to pay you back in three

2     months because that's the period we've set up.  What do I

3     have to do now?

4          Now, as long as the Ponzi schemer can keep the

5     plate spinning and keep getting new investors, right -- but

6     remember, Investor Number 37, did she get her money back?

7     Because I paid her with Juror Number 10's money.  Is she

8     going to be someone who says, "Yeah, it worked"?  Yeah.

9     She's going to say this scheme worked.

10          And is that how Bernie Madoff's scheme worked?

11          PROSPECTIVE JUROR:  Yeah.

12          MS. RATTAN:  Yeah.  I think that they were meeting

13     people at synagogue and they were vouching for him; and

14     actually it was just a strip center somewhere in Jersey,

15     right, where he had his business set up?  Right.

16          And finally someone went out there and they were

17     like this billion-dollar business?  And it fell.

18          So you have a pyramid or a Ponzi scheme, solicit

19     money based on a promise.  The promise is broken, and the

20     money is traced to another -- money goes for another

21     purpose and goes to pay off previous investors.

22          So any money that's made from a Ponzi scheme, it's

23     stolen money based on a lie.  So if you put that money into

24     the banking system, what do you have?  Money laundering.

25          So any money that comes into the account that's

```
 1   based on a lie, stolen, and a wire is involved that goes
 2   interstate, that's going to be wire fraud.
 3             Then if you take the money that was stolen based
 4   on the lie and you put it in the banking system, you're
 5   laundering that money.  So it would be wire fraud and money
 6   laundering.
 7             So in this case if you involve your airplane
 8   business in the cocaine transactions, allow planes that
 9   you're responsible for -- or look the other way -- to be
10   involved in cocaine trafficking and you make money off
11   that, it's money laundering; but it's also money laundering
12   if you make money based on wire fraud.
13             So knowing that the federal law allows a wire
14   that's based on a lie and stealing to be made a federal
15   criminal offense, does anyone have any concerns about that?
16             Does anyone say, "Well, why are we in federal
17   court?  That's just stealing.  Seems like that should be a
18   state court issue"?  Anyone have any concerns about that?
19             Does everyone understand what a pyramid or a Ponzi
20   scheme is?  You just keep soliciting more and more
21   investors until law enforcement intervenes and figures out
22   what's going on.
23             I know we have a number of accountants here, if
24   you're an accountant, a CPA, or work in the accounting
25   industry -- yes.
```

```
1              And so the same thing I was asking about earlier
2    about pilots, there will be accountants to who testify who
3    followed the money, forensic accountants who traced what
4    happened to the money after it was solicited and look at
5    whether promises were broken and where the money went.
6              Is there anyone here who, if you're an accountant,
7    will be like, "Hold on.  That's what the accountant
8    testified to, but I look at it differently"?
9              You can know that and think that, but you can't be
10   an expert witness and share it with the other jurors.  Any
11   of you accountants here have any concerns about that?
12             So the other thing about all of these offenses is
13   the defendant, Debra Mercer-Erwin, is charged in all but
14   Count 3 with conspiracy, conspiring to commit these
15   offenses.
16             So when I say "conspiracy," what comes to mind?
17   It's like what?  What is that?
18             A conspiracy is an agreement between the defendant
19   and one other person to commit the crime charged.  The
20   defendant and one other person enter into an agreement to
21   launder money.  The defendant and one other person enter
22   into an agreement to commit wire fraud.  So the heart of
23   the crime of conspiracy is the agreement.
24             So if you, as a juror, find that the defendant
25   entered into an agreement and there's circumstantial
```

1    evidence that they entered into an agreement, then you can

2    find them guilty of conspiring to do wire fraud, money

3    laundering, any one of the crimes that she's charged with.

4         So knowing that the defendant in all but one

5    count, Count 3, is charged with conspiring, not with

6    actually committing the crime but with conspiring to do it,

7    entering into an agreement to do it -- knowing that that's

8    what she's charged with, would you say, "You know what?  I

9    know the law allows that.  I know that I could return a

10   verdict of guilty if I believe beyond a reasonable doubt

11   that she entered into the agreement.  But I would require

12   that the crime actually be committed.  I need the wire to

13   be sent.  They just can't reach an agreement that it's

14   going to happen; I need the wire to be sent.  I need the

15   money to actually be laundered.  I can't base my verdict

16   just on an agreement"?

17        And what do you look to to determine whether

18   someone entered into an agreement, what they were thinking?

19   Well, what's the best way to know anything about any of us?

20   Look at our emails, our text messages, the things that we

21   did, what happened to the money, were we benefited by the

22   money.  All of these things we look at to figure out what

23   someone was intending to do and what they agreed to do.

24        But my question is is there anyone here who you

25   feel like I would need to know she actually laundered the

 1  money.  I would need to know that she was the one who

 2  actually lied, not her co-conspirator.  I need to know she

 3  did it.

 4          Aiding and abetting.  Aiding and abetting.  That's

 5  helping somebody else commit a crime.

 6          Who is in the banking industry?  Banking.

 7          Okay.  Do you have a rule where you need to know

 8  your customer?

 9          PROSPECTIVE JUROR:  Yes.

10          MS. RATTAN:  And --

11          PROSPECTIVE JUROR:  I mean not personally, but you

12  have to verify.

13          MS. RATTAN:  Who is this person?  You want to make

14  sure that they are somebody legitimate who the bank would

15  want to do business with, know your customer.

16          PROSPECTIVE JUROR:  Yes.

17          MS. RATTAN:  So you don't want your bank to be

18  used to commit a crime; is that right?

19          PROSPECTIVE JUROR:  Correct.

20          MS. RATTAN:  So you keep an eye out.  If anything

21  looks suspicious, what do you do?

22          PROSPECTIVE JUROR:  Report it.

23          MS. RATTAN:  Okay.  Thank you.

24          So you can also be found guilty if you're aiding

25  and abetting, helping somebody else who is committing the

 1   crime.
 2          The typical thing we think of when we think of
 3   aiding and abetting is the getaway driver at a bank
 4   robbery.  They didn't go inside and rob the bank, but they
 5   sure were outside waiting in a car when he came out, jumped
 6   in with a mask on and the bag in his hand.
 7          So is that bank robbery?  No.  It's conspiring to
 8   rob the bank with that other person.  It's aiding and
 9   abetting that other person as they robbed the bank.  Okay?
10          So a little bit more about conspiracy that I want
11   to ask you about.  Of course, none of the charges in this
12   Indictment involve literally robbing a bank; but let's talk
13   about bank robbery, conspiracy to commit a bank robbery.
14          Let's say that I want to rob a bank and I don't
15   want to do it by myself; so I'm going to recruit some other
16   people to get involved.  I go to Ernest Gonzalez.  I know
17   he works at the bank and we went to grade school together,
18   known each other a long time.
19          I ask him to get me the floor plan of the bank.  I
20   want to know where the safe is, where the cameras are, when
21   the security is around.  I ask him to assist me with that,
22   and he does.
23          He doesn't know that I'm going to somebody else.
24   I go to Special Agent Justin Marshall and I recruit him as
25   well and I tell him I'm going to need another set of plates

1  because I'm going to throw another set of plates on the car

2  before we drive away and I'm going to need a weapon.  I

3  want to take a gun into the bank with me, okay?

4        Ernest Gonzalez never goes in the bank to rob the

5  bank.  He gives me information that helps me.  Is he aiding

6  me and abetting me?  Yes.

7        Is he conspiring with me to rob the bank?  Yes.

8        Justin Marshall never goes in there, doesn't rob

9  the bank.  He's helping me, too.

10        Ernest Gonzalez doesn't know that Justin Marshall

11  is involved.  They don't have to know.  We can all be

12  charged in the same Indictment, in one count, with

13  conspiracy to commit a bank robbery even if I never rob the

14  bank.

15        Now, all three of us have to join in the agreement

16  separately -- we don't have to know each other -- with the

17  intent to further it.  It can't just be a beer on a Friday

18  night saying we should rob a bank.  There needs to be a

19  plan, and everyone needs to join in it voluntarily.

20        So the question at this point, as you consider

21  that you're going to take an oath to uphold and enforce the

22  law, is the law of conspiracy.  Can you enforce the law of

23  conspiracy?

24        The bank doesn't have to be robbed.  The crime

25  doesn't have to be committed.  The only thing that you, as

Jury Selection, 4/10/2023                                                 97

 1   a juror, would need to find is that there was an agreement

 2   to do it.  And it doesn't have to be a written agreement,

 3   an overt handshake agreement.  You look to what the parties

 4   did to evaluate what they intended.

 5          Does anyone have any concerns about that?

 6          Yes, sir.

 7          PROSPECTIVE JUROR:  I have a question.

 8          MS. RATTAN:  Yes, sir.

 9          PROSPECTIVE JUROR:  Juror Number 12.

10          Yeah.  What if the person who was -- let's say in

11   your example the person who is looking up the floor plans

12   of the bank, telling you where the cameras were, what if he

13   was unaware of the purpose of your inquiry?

14          Maybe it was for -- you know, maybe you were a

15   contractor trying to, you know, repair something in the

16   bank, you know, but he didn't know it was part of a larger

17   plan for you to rob the bank.  Is that considered something

18   that is, you know, a conspiracy?

19          MS. RATTAN:  That's something that the jury would

20   evaluate to evaluate their intent, did they knowingly and

21   intentionally enter into the conspiracy.

22          Maybe there is a money trail where it shows that I

23   gave him $50,000.  Why would you give someone $50,000 for

24   that kind of information if you're a contractor?  It makes

25   no sense.

 1              PROSPECTIVE JUROR:  It could have been for

 2    supplies, though.  I mean, that intent isn't necessarily

 3    proven by a transfer of money alone.

 4              MS. RATTAN:  Right.

 5              PROSPECTIVE JUROR:  Maybe two or three things, you

 6    know, but --

 7              MS. RATTAN:  Right.

 8              PROSPECTIVE JUROR:  So the jury would have to

 9    decide that; is that correct?

10              MS. RATTAN:  Yes.  Yes.  You would look at the

11    law.  The law allows someone to be convicted if they

12    entered into an agreement with another person.  It doesn't

13    have to be an overt written handshake agreement, but you

14    look at the things they said and did and evaluate is that

15    what they meant.

16              PROSPECTIVE JUROR:  Okay.

17              MS. RATTAN:  But the jury would make the decision.

18              The question is the law of conspiracy.  Do you

19    have a concern about the law that allows someone to be

20    convicted for conspiracy?  The bank is never robbed.  We

21    just talked about robbing it and we were serious and we had

22    a plan.

23              PROSPECTIVE JUROR:  If that conspiracy was

24    evident -- or that intent was evident, then no.  But,

25    again, that would have to be very clear.  Otherwise, I

 1  would feel awful for trying to put -- pin something on

 2  somebody that it wasn't meant to be.

 3          MS. RATTAN:  Of course.  Of course.  You would

 4  want evidence to show that that's what happened.

 5          PROSPECTIVE JUROR:  Right.

 6          MS. RATTAN:  Okay.  Thank you.

 7          Anybody else when we're talking about conspiracy?

 8  Anyone else?

 9          Let's see, Juror Number 18 -- 15, just pass the

10  mic.

11          Yes, sir.  I haven't asked you anything.  As we've

12  talked about things in the last couple hours -- I know.

13  You don't want to -- is there anything that's come to mind?

14  Where do you work?  What do you do?

15          PROSPECTIVE JUROR:  So I work for an engineering

16  firm.  I'm a proposal manager, basically business

17  development.

18          MS. RATTAN:  And are there any of the issues that

19  we've talked about, whether it was this morning when we

20  were talking about the airline industry, the N tail

21  numbers, issues related to regulation or the Ponzi scheme,

22  is there anything -- conspiracy -- that's come up that's

23  concerned you?

24          PROSPECTIVE JUROR:  Not of any of the things that

25  you just said.

  1              When it comes to drugs, the things that come to my

  2    mind is I have a 9-year-old daughter and I'm terrified that

  3    she's going to get into this.  And there's -- you know, I'm

  4    not trying to, you know, do any, you know -- I'm not trying

  5    to blame guilt on anybody; but I'm having a hard time

  6    already kind of understanding where this may be going and

  7    thinking that I'm not going to be able to put my personal,

  8    I guess, bias of how terrified I am of my daughter, you

  9    know, in any kind of drug activity, bringing it into the

 10    country, you know, or whatever.  That's where I'm

 11    struggling in my head, just honest to be honest.

 12              MS. RATTAN:  Okay.  Thank you for letting me know.

 13              And everyone feels so protective of their family

 14    and their children, and drugs are a problem.  You know,

 15    we've got the fentanyl right now going on, one pill can

 16    kill, the cocaine.

 17              PROSPECTIVE JUROR:  Right.

 18              MS. RATTAN:  And it needs to be something you can

 19    have in your life -- we all do -- but still base your

 20    verdict on the law and the evidence that Judge Mazzant

 21    gives you.  It can't be something that overwhelms your

 22    judgment and your opinion.

 23              PROSPECTIVE JUROR:  Right.

 24              MS. RATTAN:  Can you do that?

 25              PROSPECTIVE JUROR:  I can try.  I'm not trying to

 1    be that --

 2          MS. RATTAN:  No.

 3          PROSPECTIVE JUROR:  -- Southwest pilot that can't

 4    fly the plane.  But, you know, I'm going to be honest.  I

 5    think I could fly the plane; and, you know, I'll try my

 6    best.  But, like I said, I mean, there's raw emotions in me

 7    right now that -- I mean, I'm kind of shaking just talking

 8    about it, just, you know, answering your question.

 9          MS. RATTAN:  Okay.  Okay.  Thank you for letting

10    us know.

11          So that's a perfect example.

12          Is there anyone who, sitting here with the things

13    that we've reviewed, you don't think you can follow the law

14    or there is something that you're just concerned about?

15          And if it's something personal and you'd rather

16    approach the bench later, at the end, I would imagine that

17    we could ask Judge Mazzant and that he might allow that to

18    happen.

19          But concerns that we all have for our family and

20    our family's safety and drugs and the airlines, things that

21    we all use all the time, we all have that; but we also have

22    a duty and a responsibility to listen to the evidence and

23    follow the law that's provided.  And it's hard.

24          It's just like earlier Judge Mazzant asked is

25    there anyone here who can't sit in judgment of another

 1   person.  None of us want to sit in judgment of another

 2   person.  It's not something that we relish, but it's

 3   something that our system of justice calls upon us to do.

 4        There are two times in the United States when you

 5   have conscripted or forced service.  One is military, and

 6   the other is --

 7        PROSPECTIVE JUROR:  Jury service.

 8        MS. RATTAN:  Jury service.  Uh-huh.

 9        Those are the two things that our country calls

10   upon us to do, and these are the laws that we have.  And so

11   the question is can you take an oath to uphold and enforce

12   these laws:  the law of conspiracy, the law of aiding and

13   abetting, the law related to wire fraud, the law related to

14   the use of your trustee status and lending that to these

15   aircraft?

16        Anyone?

17        Okay.  Let me ask some questions about prior jury

18   service.  Let me focus on this side of the room first.  Who

19   has had prior jury service where you actually served on the

20   panel?  A lot of us get called to the open panel like this

21   but maybe don't get seated over here.

22        Prior jury service, starting up here.  Yes, ma'am,

23   Number 3.

24        PROSPECTIVE JUROR:  What are you wanting me to

25   explain?  I'm Number 3.

1          MS. RATTAN:  Yes.  What is your prior jury

2    service?  Was it civil or criminal?

3          PROSPECTIVE JUROR:  It was civil.

4          MS. RATTAN:  Okay.  How long ago was it?

5          PROSPECTIVE JUROR:  It's been several years, about

6    four or five years ago.

7          MS. RATTAN:  Was there anything about your service

8    that you think will affect you here?

9          PROSPECTIVE JUROR:  No, not at all.

10          MS. RATTAN:  Thank you for letting me know.

11          And then just coming down, Number 5, did you --

12    no?  Okay.

13          Number 8.

14          PROSPECTIVE JUROR:  It was several years ago and I

15    think it was civil, but it was like a DUI or something.

16          MS. RATTAN:  Okay.  What county was it in?

17          PROSPECTIVE JUROR:  In Brazoria County.

18          MS. RATTAN:  And then did the jury decide what the

19    punishment would be?

20          PROSPECTIVE JUROR:  Yes.

21          MS. RATTAN:  Okay.  In state court in Texas, a

22    jury can assess punishment.  In federal court only the

23    judge will assess punishment.

24          Was there anything about that experience that

25    would affect you here?

```
 1              PROSPECTIVE JUROR:  No.

 2              MS. RATTAN:  Okay.  Thank you.

 3              Coming down, prior jury service.

 4              PROSPECTIVE JUROR:  Juror 14.

 5              City of Carrollton, and it was a DUI case as well.

 6              MS. RATTAN:  Okay.  Did the jury have to set

 7   punishment?

 8              PROSPECTIVE JUROR:  Yes.

 9              MS. RATTAN:  Okay.  Anything about that that will

10   affect you?

11              PROSPECTIVE JUROR:  No.

12              MS. RATTAN:  Okay.  Thank you.

13              Coming down.  Number 19, I think, is the next one.

14   Yes, sir.

15              PROSPECTIVE JUROR:  Juror 19.

16              About 17 years ago, I was on a grand jury for six

17   months up in Illinois.

18              MS. RATTAN:  Oh, where was that?

19              PROSPECTIVE JUROR:  Up in Rockford, Illinois, a

20   county.

21              MS. RATTAN:  And then you moved here?

22              PROSPECTIVE JUROR:  We moved here about ten years

23   ago.

24              MS. RATTAN:  Anything about that that will affect

25   you?
```

```
1              PROSPECTIVE JUROR:  No.

2              MS. RATTAN:  All right.  Thank you for letting us

3     know.

4              Anybody else?  Right here, 20.

5              PROSPECTIVE JUROR:  Juror Number 20.

6              It was a civil case, and it was settled out of

7     court on the fifth day.

8              MS. RATTAN:  Okay.  Anything that will affect you?

9              PROSPECTIVE JUROR:  No.

10             MS. RATTAN:  Okay.  Thank you.

11             PROSPECTIVE JUROR:  Number 23.

12             It was a civil case.  I believe it was in

13    Arkansas, and they settled after a day of testimony.

14             MS. RATTAN:  Okay.

15             PROSPECTIVE JUROR:  Nothing about that would

16    affect me here.

17             MS. RATTAN:  Okay.  Thank you.

18             21, yes, sir.

19             PROSPECTIVE JUROR:  Juror 21.  I served around

20    2010.  It was a criminal case here in Grayson County.

21             MS. RATTAN:  And it's been awhile.  What kind of

22    case was it?

23             PROSPECTIVE JUROR:  What kind of case?

24             MS. RATTAN:  Yes, sir.

25             PROSPECTIVE JUROR:  Continuous sexual assault of a
```

1    minor.

2              MS. RATTAN:  Did the jury have to set punishment

3    in that case?

4              PROSPECTIVE JUROR:  Yes, we did.

5              MS. RATTAN:  Is there anything about that -- of

6    course, nobody wants to serve on that type of a jury.  But

7    is there anything about that that you think will affect you

8    here?

9              PROSPECTIVE JUROR:  No.

10             MS. RATTAN:  Okay.  Thank you for letting us know.

11             And then going back, Number 33.

12             PROSPECTIVE JUROR:  I served in Rockwall County on

13    a criminal case for domestic abuse.  We did not -- the

14    judge decided sentencing.

15             MS. RATTAN:  Okay.  And anything that will affect

16    you here?

17             PROSPECTIVE JUROR:  No.

18             MS. RATTAN:  All right.  Thank you.

19             And then coming over to this side of the room, we

20    have Number 40 on the front row.

21             PROSPECTIVE JUROR:  Number 40, a criminal case and

22    I think the judge set the verdict and it was awhile back.

23             MS. RATTAN:  Okay.  And nothing will affect you

24    or --

25             PROSPECTIVE JUROR:  No.

1           MS. RATTAN:  Okay.  And then going back to 42.

2           PROSPECTIVE JUROR:  It was Denton County, and it

3   was basically trying to decide in this guy slashed the

4   other guy on purpose.  We didn't assess the penalty,

5   though, we just -- either guilty or not guilty.

6           MS. RATTAN:  Okay.  Anything about that that will

7   affect you here?

8           PROSPECTIVE JUROR:  No, I don't think so.

9           MS. RATTAN:  Okay.  And how long ago was that?

10          PROSPECTIVE JUROR:  It was awhile ago.  I want to

11  say seven or eight years ago.

12          MS. RATTAN:  Okay.  Thank you.

13          And then 43.

14          PROSPECTIVE JUROR:  Juror Number 43.

15          About ten years ago, I served for the town of

16  Flower Mound.  There was just a 16-year-old kid trying to

17  fight a speeding ticket.

18          MS. RATTAN:  Okay.  How did that go?

19          PROSPECTIVE JUROR:  Well, we got him off -- well,

20  he got a ticket; but they also gave him like a reckless

21  endangerment charge and couple other, like street racing.

22  So we dropped those charges.

23          MS. RATTAN:  Okay.  He's 16.

24          PROSPECTIVE JUROR:  Yeah.

25          MS. RATTAN:  Okay.  Thank you.

1                Yes, sir, Number 53.

2                PROSPECTIVE JUROR:  Yeah, 53.

3                Probably 2008.  It was a criminal case,

4    drug-related.

5                MS. RATTAN:  Okay.  Federal?  State?  What county?

6                PROSPECTIVE JUROR:  It was county.

7                MS. RATTAN:  And did y'all have to assess

8    punishment?

9                PROSPECTIVE JUROR:  No.

10               MS. RATTAN:  Did the judge do punishment?

11               PROSPECTIVE JUROR:  Yes.

12               MS. RATTAN:  Okay.  Anything about that that will

13   affect you here?

14               PROSPECTIVE JUROR:  No.

15               MS. RATTAN:  Thank you for letting us know.

16               And then 58.

17               PROSPECTIVE JUROR:  Juror 58.

18               Collin County about six years ago.  It was

19   criminal and the judge, Walker Bennett, set the penalty and

20   nothing about that would affect this case.

21               MS. RATTAN:  Okay.  Thank you.

22               And 62.

23               PROSPECTIVE JUROR:  Juror 62.

24               Twenty years ago, a criminal case in Collin

25   County, race-based assault case.  Defense requested the

 1  judge to set punishment.

 2          MS. RATTAN:  Okay.

 3          PROSPECTIVE JUROR:  Nothing would affect me in

 4  this case.

 5          MS. RATTAN:  Okay.  Thank you.

 6          You heard on the witness list a number of law

 7  enforcement agencies were listed.  A number of law

 8  enforcement officers were named.  So I need to know if you,

 9  a family member, or a friend has ever had a negative

10  experience or encounter with law enforcement.

11          I mean, probably we've all been stopped for a

12  traffic ticket that we were frustrated about something.

13  You know, they said as to me one time "We can't catch them

14  all" because I was at the back of the pack and said, "I'm

15  at the back of the pack."

16          Anyway, so we've all had encounters but just one

17  that -- an encounter where you, a family member, or a

18  friend have had a negative experience with law enforcement?

19  IRS is testifying, so any concerns or issues that you've

20  had with IRS.  So law enforcement, federal law enforcement

21  agencies, any concerns about that?  Anyone on the front

22  row?

23          Going back, anybody?

24          PROSPECTIVE JUROR:  What did you ask again?

25          MS. RATTAN:  Law enforcement, any negative

 1  experience with law enforcement.  Could be federal law

 2  enforcement.  Could be anything.  You or a close family

 3  member or close friend, anything like that, negative

 4  experiences with law enforcement.

 5          PROSPECTIVE JUROR:  Yes.

 6          MS. RATTAN:  Thank you.

 7          PROSPECTIVE JUROR:  I'm Juror 25.

 8          And you want to know what the experience was?

 9          MS. RATTAN:  You know, I'll make a note about it;

10  and we'll ask Judge Mazzant if we can talk to you if that's

11  all right.

12          PROSPECTIVE JUROR:  Okay.

13          MS. RATTAN:  Okay.  Thank you for letting me know.

14          PROSPECTIVE JUROR:  Yes, ma'am.

15          MS. RATTAN:  Anyone else?

16          38.

17          If it's okay with the Court, we'll do the same

18  thing.

19          PROSPECTIVE JUROR:  You'll do the same?

20          MS. RATTAN:  Yes.

21          Anybody else, any concerns?

22          Okay.  Now, we received a list that has y'all's

23  name on it; and then it has a job or employment.  And some

24  of these I didn't get full information on; so I'm going to

25  ask.

 1              Let's see.  Juror Number 5, it says that you're a

 2    business owner.  What type of business are you in?

 3              PROSPECTIVE JUROR:  Just recently opened a salon

 4    with my girlfriend.  So I'm a barber, and she's an

 5    aesthetician.

 6              MS. RATTAN:  Okay.  And it's here in Grayson

 7    County?

 8              PROSPECTIVE JUROR:  It's in Colbert, Oklahoma.

 9              MS. RATTAN:  Okay.  So do you live here?

10              PROSPECTIVE JUROR:  I stay in Denison.

11              MS. RATTAN:  Okay.  So you started your business

12    up north of the border?

13              PROSPECTIVE JUROR:  Yes, ma'am.

14              MS. RATTAN:  And you all just started it?

15              PROSPECTIVE JUROR:  Yes, ma'am.

16              MS. RATTAN:  Okay.  Thank you.

17              And then, let's see, Juror Number 17.  It says

18    that you're retired, and so congratulations.  What are you

19    retired from?  What work?

20              PROSPECTIVE JUROR:  I used to work at -- I used to

21    jailer in McKinney, Collin County.

22              And then I started working with a caregiver.

23              MS. RATTAN:  Okay.

24              PROSPECTIVE JUROR:  So I was a caregiver to people

25    at home.

 1           MS. RATTAN:  Okay.

 2           PROSPECTIVE JUROR:  So I'm retired.

 3           MS. RATTAN:  Is there anything about any of those

 4  that you think will be an issue here?

 5           PROSPECTIVE JUROR:  I can't hear you.

 6           MS. RATTAN:  I know.  It's hard to hear in here.

 7           Is there anything about any of that that you think

 8  would be an issue in this case?

 9           PROSPECTIVE JUROR:  No.

10           MS. RATTAN:  Okay.  Thank you.

11           Juror Number 20, what type of work have you been

12  involved in?

13           PROSPECTIVE JUROR:  All different types, but the

14  last 20 years I was a crossing guard.

15           MS. RATTAN:  Okay.  Thank you.

16           PROSPECTIVE JUROR:  Uh-huh.

17           MS. RATTAN:  And then Juror Number 23, retired --

18  I note that you're retired.  What type of line of work were

19  you in?

20           PROSPECTIVE JUROR:  I'm an accountant, I'm a CPA,

21  and I do occasional contract work still.

22           MS. RATTAN:  Okay.  Well, is there anything --

23  there are going to be accountants who testify here, a

24  forensic accountant.  Is there anything -- because if you

25  see something, you can't say anything to the others.

```
 1              PROSPECTIVE JUROR:  No.  I don't believe I'd have
 2    any problem with it.  I spent some years doing forensic
 3    work.
 4              MS. RATTAN:  Okay.
 5              PROSPECTIVE JUROR:  -- as well so --
 6              MS. RATTAN:  Okay.  Thank you.
 7              Let's see.  Juror Number 35.
 8              PROSPECTIVE JUROR:  I'm Juror Number 35.
 9              MS. RATTAN:  Yes, sir.  What type of work are you
10    in?
11              PROSPECTIVE JUROR:  I was currently -- or at the
12    time of the questionnaire -- unemployed.  I have recently
13    been employed with Collin County Sheriff's Office.
14              Prior to that, I was working with a payment
15    processor.  They did card network and ACH payments.
16              MS. RATTAN:  Okay.  The Collin County sheriff's
17    department, what do you do there?
18              PROSPECTIVE JUROR:  I'll be a dispatcher.
19              MS. RATTAN:  And then, of course, that's in
20    affiliation with law enforcement.  Is that something that
21    you would be able to set aside and focus on the evidence
22    and the law that Judge Mazzant gives you here?
23              PROSPECTIVE JUROR:  Yes.
24              MS. RATTAN:  Okay.  Thank you.
25              Let's see.  Juror Number 38, what type of work
```

 1    have you been involved in?

 2             PROSPECTIVE JUROR:  Juror Number 38.

 3             Accounting and office management.

 4        MS. RATTAN:  Okay.  Thank you.

 5             Number 39.

 6             PROSPECTIVE JUROR:  39.

 7        MS. RATTAN:  What type of work have you been

 8    involved in?

 9             PROSPECTIVE JUROR:  Been a housewife for the past

10    40-something years.

11        MS. RATTAN:  Okay.  Thank you.

12             And then 41.  Yes, sir.

13             PROSPECTIVE JUROR:  I run a big sales team for a

14    software company.

15        MS. RATTAN:  What's the software company?

16             PROSPECTIVE JUROR:  SAP.

17        MS. RATTAN:  Okay.  Thank you.

18             48.

19             PROSPECTIVE JUROR:  Yes, 48.

20             I work in IT.  Currently recently unemployed.

21        MS. RATTAN:  Okay.  Thank you.

22             And then if you could pass it to 49.

23             Retired?

24             PROSPECTIVE JUROR:  Yes.

25        MS. RATTAN:  What type of work were you in?

```
 1              PROSPECTIVE JUROR:  I done factory work for, like,
 2   20 -- close to 25 years.  And I also worked at Zales and
 3   Sears a few years.
 4              MS. RATTAN:  Okay.
 5              PROSPECTIVE JUROR:  The last few years, I've been
 6   working with my husband.  He's a insurance adjuster.  And
 7   I've kept my insurance adjuster license until he started
 8   just working from home examining claims.  So I consider
 9   myself retired.
10              MS. RATTAN:  Okay.  Thank you for letting us know.
11              And then 52 -- oh, we already know.  Well, I don't
12   know.  Do we?  What's your -- I think you already told us.
13   It's just not on the form here.
14              PROSPECTIVE JUROR:  Oh.  I'm unemployed at the
15   moment.
16              MS. RATTAN:  Okay.
17              PROSPECTIVE JUROR:  My parents both have cancer;
18   so I stopped doing what I was doing.  And we ran a family
19   business and that got a hit during COVID, but I stopped
20   working to take care of them.
21              MS. RATTAN:  Take care for them.  Okay.  Thank
22   you.
23              So I know Judge Mazzant already asked this; but if
24   anyone has a personal conflict or something, I mean, it's
25   important to raise those issues, too, like if you were
```

 1  unable to get someone else to care for them, something like

 2  that.

 3          PROSPECTIVE JUROR:  It's good.

 4          MS. RATTAN:  Okay.

 5          59.

 6          PROSPECTIVE JUROR:  I'm Number 59.

 7          MS. RATTAN:  Yes, ma'am.  What type of work have

 8  you been involved in?

 9          PROSPECTIVE JUROR:  I'm an -- I was an educator.

10          MS. RATTAN:  Okay.

11          PROSPECTIVE JUROR:  I'm not exactly retired, but I

12  don't work anymore.

13          MS. RATTAN:  Lower school?  Middle school?

14          PROSPECTIVE JUROR:  Both.

15          MS. RATTAN:  Okay.  Thank you.

16          And then 62.

17          PROSPECTIVE JUROR:  62.

18          My career was in the IT industry within the oil

19  and gas energy industry.

20          MS. RATTAN:  Okay.  Thank you.

21          So you all, of course, went to lunch before --

22  earlier, before I finished; and you had a chance to kind of

23  mull over things -- because this is the last time.

24          The next time that we talk -- of course, defense

25  counsel is going to ask you some questions this afternoon;

1    but the next time that we talk will be when the 12 of you

2    are sitting over here and you will have taken an oath to

3    uphold and enforce the law that Judge Mazzant gives you,

4    base your decision on the law and the evidence.

5          Is there anything that's come up that you feel

6    like we should know about before you're going to begin your

7    jury service?  The 12 of you think it won't happen, but

8    it's going to be 12.

9          Okay.  Number 49, maybe we could ask Judge Mazzant

10   if he would talk to you.

11         PROSPECTIVE JUROR:  I do have one other thing to

12   add, that I had a step-grandson who overdosed on fentanyl

13   last October.

14         MS. RATTAN:  Okay.

15         PROSPECTIVE JUROR:  And he passed away.

16         MS. RATTAN:  Okay.  I'm sorry.

17         PROSPECTIVE JUROR:  He was 26.

18         MS. RATTAN:  I'm so sorry.  Is that something that

19   you would be able to set aside or --

20         PROSPECTIVE JUROR:  I think so.

21         MS. RATTAN:  Okay.  Okay.  Thank you.  I'll make a

22   note of that.

23         Is there anything else?  Anyone else?

24         Number 28, yes, sir.

25         PROSPECTIVE JUROR:  I just remembered that I have

```
 1   a doctor's appointment, I think, Thursday this week, just

 2   for blood work.  So I don't know whether that can affect --

 3          MS. RATTAN:  Okay.  Thank you for letting us know.

 4          Okay.  Thank you so much.  I know it's been a long

 5   process.  We so appreciate your time and your careful

 6   attention, and we look forward to presenting the evidence

 7   to those of you who serve on the panel.

 8          Your Honor, thank you for the time.

 9          THE COURT:  Thank you, Ms. Rattan.

10          Mr. White.

11          MR. JOE WHITE:  Good afternoon, everyone.

12          After listening to all of this for a couple hours,

13   there's one thing I want to visit about.  The forefathers

14   of our country when they were forming this country -- y'all

15   remember in Philadelphia, Pennsylvania, that they got

16   together and started writing up papers.  They were going to

17   define the greatness of what they wanted in this country,

18   whether it be the United States Constitution, the Bill of

19   Rights.

20          Everybody familiar with that?  That actually

21   happened.  I think Ben Franklin said, "We're all going to

22   hang together or we're going to hang separate."  Don't know

23   if some of y'all might have remembered that from civics.

24          But within that paperwork, there is what's called

25   the Seventh Amendment; and I believe Judge Mazzant talked
```

```
 1    about that.  Judge Mazzant said it's so important it's in
 2    our Constitution and it's in the Seventh Amendment.
 3            And so the Seventh Amendment says you all are
 4    going to decide.  You are the only ones that are going to
 5    have the power.  You are the only ones that are going to
 6    have the power to decide not guilty or guilty on each of
 7    the seven counts.  Do all of you understand that?
 8            There is no one else that has that power in this
 9    courtroom.  Judge Mazzant doesn't have it.  The
10    prosecution, they don't have it.  I don't have it.  Whoever
11    those 12 are are the ones that are empowered, under the
12    Seventh Amendment of the United States Constitution, to
13    decide guilt or innocence.  Are you up for that task?
14            If you're up for the task, I want you to raise
15    your hand, if you're up for the task of being in that
16    position, that powerful position.
17            Is anyone not up to the task in this courtroom in
18    the Paul Brown Courthouse in Sherman, Texas?  Is there
19    anyone in here that's not up to that task?
20            Because the next question -- we've heard all this
21    up here -- by the way, Deb didn't buy AGC in December
22    of 2016.  See?  It was December 2014.
23            We've got things to talk about.  We have conflicts
24    in facts that bring us here.  Do y'all understand that?
25            Everything I'm telling you, none of it is
```

1   evidence.  It's just me preaching.  It's me going to get to

2   know y'all in this concept known as *voir dire*, to speak the

3   truth.  All right?  I've got two hours to get to know

4   y'all.  I've got to make a decision.  I think I get ten

5   strikes; the government gets six.  We've got to decide

6   here, figure out who's going to be the best 12, okay?

7         Fair enough, 37?

8         PROSPECTIVE JUROR:  Sure.

9         MR. JOE WHITE:  Well, I know I'm starting behind

10  because my colleagues had two hours of talking to you about

11  9/11.  None of the planes that were involved in 9/11 that

12  took our friends -- I think everyone knows someone that was

13  affected by that tragedy.  Not one of those planes was a

14  trust airplane.  I don't know why it was brought up.

15        There isn't no bank robbery.  This isn't a bank

16  robbery case.

17        How many of you have heard the term "fearmonger,"

18  "fearmongering"?  Does fearmongering have anyplace in this

19  courtroom?  Juror --

20        PROSPECTIVE JUROR:  61.

21        MR. JOE WHITE:  61?

22        Juror 61, I want to talk about fearmongering.  Why

23  does it not have any place in this courtroom?

24        PROSPECTIVE JUROR:  I don't think opinions should

25  be in the courtroom or, like, personal biases.  I think

1  this is just straight fact and what you present to us

2  should be given as a jury and we should respond back.  I

3  don't think personal biases and emotions should be involved

4  in a courtroom.

5          You're lawyers and you spit back facts and us, as

6  a jury, is supposed to -- guilty or not guilty.  I don't

7  think we're supposed to interfere what we believe or what

8  we feel.

9          And so when people give off stories, I feel like

10 it's just a way to cover what's actually a fact and it's

11 just a way to cover -- or a way to just put in emotions or

12 just a way to manipulate the mind.

13         MR. JOE WHITE:  Thank you for sharing that.

14         PROSPECTIVE JUROR:  You're welcome.

15         MR. JOE WHITE:  So a lot of us have been affected

16 by drugs.  A lot of us have been affected by drugs.  Some

17 have died from fentanyl.  Some have died from cocaine

18 overdoses.  You heard cocaine, drugs.

19         Is it important that when the government brings a

20 case, that the words in the Indictment should be true, 41?

21         PROSPECTIVE JUROR:  Indeed.

22         MR. JOE WHITE:  Indeed.

23         Why?

24         PROSPECTIVE JUROR:  It's an allegation.  It's an

25 allegation against someone who is innocent until proven

 1   guilty.

 2           MR. JOE WHITE:  Thank you.

 3           You know, I don't know why it's this way; but it

 4   is.  You spend a lifetime earning a reputation.  You spend

 5   a lifetime working, going to church, family, friends,

 6   colleagues, whatever your profession is, whether you're a

 7   CPA, whether you own a business starting out, trying to do

 8   right.  But you, on a false allegation, can lose that

 9   reputation how -- how quick?  How quick can you lose that

10   reputation that you've earned your entire life for?

11   Overnight.

12           Have you ever -- raise your hand on this.  Does

13   anyone here know someone who's been falsely accused?  Does

14   anyone here know someone who you believe has been falsely

15   accused, ever?

16           Juror 23.

17           I don't see the card, Juror --

18           PROSPECTIVE JUROR:  25.

19           MR. JOE WHITE:  25.  Thank you.

20           Anyone else who's been falsely accused?

21           I know one time I tried to convince my daddy he

22   was falsely accusing me; but when he rolled out those

23   cigarettes in my right hand, he caught me red-handed and he

24   beat the lying out of me when I was in second grade.  So I

25   know, you know, you can be accused rightfully; but

1    sometimes you can be accused wrongfully and we're going to

2    talk a lot more about that.

3             But, Juror 25, share with us, please, on who was

4    falsely accused that you knew.

5             PROSPECTIVE JUROR:  Do I believe they were falsely

6    accused or they --

7             MR. JOE WHITE:  Do you know someone who's ever

8    been falsely accused?

9             PROSPECTIVE JUROR:  Yes.

10            MR. JOE WHITE:  And did it get straightened out in

11   their favor ultimately?

12            PROSPECTIVE JUROR:  Well, I actually know two

13   people.  In one, yes; in one, no.

14            MR. JOE WHITE:  And was either in a court of law

15   where the falsely accused found himself or herself?

16            PROSPECTIVE JUROR:  Yes.

17            MR. JOE WHITE:  And did they go to trial?

18            PROSPECTIVE JUROR:  No.

19            MR. JOE WHITE:  What happened to the one that

20   didn't get it worked out?

21            PROSPECTIVE JUROR:  He -- he just had to plead

22   guilty.

23            MR. JOE WHITE:  He had to plead guilty?

24            PROSPECTIVE JUROR:  Yes.

25            MR. JOE WHITE:  How about the other one that got

 1    it worked out?

 2           PROSPECTIVE JUROR:  I don't remember.  I think it

 3    got dismissed because of the evidence.

 4           MR. JOE WHITE:  All right.  Very good.

 5           PROSPECTIVE JUROR:  Yes.

 6           MR. JOE WHITE:  Thank you.

 7           Juror 23.

 8           PROSPECTIVE JUROR:  Early in my career, I had a

 9    client who had some tax issues.  It predated me, but he

10    came to me for some help.  And the short version of it was

11    it became a criminal matter rather than a civil matter.  It

12    became not about his taxes but his intent.

13           And I felt like he was not able to assist in his

14    defense.  He ultimately was found guilty and sentenced

15    to -- he was over in Fort Worth.  So it felt like a much

16    larger thing than, at least in my young career, what I

17    thought it was.

18           MR. JOE WHITE:  Did you assist in the trial of the

19    case?  Did it go a jury trial?

20           PROSPECTIVE JUROR:  I assisted in the preparation

21    of the work papers.  I didn't actually go to trial, but he

22    did.

23           MR. JOE WHITE:  Very good.  Thank you.

24           PROSPECTIVE JUROR:  You bet.

25           MR. JOE WHITE:  The -- I know we have folks

 1   here -- a husband that was a Southwest Airlines pilot.  We

 2   have some knowledge of airplanes, whether it's commercial

 3   airplanes or private airplanes.

 4          What I wasn't clear on was what was being drawn up

 5   here on the board from time to time about the government's

 6   advocacy of how they view a trust and how some of us have

 7   the opinion that, by golly, we don't want foreigners owning

 8   an N tail number on an airplane.

 9          49, I think you were one that expressed that; and

10   I want to visit about that.

11          But does anyone have any particular experience in

12   working in an airplane transaction where a trust -- a

13   trustee was involved in the transaction?  Is there anyone

14   that has had that experience?

15          I'm not seeing any hands.

16          Has anyone -- oh, 29.  Yes, sir.  Thank you for

17   that.

18          PROSPECTIVE JUROR:  Potentially.  I don't know the

19   full business details.  But the company that I work for

20   sold fractional ownership of jets; so the company was

21   owning the jet, leasing out portions of time on the jet to

22   others to use.  Does that satisfy your requirements?

23          MR. JOE WHITE:  I don't think so.  I think that

24   may be a -- like a NetJet or --

25          PROSPECTIVE JUROR:  Yeah.

```
 1              MR. JOE WHITE:  -- some similar-type company.

 2              PROSPECTIVE JUROR:  Uh-huh.

 3              MR. JOE WHITE:  Foreign ownership, foreign

 4    ownership of a private aircraft where there is a sale going

 5    on and they want an N tail number, there is a process.

 6              Have --

 7              PROSPECTIVE JUROR:  Not that.

 8              MR. JOE WHITE:  Thank you.  Thank you, sir.

 9              One thing I wanted to talk about is are you

10    willing to listen as to what our federal government

11    regulates as it relates -- let me unpack that again.

12              Are you willing to listen, being the fact finder,

13    that our federal government, through the FAA, maybe through

14    some customs-type work -- are you willing to listen to what

15    the regulations speak to?

16              If you're not, raise your hand because I doubt I'm

17    going to have any hands raised on that.

18              Are you interested in that aspect?  If it's

19    regulated, do you have interest in what does our government

20    say about that, the interaction that you have with agencies

21    through lawyers on -- let me ask engineers.  Are there

22    engineers here?  Do we have any engineers in our pool?  I

23    thought --

24              PROSPECTIVE JUROR:  By training or by --

25              MR. JOE WHITE:  Both.  Engineers.
```

1          So here's what I -- along this line, have you had

2    occasion -- because your industry is regulated in how you

3    build and what the torque is on a particular nut and bolt

4    on a bridge, what have you.

5          Have you ever engaged with the regulatory agency

6    as an engineer?  Has anyone done that?

7          Has anyone engaged with the IRS as an accountant

8    or a CPA?  Has anyone ever had that interaction?

9          I'm sure Juror 23 -- 23 has.

10          And have you been at odds on interpreting

11   regulation guidelines?

12          I see Juror 23 shaking his head yes.

13          And that happens.  Do you agree with me?

14          Do y'all see how you can have a regulation and you

15   involve lawyers -- not me.  But you're going to hear from

16   various lawyers that come in and talk about this regulatory

17   concept of the FAA, one out of D.C. that's going to come in

18   here and talk to you --

19          MS. RATTAN:  Your Honor, I'll object at this point

20   to contracting.

21          THE COURT:  Sustained.

22          MS. RATTAN:  So in terms of regulations, are they

23   subject to interpretation?  Has that been your experience

24   from time to time if you've been in that position?

25          And the government bearing the burden -- and I'll

1  talk about this in a minute on the burden of proof.  You

2  heard the government talk about it.  They go first.  I

3  anticipate -- because we're going to stop Thursday about

4  3:00 and then we're going to pick up Monday, I anticipate

5  sometime next week we'll get to start putting our case on.

6         And my question is this:  If you're picked,

7  Juror 12, Juror 3, Juror 8, all of you, Juror 17, all of

8  you -- if you're the 12 picked, can you wait before

9  deciding who is right and who is wrong until we put our

10 case on?

11        Any problem with that, Juror 6?  No.

12        Does anyone have an issue with prejudging?  Anyone

13 have an -- should you prejudge in this case, or should you

14 wait until everything is in and you've heard it all?

15        Everything's in and heard it all?  If so, raise

16 your hand.  I need commitments.  This is a big commitment.

17        Should it be that way?  Juror 41, shaking --

18        PROSPECTIVE JUROR:  Yes.

19        MR. JOE WHITE:  Why?

20        PROSPECTIVE JUROR:  (Indiscernible response.)

21        MR. JOE WHITE:  Did y'all hear that?  You can't

22 make a decision until you have all the data.

23        Juror 31, does that make sense?

24        PROSPECTIVE JUROR:  Absolutely.

25        MR. JOE WHITE:  Why?

```
 1                PROSPECTIVE JUROR:  Because --

 2                THE COURT:  Just wait for the mic, though.

 3                PROSPECTIVE JUROR:  Without all of the data, I

 4   can't make a decision.  I'm only getting half the side of

 5   the story.

 6                I've got four kids.  I know I can't make a

 7   decision based on what one told me without seeing the other

 8   side of the story.  I hate to liken you to my children

 9   because they tattle a lot but --

10                MR. JOE WHITE:  I know what you're talking about.

11   I've got five of them.  That's why my hair is gray.

12                So who knows about the Federal Aviation

13   Administration?  Anybody had some dealings with the FAA?

14                Are you interested in what role they play in this

15   trust concept?  Are you interested in that role, how they

16   regulate and what the issues might be as it relates to

17   having a trust company?

18                14, Juror 14, do you have any interest in how the

19   FAA may weigh in on regulations and interpretation of

20   regulations?

21                PROSPECTIVE JUROR:  I have no background knowledge

22   so I'm interested in learning about it, but not a passion

23   of mine.  Not something I would research on my own so --

24   sorry.

25                MR. JOE WHITE:  Let me ask -- let me ask this.
```

1    I'm going to come to you, 28, next.

2            Let me ask this.  Let's just think this through

3    together.  So if there is a regulation that is being

4    interpreted one way by the government and another way by

5    the defendant's attorneys, is that something that would

6    interest you on whether the regulation was violated or not?

7            Government says --

8            PROSPECTIVE JUROR:  Yes.

9            MR. JOE WHITE:  -- one thing --

10           PROSPECTIVE JUROR:  I mean, yeah.  So we would

11   have to look at what it says and then try to figure out

12   what the black-and-white -- the wording is and then the

13   interpretation of the law, the spirit of the law; and

14   that's where the jury would -- we would have to talk that

15   out.

16           MR. JOE WHITE:  And so do you recall -- and this

17   is to everybody -- that the word "intent," "intentional

18   conduct," that was raised by my colleague for the

19   government, "intentional conduct," when she was talking

20   about these crimes that they've charged Ms. Mercer with?

21   Do you recall that, Ms. Mercer-Erwin?

22           PROSPECTIVE JUROR:  Uh-huh.

23           MR. JOE WHITE:  Everybody?

24           Intent is a very important concept.

25           Juror 7, can we agree on that?

1          PROSPECTIVE JUROR:  Yes.

2          MR. JOE WHITE:  Why?

3          PROSPECTIVE JUROR:  Well, it shows what was --

4  what was on their mind, what they wanted to do, you know,

5  what they intended to do.  That's got to be shown clearly.

6          MR. JOE WHITE:  How important would it be if, in

7  looking at the concept of intent, of intent, speaking to

8  lawyers?

9          MS. RATTAN:  Your Honor, I object.  This is

10  contracting.

11          THE COURT:  Well, just rephrase.

12          MR. JOE WHITE:  I'm sorry?

13          THE COURT:  Just rephrase.

14          MR. JOE WHITE:  Certainly.

15          What do you look to in terms of -- well, let's --

16  do you have any children?

17          PROSPECTIVE JUROR:  I do.

18          MR. JOE WHITE:  And did you -- were you ever in a

19  situation where you thought one of your children acted

20  intentionally, they intended to do something that wasn't

21  right?

22          PROSPECTIVE JUROR:  Yes.

23          MR. JOE WHITE:  And do you deal -- and versus an

24  accident or a mistake?

25          PROSPECTIVE JUROR:  Absolutely.  Different.

1          MR. JOE WHITE:  Do you go about trying to assess

2    this concept of intent -- do you weigh all these factors

3    of -- before you reach intent?

4          PROSPECTIVE JUROR:  Yes.

5          MR. JOE WHITE:  Very good.  Thank you.

6          Does everyone agree there that --

7          Juror 12.

8          PROSPECTIVE JUROR:  I just have a concern with

9    that.  Juror 12.

10          So if a parent taught a child something like,

11    well, just go over -- just as long as you don't go over

12    10 miles an hour, you should be okay and the child, he goes

13    over, you know, 7 miles an hour and he's pulled over.

14    Well, his intent was okay.  His intent was good.  He was

15    just following what his parents told him, right?

16          So -- but he's still at fault, right, because he

17    exceeded the speed limit even though his parents taught him

18    the wrong thing, correct?

19          MR. JOE WHITE:  I hear what you're saying.  Yes.

20    He got bad instruction.

21          PROSPECTIVE JUROR:  Right.

22          So is it the child's fault, or are the parents to

23    blame?

24          MR. JOE WHITE:  Very good.

25          And would you be interested in why the parents

```
 1   said what they said there?

 2            PROSPECTIVE JUROR:  Maybe they didn't know any

 3   better.  I don't know.

 4            MR. JOE WHITE:  Very good.  Thank you.

 5            PROSPECTIVE JUROR:  Yeah.

 6            MR. JOE WHITE:  Juror 28, I know I was speaking

 7   about the FAA and you had raised your hand.  I wanted to --

 8            PROSPECTIVE JUROR:  Yes.  This is 28.

 9            I don't know the specifics of what you are trying

10   to want to know the FAA from me.  But having worked with

11   American Airlines for many years and also with Boeing for

12   some years, too, I know there are relationships between the

13   FAA and these two companies that I've discussed.  So FAA is

14   there to make laws which these airlines are expected to

15   follow.  And once they are just law, there is supposed to

16   be strict compliance with the laws.

17            So I don't know what you want to ask me about

18   this.

19            MR. JOE WHITE:  Have you had any dealings with the

20   Department of Commerce?

21            PROSPECTIVE JUROR:  No.  I don't have anything to

22   do with them based on my work.

23            MR. JOE WHITE:  And are there -- is there a

24   specific part within the FAA that you've had dealings with,

25   whether it was your time at Boeing or your time with
```

1    American?

2           PROSPECTIVE JUROR:  Not really.  But I've had

3    other situations where there were incidents with the planes

4    and the FAA had to come in and made some sanctions, and I

5    think that is what they are meant to do.

6           MR. JOE WHITE:  FAA regulates how a commercial

7    airliner is to be inspected?

8           PROSPECTIVE JUROR:  Yeah.

9           MR. JOE WHITE:  And maintained?

10          PROSPECTIVE JUROR:  Yeah.

11          MR. JOE WHITE:  Very good.

12          On prior jury service, kind of following up at the

13   end of questioning by my colleague, there was a juror that

14   let someone go on tickets, this kid that was charged,

15   Juror 43.

16          Yes.  Why did you let him go on the other counts?

17          PROSPECTIVE JUROR:  Juror 43.

18          Just because, I mean, he wasn't fighting the

19   actual speeding ticket.  He was owning up to it, and he

20   represented himself in a manner that was very respectable

21   to the Judge.  It just seemed excessive what the other

22   charges were for just a simple speeding ticket, and that's

23   why we let him off.

24          MR. JOE WHITE:  And how long did y'all deliberate?

25          PROSPECTIVE JUROR:  It's been ten years.  Maybe an

1    hour or two.

2              MR. JOE WHITE:  Very good.

3              Let me -- let me finish up on that.  One other

4    area.  In terms of letting him go, was it out of empathy,

5    sympathy that you let him go; or did you really believe

6    that he didn't commit the offense that he received the

7    ticket for?

8              PROSPECTIVE JUROR:  To be honest with you, it's

9    probably more empathy just because, I mean, he was there by

10   himself and, you know, he was fighting it, wasn't arguing

11   about the other speeding charge just the other two; so we

12   just decided to let him go.

13             MR. JOE WHITE:  Very good.  Thank you.

14             What about getting pulled over and speeding -- how

15   about 60 in a 65?  How about getting a ticket for going 60

16   when the speed limit is 65?

17             Juror 12, is that right?

18             PROSPECTIVE JUROR:  Juror 12.

19             Well, I mean, it depends on what the speed limit

20   suggests.  I mean, if it's -- if you can't go under the

21   speed limit, then -- but given our current laws, then no,

22   that wouldn't be a problem because you're following the

23   law, right?

24             MR. JOE WHITE:  Right.  Right.

25             Does everybody agree?  If you're within the speed

 1   limit, should you be pulled over?

 2          Everything being equal, your headlights work, your

 3   tag's right, you've got everything going right.  You were

 4   just going 62 in a 65, and you're pulled over.

 5          PROSPECTIVE JUROR:  Then that wouldn't be just.

 6          MR. JOE WHITE:  There you go.

 7          Should -- is there -- all things being equal --

 8   the sun's out.  It's not icy.  You're not putting anyone at

 9   harm.  Do you agree that's a situation where a person

10   didn't violate the law?

11          PROSPECTIVE JUROR:  If he's going 62 in a 65?

12          MR. JOE WHITE:  Yes.

13          PROSPECTIVE JUROR:  Well, under our current law,

14   no.  I mean if it's a 65-mile-an-hour --

15          MR. JOE WHITE:  Any problem with that?

16          PROSPECTIVE JUROR:  No.

17          MR. JOE WHITE:  Very good.  Thank you.

18          This Ponzi scheme that was discussed -- the

19   banker, where is the banker, Juror -- do we have the banker

20   that was being questioned?

21          Right here, Juror 15, the Ponzi scheme.

22          PROSPECTIVE JUROR:  No.

23          MR. JOE WHITE:  Who spoke on the Ponzi scheme?

24          37, okay.  I couldn't -- I couldn't find it in my

25   notes.

```
 1            All right.  I want to talk about this.  Have you
 2   been involved in a -- from your profession -- in knowing a
 3   Ponzi scheme was occurring or discovering a Ponzi scheme?
 4            PROSPECTIVE JUROR:  No.
 5            MR. JOE WHITE:  All right.  We all know about
 6   Madoff, right, Bernie Madoff who made off with billions and
 7   billions until he couldn't keep it together anymore, right?
 8            PROSPECTIVE JUROR:  Correct.
 9            MR. JOE WHITE:  All right.  Now, do you recall the
10   investors that were -- like I know Kevin Bacon and his
11   wife, Ms. Sedgwick, they lost, I think, some 20 million
12   bucks on that guy's scheme.
13            But would you expect investors to be upset as to
14   the ones that lost their money in the scheme?
15            PROSPECTIVE JUROR:  Yes.
16            MR. JOE WHITE:  Wouldn't you expect those
17   investors to want to participate in seeing justice done on
18   someone that is like Madoff?
19            PROSPECTIVE JUROR:  Absolutely.
20            MR. JOE WHITE:  Why?
21            PROSPECTIVE JUROR:  Well, they were involved in
22   something illegal; and that's going to affect their
23   reputation.
24            MR. JOE WHITE:  And they'd been wronged.
25            PROSPECTIVE JUROR:  Yeah.
```

```
 1            MR. JOE WHITE:  They had had money stolen from
 2  them, right?
 3            PROSPECTIVE JUROR:  Uh-huh.
 4            MR. JOE WHITE:  I mean, isn't a Ponzi scheme where
 5  you literally steal from investors?
 6            PROSPECTIVE JUROR:  Basically.  I'm not an expert.
 7            MR. JOE WHITE:  Well, I'm not either.  I'm just
 8  kind of thinking through.
 9            But you would expect those that were taken
10  advantage of in a scheme to participate in wanting justice
11  done.
12            PROSPECTIVE JUROR:  Absolutely.
13            MR. JOE WHITE:  Thank you.
14            Now, we've heard a lot this morning about this,
15  that, and the other, 9/11, bank robbery, plans inside the
16  bank, is that aiding and abetting.  And I've got to tell
17  you I was impressed with my colleague's presentation.  I
18  was impressed with the way Ms. Rattan went about discussing
19  these facets from her part of advocating for the
20  prosecution.
21            "Trust but verify," do you know what those words
22  mean?  Trust?  She seemed like, well, that sounds right.
23  But you've got to verify.
24            Are y'all willing to make sure that you verify
25  what's right and what's wrong?
```

1          Y'all have seen my -- you've seen Ms. Erwin.

2   You've seen her, and you'll see her throughout.  She won't

3   be able to talk to you like I won't be able to talk to you,

4   like none of us will be able to talk to you once you 12 are

5   in the box.  We may have some others, alternates, because

6   of how long this thing is going to take.  Hopefully, we can

7   get it done sooner rather than later.

8          But can we all agree that part of your

9   fact-finding mission that you're empowered with under the

10  Seventh Amendment of the United States Constitution

11  requires verification to your satisfaction?

12         Anybody have a problem with that?  Anybody?

13         Juror 21?

14         PROSPECTIVE JUROR:  I don't have a problem with

15  that.

16         MR. JOE WHITE:  I want to visit with 21 just a

17  little bit.

18         Why?  Why do you not have a problem about you, as

19  a fact-finder, verifying?

20         PROSPECTIVE JUROR:  Because that's our job here

21  today.

22         MR. JOE WHITE:  Does everybody agree?

23         Have you heard that old axiom when I was growing

24  about what happened to the boy who cried wolf?

25         PROSPECTIVE JUROR:  Yes.

```
 1            MR. JOE WHITE:  That he cried wolf so many times
 2   it fell on deaf ears?
 3            PROSPECTIVE JUROR:  Yes, sir.
 4            MR. JOE WHITE:  And that when he really meant it,
 5   no one came to his defense, right?
 6            PROSPECTIVE JUROR:  Yes, sir.
 7            MR. JOE WHITE:  Do you have children?
 8            PROSPECTIVE JUROR:  No, sir.
 9            MR. JOE WHITE:  Have you had to hold people
10   accountable for things they say from time to time in your
11   walk in life?
12            PROSPECTIVE JUROR:  Yes.
13            MR. JOE WHITE:  How do you go about it?
14            PROSPECTIVE JUROR:  I own a small business.  I
15   have employees that represent my company to the public.  So
16   there's instances where I get feedback from our clients
17   that's not always positive.  And then I have to talk to the
18   employee and find out exactly what happened, talk to other
19   employees that may have been witnesses to those actions,
20   and take appropriate measures.
21            MR. JOE WHITE:  Very good.  Thank you, sir.
22            Briefly talk about the law.  Y'all have not been
23   instructed on anything yet from Judge Mazzant.  Judge
24   Mazzant is the boss of the law, not the prosecution, not
25   the prosecutors here, not my table.  We suggest
```

 1   instructions, but ultimately your judge here decides what

 2   written instructions you're going to get.  All right?

 3          And I know that there have been some of you that

 4   have served on other juries.  I bet you got them in your

 5   case on criminal instructions, Juror 43, and all the others

 6   that have had -- whether it's a civil case or a criminal

 7   case.  And I have yet to have a juror say, "No, I'm not

 8   going to follow the law."  I've asked this question for 35

 9   years.

10          Will y'all follow Judge Mazzant's law that he

11   gives on the instructions even if you don't agree with it?

12          Juror 15, yes?

13          PROSPECTIVE JUROR:  Juror 15.

14          Yes, I will follow the law.

15          MR. JOE WHITE:  Why?

16          PROSPECTIVE JUROR:  Because that's my duty as a

17   citizen.

18          MR. JOE WHITE:  You know, there are -- one of the

19   things we agree on, our country calls us to duty on two

20   occasions.  And you all heard that.  Do you agree the call

21   to duty in this case is a serious call?

22          PROSPECTIVE JUROR:  Yes.

23          MR. JOE WHITE:  All right.  Thank you.

24          All this writing up here -- this writing -- I'm

25   not sure you can really see that T right through there.

 1              Now, y'all see that?  Everybody see that?

 2         Do those words mean something?  That's why we're

 3    here.  Regardless of what's written up there, whether --

 4    well, that's just one small, itty-bitty, minutiae piece;

 5    but that's why there are things that we've got to figure

 6    out.

 7         Juror 4, I haven't heard much from you; and I just

 8    want to visit with you a minute.  It's my only chance I'm

 9    going to get to visit.

10         PROSPECTIVE JUROR:  Yes.  Juror 4.

11         MR. JOE WHITE:  Are you willing to listen to all

12    the evidence?

13         PROSPECTIVE JUROR:  Absolutely.

14         MR. JOE WHITE:  Why?

15         PROSPECTIVE JUROR:  Because that's my job.

16         MR. JOE WHITE:  How do you see your job?

17         PROSPECTIVE JUROR:  It's very important.

18         MR. JOE WHITE:  Do you see it as -- and I had know

19    this sounds like a cliche -- but as a search for the truth?

20         PROSPECTIVE JUROR:  Yes.

21         MR. JOE WHITE:  Is the search for the truth

22    important?

23         PROSPECTIVE JUROR:  Yes.

24         MR. JOE WHITE:  Thank you.

25         There are three burdens of proof.  Juror 13, I

 1   want to talk to you.  I'm not going to ask you a question

 2   just yet.

 3          There are three burdens of proof.  Have you served

 4   on a civil case?

 5          PROSPECTIVE JUROR:  No, sir.

 6          MR. JOE WHITE:  Have you served on a criminal

 7   case?

 8          PROSPECTIVE JUROR:  No.

 9          MR. JOE WHITE:  Who's served on a civil case?

10          Juror 14.  Let me -- pass the mic.  I'm not going

11   to ask you just yet.  I want to talk a little bit about --

12   okay.  I don't want to get ahead of myself.

13          Three words:  burden of proof.  Okay.  It's easy

14   to say.  It just kind of flows.  It's like ordering

15   something from Sonic and wanting a chili cheese coney.

16   Words just flow.

17          "Burden of proof" means -- each word is

18   significant.  "Burden" is like carrying a wheelbarrow full

19   of rocks uphill.  That's a burden.  And the more rocks

20   you've got in that wheelbarrow, the heavier the burden is.

21          Everybody agree?  The more rocks you've got in a

22   wheelbarrow, the heavier your burden is.

23          I want to talk about the rocks in the wheelbarrow.

24   My colleague talked about it.  In a civil case you have two

25   different burdens of proof.  Preponderance of evidence --

1    boy, that's a big word.  Why did they name preponderance of

2    evidence?  How -- that's not a very sexy three-word --

3    preponderance of -- what's "preponderance"?

4          Well, the law says -- the preponderance law says

5    what's more probably true than not true.  Scales of

6    justice, lady scales of justice, they teach us in law

7    school they tilt ever so slight.  They even teach that if

8    you float a feather down and it moves the scale, you win.

9    That's the preponderance.  That's how slight it is.

10         So that's on like a car wreck.  Who's at fault

11   fighting over money?  Preponderance of the evidence.  Okay?

12   That's down here, burden of proof, Level 2 burden.

13         Fraud.  How many of us have heard fraud is easy to

14   say but hard to prove?  Has anyone here heard that axiom

15   that fraud is easy to say but hard to prove?  Any hands?

16         I'm not seeing any hands.  Do you know why I've

17   heard fraud is easy to say hard to prove?  Clear and

18   convincing evidence is what you've got to prove to get to

19   fraud.  What is clear and convincing evidence?

20         Preponderance.

21         Clear and convincing evidence.

22         You ready for this?  The legal definition of what

23   you've got to prove in a civil case -- not talking about

24   someone's liberty, just talking about money, fraud --

25   highly probable and free from serious doubt.  Highly

1    probable and free from serious doubt.

2         What do you think of that burden?  That's heavier

3    than that feather.  We're not even here yet on beyond a

4    reasonable doubt.  You know why?  Because we're dealing

5    with liberty.  We're dealing with someone's liberty.

6         Juror 16, I haven't spoken to you.

7         Can we pass the mic down to Juror 16?

8         I'd like to know your thoughts about those three

9    levels of proof, preponderance, clear and convincing,

10   beyond a reasonable doubt.  Do you believe that in a

11   criminal case, the burden of proof should, in fact, be

12   higher than, greater than highly probable and free from

13   serious doubt?

14        PROSPECTIVE JUROR:  Yes, absolutely.

15        MR. JOE WHITE:  Tell us why.  Share your thoughts

16   with us, please.

17        PROSPECTIVE JUROR:  If we're looking at some --

18   somebody's liberty, if we're looking at convicting

19   somebody, we'd better be sure that we're acting on what

20   actually happened.

21        MR. JOE WHITE:  Listening to all of it.  Can you

22   commit with me to listen to all the evidence?

23        PROSPECTIVE JUROR:  Yes.

24        MR. JOE WHITE:  That -- wait until we put our case

25   on.  Can you do that?

1              PROSPECTIVE JUROR:  Yes.

2              MR. JOE WHITE:  Juror 11, can you do that?  Can

3    you wait until we put our case on before you start drawing

4    conclusions?

5              PROSPECTIVE JUROR:  Yes.

6              MR. JOE WHITE:  Do you think that's fair?

7              PROSPECTIVE JUROR:  Yes, very fair.

8              MR. JOE WHITE:  Why?  Why?

9              PROSPECTIVE JUROR:  You've got to hear both sides,

10   got to have all the evidence.  I mean, you said the word.

11   It's fair.  You can't make a decision too early.  You've

12   got to hear it all out.

13             MR. JOE WHITE:  Let me ask you this.  Let me ask

14   you this.  Can you return -- if after you've heard all the

15   evidence and you do not believe the United States

16   government has not met their burden of proof of beyond a

17   reasonable doubt, can you return a not-guilty verdict on

18   all counts?

19             I'll say it again.

20             PROSPECTIVE JUROR:  Say it again, yes.

21             MR. JOE WHITE:  I don't want any hesitancy here.

22             If the United -- this is not a trick question, and

23   I'm asking it of every one of you.  I'm asking this

24   question of every one of you.

25             If the United States federal government does not

 1  prove their case beyond a reasonable doubt, which is their

 2  agreed-upon burden, will you return a verdict of not guilty

 3  on all counts?

 4          PROSPECTIVE JUROR:  Yes.

 5          MR. JOE WHITE:  Is there anyone here that says,

 6  "Oh, no, wait a minute.  I'm going to give the government a

 7  maybe, kind of, sort of.  Maybe it's by clear and

 8  convincing evidence, highly probable and free from serious

 9  doubt, but it's not beyond a reasonable doubt"?

10          Is there anyone here that would hold up a

11  not-guilty verdict on all counts as it relates to Deb

12  Erwin, my client?  Anyone?  Because I want to visit.

13          PROSPECTIVE JUROR:  I want to clarify.

14          MR. JOE WHITE:  Yes.

15          PROSPECTIVE JUROR:  There are seven counts.  You

16  don't have to get all or nothing, right?  You can do

17  guilty --

18          THE COURT:  Wait for the mic, please.

19          PROSPECTIVE JUROR:  Okay.

20          MR. JOE WHITE:  Thank you, Juror 11.

21          PROSPECTIVE JUROR:  I just want to confirm my --

22          THE COURT:  And stand and say your number.

23          PROSPECTIVE JUROR:  41.

24          I think I heard you say not guilty on all counts.

25  Given there are seven counts, isn't it possible to say

1   guilty of some and not guilty on others?

2       You are implying it's an all-or-nothing-type case,

3   and I'm confused.

4       MR. JOE WHITE:  I don't mean to imply that.  I

5   want to visit about it --

6       PROSPECTIVE JUROR:  Okay.

7       MR. JOE WHITE:  -- because I'm talking to everyone

8   here.

9       The government has charged my client with

10  committing crimes on seven different counts.  You've got

11  that?  You understand?

12      PROSPECTIVE JUROR:  I understand that, yes.

13      MR. JOE WHITE:  If the government does not meet

14  their burden on each and every count, will you return a

15  verdict -- and let me say it again.  If the government does

16  not reach or meet their burden to your satisfaction on each

17  and every count, will you return a verdict of not guilty on

18  all counts?

19      PROSPECTIVE JUROR:  Correct.

20      But if they found -- if I reach a total conclusion

21  on one of the seven, I'm just stating I believe I can still

22  say -- one of the seven I believe beyond a reasonable doubt

23  that she was guilty.  Is that fair?

24      MR. JOE WHITE:  Yes.

25      Let's talk about it.  Let's say 12 jurors are back

1   there deliberating and you're of the opinion that Count 3

2   or Count 6 or Count -- I don't care.  Pick a count.  They

3   didn't meet the burden on any of the others but they met it

4   on one.  Yes, you can discuss with your fellow jurors, "I

5   believe the government met their burden on one count and

6   it's this count and here's why."  Right?

7              PROSPECTIVE JUROR:  That's what I thought that --

8   yes.

9              MR. JOE WHITE:  Yes.

10             And the next thing is will you agree to deliberate

11  and listen to your fellow jurors when you go back and

12  deliberate?

13             PROSPECTIVE JUROR:  Of course.

14             MR. JOE WHITE:  Why?

15             THE COURT:  Because I want to make sure -- this is

16  a serious situation.  And if everyone is not 100 percent

17  convinced, then we have to figure out the right answer.

18             MR. JOE WHITE:  And so the -- all 12 -- 12 minds

19  are better than one mind, typically speaking.  You agree?

20             PROSPECTIVE JUROR:  Fair statement.

21             MR. JOE WHITE:  I mean, I don't even know -- even

22  if Einstein was in there, if Albert was in there, maybe,

23  you know, Mr. Einstein -- Professor Einstein ought to

24  listen to the other views and comments.  You agree?

25             PROSPECTIVE JUROR:  Totally.

 1              MR. JOE WHITE:  Regardless of how brilliant his

 2    mind was.

 3              And will you agree to do that?  Will you agree to

 4    deliberate and listen to your fellow --

 5              PROSPECTIVE JUROR:  Yes.  My question was simply I

 6    wanted to make sure I understood it wasn't an

 7    all-or-nothing; there were seven individual counts.

 8              MR. JOE WHITE:  Well, it may be -- we're coming at

 9    you all or nothing.

10              PROSPECTIVE JUROR:  Oh, I just wanted to make

11    sure.  My implication from your question for -- I think

12    Number 11 -- was all or nothing, and I just wanted to make

13    sure I understood.

14              MR. JOE WHITE:  Let me visit with --

15              Yes.  Thank you, Juror 41.

16              Juror 10, would you like to speak on this topic?

17              If the government does not meet its burden of

18    proof beyond a reasonable doubt in your mind as it relates

19    to the seven counts, will you return a verdict of not

20    guilty?

21              PROSPECTIVE JUROR:  Yes.

22              MR. JOE WHITE:  Everybody agree?

23              Is there anyone that doesn't agree?

24              PROSPECTIVE JUROR:  I agree with them that --

25              THE COURT:  Wait for the -- I'm sorry.  Wait for

1    the mic, please.

2            PROSPECTIVE JUROR:  You return a verdict of not --

3            THE COURT:  Stand up and say your juror number.

4            PROSPECTIVE JUROR:  You return a verdict of --

5            THE COURT:  Ma'am --

6            PROSPECTIVE JUROR:  -- not guilty --

7            THE COURT:  Ma'am --

8            PROSPECTIVE JUROR:  -- on that --

9            THE COURT:  Ma'am --

10           PROSPECTIVE JUROR:  -- which --

11           THE COURT:  Ma'am, ma'am, I'm sorry.  I just --

12   no.  Stand up and just make sure you say your juror number

13   so we can get it in the record.

14           PROSPECTIVE JUROR:  Juror Number 40.

15           You return a verdict of guilty or not guilty

16   according to the evidence and the evidence alone.  If they

17   have proved the evidence of 1, 3, and 4, then that's what

18   you would say yes on.  If they proved the evidence of eight

19   of them -- excuse me -- seven of them, then that's what you

20   would say yes on.  If they only prove the evidence of four,

21   that's what you would say yes on.  And so it would totally

22   depend on each individual one.

23           MR. JOE WHITE:  My question is, Juror 40 --

24           PROSPECTIVE JUROR:  Yes.

25           MR. JOE WHITE:  -- if they do not prove beyond a

 1  reasonable doubt evidence from that witness chair and

 2  documents to satisfy you on all counts, will you return a

 3  verdict of not guilty?

 4          PROSPECTIVE JUROR:  So your question again is the

 5  same question because it all comes down to the "all."  And

 6  again the same question is are we able to deliberate about

 7  each individual one?  And if we are, then we return a

 8  guilty or not guilty according to what we have each

 9  individually -- on each individual count assessed.

10          MR. JOE WHITE:  I agree with what you're saying.

11  That's right.

12          PROSPECTIVE JUROR:  So if you can leave the "all"

13  out, then I would agree with you.  It's according to each

14  individual count.

15          MR. JOE WHITE:  Right.

16          And if, as to each individual count, you do not

17  believe they've met their burden, can you return a verdict

18  of not guilty?

19          PROSPECTIVE JUROR:  On each count --

20          MR. JOE WHITE:  Yes.

21          PROSPECTIVE JUROR:  -- if the proof on each one of

22  the counts is not there, then, yes, you would return the

23  guilty or not guilty according to what you have found

24  together as a group.

25          MR. JOE WHITE:  Why do you say that?

```
 1              PROSPECTIVE JUROR:  Because that's correct.
 2   That's why.
 3              MR. JOE WHITE:  Have you served on a jury before?
 4              PROSPECTIVE JUROR:  Yes, I have.
 5              MR. JOE WHITE:  Was it a civil or a criminal case?
 6              PROSPECTIVE JUROR:  I believe it was a criminal
 7   case.
 8              MR. JOE WHITE:  And did y'all, as the jury, set
 9   the punishment or --
10              PROSPECTIVE JUROR:  No.
11              MR. JOE WHITE:  The judge set the punishment?
12              PROSPECTIVE JUROR:  Right.
13              MR. JOE WHITE:  Now, did it bother you that you
14   did not get to set the punishment in the --
15              PROSPECTIVE JUROR:  No.
16              MR. JOE WHITE:  -- criminal case?
17              Very good.  Thank you.
18              So in this matter you're deciding guilt or not
19   guilt -- not guilty/guilty -- not the punishment.
20              Juror 7, do you understand that?
21              PROSPECTIVE JUROR:  Yes, sir.
22              MR. JOE WHITE:  Juror 7 said, "Yes, sir."
23              And is there anyone that has an issue of only
24   deciding, under the Seventh Amendment of the United States
25   Constitution, guilt or innocence, guilt or not guilty?
```

```
 1              THE COURT:  It's actually the Sixth Amendment.

 2   Seventh Amendment is civil --

 3              MR. JOE WHITE:  Right to a jury trial.  Thank you,

 4   your Honor, the Sixth Amendment.

 5              THE COURT:  Our jurors are educated, and they

 6   would know that answer.

 7              MR. JOE WHITE:  I was thinking seventh on power,

 8   but yes.  Thank you.

 9              THE COURT:  Seventh is civil cases.  Sixth is

10   criminal.

11              MR. JOE WHITE:  And so -- thank you, your Honor.

12              Anybody have an issue with that?

13              All right.

14              Juror 18.  Where is Juror 18?

15              Anything that I've discussed so far that you want

16   to speak to?

17              PROSPECTIVE JUROR:  Juror 18.

18              No.

19              MR. JOE WHITE:  All right.  Very good.

20              PROSPECTIVE JUROR:  Excited to be here.

21              MR. JOE WHITE:  I'm glad you're here.  Thank you.

22              I'll get back to my notes.

23              Now Juror 32.  Juror 32, insurance adjuster with

24   Liberty Mutual?

25              PROSPECTIVE JUROR:  Juror Number 32.
```

 1          MR. JOE WHITE:  Thank you, sir.

 2          What kind or type of claims do you typically

 3 adjust at Liberty Mutual?

 4          PROSPECTIVE JUROR:  Sir, right now I handle bodily

 5 injury claims for auto.

 6          MR. JOE WHITE:  First party?  Third party?  Both?

 7          PROSPECTIVE JUROR:  Third party.

 8          MR. JOE WHITE:  Very good.  Thank you.

 9          And Juror 34.  Juror 34, earlier --

10          PROSPECTIVE JUROR:  Juror 34.

11          MR. JOE WHITE:  Earlier you had indicated you work

12 for a trucking company that puts trucks in trust.

13          PROSPECTIVE JUROR:  No, sir.  I work for a

14 manufacturing firm; so we hire trucking companies.

15          MR. JOE WHITE:  All right.

16          PROSPECTIVE JUROR:  And as part of our compliance

17 program, we have to review what those trucking companies

18 consist of.  A lot of times they hire third parties or they

19 are a freight forwarder who are then hiring individual

20 truckers.

21          MR. JOE WHITE:  And so are you part of the due

22 diligence side of your company on deciding who you're going

23 to use?

24          PROSPECTIVE JUROR:  No.  I'm actually on the --

25 well, that part of my role, I'm on the investigative and

 1    security side.  So my department on that side of the house

 2    creates the policies, and then we investigate issues that

 3    arise after the fact.

 4         MR. JOE WHITE:  And how do you go about

 5    investigating the issues as it relates to your job with

 6    this manufacturing company?

 7         PROSPECTIVE JUROR:  Well, it depends on the type

 8    of issue.  So when it comes to the trucking firms -- and we

 9    look at it as typical investigations.

10         We're interviewing the parties involved.

11         We're interviewing -- and we're primarily on the

12    internal side, looking for where things went wrong and how

13    do we fix them.

14         A lot of times it's a process issue.

15         A lot of times -- the other half of it is that if

16    it is a civil or criminal issue, that gets referred out to

17    the right authorities to investigate.

18         We're looking to support that investigation and

19    then correct internal issues.

20         MR. JOE WHITE:  Do you have occasion to go out and

21    actually interview folks at the trucking company that might

22    be involved?

23         PROSPECTIVE JUROR:  I typically don't personally.

24    I have members on my team that do that.

25         MR. JOE WHITE:  Do you stay purely internal within

1    your own company?

2            PROSPECTIVE JUROR:  As far as the investigation?

3            MR. JOE WHITE:  Yes.

4            PROSPECTIVE JUROR:  Not always.  It depends on the

5    degree to which it's a process issue versus a civil or

6    criminal issue.

7            MR. JOE WHITE:  Civil/criminal, I understand you

8    farm that out.

9            PROSPECTIVE JUROR:  Uh-huh.

10           MR. JOE WHITE:  As it relates to your

11   investigation and what role you play, do you do your dead

12   level best to be accurate in what you're reporting?

13           PROSPECTIVE JUROR:  Yes.

14           MR. JOE WHITE:  Why?

15           PROSPECTIVE JUROR:  Because we're making decisions

16   based on that.

17           Those can be HR-type decisions if we're firing

18   someone.

19           They could be process decisions if we have to

20   change something and meet a certain regulatory requirement.

21           Those types of decisions usually mean dollars are

22   involved, and so we want to be right when we're reporting

23   up that we're causing the company to spend more money and

24   why we're doing it.

25           MR. JOE WHITE:  I want to ask you this:  How long

 1  have you been doing this type of work?

 2          PROSPECTIVE JUROR:  Well, this function I have

 3  only overseen for the last two years.

 4          MR. JOE WHITE:  When you're interviewing

 5  someone -- have you had occasion to interview?

 6          PROSPECTIVE JUROR:  I usually sit in.  I don't do

 7  the interviewing myself.

 8          MR. JOE WHITE:  How many people are in the

 9  interview from your side of HR or --

10          PROSPECTIVE JUROR:  It depends on the type of

11  issue.  Usually we will have the investigator themselves

12  conducting the interview.  Depending on the type of issue,

13  there may be someone from HR, someone from legal, and

14  perhaps an oversight -- someone from the oversight board

15  like myself.

16          MR. JOE WHITE:  Once you've completed the

17  interview of James Doe, whoever the person is -- once

18  you're finished with the interview, do you ever -- do you

19  record it?

20          PROSPECTIVE JUROR:  Our interviews are recorded if

21  they are for internal use.

22          MR. JOE WHITE:  And do you try to -- do you look

23  over the shoulder of your counterpart to make sure that the

24  report of the interview is accurate?

25          PROSPECTIVE JUROR:  Yes.

1           MR. JOE WHITE:  How important is that, accuracy?

2           PROSPECTIVE JUROR:  That is actually our internal

3    function, is the accuracy of the reporting.  We don't make

4    the recommendation on what happens.  Our job is to gather

5    the facts, report on them -- well, at least in this role

6    that part is.

7           MR. JOE WHITE:  Everybody agree with Juror 34 that

8    accurate reporting of what goes on in an interview is

9    critical?

10          Everybody agree?

11          Would you hand that mic up front to the juror

12   right in front of you.

13          You're nodding your head up and down, Juror -- I

14   think you're 29.

15          PROSPECTIVE JUROR:  29.

16          MR. JOE WHITE:  Why is that?

17          PROSPECTIVE JUROR:  Because we're here to examine

18   the facts and if an interview is presented inaccurately,

19   we're not examining the facts.

20          MR. JOE WHITE:  Have you ever -- have you ever

21   been a part of a process where that happened, where there

22   was some fudging going on?

23          PROSPECTIVE JUROR:  The closest I could say would

24   be interpersonal disagreements within our software

25   organization.  Typically, those arise in code review,

1  things -- sometimes people will assume someone meant

2  something else when they said a code does X, Y, or Z thing.

3         Accusations will be lodged; and typically as a

4  manager, I have to go in and find out is what was said

5  accurately represented to me and to others who it was said

6  to or do I need to correct a misunderstanding.

7         MR. JOE WHITE:  Very good.

8         Juror 9.

9         In terms of accurate reporting, Juror 9 --

10        PROSPECTIVE JUROR:  9.

11        MR. JOE WHITE:  -- how important is it to you that

12  a report of an interview of a person be accurate?

13        PROSPECTIVE JUROR:  That's the most important

14  thing, the truth, to get all the truth out.

15        MR. JOE WHITE:  Thank you.

16        As we sit here right now -- raise your hand --

17  there is someone in this room, I'm sure, that believes

18  simply because the United States government has charged my

19  client, Ms. Erwin, with something -- seven counts -- that

20  she's done something wrong, she has to have done something

21  wrong.

22        Juror 28 -- gosh, I need to talk to other jurors.

23        56, I'm coming.

24        PROSPECTIVE JUROR:  Juror 28.  I cannot give what

25  I don't have so -- (Indiscernible.) --

```
 1            THE COURT REPORTER:  Can you repeat that?
 2            PROSPECTIVE JUROR:  Okay.
 3            I cannot give what I don't have.  I have to know
 4   the facts of the case before I know whether your client is
 5   guilty or not.
 6            MR. JOE WHITE:  You've got to hear it all.
 7            PROSPECTIVE JUROR:  Yeah.
 8            MR. JOE WHITE:  Thank you.
 9            Juror 56, I haven't heard anything.  And it's not
10   your fault; it's my fault.  What do you say about simply
11   because we're over here at that table -- by the way, the
12   reason the government gets to sit closer to y'all is
13   because they've got the burden of proof.  We don't.  That's
14   why we sit over there.
15            Simply because Ms. Erwin is here, seven counts --
16   you've heard some of your colleagues talk about, man, what
17   happens if they prove one or two or all or nothing, you
18   know.  Do you believe that she must have done something
19   wrong --
20            PROSPECTIVE JUROR:  No.
21            MR. JOE WHITE:  -- criminally?
22            PROSPECTIVE JUROR:  Necessarily, no.
23            MR. JOE WHITE:  Why?
24            PROSPECTIVE JUROR:  I think we can all look back
25   over history and court cases that we watched where just
```

 1   because somebody is on trial doesn't mean that they

 2   committed the crime.  And so that's why we have due

 3   justice.

 4          Like we owe her justice as much as we owe if she

 5   committed the crime that we should enact that.  So, no, I

 6   absolutely don't think that means that she's guilty.

 7          MR. JOE WHITE:  I want to ask you about current

 8   situations.  Have you seen where -- have you ever been of

 9   the opinion that the government has gone too far?

10          PROSPECTIVE JUROR:  Yes.

11          MR. JOE WHITE:  Can you give me an example?

12          I don't want to be here all night.

13          PROSPECTIVE JUROR:  Can I give you an example?  I

14   mean, I think there are a lot of laws that people disagree

15   with.  I think there's legislation that's overturned that

16   people disagree with or they feel like the government

17   overstepped somebody's civil -- or somebody's liberty as an

18   amendment would give it, whether it's the Second Amendment

19   or whether it's abortion or whatever.  So, yeah, I think

20   that there is -- there are certainly times where the

21   government can absolutely overstep.

22          MR. JOE WHITE:  Very good.  Thank you.

23          Does anyone have relatives who are members of law

24   enforcement?

25          We're going to have a bunch of agents testify, and

 1   I want to -- just generally speaking, there are going to be

 2   times where agents are going to be challenged on their

 3   work.  Is there anyone by virtue of the relationship

 4   involving law enforcement, that you have a loved one or you

 5   have a dear friend or a trusted friend that's part of law

 6   enforcement -- that you're going to hold it against -- most

 7   important, that you're going to hold it against my client.

 8   You can hold anything against me, just not my client.

 9        But is there -- is that situation an issue we need

10   to talk about with any of you that have law enforcement in

11   your background?  I don't want to go juror by juror unless

12   I have to.

13        I don't see anyone raising their hand that because

14   I know someone in law enforcement or I have a loved one in

15   law enforcement, that somehow that's going to prevent you

16   from being fair as we cross-examine the government's

17   agents.  I don't see anyone.  Thank you.

18        How about determining one of these many agents'

19   credibility in the same manner you determine anyone else's

20   credibility because they are an agent?  Whether it's with

21   Department of Commerce, whether it's with Homeland

22   Security, is somehow, by virtue of the mere fact that they

23   are an agent with that particular agency, that they get a

24   leg up on a layperson who is not in law enforcement in

25   terms of judging their credibility?  Anybody want to speak

1    to that?

2             Is everything even?

3             PROSPECTIVE JUROR:  No.

4             MR. JOE WHITE:  Tell us why, Juror 41.

5             PROSPECTIVE JUROR:  I believe -- oh, sorry.

6    Juror 41.

7             I believe that FBI agents -- I've got a family

8    full of them.  They take an oath, and they are committed.

9    And, therefore, all things equal, I would believe the FBI

10   agent over a non-FBI agent.

11            MR. JOE WHITE:  Very good.

12            And you base that upon an oath they take in

13   becoming an agent?

14            PROSPECTIVE JUROR:  A career oath, yes.

15            MR. JOE WHITE:  All right.

16            PROSPECTIVE JUROR:  And to qualify, they have to

17   pass a big background investigation; and they have to be

18   vetted carefully.

19            MR. JOE WHITE:  And so does that apply with any

20   agent that testifies, in your mind, on behalf of the

21   government?

22            PROSPECTIVE JUROR:  No.  I want to qualify it by

23   I'm talking about FBI agents.

24            MR. JOE WHITE:  FBI.  Very good.  Thank you.

25            Anyone else want to speak to that issue?  I want

```
 1   to give anyone and everyone a fair opportunity because

 2   there is going to be some cross-examination of these

 3   agents.

 4            PROSPECTIVE JUROR:  I do agree.  Not so much with

 5   the FBI but all of the law enforcement that I've been

 6   around, I automatically take their word just because the

 7   ones I know are very honest, very true to their job.

 8   They're not out to go after anything false.

 9            MR. JOE WHITE:  And --

10            PROSPECTIVE JUROR:  It may be personal bias, but

11   I'm just being honest.

12            MR. JOE WHITE:  That's -- this is my one chance.

13   I want to be sure that when I am trying to go about my

14   questioning of an agent or agents and -- can you judge that

15   same questioning, whether it's an agent or a layperson, on

16   the same standard?

17            PROSPECTIVE JUROR:  I feel like an agent will have

18   a slightly higher standard.

19            MR. JOE WHITE:  Why?

20            PROSPECTIVE JUROR:  Because of their job, they are

21   in danger most of the time, the oaths that they have taken,

22   all of that.

23            Doesn't mean that they're all honest.  I'm just

24   going by my personal experience.

25            MR. JOE WHITE:  I understand.
```

1              PROSPECTIVE JUROR:  And if you prove that they

2     aren't being honest, then, of course, I would not believe

3     them.  I would take that into account.

4              MR. JOE WHITE:  Fair enough.

5              Anyone else?

6              Juror 33.

7              PROSPECTIVE JUROR:  I have to agree that I would

8     probably give more credit to a government policeman,

9     government official, government investigator because they

10    have been vetted to have their job to begin with.

11             And I have a lot of trust in our government; and I

12    like to give the benefit of the doubt for the most part to

13    our police department, et cetera, because we need that.

14             MR. JOE WHITE:  And I'll ask the same question of

15    you that I asked of Juror 37, and that is when I'm doing my

16    examination of an agent as to the work that he has put in

17    or she has put into this case, can you take that

18    examination along the same standard as any other person,

19    notwithstanding their connection or tie to law enforcement?

20             PROSPECTIVE JUROR:  I'm going to say yes.  I think

21    that they have to legitimately present their case.  They

22    have to be valid, and I think there's ways of determining

23    that.  But, yeah, they have a burden to be truthful.

24             MR. JOE WHITE:  Well, I'm hearing that just

25    because they are an agent, they don't get a hall pass for

 1  what they've done.

 2          PROSPECTIVE JUROR:  No hall pass.

 3          MR. JOE WHITE:  Thank you.

 4          Everybody agree?

 5          54.

 6          PROSPECTIVE JUROR:  Juror 54.

 7          MR. JOE WHITE:  Yes, sir.

 8          PROSPECTIVE JUROR:  I was just going to say on

 9  that matter, I mean, anybody that steps up there to the

10  podium takes an oath.  So I would assume that whether they

11  are an agent, a special agent, or a citizen, if they are

12  called up there to that stand, I would have to believe that

13  their oath is equal.

14          So I would have to study each and every one of

15  them the same, whether you're a special agent -- the FBI

16  may have put you under surveillance and watched you and

17  lie-detectored you, but there's ways around that.  I

18  know -- I mean, I volunteer and I have friends that are in

19  the fire department, friends that are in the police

20  department.

21          They all have to take these tests and -- I mean,

22  I'm not naming anybody; but you hear some of them go, "You

23  can lie."  I mean, if they can lie there, they can lie

24  anywhere so -- I mean, you've got to investigate everybody

25  the same, whether they're special or not.

```
1              MR. JOE WHITE:  Everybody agree with Juror 54?

2         When they walk in here and they swear to god to

3    tell the truth, the whole truth, nothing but the truth,

4    will you hold them to it?  Will everybody hold them to it?

5         Very good.  Thank you.

6         I can't ask this of everybody because it's just

7    going to take too long.  One of my favorite questions that

8    I like to ask jurors is who is the public figure you admire

9    most, living or dead, and why?  Who is the public figure

10   you admire most, living or dead, and why is that public

11   figure the one you admire?

12        I like to try to keep -- because we're coming out

13   of Resurrection Sunday, Easter, Sunday yesterday, I'd like

14   to try to avoid religion because somebody starts saying our

15   lord or something along religion and then everybody feels

16   like, well, I'm a sinner if I don't, you know, go down

17   the -- so I'd like to stay away from religion and family,

18   religion and family, if possible.

19        I know I haven't spoken with Juror 11.  Juror 11.

20   Briefly I spoke to you.  Public figure you admire most,

21   living or dead, and why?

22        PROSPECTIVE JUROR:  Ken Griffey, Jr.

23        MR. JOE WHITE:  Baseball player.

24        PROSPECTIVE JUROR:  Baseball player.

25        MR. JOE WHITE:  Why?
```

    1           PROSPECTIVE JUROR:  Hero growing up, fun to watch.
    2  He was just, you know -- you know, he was known as "the
    3  Kid."  Everybody just appreciated his athleticism and just
    4  what he brought to baseball.  He was just a great player to
    5  watch.
    6           MR. JOE WHITE:  I think he's still getting paid.
    7           PROSPECTIVE JUROR:  He is, by the Cincinnati Reds.
    8           MR. JOE WHITE:  Thank you for sharing that.
    9           Juror 13.  Where is Juror 13?  Same question.
   10  Public figure you admire most living or dead and why.
   11           PROSPECTIVE JUROR:  Juror 13.
   12           I don't really have a great deal of favorites.  I
   13  admire lots of athletes because of the hard work and
   14  dedication they put in to get to where they are.
   15           MR. JOE WHITE:  Very good.  Thank you for sharing.
   16  Any particular name come to mind?
   17           PROSPECTIVE JUROR:  No.
   18           MR. JOE WHITE:  Thank you.
   19           Juror 22.  Juror 22.
   20           PROSPECTIVE JUROR:  Well, you already said we
   21  can't go down the religious road; so you already took that
   22  one.  I don't really have anyone that I admire greatly,
   23  that I am trying to emulate in my life.  I respect a lot of
   24  people, but --
   25           MR. JOE WHITE:  Very good.

```
 1              PROSPECTIVE JUROR:  -- people are human.

 2              MR. JOE WHITE:  All right.  Thank you.

 3              Would you hand the microphone, please, to

 4  Juror 17.

 5              You're on.

 6              PROSPECTIVE JUROR:  Oprah Winfrey.

 7              MR. JOE WHITE:  Why?

 8              PROSPECTIVE JUROR:  I just love her.  And my kids

 9  would look at TV and were raised by Oprah while I was at

10  work.  I think she's a fantastic woman.

11              MR. JOE WHITE:  Very good.

12              PROSPECTIVE JUROR:  That's why.

13              MR. JOE WHITE:  Thank you.

14              PROSPECTIVE JUROR:  You're welcome.

15              MR. JOE WHITE:  24, Juror 24.

16              PROSPECTIVE JUROR:  Juror 24.

17              Lewis and Clark.  They didn't lose anybody, and it

18  was a great adventure.  I like to travel.  I would have

19  gone if I was -- if they would have let me if I was back

20  then.

21              MR. JOE WHITE:  Have you followed their path?

22              PROSPECTIVE JUROR:  Yes, and I've wanted to go;

23  but I can't find anybody to go with me on those -- the

24  river.  Yeah.  But they wouldn't have let me go anyway back

25  in the day but --
```

```
 1            MR. JOE WHITE:  Very good.

 2            PROSPECTIVE JUROR:  -- I would have snuck on.

 3            MR. JOE WHITE:  Lewis and Clark.  That's good.

 4  Thank you.

 5            26, Juror 26.

 6            PROSPECTIVE JUROR:  Juror 26.

 7            Steve Young.  I admire his hard work and

 8  dedication so -- I also went to BYU.  He came on as, like,

 9  a fifth-string quarterback, got told he should switch to

10  defense, fought through and became a starting quarterback,

11  earned a law degree while playing in the NFL.  So what

12  matters is hard work.

13            MR. JOE WHITE:  I didn't know that about him.

14  Thank you for sharing.

15            Juror 30.  Juror 30.

16            PROSPECTIVE JUROR:  Hi.

17            MR. JOE WHITE:  I haven't asked you anything.

18            PROSPECTIVE JUROR:  I know.

19            MR. JOE WHITE:  You're not invisible.

20            PROSPECTIVE JUROR:  Although I have a question for

21  you if I can steal the mic after this.

22            So, I mean, the person I've always admired was FDR

23  because, you know, tough times during the Great Depression;

24  but as I do travel the nation, you can still see, you know,

25  the Civilian Conservation Corps.  And to me, he was a
```

 1    problem solver.  He wasn't perfect.  I mean, if you've ever

 2    read about him, he was not a perfect guy.  But still he was

 3    a problem solver, and I appreciated that about him.

 4          MR. JOE WHITE:  Very good.

 5          PROSPECTIVE JUROR:  And then my quick question --

 6    hopefully it's quick -- is there a legal definition or a

 7    difference between "clear and convincing" and "reasonable

 8    doubt"?  Because I've been noodling that for about 15

 9    minutes and I don't know the difference.

10          MR. JOE WHITE:  There are two definitions.  The

11    most important definition that you all will be instructed

12    on by Judge Mazzant is the "beyond a reasonable doubt"

13    instruction.

14          I know that the -- a reasonable doubt is a doubt

15    based upon reason and common sense after careful and

16    impartial consideration of all the evidence in the case.

17          Proof beyond a reasonable doubt, therefore, is

18    proof of such a convincing character that you would be

19    willing to rely and act upon it without hesitation in

20    making the most important decisions of your own affairs.

21    Beyond a reasonable doubt.

22          Now, you had said something about "clear and

23    convincing."  Highly probable and free from serious doubt,

24    which is below beyond a reasonable doubt.

25          So preponderance, clear and convincing, beyond a

 1  reasonable doubt is the greatest burden because we're

 2  dealing with someone's liberty.

 3          MS. RATTAN:  Your Honor, I object.  This goes to

 4  the motion *in limine*.  And it's been said before, but it's

 5  a violation of the Court's order.

 6          THE COURT:  Sustained.

 7          MR. JOE WHITE:  Anybody here supervise?  How many

 8  supervisors do we have on the jury?

 9          Oh, I have a lot.  I know I spoke with Juror 21 on

10  his supervisory duties.

11          The first row, supervisor?

12          PROSPECTIVE JUROR:  Yes.

13          MR. JOE WHITE:  Jurors 1 and 3.  Let me start with

14  Juror 1, please.  I just want general information about how

15  many you might supervise.

16          PROSPECTIVE JUROR:  I only supervise one person,

17  and it's in the treasury function.  We manage the pension

18  plan for a group of chemical people.

19          MR. JOE WHITE:  Very good.  Thank you.

20          Juror 3.

21          PROSPECTIVE JUROR:  For the past about seven or

22  eight years, I've supervised about five to six people.  I

23  recently promoted, and so now I only supervise three.

24          MR. JOE WHITE:  Thank you.

25          Second row, Juror 6.

```
 1              PROSPECTIVE JUROR:  Juror 6.

 2              I have two companies, and altogether I probably

 3    manage about nine people.

 4              MR. JOE WHITE:  What is the position you hold

 5    within the company?  You own both?

 6              PROSPECTIVE JUROR:  Yes, like a manager or CEO or

 7    whatever you want to call it.

 8              MR. JOE WHITE:  Very good.  Very good.  Thank you.

 9              Anyone else?

10              Next row, any -- Juror 14 and 13.

11              PROSPECTIVE JUROR:  Juror 14.

12              I supervise the 24 elementary principals in our

13    school district.

14              MR. JOE WHITE:  What do you do?

15              PROSPECTIVE JUROR:  My title is chief of school

16    leadership so --

17              MR. JOE WHITE:  Are you like -- is there a

18    superintendent?

19              PROSPECTIVE JUROR:  Yes.  I'm on the

20    superintendent's cabinet.

21              MR. JOE WHITE:  Got it.  Thank you.  What school

22    district?

23              PROSPECTIVE JUROR:  Carrollton-Farmers Branch.

24              MR. JOE WHITE:  You've got your hands full.

25    You've got a lot of people.
```

```
 1              PROSPECTIVE JUROR:  Yes.

 2              MR. JOE WHITE:  Yes, sir, Juror 13.

 3              PROSPECTIVE JUROR:  Juror 13.

 4              Direct supervision of about 5.  But I manage a

 5   recreation center so another 5 full-time staff, 55 regular

 6   part-time staff, and about 70 seasonal part-time staff.

 7              MR. JOE WHITE:  What do you -- what type of job do

 8   you have where you're supervising all these people?

 9              PROSPECTIVE JUROR:  Manager of a recreation

10   center.

11              MR. JOE WHITE:  Where is it located?

12              PROSPECTIVE JUROR:  Flower Mound.

13              MR. JOE WHITE:  Did you grow up here?

14              PROSPECTIVE JUROR:  No, sir.

15              MR. JOE WHITE:  Where did you get that accent?

16              PROSPECTIVE JUROR:  England.

17              MR. JOE WHITE:  In England.  Thank you.

18              Next row.  Anybody supervise?

19              Next row?

20              Anybody supervise on -- Juror 26 and these right

21   there.

22              PROSPECTIVE JUROR:  I'm Juror 30, and I supervise

23   five people directly and six indirect.

24              MR. JOE WHITE:  I'm sorry?

25              PROSPECTIVE JUROR:  Five direct and six indirect.
```

```
 1            MR. JOE WHITE:  And what do you -- what type of

 2    business?

 3            PROSPECTIVE JUROR:  I'm director of strategic

 4    projects and analytics for 7-Eleven.

 5            MR. JOE WHITE:  Of 7-Eleven?

 6            PROSPECTIVE JUROR:  Uh-huh.

 7            MR. JOE WHITE:  Very good.  And where is your

 8    office?

 9            PROSPECTIVE JUROR:  It's in Irving but kind of

10    Coppell.

11            MR. JOE WHITE:  Thank you.

12            PROSPECTIVE JUROR:  Juror 29.

13            I supervise 22 people overall, 7 of those

14    directly.

15            MR. JOE WHITE:  Refresh me on your --

16            PROSPECTIVE JUROR:  I'm a director of software

17    engineering at a software company.

18            MR. JOE WHITE:  And so the software that you're

19    the -- that you are involved with, what's it relate to in

20    our world?

21            PROSPECTIVE JUROR:  Insurance, property and

22    casualty.

23            MR. JOE WHITE:  Thank you.

24            PROSPECTIVE JUROR:  Juror 27.

25            I supervise five people.
```

```
 1            MR. JOE WHITE:  What type of business?

 2            PROSPECTIVE JUROR:  We are a telecommunication

 3   company that builds the infrastructures, headends, hub

 4   sites for major cable companies.

 5            MR. JOE WHITE:  And what is the name of your

 6   position?

 7            PROSPECTIVE JUROR:  I'm the office manager, and I

 8   handle all the business finances.

 9            MR. JOE WHITE:  Thank you.

10            Yes, sir.

11            PROSPECTIVE JUROR:  Juror 26.

12            Accounting manager.  I have a team of five.

13            MR. JOE WHITE:  And your educational background

14   with -- I take it -- is it --

15            PROSPECTIVE JUROR:  Accounting.

16            MR. JOE WHITE:  In accounting?

17            PROSPECTIVE JUROR:  Yep.

18            MR. JOE WHITE:  CPA?

19            PROSPECTIVE JUROR:  That's right.

20            MR. JOE WHITE:  And when did you pass the boards?

21            PROSPECTIVE JUROR:  About a year and a half ago.

22            MR. JOE WHITE:  Very good.  Thank you.

23            Back row, 33.

24            PROSPECTIVE JUROR:  I'm a director of therapy for

25   a home health company in Dallas-Fort Worth.  I have 100
```

1    people.

2          MR. JOE WHITE:  Physical therapy?

3          PROSPECTIVE JUROR:  PT, OT, and speech.

4          MR. JOE WHITE:  Thank you.

5          Anybody else?  That's it?

6          34.

7          PROSPECTIVE JUROR:  34.

8          I'm director of real estate operations.  So on my

9    facilities and security teams, I have 10 direct employees

10   and 67 indirects.

11         MR. JOE WHITE:  Thank you.

12         Do part of those 10 assist in supervising the 67?

13         PROSPECTIVE JUROR:  Yes.

14         MR. JOE WHITE:  Thank you.

15         36.

16         PROSPECTIVE JUROR:  36.

17         I just supervise one person.  I'm a speech

18   pathologist and have a speech pathologist assistant.

19         MR. JOE WHITE:  Thank you.

20         Anybody else on that row?

21         Next row, Juror --

22         PROSPECTIVE JUROR:  Do you want me to go?

23         MR. JOE WHITE:  Do you -- yes, 41.

24         PROSPECTIVE JUROR:  Yeah, nine directs and

25   about -- sorry.  41.

```
 1              Nine directs and about 160 overall.

 2              MR. JOE WHITE:  Same question that I had for 34.

 3   Do those nine assist in supervising --

 4              PROSPECTIVE JUROR:  Yeah, I'm a, yeah, third-line

 5   manager.  So they've got managers of managers.

 6              MR. JOE WHITE:  Very good.

 7              PROSPECTIVE JUROR:  43.

 8              I have 2 direct employees and about 15 to 20

 9   indirect employees.

10              MR. JOE WHITE:  Thank you, 43.

11              PROSPECTIVE JUROR:  44.

12              I have 22 direct reports.

13              MR. JOE WHITE:  The nature of your work?

14              PROSPECTIVE JUROR:  Medical maintenance, repair

15   and maintaining medical equipment.

16              MR. JOE WHITE:  And are you the supervisor of the

17   20?

18              PROSPECTIVE JUROR:  22, yes.

19              MR. JOE WHITE:  22.  Very good.  Thank you.

20              PROSPECTIVE JUROR:  Number 45.  I'm the director

21   of quality at an inpatient hospital.  I have one under me,

22   and then I help the chief nurse officer with her 75 nursing

23   department.

24              MR. JOE WHITE:  Thank you.

25              Anybody on the next row?
```

1          50.

2          PROSPECTIVE JUROR:  Over the last three-plus

3  years, I was executive pastor at a church, had five people

4  work under me.  And then one week ago, I started a new job;

5  and I don't know how many people report to me until I have

6  a meeting after this gets done.

7          MR. JOE WHITE:  Very good.  Favorite -- the public

8  figure you admire most living or dead?

9          PROSPECTIVE JUROR:  Well, you scratched that one

10 earlier; so I'll say Tony Dungy.

11         MR. JOE WHITE:  Very good.  Thank you, Pastor.

12         PROSPECTIVE JUROR:  52.

13         I've managed between 30 and 45 for 10, 15 years.

14         MR. JOE WHITE:  Does anyone assist you in managing

15 the --

16         PROSPECTIVE JUROR:  I had one assistant at that

17 point.

18         MR. JOE WHITE:  I'm sorry?

19         PROSPECTIVE JUROR:  One other for those years.

20         MR. JOE WHITE:  Does that person report to you?

21         PROSPECTIVE JUROR:  No.

22         MR. JOE WHITE:  Y'all are equal?

23         PROSPECTIVE JUROR:  We were.  I'm unemployed at

24 the moment but --

25         MR. JOE WHITE:  Thank you.

```
 1            PROSPECTIVE JUROR:  Yeah.

 2            PROSPECTIVE JUROR:  55.

 3            I have ten.  I'm an advanced practice

 4  practitioner; and I supervise the OR, PAs and NPs.

 5            MR. JOE WHITE:  At a hospital?

 6            PROSPECTIVE JUROR:  Yes.

 7            MR. JOE WHITE:  Thank you.

 8            PROSPECTIVE JUROR:  Juror 58.

 9            I have anywhere from 75 to 150, depending on the

10  time of year.  They assemble all of the grills and

11  wheelbarrows at Home Depot.

12            MR. JOE WHITE:  The 75 to 150, what type of work?

13            PROSPECTIVE JUROR:  What type of workers?

14            MR. JOE WHITE:  Yeah.

15            PROSPECTIVE JUROR:  They are seasonal part-time,

16  is how they are categorized in HR; but 90 hours a week is

17  what they usual put in.

18            MR. JOE WHITE:  What's the nature of your

19  business?

20            PROSPECTIVE JUROR:  It's assembly, putting

21  together things for Home Depot, a third-party vendor.

22            MR. JOE WHITE:  What type of products do y'all put

23  together?

24            PROSPECTIVE JUROR:  Wheelbarrows, grills,

25  toolboxes, patio furniture, anything that comes in a box.
```

```
 1              MR. JOE WHITE:  Very good.  Thank you, sir.

 2         Juror 56.

 3              PROSPECTIVE JUROR:  56.

 4              I work for a private wealth management group, and

 5    I supervise two people.

 6              MR. JOE WHITE:  Approximately how many do you

 7    supervise?

 8              PROSPECTIVE JUROR:  Oh, two.

 9              MR. JOE WHITE:  Thank you.

10              PROSPECTIVE JUROR:  Uh-huh.

11              MR. JOE WHITE:  Is that it?

12              That's it.  All right.

13              There were two -- I believe Juror 25 and

14    Juror 38 -- that had a negative experience with law

15    enforcement.  Am I right there?  Juror 25 and Juror 38.

16              And is that something you want to speak about in

17    private or --

18              PROSPECTIVE JUROR:  Yes.  I would rather speak

19    about it in private.

20              MR. JOE WHITE:  Juror 38?

21              PROSPECTIVE JUROR:  Same.

22              MR. JOE WHITE:  Private?

23              PROSPECTIVE JUROR:  Yes, sir.

24              MR. JOE WHITE:  Thank you.

25              Has anyone here ever been accused of doing
```

1   something that you didn't do and you showed you didn't do

2   it and they did it -- they followed through with the

3   accusation anyway?  Anybody have that experience?

4         You're accused of doing something.  You didn't do

5   it.  You have proof you didn't do it or they got it wrong,

6   and they went about it anyway.  Anybody have that

7   experience?

8         Juror 17.

9         PROSPECTIVE JUROR:  17.

10         When I worked at the sheriff's department, I was

11   accused of not paying for my lunch, okay?  So I had to go

12   to take a lie detector test.  I mean, I had to be --

13         MR. JOE WHITE:  Polygraphed.

14         PROSPECTIVE JUROR:  Right.

15         So I had to take a polygraph test.  I went through

16   a lot before I went through that polygraph test and then I

17   ended up going through the polygraph test and then I ended

18   up passing the polygraph test.

19         And the sheriff that took me to get the polygraph

20   test, he was upset because he was waiting for -- to say I

21   lied when I didn't; so we came through Dallas flying like a

22   bat out of hell getting back to McKinney.  But I was

23   accused of something I didn't do.

24         And then I turned around and they accused me again

25   of the same identical thing and so I had to fight to clear

1  my name.  I know how it feels for someone to lie on you.

2       MR. JOE WHITE:  Do you hold it against my client

3  for fighting these charges?

4       PROSPECTIVE JUROR:  No, I don't.

5       MR. JOE WHITE:  All right.

6       PROSPECTIVE JUROR:  I don't.

7       MR. JOE WHITE:  Very good.  And did you get that

8  worked out with the sheriff's department?

9       PROSPECTIVE JUROR:  Yes, I did.

10       MR. JOE WHITE:  Very good.

11       PROSPECTIVE JUROR:  I certainly did.

12       MR. JOE WHITE:  Thank you.

13       Can I have just a moment, your Honor?

14       THE COURT:  Yes.

15       (Off-the-record discussion among defense counsel.)

16       MR. JOE WHITE:  I want to ask all of you, do you

17  all understand --

18       THE COURT:  Is your mic back on?

19       MR. JOE WHITE:  I'm sorry?

20       THE COURT:  You need to turn your mic back on.

21       MR. JOE WHITE:  I'm on.

22       Do you-all understand that this is not evidence?

23  Does everybody understand?

24       This morning, all this, no evidence.  Are you okay

25  with that?

1          Do you also understand that we start out with a

2   clean slate?

3          Juror 19, I haven't asked you any questions.

4          PROSPECTIVE JUROR:  Juror 19, yes.

5          MR. JOE WHITE:  Yes.  You've had prior jury

6   experience.

7          PROSPECTIVE JUROR:  Okay.  And --

8          MR. JOE WHITE:  Do you understand that we're

9   starting out with a clean slate?

10         PROSPECTIVE JUROR:  As far as I'm concerned, you

11  don't have to say a thing.  The prosecution has to come

12  with all the evidence.

13         MR. JOE WHITE:  You raise a great point.  I could

14  just sit over there and do nothing.

15         Do y'all understand that?  I could literally sit

16  over there on my hands and just do nothing.

17         You don't expect me to do that, though, do you?

18         PROSPECTIVE JUROR:  I doubt if you will.

19         MR. JOE WHITE:  And do you understand, everyone,

20  the burden never shifts?  The burden doesn't shift.

21  Everybody get that?

22         Are you okay with it?

23         Would you hand it to Juror 22, please, right

24  behind you.  Thank you.

25         PROSPECTIVE JUROR:  22.

1           Absolutely.

2           MR. JOE WHITE:  Why?

3           PROSPECTIVE JUROR:  Because that's our

4  responsibility, not only to understand what the truth is

5  but make a decision with something that's this serious.

6           But to your point, if we have -- if the

7  prosecution has to prove to a certain level, then we have

8  to be at that level.

9           MR. JOE WHITE:  And will you hold them to that

10  level based on what Judge Mazzant provides you in

11  instructions of what the definition of "beyond a reasonable

12  doubt" is?  That burden, that wheelbarrow burden, that

13  wheelbarrow burden of going up the hill, will you hold him

14  to it?

15           PROSPECTIVE JUROR:  Yes.  Is that what we're being

16  told?  Because you're the only one that's said that.

17           MR. JOE WHITE:  Yes.

18           PROSPECTIVE JUROR:  Okay.  If that's what we're

19  being told, absolutely.

20           MR. JOE WHITE:  There is a burden of proof.

21           PROSPECTIVE JUROR:  Okay.

22           MR. JOE WHITE:  Will you told them to it?

23           PROSPECTIVE JUROR:  Yes.

24           MR. JOE WHITE:  Everybody?

25           PROSPECTIVE JUROR:  Yes.

 1           MR. JOE WHITE:  Is it your civic duty?  Do you

 2   believe it's your civic duty to make your government do

 3   that?

 4           Juror 13, is it your civic duty?

 5           PROSPECTIVE JUROR:  Juror 13.

 6           Yes.

 7           MR. JOE WHITE:  Your Honor, I have no further

 8   questions of the panel.

 9           THE COURT:  Okay.  Very good.

10           Well, ladies and gentlemen, at this time I know

11   it's -- we have spent a lot of time, and I'm going to meet

12   with the attorneys in chambers.  There are several of you

13   we're going to have to probably call back and ask

14   additional follow-up questions.

15           Bear with us.  We probably will go a little past

16   5:00, but I'll try to make that as quick as possible so we

17   can get -- the goal is to get everyone so I don't make

18   everyone come back tomorrow so we can finish, get the jury

19   seated, and then we'll stop for the day.

20           Again, please don't discuss the case among

21   yourself or anyone else and also don't do any outside

22   research.  I'll say that every time we break when the jury

23   is even seated.

24           Let me just ask the attorneys.  Does anybody in

25   the attorneys need to use any of the facilities?  Do the

 1   attorneys need to use the facilities?  Because I'll let you

 2   go first but --

 3            MR. JOE WHITE:  No, sir.

 4            THE COURT:  Okay.  Then I will have the attorneys,

 5   if you'll come -- I'll let you go out first, and I'll meet

 6   you over by the far door of my chambers.  My lawyer will

 7   let you in, and I will see them back there.

 8            Everyone, thank you for your patience.  We'll get

 9   back to you as soon as we can.

10            (Recess, 4:11 p.m. to 4:14 p.m.)

11            (In chambers, all parties represented.)

12            THE COURT:  Okay.  We're on the record.  Strikes

13   for cause from the government?

14            MS. RATTAN:  Well, there is the two who wanted to

15   approach the bench, 25 and 38, and I don't know --

16            THE COURT:  Well let me -- let's go -- we'll come

17   back to the ones we need to talk to again.

18            I know 38 was listed there, but 38 had other

19   objections.  I didn't know if everyone -- there could be an

20   agreement that we'll excuse 38.

21            MS. RATTAN:  I think 38 did say there was a bias

22   and --

23            THE COURT:  Well, there was other issues before

24   she said she wanted to talk about a bad experience with law

25   enforcement.  But I just wanted to make sure her -- I mean,

 1  we can follow it through.  But there is no objection, I

 2  just need someone to say it from the defense.  Do you agree

 3  with that?

 4          MR. JOE WHITE:  No objection from us.

 5          THE COURT:  Okay.  I'll strike 38.

 6          There were a couple -- the two -- there's plenty

 7  of jurors, so there were two that had hardships -- well,

 8  actually three.  There was -- the question is 28.  He has

 9  blood work on Thursday.  I usually try to accommodate --

10  because we have plenty of jurors -- unless someone has an

11  objection.

12          MR. GONZALEZ:  No objection from the government,

13  your Honor.

14          MR. JOE WHITE:  No objection.

15          THE COURT:  Okay.  I'll let 28 go.

16          The other one was 36.  It's a job impact because

17  she's a speech pathologist at -- and just really couldn't

18  be gone for two weeks.  I'll release her if there is no

19  objection.

20          MR. JOE WHITE:  No objection.

21          MR. GONZALEZ:  No objection.

22          THE COURT:  Okay.  And then the only other

23  hardship was 37.  But that was only -- it won't be going

24  two weeks; so I don't necessarily see that as problem based

25  upon the hardship issue.

 1           MR. JOE WHITE:  I don't have an objection.

 2           THE COURT:  I mean, I don't have any objection to

 3  releasing her just to be safe, too.  I just -- I will tell

 4  you when someone says they have a conflict, if for some

 5  reason we roll into the third week, I'll release the juror

 6  at that point because I'm not going to -- they spoke up.

 7           So the question is do we -- I don't have any

 8  problem -- we have just plenty of jurors.  I don't know

 9  if -- you know, I don't have any problem releasing her if

10  you want to.

11           MR. GONZALEZ:  No objection, your Honor.

12           MR. JOE WHITE:  No objection.

13           THE COURT:  Okay.  I'll release 37.

14           Okay.  There were a couple that I marked, and then

15  we can see about additional ones.  I marked Number 10.

16           MR. GONZALEZ:  I did, too.

17           THE COURT:  They met the threshold for me but --

18  I'm just, again, trying to streamline the process here just

19  for time.  If there is no objection, I'll --

20           MR. JOE WHITE:  No objection from the defense.

21           MR. GONZALEZ:  We have Number 10, yes.

22           THE COURT:  Okay.  I'll strike Number 10.

23           The next one I had was Number 15.  She had a

24  personal bias, she stated, because her daughter is

25  struggling.

```
 1              MS. KATE WHITE:  15 I have as ////////////.  It's a

 2    man.

 3              MR. GONZALEZ:  It's a male.  He's a man.

 4              MS. KATE WHITE:  He's the one with the 9-year-old

 5    daughter.  Is that the one?

 6              THE COURT:  Right.

 7              THE LAW CLERK:  You said "she" by accident.

 8              THE COURT:  Oh, I'm sorry.  I didn't mean to -- I

 9    used the wrong pronoun.  I'm sorry.

10              MR. JOE WHITE:  No objection on 15.

11              MS. RATTAN:  Well, your Honor, he is concerned;

12    but I don't think he rose to the level of cause.  I think

13    that would be a defense peremptory.

14              THE COURT:  Well, I disagree.  I'm going to strike

15    15.  He met -- I keep my own track record if their

16    statements go across the line, and I thought they did.

17              (Off-the-record discussion between the court

18    reporter and the court.)

19              THE COURT:  We'll strike the name from the record.

20    That's fine.

21              Well, I may go ahead and see.  I have some others,

22    too; but I can't read my chicken scratch to say why I

23    marked it.

24              So other strikes for cause from the government?

25              MS. RATTAN:  We're looking at 27, your Honor.
```

```
 1            THE COURT:  I marked 27, but I just can't read my
 2   notes of why.
 3            Is there any disagreement about that?
 4            MR. JOE WHITE:  No objection.
 5            THE COURT:  Okay.  No disagreement by the defense;
 6   so I'll strike 27.
 7            Any others from the government?
 8            MS. RATTAN:  Let's see, we're looking at 45.
 9            THE COURT:  Okay.  I also marked 45, but I can't
10   read my reasoning so --
11            MS. BROOKS:  They have the son with a pending drug
12   case.
13            THE COURT:  Oh, it's the one that has -- okay.
14   Their son does -- that's what that means.  Okay.
15            Is there any objection to that?
16            MR. JOE WHITE:  No objection, your Honor.
17            THE COURT:  Okay.  I'll strike 45.
18            Others from the government?
19            MR. GONZALEZ:  Do you have 29?
20            THE COURT:  We have not spoken -- we have not
21   talked about 29.
22            MR. GONZALEZ:  I'm concerned about 29.  Brother
23   convicted for federal sex crimes, not treated fairly; but I
24   don't think we went any further than that.
25            THE COURT:  I put a question mark by 29; so I
```

 1   didn't star it.

 2           Any comments from defense?

 3           MR. JOE WHITE:  I didn't hear him say anything

 4   that crossed the line from my end.

 5           THE COURT:  Okay.  We'll bring 29 in in a second

 6   just to follow up.

 7           Any others from the government?

 8           MR. GONZALEZ:  That's all we have.

 9           THE COURT:  If you think of others, that's fine.

10           Any strikes for cause from defense?

11           MR. JOE WHITE:  49 from --

12           THE COURT:  Actually, I marked 49; but I just

13   can't read my writing so --

14           MS. KATE WHITE:  She's the one who -- she had a

15   grandson that was convicted of possession of controlled

16   substance, and then she volunteered that her

17   step-granddaughter died of a fentanyl overdose.

18           THE COURT:  That was later.  I think -- what I

19   think -- from my chicken scratch, what I think I wrote

20   down, I must have asked could you say it wouldn't impact

21   your -- she goes, "Really can't."  She said she really

22   couldn't say whether it would impact or not.  Well, I don't

23   think that's sufficient, though; so I am going to strike

24   49.

25           Any others from defense?

1          MR. JOE WHITE:  No.  No, sir.

2          THE COURT:  And let me just ask both counsel.  I

3    marked one other; but, again, my writing has gotten really

4    bad because I can't read it.  It is 33.  And maybe -- I put

5    a star there, but I don't know what they said.

6          MS. RATTAN:  Let's see, there was a --

7          THE COURT:  I'm not saying -- neither side has

8    asked for that one.  I just want to make sure there is not

9    an issue with that one.

10          MS. RATTAN:  Well, Number 33 said that they would

11    provide a benefit or credibility to the police; and I just

12    made the note it doesn't rise to the level of cause.

13          THE COURT:  Yeah.  I guess I didn't -- I didn't

14    put the star where it should go so -- okay.  I am not going

15    to take any action on there.

16          Now, we need to talk to 25 who had a bad

17    experience and 29, a follow-up by Mr. Gonzalez.

18          MR. GONZALEZ:  Yes, sir.

19          THE COURT:  Were there any others we need to

20    bring?

21          MR. JOE WHITE:  There was one other.

22          THE COURT:  Well, I think I already took away --

23    the other ones, I think, we took away.

24          MR. JOE WHITE:  Oh, you took away.

25          THE COURT:  So if you want to line up 25 and 29.

```
 1              THE COURTROOM DEPUTY:  Okay.

 2              (Prospective Juror 29 enters chambers.)

 3              THE COURT:  Okay.  Thank you.

 4              Sir, I just want us to follow up.

 5              Mr. Gonzalez, did you want to ask a follow-up

 6   question?

 7              MR. GONZALEZ:  Yes.

 8              You indicated in one of your responses that -- I

 9   need to look what the question was --

10              PROSPECTIVE JUROR:  Is it about using my

11   specialized knowledge?

12              MR. GONZALEZ:  No, no, no, no.  It wasn't for

13   that.

14              Oh, that there was a brother convicted of a

15   federal sex crime and that you felt that he was not treated

16   fairly.

17              PROSPECTIVE JUROR:  Correct.  That, I think, is a

18   little different than this scenario.  He was in the

19   military at the time, and their system works differently.

20              I think it's a little bit more difficult to be

21   treated fairly as a defendant in that scenario.

22              I also don't feel like he had adequate

23   representation.  I hope that doesn't cause issues.  Those

24   are not issues.

25              MR. GONZALEZ:  No, they are not.  The question is
```

 1    could you set all that aside and listen to the evidence,

 2    all the evidence in this case, and base your judgment

 3    whether someone is guilty or innocent strictly on the

 4    evidence that you hear in this case?

 5            PROSPECTIVE JUROR:  Yes.

 6            MR. GONZALEZ:  And what happened to your brother

 7    would have no impact in your judgment or your decision

 8    here?

 9            PROSPECTIVE JUROR:  Correct, yes.

10            THE COURT:  Okay.  Additional questions?

11            MR. JOE WHITE:  It's just fairness.  Can you be

12    fair to both sides?

13            PROSPECTIVE JUROR:  Yes.

14            MR. JOE WHITE:  Thank you.

15            THE COURT:  Thank you, sir.

16            (Prospective Juror 29 exits chambers.)

17            (Prospective Juror 25 enters chambers.)

18            THE COURT:  Hi, Juror 25.  Just right here is

19    fine.  I just wanted to follow up.  There was something you

20    wanted to talk -- this is as private as we can be -- about

21    a bad experience with law enforcement so --

22            PROSPECTIVE JUROR:  Well, and it wasn't personal;

23    it was my nephew.  He was accused of shooting up a

24    sheriff's home and his vehicle, his property with him and

25    his wife in the property.  But they later found out --

1   well, and they -- so not long -- I want to say hours,

2   within a few hours afterward, they went to his home, pulled

3   him out of bed, beat the crap out of him; and then they

4   later found out that it wasn't him that did it.

5           THE COURT:  So how would that -- and I'm sorry --

6           PROSPECTIVE JUROR:  Yeah.

7           THE COURT:  -- for your family to go through all

8   that.  How would that impact your ability to serve as a

9   juror here?  And just be open and candid.  I just --

10          PROSPECTIVE JUROR:  I don't think it would.

11          THE COURT:  Well, you don't think it would?

12          PROSPECTIVE JUROR:  I don't think it would.

13          No.  I mean, I can be impartial.

14          THE COURT:  Okay.  Any follow-up questions from

15  anybody?

16          MR. JOE WHITE:  Can you be fair to both sides?

17  That's all we ask.

18          PROSPECTIVE JUROR:  Correct, yes.  Yeah.

19          MS. RATTAN:  How long ago was that?

20          PROSPECTIVE JUROR:  Probably three or four years

21  ago.

22          MS. RATTAN:  In what county?

23          PROSPECTIVE JUROR:  It was in Maine.

24          THE COURT:  Thank you, ma'am.

25          MS. RATTAN:  You're welcome.

```
 1              (Prospective Juror 25 exits chambers.)

 2              THE COURT:  Okay.  There is not a basis there

 3    so -- any other strikes for cause from anybody, as you have

 4    looked at your notes?

 5              MR. GONZALEZ:  No, your Honor.

 6              MR. JOE WHITE:  No, your Honor.

 7              THE COURT:  Okay.  And let me just -- I'll read

 8    the ones I've struck so you can just see and make sure

 9    we're all on the same page.  I've struck 10, 15, 27, 28,

10    36, 37, 38, 45, and 49.

11              MR. BEHENNA:  Total of 9, your Honor?

12              THE COURT:  Oh, I didn't add those up.

13              Yes.

14              Keary, do you have the first 12 out of 32?

15              THE COURTROOM DEPUTY:  32.

16              THE COURT:  Okay.  So you'll exercise your 10

17    strikes only through 32.  The government will have their 6

18    strikes, and that will set up the 10-person jury.

19              And then because it is two weeks and even though

20    we didn't have many outbreaks of COVID lately -- not that

21    I'm superstitious; I'm knocking on wood -- I am going to

22    seat four alternates just to be safe.

23              So each side will get two challenges just among

24    the alternates area, so from 33 to 43.

25              Right, Keary?
```

```
1              THE COURTROOM DEPUTY:  Yes.

2              THE COURT:  So if you want to exercise -- each

3    side will get two peremptory challenges in that space of

4    the alternates, and we'll seat the first two that have no

5    objections.

6              Okay.  Any questions -- oh, four, the first four.

7    Yeah, that's right.

8              Any questions?

9              MR. JOE WHITE:  No, your Honor.

10             THE COURT:  If you can go to your rooms -- can you

11   get your lists back, like, 20, 25 minutes tops?  And you'll

12   have the form to fill the strike list out.  What I'll do is

13   we'll get the jury seated.  I'll do my preliminary

14   instructions tomorrow morning before opening statements.

15             But that will get us basically almost around

16   5:00-ish so -- just trying to get the jury out of here as

17   quick as possible.

18             Let me ask.  Now that we're down to just one

19   defendant, how much time does the government want for

20   opening statements?

21             MS. RATTAN:  May I have the same?  I don't think

22   I'll use it, but may I please?

23             THE COURT:  You want an hour and 15 minutes?

24             MS. RATTAN:  Is that all right?  I don't think it

25   will be that long.
```

 1            THE COURT:  Okay.  Well, I'll give y'all the same

 2   amount, then.  I just wanted to clarify that since --

 3            MS. RATTAN:  Thank you.

 4            THE COURT:  You had a combined time, I think,

 5   or -- I'm not sure what I did with that but --

 6            MR. JOE WHITE:  May I ask a question, your Honor?

 7            THE COURT:  Yes.

 8            MR. JOE WHITE:  Concerning the number with 4

 9   alternates, do we go beyond the 32?

10            THE COURT:  Yes.  So through 32, you'll seat the

11   12.

12            And then the alternates will be selected from 33

13   to 43.  You get two strikes to use during that time.

14            Under the rule -- I understand the way -- under

15   the rule, the alternate strikes -- peremptory challenges

16   can't be used for the main panel; so that's why I separate

17   it that way.

18            MR. JOE WHITE:  33 to --

19            THE COURT:  33 to 43, you have two strikes to use

20   there.

21            MR. JOE WHITE:  Thank you.

22            THE COURT:  Okay.  Well, if you'll go to your

23   rooms and give them to Ms. Conrad as soon as you're done

24   and -- thank y'all.  It was an interesting *voir dire*.  Good

25   *voir dire*.

1          (Recess, 4:30 p.m. to 5:01 p.m.)

2          (Open court, defendant present, prospective jurors

3     present.)

4          THE COURT:  Please be seated.

5          Ladies and gentlemen, thank you for your

6     participation in the *voir dire* process and thank you for

7     your patience.

8          If your number is called, please come forward.

9     Our court security officer will get you seated in the jury

10    box.

11         THE COURTROOM DEPUTY:  Number 2, Number 4,

12    Number 5, Number 6, Number 9, Number 14, Number 16,

13    Number 18, Number 20, Number 21, Number 23, Number 24,

14    Number 33, Number 35, Number 39, Number 42.

15         THE COURT:  And we're going to add two extra

16    chairs there.

17         Are there chairs there right now for them?

18         THE COURT SECURITY OFFICER:  Yes.  There are

19    chairs.

20         THE COURT:  Okay.  Very good.  If y'all will all

21    stand, raise your right hand, and be sworn in.

22         (The oath is administered to the jury.)

23         THE COURT:  You may be seated.

24         Everyone else, I want to thank you for your

25    participation.  If you need a work excuse, they are

 1   available at the front desk when you leave.  But you are

 2   excused.  Thank you.

 3            (Remaining prospective jurors exit the courtroom,

 4   5:04 p.m.)

 5            THE COURT:  So, ladies and gentlemen, normally I

 6   would give you my preliminary instructions.  But it's after

 7   5:00; so we're going to stop for the day.  We'll operate

 8   9:00 to 5:00.  I'll give you those detailed preliminary

 9   instructions tomorrow morning when we come back.

10            But just some general instructions again.  I don't

11   want you to go do any research when you go home tonight.

12            You shouldn't even do any research on the

13   attorneys or me, the judge, or anything like that.

14            You can do all that when you're done, but I want

15   you to be able to base your decision based on what happens

16   in the four confines of the walls here.

17            Also, you can't talk about the case so -- even

18   among yourselves.  But even among your family or your

19   coworkers, all you can tell is you were selected.

20            You can tell your coworkers or your family you

21   were selected for a criminal case in Sherman, Texas, in

22   federal court; and that's all.

23            When this is over, you can say, to whomever you

24   want to, anything you want to say but not until then.

25            So what I'm going to do is I'm going to release

 1   you up to -- I'm going to send you up to the jury room just

 2   so you can see where you will -- it's on the third floor.

 3   That's where you will come every day.

 4         There will be -- you are no longer Number 2,

 5   you're going to be 1 through 16.  I did seat four

 6   alternates just because it's going to take a couple weeks.

 7   Life interferes sometimes; so that's why we'll have extra

 8   alternates.  Normally I just have 14 total jurors, but

 9   we're doing two extra for that.

10         And then when you come back tomorrow, just be here

11   before 9:00 and be in the jury room upstairs; and then

12   we'll bring y'all down as soon as we begin.

13         I hope you have a good evening and have a safe

14   drive home.  We'll see you back tomorrow.  Thank you.

15         (The jury exits the courtroom, 5:07 p.m.)

16         THE COURT:  Anything further from the government

17   before we recess for the day?

18         MS. RATTAN:  Yes, your Honor, briefly.

19         May I proceed?

20         THE COURT:  Yes.

21         MS. RATTAN:  Okay.  In our hearing this morning,

22   the Court considered the government's motion *in limine*; and

23   it was my understanding that the Court granted the motion

24   *in limine* and instructed defense counsel not to bring up

25   the advice-of-counsel issue.

1            It was brought up in *voir dire*.  "Would it make a

2    difference to you if the defendant brought attorney

3    witnesses who advised her?"  It was my understanding the

4    Court had instructed defense counsel not to bring it up at

5    this point.

6            THE COURT:  No, I denied that --

7            MS. RATTAN:  Okay.

8            THE COURT:  -- because they gave notice of the

9    defense as requested by the government, which I ordered

10   them to do and they did, although they objected to that but

11   they still provided it that they were going to be relying

12   on that defense; and so I denied that MIL.

13           MS. RATTAN:  I just thought this morning you said

14   don't bring it up in opening statement.  Sorry.

15           THE COURT:  If I did, I was talking about the

16   other -- Ms. Rattan, I'm going to check and see what we put

17   in the written order.

18           MS. RATTAN:  Okay.

19           THE COURT:  If I did, that was a mistake on my

20   part.  Mentally, I was thinking that's fair game because

21   they have notified that as a defense --

22           MS. RATTAN:  Okay.

23           THE COURT:  -- at the request of -- the government

24   asked them to disclose that.

25           MS. RATTAN:  We did.

 1              The government's motion, I believe, was 361.

 2              THE COURT:  So, Ms. Rattan, I have to apologize.

 3    My staff has me showing that as granted, but I actually

 4    meant to deny it so --

 5              MS. RATTAN:  I showed it granted, too.

 6              THE COURT:  No.  You're correct.

 7              MS. RATTAN:  Okay.

 8              THE COURT:  You're exactly correct because my

 9    staff has me showing -- and that's the order I signed, I

10    think, today -- showing that it was granted, but I actually

11    meant to deny it.

12              MS. RATTAN:  Okay.

13              THE COURT:  So I understand that it is a technical

14    violation, but the Court meant to deny it.

15              MS. RATTAN:  May I be heard on it, your Honor?

16              THE COURT:  Yes, go ahead.

17              MS. RATTAN:  Well, I think that the advice of

18    counsel has to be fleshed out in terms of the levels of

19    hearsay.

20              If one lawyer specifically said to the defendant

21    something that gave the defendant a belief, I understand

22    that.

23              But if that lawyer is relying on other lawyers,

24    that's just double hearsay.  I don't know that that

25    happened, but I do think it needs to be fleshed out.  And I

 1   don't think it's appropriate in opening statement to say,

 2   "Five lawyers said."

 3            THE COURT:  Well, let me ask what -- how is that

 4   testimony going to come in later?  Is it each lawyer

 5   independently gave that advice, or is it a compounding

 6   effect?

 7            MR. JOE WHITE:  I anticipate that we're going to

 8   present testimony from three lawyers.

 9            We'll waive the attorney-client privilege as to

10   each of the three lawyers as it relates to the advice and

11   counsel that they provided Deb Mercer-Erwin contemporaneous

12   in time with the advice that was being given, whether it's

13   from a white paper, from commerce, what have you.

14            I anticipate McCreary is going to be a witness,

15   Henry Hoss is going to be a witness, and then we're going

16   to follow up that witness with Jonathan Epstein out of D.C.

17   the week of April 17th.

18            I also -- but those are the three

19   advice-of-counsel lawyers that we have identified and

20   that -- I believe the evidence will be that

21   Ms. Mercer-Erwin followed their advice.

22            THE COURT:  My question, though, and the

23   government's distinction of that, is did they each

24   personally give her advice or did -- are they operating

25   more as looking at what the other attorneys did and

 1    affirming that?

 2           MR. JOE WHITE:  Singularly and separately, each of

 3    the three.

 4           THE COURT:  Okay.  Okay.  That answers the

 5    government's question.

 6           And I do apologize.  In going over that today I --

 7    that was -- I meant to deny that one, and I will change

 8    that to modify that.  So I am sorry I caused confusion.

 9           MS. RATTAN:  I'm glad I didn't object in *voir*

10    *dire*.

11           THE COURT:  And you made the objection, and I was

12    wondering why is she objecting to that.  But I certainly

13    thought one thing and said another apparently; so I

14    apologize.

15           MS. RATTAN:  And then the other issue, the Court

16    had granted the motion *in limine* where the defense is not

17    to refer to the effect of the verdict; and then we get in

18    *voir dire* and "Why is the burden of proof what it is?

19    Because liberty is at stake."  That goes to the issue that

20    the Court granted the motion *in limine* related to.

21           THE COURT:  Yeah, and I think of that as more of a

22    global kind of issue.  I mean, that naturally comes with

23    it.  That wasn't really singling out this defendant's going

24    to go to jail or something like that if you convict her

25    or -- so I understand generally.

1        I don't necessarily take that as a violation of

2    that -- that kind of -- talking to that -- he's talking at

3    a really wide, high level.  But I agree that if he goes

4    deeper than that, that will be a problem.

5        MS. RATTAN:  But all of these things go toward

6    pity, nullification.  It's just chipping away.

7        THE COURT:  No, but I think -- I think that's fair

8    game in *voir dire* so -- I mean, at that global level.

9        Anything else, Ms. Rattan?

10        MS. RATTAN:  Thank you.

11        THE COURT:  I think Mr. Gonzalez has something.

12        MR. GONZALEZ:  Yes, your Honor.  Now that they

13    have indicated that they are going to have some testimony

14    of these witnesses, is there any reciprocal discovery?  We

15    would ask for reciprocal discovery in regards to these

16    witnesses or anything of that nature.

17        THE COURT:  So do you have your terabytes of

18    information to give?  I'm sorry.  Maybe that's too soon to

19    joke.  I said it just too soon.  I don't mean to make light

20    of that.

21        MR. JOE WHITE:  This is the first request we've

22    had made of this, just now.  We will search and go about

23    the process of --

24        THE COURT:  Actually, I thought the government did

25    make a request for reciprocal discovery in one of their

```
 1   responses, relatively -- it was in the last few days, but I
 2   remember reading it.  I read all the materials.  They did
 3   make that request before today but -- I think in one of
 4   their responses to one of your notices on discovery, I
 5   believe.
 6              MR. GONZALEZ:  I believe it was with our expert
 7   witness.  We asked for reciprocal discovery, and typically
 8   what we can do -- and I can go back and look at our
 9   records.  Typically when we send out our discovery, we also
10   ask for reciprocal discovery at that time.
11              And Ms. Rattan is pointing to Document 391 on
12   page 8.  It does ask for reciprocal discovery.
13              THE COURT:  And you're not being chided for not
14   doing that yet; so you're fine.  It's just they did make
15   the request prior to today although just recently so --
16              MR. JOE WHITE:  We'll go to work on it.
17              THE COURT:  I understand.
18              Okay.  Anything else from the government?
19              MR. GONZALEZ:  No, your Honor.  Thank you.
20              THE COURT:  And then anything from the defense?
21              MR. JOE WHITE:  Yes.
22              I have asked my colleagues with the government as
23   to a witness lineup.  I understand the one witness they
24   have told me they are going to call tomorrow as their first
25   witness is Agent Justin Marshall.  We have received *Jencks*
```

1    material today, over the lunch hour.  We got it as we came

2    back into court to start at 2:00.

3              I understand this *Jencks* material for Agent

4    Marshall only includes his testimony before the grand jury

5    on the third and fourth superseding indictments, not the

6    first, second, or fifth.  I understand that he did not

7    testify before the grand jury regarding the fifth

8    superseding Indictment.

9              I am requesting all material concerning whether he

10   testified in the first or second grand jury proceedings.

11   As it relates to any other material the government may have

12   for all transcripts of his testimony, whether -- before the

13   grand jury, specifically, we're seeking the first and

14   second since we've only been given --

15             THE COURT:  Well, let me just ask.  I mean, I

16   assume the government would provide it if he had testified.

17             MR. GONZALEZ:  We're going to verify, your Honor.

18   I did give them the transcripts that I believe Agent

19   Marshall had -- the grand juries that he had presented in

20   front of.  I'm going to verify one, and I've indicated that

21   I'm going to do that.  I believe he testified twice before

22   the grand jury; so I'm going to make sure that they have

23   those transcripts.

24             In regards to what else we've given them, we've

25   given them all the emails that Agent Marshall has sent out

 1   during this investigation.

 2          THE COURT:  Well, just double-check that.  If

 3   there is anything else, you know, do it within an hour of

 4   adjournment of court today.

 5          MR. GONZALEZ:  Sure.

 6          MR. JOE WHITE:  I'm requesting a lineup of

 7   witnesses each day before the close of business so we can

 8   prepare and be as prepared as possible for the next day's

 9   witnesses.  The only witness I've been advised of is

10   Marshall, Agent Marshall.  I don't anticipate he's going to

11   be an all-day witness, but I don't know.

12          THE COURT:  Well, by the time we do opening

13   statements and, you know -- we'll start -- I don't know

14   what else you have planned for tomorrow, how long Agent

15   Marshall will take.

16          MR. GONZALEZ:  Well, it kind of changed with the

17   defendants pleading today; so we're going to rework --

18   actually, we're going to work on our lineup tonight and see

19   how we're going to present it because of the people that

20   pled today.

21          THE COURT:  Okay.  That's fine.  Just as soon as

22   you know, you know, just give them a day's notice so that

23   they can -- just be sure if there is any *Jencks* material.

24          If there is a witness that y'all haven't had time,

25   we'll take a break or whatever to let you look at any

 1   *Jencks* material if that's applicable to that witness, okay?

 2   So remind me tomorrow if that comes up.

 3         Okay.

 4         MR. JOE WHITE:  Understood.  Thank you.

 5         THE COURT:  Okay.  And then anything else from the

 6   defense?

 7         MR. JOE WHITE:  No, your Honor.

 8         THE COURT:  Okay.  If some other issue comes up,

 9   just be here early.  I like to start at 9:00 because I

10   don't like to make the jury wait.  But, otherwise, you

11   know, we'll start at 9:00.

12         Y'all have a good evening.  Thank you.

13         (Proceedings concluded, 5:18 p.m.)

14   <u>COURT REPORTER'S CERTIFICATION</u>

15         I HEREBY CERTIFY THAT ON THIS DATE, OCTOBER 12,

16   2023, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD

17   OF PROCEEDINGS.

18

19         _____/s/_____

                CHRISTINA L. BICKHAM, CRR, RDR

20

21

22

23

24

25