1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF TEXAS
2                          SHERMAN DIVISION

3    UNITED STATES OF AMERICA        |  DOCKET 4:20-CR-212
                                     |
4                                    |
     VS.                             |  APRIL 20, 2023
5                                    |  SHERMAN, TEXAS
                                     |
6    DEBRA LYNN MERCER-ERWIN         |

7    ---------------------------------------------------------

8            VOLUME 1 OF 1, PAGES 1 THROUGH 27

9        REPORTER'S TRANSCRIPT OF JURY TRIAL EXCERPT
            TESTIMONY OF JULIO CESAR OLIVAS-FELIX
10
             BEFORE THE HONORABLE AMOS L. MAZZANT, III,
11          UNITED STATES DISTRICT JUDGE, AND A JURY

12   ---------------------------------------------------------

13
     APPEARANCES:
14
     FOR THE GOVERNMENT:      ERNEST GONZALEZ
15                            HEATHER RATTAN
                              U.S. ATTORNEY'S OFFICE - PLANO
16                            101 E. PARK BOULEVARD, SUITE 500
                              PLANO, TX 75074
17
                              LESLEY BROOKS
18                            U.S. ATTORNEY'S OFFICE - SHERMAN
                              600 EAST TAYLOR STREET, SUITE 2000
19                            SHERMAN, TX 75090

20

21   COURT REPORTER:         CHRISTINA L. BICKHAM, CRR, RDR
                             FEDERAL OFFICIAL REPORTER
22                           101 EAST PECAN
                             SHERMAN, TX 75090
23

24

25       PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
      TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

```
 1
      FOR THE DEFENDANT:        JOE ELLIS WHITE, JR.
 2                              KATE C. WHITE
                                MATTHEW P. CYRAN
 3                              WHITE & WEDDLE, PC
                                630 NE 63RD STREET
 4                              OKLAHOMA CITY, OK 73105

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              INDEX

2

3                                                      PAGE

4    DIRECT EXAMINATION BY MR. GONZALEZ              4

5    CROSS-EXAMINATION BY MR. WHITE                 25

6    COURT REPORTER'S CERTIFICATION                 27

7

8

9                       INDEX OF EXHIBITS

10   Government's Exhibit 105                        13

11   Government's Exhibit 105010                     17

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Open court, defendant present, jury present.)

 2              MR. GONZALEZ:  The government calls Julio Olivas.

 3              THE COURT:  This witness is using a court

 4   interpreter.  Have you already been sworn in?

 5              THE INTERPRETER:  Almost ready, your Honor.

 6              Ready, your Honor.

 7              THE COURT:  Okay.  And you've already been sworn

 8   in?

 9              THE INTERPRETER:  Yes, your Honor.

10              THE COURT:  Okay.  That's fine.

11              Sir, if you'll raise your right hand to be sworn

12   in.

13              (The oath is administered to the witness through

14   the interpreter.)

15              THE COURT:  Go ahead and proceed.

16          DIRECT EXAMINATION OF JULIO CESAR OLIVAS-FELIX

17               CALLED ON BEHALF OF THE GOVERNMENT

18   BY MR. GONZALEZ:

19   Q.  Sir, would you please state your full name for the

20   Court, the jury, and the record.

21   A.  Julio Cesar Olivas-Felix.

22   Q.  How old are you, sir?

23   A.  48 years old.

24   Q.  And where were you born?

25   A.  In Los Angeles, California.
```

1    Q.  What's the highest level of education that you've

2    attained in your life?

3    A.  I studied all the way to second year in college.

4    Q.  Was that here in the United States?

5    A.  No, in Sinaloa, Mexico.

6    Q.  What type of work have you done for a living?

7    A.  I have had disco clubs in Mexico.

8    Q.  And how long have you had that business?

9    A.  For about six years, from 2004 to 2010.

10   Q.  And was that in Sinaloa, Mexico?

11   A.  It is correct.

12   Q.  Are you married?

13   A.  Yes, sir.

14   Q.  Do you have any children?

15   A.  Yes, three children, two boys and one girl.

16   Q.  You indicated that you had your education in Mexico,

17   but are you -- you are a U.S. citizen, correct?

18   A.  Yes, but I have lived over there all my life.

19   Q.  And you're presently incarcerated.  Why are you

20   incarcerated?

21   A.  For drug trafficking, narco traffic.

22   Q.  And was that a conspiracy charge out of the Eastern

23   District of Texas?

24   A.  Yes, sir.

25   Q.  Have you been sentenced on that charge?

 1   A.  Yes, sir.

 2   Q.  How much time did you receive?

 3   A.  30 years, 360 months.

 4   Q.  When -- well, obviously because of your conviction, you

 5   at some point became involved in distributing drugs.  When

 6   did you become involved in the distribution of drugs?

 7   A.  Since 2010.  In this case I started in this conspiracy

 8   since 2010.

 9   Q.  How was it that you became involved in distributing

10   drugs?

11   A.  When -- within the disco clubs a local war ensued

12   between cartels in Sinaloa, and I had to shut them down.

13   The war was in the city.

14   Q.  And who was at war?

15   A.  The Beltrán-Leyva Cartel and the Sinaloa Cartel.

16   Q.  And was it a violent war?

17   A.  Yes.  It was a very violent war.  The city after

18   8:00 p.m., it was like -- what do you call that? -- like

19   quarantined.

20   Q.  And did those cartels use firearms?

21           MR. WHITE:  Relevance, your Honor.

22           THE COURT:  Well --

23           MR. GONZALEZ:  In regards to the testimony

24   yesterday, your Honor, where the cartels are receiving

25   firearms from the United States.

1            THE COURT:  Okay.  Overruled.

2   A.  Yes, of course.

3   BY MR. GONZALEZ:

4   Q.  Now, what was your main role in the distribution of

5   drugs that you have now pled guilty to and been sentenced

6   for?  What was it that you were doing?

7   A.  I was kind of an office for the Sinaloa Cartel.  I

8   would -- I was in charge of collecting drugs from Central

9   and South America for the cartel of Sinaloa.

10  Q.  And you just said that you had an office where?

11  A.  In Tapachula, Chiapas, and also in Guatemala.

12  Q.  And is that where you operated out of for the Sinaloa

13  Cartel?

14  A.  Yes.  Basically that was an office, but also I would

15  work other countries.

16  Q.  And what was it that you were asked to do by the

17  Sinaloa Cartel?

18  A.  Sometimes to review drug quality, sometimes to collect

19  drugs and to be in charge of transportation.

20  Q.  What quantities of drugs were you transporting for the

21  Sinaloa Cartel or arranging for transportation?

22  A.  Quantities starting from 100 kilos to 2 tons.

23  Q.  And would you find the cocaine for the Sinaloa Cartel

24  in Central American countries?

25  A.  Yes.

Trial Testimony of Julio Cesar Olivas-Felix                8

1   Q.  What countries?

2   A.  In Honduras in -- the base basically was Guatemala, the

3   majority of it.  I also worked in Panama, Costa Rica.

4   Q.  And where was the cocaine that was being delivered to

5   the Sinaloa Cartel being produced?

6   A.  In Colombia.

7   Q.  And how was the cocaine produced in Colombia being

8   transported to Honduras, Guatemala, Costa Rica?

9   A.  Through maritime and air.

10  Q.  You said that you primarily worked in Guatemala.  Were

11  there certain areas in Guatemala where the cocaine would

12  arrive?

13          THE INTERPRETER:  Sorry.  Repeat for the

14  interpreter.

15  BY MR. GONZALEZ:

16  Q.  Were there certain areas in Guatemala where the cocaine

17  would arrive?

18  A.  Yes, of course.  It was several areas, basically.  In

19  Petén, Zacapa, Cobán, Huehuetenango, Retalhuleu,

20  Suchitepeque.  I could mention many more.  I don't know if

21  you need it.

22  Q.  Okay.  No, that's fine.

23          So once the drugs got to Guatemala, was it your

24  obligation or role in the organization to arrange for

25  transport into the interior of Mexico?

1    A.  Yes, it is correct.

2    Q.  Where was the cocaine that you were finding for the

3    Sinaloa Cartel in Guatemala -- where was it going?

4    A.  In the majority, it was distributed in the different

5    offices in Mexico; and from there, it would continue on to

6    the United States.

7    Q.  So the United States was its final destination?

8    A.  The majority.  A portion of it to Canada.

9    Q.  And are you familiar -- being in this business, are you

10   familiar with the logos or the labeling that's on

11   individual kilos of cocaine?

12   A.  Yes, of course.

13   Q.  Based on your involvement in this business, what do

14   those stamping or logos mean?

15   A.  It's like the laboratory brand.  But we use it for

16   security, for follow-up, and for quality.

17   Q.  How much were you being paid by the cartel, the Sinaloa

18   Cartel, to do this role of assisting with transportation

19   and finding cocaine in these Central American countries?

20   A.  Sometimes I would get paid three per unit.  Sometimes

21   it was by the job.  But per unit, $300 -- between 100 and

22   300.

23   Q.  So 100 to $300 per kilo?

24   A.  Correct.

25   Q.  And were you -- did you become familiar or were you

1   aware the types of aircraft that were being used to get the

2   drugs to Guatemala?

3   A.  Yes, because they are the ones that everyone uses.

4   Q.  What are some of those aircraft?

5           THE INTERPRETER:  I'm sorry.  Your Honor, the

6   interpreter -- could the witness wait until the whole

7   question is answered, please.

8           THE COURT:  Yes.

9           THE INTERPRETER:  Thank you, your Honor.

10           I'm sorry.  Repeat for the interpreter.

11  BY MR. GONZALEZ:

12  Q.  What are some of those aircraft that were used?

13  A.  Hawker, Gulfstream, and also the Cessna 210.  And there

14  are a lot of others, but I wouldn't be able to tell you

15  models because that's not my specialty.

16  Q.  And during your involvement during this period of

17  involvement that you indicated from 2010 to 2016 with the

18  Sinaloa Cartel, approximately how much cocaine did you help

19  them distribute?

20  A.  Well, I don't know.  Between 20 and 30 tons.

21  Q.  And with that quantity mostly ending up in the United

22  States?

23  A.  Yes, of course.  Well, it's not that I can state it as

24  a fact, but it was for Sinaloa and everybody who works for

25  Sinaloa knows it's for the United States.

1   Q.  And are there other rival cartels in Mexico to the

2   Sinaloa Cartel?

3           MR. WHITE:  Relevance, your Honor.

4           THE COURT:  Overruled.

5   A.  Of course.  As in that they are fighting among

6   themselves?

7   BY MR. GONZALEZ:

8   Q.  Yes.

9   A.  Yes.

10  Q.  Based on your involvement and what you've seen during

11  your involvement with the cartel, why do most people get

12  involved in this illegal distribution business?

13  A.  The -- many of times it is because of the culture.

14  It's the only thing that you see around you.  But many

15  times it's because of jobs not well paid.

16  Q.  How do the drugs get transported into the United

17  States?

18  A.  Inside Mexico in the same manner.  It can be train,

19  terrestrial, and by plane.

20          And then at the border, cars can be used or

21  tunnels or trailers and also people.

22  Q.  So those are different methods that the drugs are

23  making it across the border; is that correct?

24  A.  Yes, it is correct.

25  Q.  And the drug proceeds that are generated from the sale

1    of the drugs in the United States -- how do the drug

2    proceeds get back to the Sinaloa Cartel in Mexico?

3    A.   Money exchanges are used or crossing by land, crossing

4    to Mexico and the border.

5           And from there, sometimes airplanes are used or

6    cars in order to get them to their destination.

7    Q.   And do people that work for the cartel, like you, have

8    different responsibilities?

9    A.   Yes.  Each one has their own role.

10   Q.   And do you know all the people that work for the

11   Sinaloa Cartel?

12   A.   All people?  No, I do not.

13   Q.   Are there people that you just know by nicknames?

14   A.   Yes.  As a matter of fact, the great majority of people

15   that you deal with is just nicknames.

16   Q.   And how important is and how vital is the

17   transportation of the drugs in order for the Sinaloa Cartel

18   to be successful?

19   A.   Well, it's the main thing.  Without good

20   transportation, the business would not exist.

21   Q.   And, again, part of the transportation that you've

22   indicated is maritime and aviation, correct?

23           Are those the two primary modes of transportation?

24           MR. WHITE:  Leading.

25           THE COURT:  Overruled.

1   A.  Yes.  For large amounts, yes.

2   BY MR. GONZALEZ:

3   Q.  And you did this for how many years?

4   A.  From 2010 to 2016.

5   Q.  And where were you arrested?

6   A.  In Milan, Italy.

7   Q.  Were you extradited to the United States?

8   A.  Yes, sir.

9   Q.  And when you arrived in the United States, did you

10  enter into a plea agreement with the government?

11  A.  It is correct.

12  Q.  And did you enter into that plea agreement after

13  reviewing it with your attorney?

14  A.  It is right.

15          MR. GONZALEZ:  Your Honor, may I approach the

16  witness?

17          THE COURT:  Yes.

18  BY MR. GONZALEZ:

19  Q.  Sir, I've placed before you what's been previously

20  marked for identification purposes as Government's

21  Exhibit 105.  If you can review that document and let me

22  know when you're ready to proceed.

23  A.  Yes.  I know that one perfectly.

24  Q.  Do you recognize that document?

25  A.  Yes.  That is the agreement that I signed when I was

Trial Testimony of Julio Cesar Olivas-Felix          14

1  going to plead guilty.

2  Q.  And has it been changed since the time that you signed

3  it?

4  A.  No.

5          MR. GONZALEZ:  Your Honor, at this time we would

6  offer Government's Exhibit 105 into evidence.

7          MR. WHITE:  No objection.

8          THE COURT:  105 will be admitted.

9          MR. GONZALEZ:  And may we publish?

10         THE COURT:  Yes.

11  BY MR. GONZALEZ:

12  Q.  And is this your Plea Agreement that you signed?

13  A.  That is right.

14  Q.  And did you understand that by entering into this Plea

15  Agreement with the government, you were agreeing to plead

16  guilty to conspiracy to manufacture and distribute cocaine

17  intending, knowing, and with reasonable cause to believe

18  that the cocaine would be unlawfully imported into the

19  United States?

20  A.  That is right.  Correct.

21  Q.  And that's contained here in this paragraph.  Do you

22  see that?

23  A.  Right here.

24  Q.  And that's what you pled guilty to and accepted

25  responsibility for, correct?

Trial Testimony of Julio Cesar Olivas-Felix        15

1   A.  Yes, sir.

2           MR. GONZALEZ:  If we can go to Paragraph 4,

3   please.

4   BY MR. GONZALEZ:

5   Q.  Did you review Paragraph 4 with your attorney?

6   A.  Yes.  Yes.

7   Q.  In Paragraph 4 is entitled Court's Sentencing

8   Discretion and Role of the Guidelines, and it says, "The

9   defendant understands that the sentence in this case will

10  be imposed by the court after consideration of the *United*

11  *States Sentencing Guidelines Manual*.  The guidelines are

12  not binding on the court but are advisory only.  The

13  defendant has reviewed the guidelines with defense counsel

14  but understands that no one can predict with certainty the

15  outcome of the court's consideration of the guidelines in

16  this case."

17          Who ultimately decided your sentence?

18  A.  What the judge says at the end is what determines it.

19  Q.  And that's what happened in your case?  The judge

20  decided your sentence?

21  A.  Yes, that is correct.

22  Q.  Now, Paragraph 6 is entitled Acceptance of

23  Responsibility and it states, "The defendant understands

24  that by accepting responsibility and giving truthful and

25  complete information concerning his participation in the

 1  offense of conviction."

 2          Did you understand that you would have to, if

 3  called upon, give truthful and complete information?

 4  A.  That is right, correct.

 5  Q.  And if you didn't do that, then there could be

 6  consequences?

 7  A.  Yes, of course.

 8  Q.  In fact, there could be other charges, such as perjury

 9  or obstruction of justice or lying to a federal agent?

10  A.  Yes, it is correct.

11  Q.  Paragraph 10, Violation of Agreement.  Here it says,

12  "The defendant understands that upon violation of any

13  provision of this agreement or any court order or rule, or

14  if the guilty plea pursuant to this agreement is vacated or

15  withdrawn, the government will be free from its obligations

16  under this agreement and may prosecute the defendant for

17  all offenses of which it has knowledge."

18          Did you understand that as well?

19  A.  Yes, sir.

20  Q.  Did you understand that you had to abide by this

21  agreement and if you didn't, then other charges could be

22  filed against you?

23  A.  Yes, sir.

24  Q.  And part of your agreement is to testify, if called

25  upon, and be truthful and complete?

```
 1   A.  It is correct.

 2           MR. GONZALEZ:  Now if we can go to another

 3   document.  Can we go to 105010, please.

 4   BY MR. GONZALEZ:

 5   Q.  And was this another document that you reviewed with

 6   your attorney?

 7   A.  Yes.

 8           MR. GONZALEZ:  Ms. Adams, can we go to the next

 9   page, please.

10   BY MR. GONZALEZ:

11   Q.  And is that your signature?

12   A.  It is correct.

13   Q.  Did you sign it after reviewing it with your attorney?

14   A.  Yes, sir.

15   Q.  Now turning to the first paragraph, entitled

16   Substantial Assistance.  Did you review that particular

17   paragraph with your attorney?

18   A.  Yes, sir.

19   Q.  And it states:  "If, in its sole discretion, the

20   government determines that the defendant has provided

21   substantial assistance in the investigation or prosecution

22   of others and has otherwise complied with the terms of this

23   agreement, the government may file a motion for downward

24   departure pursuant to United States Sentencing Guidelines

25   Section 5K1.1 or a motion for reduction of sentence
```

 1  pursuant to Federal Rules of Criminal Procedure 35(b).  The

 2  defendant's cooperation does not automatically require the

 3  government to request a downward departure or a reduction

 4  in sentence, and the time for filing such motion will be

 5  determined by the government."

 6          Did you understand that as well?

 7  A.  Yes, sir.

 8  Q.  Did you understand that just simply because you're

 9  testifying here today does not guarantee you a motion from

10  the government for a reduction in sentence?

11  A.  Yes, I know it perfectly.

12  Q.  And then the final sentence says, "It is entirely

13  within the court's discretion as to what, if any, reduction

14  in sentence the defendant will receive."

15          Did you understand that?

16  A.  Yes, sir.

17  Q.  So did you understand that if the government decides to

18  file a motion for a reduction in the sentence -- who is

19  ultimately going to decide your sentence or any kind of

20  reduction?

21  A.  The judge.

22  Q.  And the judge can decide to grant a reduction or not

23  grant a reduction, correct?

24  A.  Yes, it is correct.

25  Q.  Have I or any of the agents working on this case

Trial Testimony of Julio Cesar Olivas-Felix          19

1   promised you anything in exchange for your testimony here

2   today?

3   A.  No.  Absolutely nothing.

4   Q.  Have I or any of the agents working on this case told

5   you that if you testify in this case, you're going to

6   receive a certain amount of time off?  A year?  Two years?

7   Five years?  Anything like that?

8   A.  No, sir.

9   Q.  And you and I have met on a couple of occasions; is

10  that correct?

11  A.  Yes, sir.

12  Q.  Did I tell you what you needed to say or testify here

13  today?

14  A.  No.

15  Q.  Or did I simply just ask you questions and you answered

16  my questions?

17  A.  It is correct.

18  Q.  Now being 100 percent truthful with this jury, are you

19  hoping that you get some sort of reduction for your

20  testimony here today?

21  A.  Well, of course I would like that; but I don't know

22  that that will happen.

23  Q.  And I haven't promised you that or guaranteed you that,

24  correct?

25  A.  No, sir.

1    Q.  Thank you.

2              MR. GONZALEZ:  I'll pass the witness.

3              THE COURT:  Cross-examination?

4              MR. WHITE:  Can I approach briefly to raise an

5    issue with the Court?

6              THE COURT:  Yes.

7              (The following proceedings were conducted at

8    sidebar with all parties represented.)

9              MR. WHITE:  The Sentencing Memorandum for this

10   person has been sealed, and I'm asking the Court to unseal

11   the sentencing -- the presentence -- the Final Presentence

12   Investigation Report.

13             THE COURT:  Okay.  Well, that's a court document

14   and that's sealed and so I typically don't give that.

15             What particular -- it comes up pretrial only when

16   the attorneys sometimes ask for that.  The government

17   doesn't have possession of it, so it's a court document.

18   It's under seal, so that is kept confidential.

19             What particular information do you want?  I mean,

20   I will look at it over the lunch hour but --

21             MR. WHITE:  My colleague covered with him his --

22             THE COURT:  So it is not a discovery obligation of

23   the government.  They don't have it.

24             MR. WHITE:  I'm not -- I know.

25             THE COURT:  Okay.

 1              MR. WHITE:  I'm not saying that.

 2              THE COURT:  So you're asking the Court to now

 3     order --

 4              MR. WHITE:  No.  I just want to make my record.

 5              THE COURT:  What are you asking for?  The record

 6     that is made -- then make a request.

 7              MR. WHITE:  I am making a request to unseal the

 8     presentence report so -- because on direct exam, 2010

 9     through 2016, his involvement in drug trafficking was

10     discussed; and my client apparently in some way, shape, or

11     form is tied to this person.  I would like to see what was

12     contained within the Presentence Investigation Report as to

13     his drug activity to see if there is anything mentioned of

14     my client.

15              THE COURT:  Well, okay, first of all, I am not

16     going to unseal the presentence report.  The Court doesn't

17     do that.  What I will do is have my staff -- I'll look at

18     it and -- are you staying in the building?

19              MR. WHITE:  Yes, sir.  I'll be downstairs.

20              THE COURT:  I'll have them bring down to you just

21     the offense conduct part of that.  That, in my view, is not

22     confidential, that part of it; so I'll get those pages

23     printed.

24              MR. WHITE:  That would be appreciated.

25              THE COURT:  I'm going to review it first.  But

1   assuming I don't have an issue with that, I will give you

2   access to just that portion of his acts, what he -- the

3   offense conduct.

4          MR. WHITE:  That would be appreciated, your Honor.

5          THE COURT:  Okay.  And then we're going to go

6   ahead and break for lunch.

7          MR. WHITE:  I can start if you would like me to.

8          THE COURT:  Well, I mean, 2 minutes seems like

9   crazy to start so --

10          MR. WHITE:  Okay.  11:45 to 12:45?

11          THE COURT:  Yes.

12          MR. WHITE:  Thank you.

13          (Sidebar conference concluded.)

14          THE COURT:  Okay.  Ladies and gentlemen, at this

15   time we're going to go ahead and take our lunch break and,

16   again, 11:45 to 12:45.  Again, please don't discuss the

17   case among yourself or anyone else.  We'll come back at

18   12:45.  Have a good lunch.

19          (The jury exits the courtroom, 11:43 a.m.)

20          THE COURT:  Anything further from the government?

21          MS. BROOKS:  Yes, your Honor.  I just would like

22   to make a record that we did produce the *Jencks* material on

23   Agent Mack and Agent Villarreal, but on Agent Mack the

24   material includes sensitive documents that are ongoing as

25   part of another investigation.  We have agreed that those

1  documents would not be copied and they would be protected,

2  so I just want to make a record of that.

3          And then also in response to your question on

4  forfeiture, we've discussed that.  It appears the only

5  applicable issue would be a money judgment, and that's not

6  an issue that goes back to the jury.

7          THE COURT:  Okay.  That's what I -- in looking at

8  it I didn't think there was anything, but I didn't know

9  some of the assets.  Okay.  Very good.

10         MR. WHITE:  I do have something there, your Honor.

11         THE COURT:  Yes.

12         MR. WHITE:  This is the *Jencks* material that was

13  produced, and it is three banker boxes full of stuff that I

14  have not yet reviewed.  It is -- just by way of example,

15  this one is full but -- export documents, that is a lot of

16  material; and I need time to look at this.

17         I don't know what the government's intention is in

18  using -- this is just one of three boxes -- in using all of

19  this information.  But putting that summary witness on

20  tomorrow, I don't have time to prepare for my cross on this

21  man with this much information.

22         MS. BROOKS:  Your Honor, we've complied with the

23  Court's order to provide *Jencks* material; and that's what

24  we've done here.

25         THE COURT:  Well, what do you propose the Court

1    do?

2            MS. BROOKS:  I don't know.

3            THE COURT:  When is that witness going to testify?

4    Tomorrow?

5            MS. BROOKS:  We anticipate that both of those

6    agents would testify tomorrow.

7            MR. WHITE:  If the Court recalls -- which I know

8    it does -- we had a hearing on this where we were asking

9    for the *Jencks* material ahead of time to avert this kind of

10   ambush but --

11           THE COURT:  First of all, it's not an ambush.

12           MR. WHITE:  Well --

13           THE COURT:  They are in compliance with what the

14   Court required and --

15           MR. WHITE:  As I recall, the Court said, "Try to

16   get your *Jencks* material to them as soon as you can."

17           THE COURT:  Well, but again, the rule is before

18   the witness.  So I think -- I don't know if it's 24 hours

19   or -- I think was what I indicated but --

20           MS. BROOKS:  That's correct.

21           THE COURT:  Okay.  Well, we'll address that -- you

22   have tonight so -- to review it in terms -- but could I

23   have counsel approach?  I want to just show the part of the

24   presentence report.

25               (The following proceedings were conducted at

1  sidebar with all parties represented.)

2          THE COURT:  I'm just going to show -- this is just

3  the offense conduct, which is page 4, 5, and actually 6.

4  I'm going to provide that to the defendant.  I don't see in

5  just going through --

6          I don't know if the government wants to see any of

7  that.

8          MR. GONZALEZ:  No.

9          MR. WHITE:  Thank you, your Honor.

10         THE COURT:  And then see you back at 12:45.

11         (Recess, 11:47 a.m. to 12:47 p.m.)

12         (Open court, defendant present, jury present.)

13         THE COURT:  Please be seated.

14         Ladies and gentlemen, I hope you had a nice lunch.

15         Cross-examination?

16         CROSS-EXAMINATION OF JULIO CESAR OLIVAS-FELIX

17  BY MR. WHITE:

18  Q.  I understand you were arrested in Milan, Italy.

19  A.  Yes, sir.

20  Q.  What year?

21  A.  In 2016.

22  Q.  What month, if you recall?

23  A.  In May, 31st of May.

24  Q.  What were you doing in Milan, Italy?

25  A.  I took my son to see the final of the champions

```
 1  football.

 2  Q.  I'm sorry?

 3  A.  The finals for the football championship.

 4  Q.  Soccer?

 5  A.  Yes, sir.

 6  Q.  Was Mexico in the finals?

 7  A.  No.  They don't compete in champions.

 8  Q.  How long was it before you were brought to the United

 9  States following your arrest on May 31st of 2016?

10  A.  Three months.

11  Q.  Three months.

12          Do you know this person?

13  A.  No, sir.

14  Q.  Have you ever seen her?

15  A.  No, never.

16          MR. WHITE:  Thank you, Deb.

17  BY MR. WHITE:

18  Q.  And you started in drug activity in 2010?

19  A.  In this case, yes.

20  Q.  The case that you entered a plea?

21  A.  Yes, sir.

22          MR. WHITE:  No further questions.

23          THE COURT:  Anything else?

24          MR. GONZALEZ:  No, your Honor.  Thank you.

25          THE COURT:  Can this witness be fully excused?
```

1          MR. GONZALEZ:  Yes, your Honor.

2          MR. WHITE:  Certainly.

3          THE COURT:  Thank you, sir.  You are finished.

4          (Excerpt of proceedings concluded.)

5    COURT REPORTER'S CERTIFICATION

6           I HEREBY CERTIFY THAT ON THIS DATE, MARCH 6,

7    2024, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD

8    OF PROCEEDINGS.

9

10           /s/
             CHRISTINA L. BICKHAM, CRR, RDR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25